# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Diocese of Winona-Rochester,

Debtor.

Case No. 18-33707

Chapter 11

---

### CORRECTED THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE DIOCESE OF WINONA-ROCHESTER

---

**RESTOVICH BRAUN & ASSOCIATES**
Thomas R. Braun (#350631)
Christopher W. Coon (#390083)
117 East Center Street
Rochester, MN 55904
(507) 216-8652
thomas@restovichlaw.com
christopher@restovichlaw.com

**BODMAN PLC**
Robert J. Diehl, Jr. (P31264)
Brian R. Trumbauer (P57747)
Jaimee L. Witten (P70068)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
rdiehl@bodmanlaw.com
btrumbauer@bodmanlaw.com
jwitten@bodmanlaw.com

**ATTORNEYS FOR THE DIOCESE OF WINONA-ROCHESTER**


Dated:  June 28, 2021

**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE DIOCESE OF WINONA-ROCHESTER**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................V

ARTICLE I DEFINITIONS AND INTERPRETATION..................................................1
    **1.1 DEFINED TERMS** ...........................................................................1
    **1.2 INTERPRETATION** .....................................................................17
    **1.3 TIME PERIODS** ...........................................................................18
    **1.4 EXHIBITS AND SCHEDULES** .................................................18

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .........................................18
    **2.1 ADMINISTRATIVE CLAIMS**...................................................18
    **2.2 STATUTORY FEES**...................................................................19
    **2.3 PRIORITY TAX CLAIMS** .......................................................20

ARTICLE III CLASSIFICATION OF CLAIMS ............................................................20
    **3.1 SUMMARY** .................................................................................20
    **3.2 CLASSIFICATION AND VOTING** ..........................................20

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS .............................................21
    **4.1 PRIORITY CLAIMS (CLASS 1)** .............................................21
    **4.2 GOVERNMENTAL UNIT CLAIMS (CLASS 2)**...........................21
    **4.3 TORT CLAIMS OTHER THAN IMPAIRED UNKNOWN TORT
        CLAIMS (CLASS 3)** .............................................................21
    **4.4 UNIMPAIRED UNKNOWN TORT CLAIMS (CLASS 4A)** .........23
    **4.5 IMPAIRED UNKNOWN TORT CLAIMS (CLASS 4B)**................23
    **4.6 GENERAL UNSECURED CLAIMS (CLASS 5)** .........................25
    **4.7 UNIMPAIRED UNKNOWN CONTINGENT CLAIMS (CLASS 6)** .............25
    **4.8 MINNESOTA DEPARTMENT OF COMMERCE (CLASS 7)**......................25
    **4.9 COMMUNITY BANK OF MANKATO (CLASS 8)** .......................26

ARTICLE V MEANS OF IMPLEMENTATION OF THE PLAN............................................26
    **5.1 TRUST FORMATION AND FUNDING**.......................................26
    **5.2 PAYMENT OF PROFESSIONAL FEES**......................................28
    **5.3 PAYMENTS EFFECTIVE UPON TENDER** ..............................28

ARTICLE VI TRUST.........................................................................................................29
    **6.1 ESTABLISHMENT OF TRUST** ...............................................29
    **6.2 PURPOSE, FORMATION AND ASSETS**..................................29
    **6.3 ALLOCATIONS WITHIN AND DISTRIBUTIONS AND
        PAYMENTS FROM THE TRUST** ..........................................29
    **6.4 TAX MATTERS** .......................................................................30
    **6.5 APPOINTMENT OF THE TRUSTEE** ......................................30
    **6.6 RIGHTS AND RESPONSIBILITIES OF TRUSTEE** ...............31
    **6.7 TRANSFERRED INSURANCE INTERESTS** .........................32
    **6.8 SPECIAL DISTRIBUTION CONDITIONS**...............................35

- i -

**6.9** **INVESTMENT POWERS; PERMITTED CASH EXPENDITURES** ...........39
**6.10** **REGISTRY OF BENEFICIAL INTERESTS** ................................................39
**6.11** **NON-TRANSFERABILITY OF INTERESTS** .............................................39
**6.12** **TERMINATION** .............................................................................................39
**6.13** **IMMUNITY; LIABILITY; INDEMNIFICATION** ......................................39
**6.14** **TREATMENT OF TORT CLAIMS** ............................................................41

ARTICLE VII SETTLING INSURERS.........................................................................47
**7.1** **SETTLING INSURER SETTLEMENT AGREEMENT** ...............47
**7.2** **SALE FREE AND CLEAR OF INTERESTS OF SETTLING
INSURER POLICIES** ...................................................................................47
**7.3** **RESOLUTION OF CLAIMS INVOLVING SETTLING INSURERS** .........48
**7.4** **THE SETTLING INSURERS' PAYMENTS**.................................................48
**7.5** **JUDGMENT REDUCTION** ..........................................................................48
**7.6** **FURTHER ASSURANCES; NON-MATERIAL MODIFICATIONS** ..........49
**7.7** **INDEMNIFICATION OBLIGATIONS** .......................................................49
**7.8** **WAIVER/ CONSENT** ....................................................................................50
**7.9** **DEBTOR WAIVER AND RELEASE OF CLAIMS** ....................................50
**7.10** **SUPPLEMENTAL SETTLING INSURER INJUNCTION** ........................50

ARTICLE VIII.................................................................................................................52

NON-SETTLING INSURERS .......................................................................................52
**8.1** **PRESERVATION OF RIGHTS AND OBLIGATIONS** ................................52
**8.2** **ESTIMATIONS/ASSESSMENTS ARE NOT BINDING**.............................52
**8.3** **RIGHTS UNDER INSURANCE SETTLEMENT AGREEMENTS** ............53
**8.4** **THE PLAN IS NEUTRAL AS TO NON-SETTLING INSURER
POLICIES** ......................................................................................................53
**8.5** **THE DIOCESE'S OBLIGATIONS SURVIVE** ..............................................54
**8.6** **TRUST POWERS WITH RESPECT TO TORT CLAIMS AND
NON-SETTLING INSURERS** .......................................................................54

ARTICLE IX INSURANCE POLICIES ........................................................................54
**9.1** **CONTINUATION OF INSURANCE POLICIES** ..........................................54
**9.2** **THE PLAN IS NEUTRAL AS TO NON-IMPLICATED
INSURANCE POLICIES** ..............................................................................55

ARTICLE X PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION.......55
**10.1** **RESERVATION OF RIGHTS TO OBJECT TO NON-TORT
CLAIMS**...........................................................................................................55
**10.2** **OBJECTIONS TO NON-TORT CLAIMS** ...................................................56
**10.3** **DETERMINATION OF CLAIMS** ................................................................56
**10.4** **NO DISTRIBUTIONS PENDING ALLOWANCE**......................................56
**10.5** **CLAIM ESTIMATION** .................................................................................56

ARTICLE XI DISTRIBUTIONS UNDER THE PLAN ................................................57
**11.1** **PAYMENT DATE** .........................................................................................57

| | | |
|---|---|---|
| **11.2** | **UNDELIVERABLE DISTRIBUTIONS** | 57 |
| **11.3** | **SETOFFS** | 57 |
| **11.4** | **NO INTEREST ON CLAIMS** | 57 |
| **11.5** | **WITHHOLDING TAXES** | 58 |

ARTICLE XII EFFECTIVENESS OF THE PLAN ............................................. 58

| | | |
|---|---|---|
| **12.1** | **CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE** | 58 |
| **12.2** | **NOTICE OF EFFECTIVE DATE** | 58 |
| **12.3** | **EFFECT OF NON-OCCURRENCE OF CONDITIONS** | 58 |

ARTICLE XIII EFFECTS OF CONFIRMATION ............................................. 59

| | | |
|---|---|---|
| **13.1** | **DISSOLUTION OF UCC** | 59 |
| **13.2** | **DISCHARGE AND INJUNCTION** | 59 |
| **13.3** | **CHANNELING INJUNCTION** | 59 |
| **13.4** | **EXCULPATION; LIMITATION OF LIABILITY** | 61 |
| **13.5** | **TIMING** | 62 |
| **13.6** | **NO BAR ON CERTAIN CLAIMS** | 62 |

ARTICLE XIV INCORPORATION OF CHILD PROTECTION PROTOCOLS ..... 62

| | | |
|---|---|---|
| **14.1** | **CHILD PROTECTION PROTOCOLS** | 62 |

ARTICLE XV THE REORGANIZED DEBTOR ............................................. 62

| | | |
|---|---|---|
| **15.1** | **CONTINUED CORPORATE EXISTENCE** | 62 |
| **15.2** | **VESTING OF ASSETS** | 62 |
| **15.3** | **IDENTITY OF OFFICERS OF REORGANIZED DEBTOR** | 62 |
| **15.4** | **FURTHER AUTHORIZATION** | 63 |

ARTICLE XVI MISCELLANEOUS PROVISIONS ............................................. 63

| | | |
|---|---|---|
| **16.1** | **RETENTION OF JURISDICTION** | 63 |
| **16.2** | **ASSUMPTION OF EXECUTORY CONTRACTS** | 65 |
| **16.3** | **INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES** | 65 |
| **16.4** | **DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS** | 66 |
| **16.5** | **RESERVATION OF RIGHTS** | 66 |
| **16.6** | **NON-APPEALABLE ORDER** | 66 |
| **16.7** | **AMENDMENTS AND MODIFICATIONS** | 66 |
| **16.8** | **U.S. TRUSTEE REPORTS** | 66 |
| **16.9** | **NO WAIVER** | 67 |
| **16.10** | **TAX EXEMPTION** | 67 |
| **16.11** | **NON-SEVERABILITY** | 67 |
| **16.12** | **REVOCATION** | 67 |
| **16.13** | **CONTROLLING DOCUMENTS** | 67 |
| **16.14** | **GOVERNING LAW** | 67 |
| **16.15** | **NOTICES** | 67 |
| **16.16** | **FILING OF ADDITIONAL DOCUMENTS** | 68 |
| **16.17** | **POWERS OF OFFICERS** | 68 |

- iii -

**16.18  DIRECTION TO A PARTY** ...................................................................68
**16.19  SUCCESSORS AND ASSIGNS** ............................................................69
**16.20  CERTAIN ACTIONS** ..........................................................................69
**16.21  FINAL DECREE** ................................................................................69
**16.22  PLAN AS SETTLEMENT COMMUNICATION** ............................69
**16.23  OTHER RIGHTS** ...............................................................................69

ARTICLE XVII BANKRUPTCY RULE 9019 REQUEST ...........................................69

ARTICLE XVIII CONFIRMATION REQUEST ........................................................70

## EXHIBITS AND SCHEDULES

EXHIBIT A:      UNKNOWN CLAIMS REPRESENTATIVE'S REPORT AND
                RECOMMENDATIONS
EXHIBIT B:      NON-SETTLING INSURERS
EXHIBIT C:      NON-SETTLING INSURER POLICIES
EXHIBIT D:      TRUST AGREEMENT AND TRUST DISTRIBUTION PLAN
EXHIBIT E:      TORT CLAIM RELEASE
EXHIBIT F:      IMPAIRED UNKNOWN TORT CLAIM RELEASE
EXHIBIT G:      INADVERTENTLY TITLED REAL PROPERTY
EXHIBIT H:      LIST OF CURRENT PARISHES
EXHIBIT I:      KNOWN DIOCESE ENTITY INSURANCE POLICIES
EXHIBIT J:      OFFICERS AND DIRECTORS OF REORGANIZED DEBTOR
EXHIBIT K:      CHILD PROTECTION PROTOCOLS
EXHIBIT L:      OTHER ALLEGEDLY INSURED ENTITIES
EXHIBIT M:      LIST OF CATHOLIC ENTITIES
EXHIBIT N:      SETTLING INSURER POLICIES

CORE/3515029.0002/166654194.1
Bodman_17817138_4

# INTRODUCTION

The Official Committee of Unsecured Creditors and the Diocese of Winona-Rochester, the debtor and debtor in possession in the above-captioned Chapter 11 case, propose this Corrected Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan") pursuant to the provisions of the Bankruptcy Code.

All creditors are encouraged to consult the disclosure statement for the Chapter 11 Plan of Reorganization (the "Disclosure Statement"), before voting to accept or reject this Plan. Among other information, the Disclosure Statement contains discussions of the Diocese of Winona-Rochester, events prior to and during this Chapter 11 case, and a summary and analysis of the Plan. No solicitation materials, other than the Disclosure Statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

# ARTICLE I
## DEFINITIONS AND INTERPRETATION

    **1.1**    **DEFINED TERMS.** For the purposes of the Plan, except as expressly provided, all capitalized terms not otherwise defined herein have the meanings ascribed to them below:

1. "Abuse" means (i) any actual or alleged act of sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in Minnesota Statutes Section 541.073(1); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; or (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, or intimidation.

2. "Abuse-Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Tort Claim against a Protected Party.

3. "Administrative Claim" means a Claim for costs and expenses of administration that is allowable and entitled to priority under Sections 503, 507(a)(2), or 507(b) of the Bankruptcy Code, including any post-petition tax Claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

4. "Affiliates" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

5. "Agents" means all past and present employees, officers, directors, agents, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy, Persons bound by monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in their capacities as such.

6. "Allowed Professional Claim" means a Professional Claim for which the Bankruptcy Court has entered an Order, which has become a Non-Appealable Order allowing the relevant Fee Application.

7. "Approval Order" means an order of the Bankruptcy Court approving one or more Insurance Settlement Agreements.

- 1 -

8.      "Assets" of the Diocese or the Estate means, collectively, any and all property of the Diocese or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including cash (including the residual balance of any reserves established under the Plan, but not the Trust) and Causes of Action.

9.      "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the disclosure statement provided to each holder of a Claim entitled to vote to accept or reject the Plan.

10.     "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code.

11.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Minnesota.

12.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as currently promulgated.

13.     "Bar Order" means those provisions within any order approving an Insurance Settlement Agreement (including the order approving the LMI/Interstate Settlement Agreement), effective as of the date the Trust receives the settlement amount required under the applicable Insurance Settlement Agreement, barring, estopping, and permanently enjoining all Persons from asserting any Barred Claims against the Settling Insurer(s).

14.     "Barred Claims" means all Claims enjoined by the Bar Order, which shall include all Tort Claims, Direct Action Claims, Coverage Claims, and Released Claims.

15.     "Canon Law" means the Code of Canon Law of the Roman Catholic Church, as codified in 1983 and as may hereafter be amended, and all binding universal and particular laws of the Roman Catholic Church.

16.     "Catholic Entities" means the Diocesan Parishes, the Catholic schools and cemeteries located within the Diocese, including those listed on Exhibit M, and other non-Diocesan Catholic entities located within the Diocese that are listed on Exhibit M.

17.     "Cause of Action" or "Causes of Action" means, except as provided otherwise in the Plan, the Confirmation Order, or any document, instrument, release, or other agreement entered into in connection with the Plan, all Claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party Claims, counterclaims, and cross claims of the Diocese or its Estate, the Committees, or the Trust (as successor to the Diocese or its Estate), including an action that is or may be pending on the Effective Date or instituted by the Reorganized Debtor after

- 2 -

the Effective Date against any Person based on law or equity (in each case, in respect of a Cause of Action that arose before the Effective Date), including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, any action brought pursuant to Sections 522, 541–45, 547–51, and 553 of the Bankruptcy Code; provided, however, that any affirmative defense or cross-claim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

18.     "Channeled Claims" means all (a) Tort Claims, Direct Action Claims, and Indirect Claims, except for any portion of such Claims that is a Non-Settling Insurer Policy Claim; (b) Abuse-Related Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a) – (c) of this sentence; provided, however, that the following are not Channeled Claims: (i) a Claim against an individual who committed the Abuse from which a Tort Claim arises; (ii) a Claim against any religious order, diocese or archdiocese (other than a DoW Entity); (iii) Unimpaired Unknown Tort Claims; and (iv) Unimpaired Unknown Contingent Claims.

19.     "Channeling Injunction" means the injunction imposed pursuant to Section 13.3 of the Plan.

20.     "Child Protection Protocols" means the document entitled "Child Protection Protocols" attached as Exhibit K.

21.     "Claim" means any past, present or (to the extent it arises prior to the Effective Date) future Claim, demand, action, request, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party Claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders, and any other Claim within the definition of "Claim" in Section 101(5) of the Bankruptcy Code.

22.     "Claims Filing Date" means April 8, 2019.

23.     "CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any Agent or successor Person charged with responsibility for monitoring, assessing, or

- 3 -

receiving reports made under MMSEA for reimbursement of Medicare Claims.

24.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

25.     "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code which becomes a Non-Appealable Order.

26.     "Contribution Claims" means Abuse-Related Contribution Claims and Non-Abuse Related Contribution Claims.

27.     "Coverage Claims" means all Claims against a Settling Insurer (including LMI/Interstate (or any of them)) under or relating to the policies issued by such Settling Insurer that are the subject of the Insurance Settlement Agreement with such Settling Insurer (including the Settling Insurer Policies issued by LMI/Interstate (or any of them)) or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

28.     "Covered Non-Tort Claim" means any Claim, other than Tort Claims, Unimpaired Unknown Tort Claims, Abuse-Related Contribution Claims, Indirect Claims, or Medicare Claims, for which the Diocese, a Catholic Entity or Other Allegedly Insured Entity would otherwise have coverage under a Settling Insurer Policy but for the sale, transfer, or release by the Debtor, Catholic Entity, or Other Allegedly Insured Entity of such Settling Insurer Policy in connection with an Insurance Settlement Agreement.

29.     "Debtor" means the Diocese.

30.     "Diocesan Parishes" means all past and present parishes of or in the Diocese and includes all the parishes identified on Exhibit H.

31.     "Diocese" and "Diocesan" refers to the Diocese of Winona-Rochester, which is the diocesan corporation formed pursuant to Minnesota Statutes Section 315.16 that is the public juridic person of the Roman Catholic Diocese of Winona-Rochester, as now constituted or as it may have been constituted, and the Estate (pursuant to Section 541 of the Bankruptcy Code).

32.     "Diocese Entity Insurance Policies" mean the insurance policies that are listed on Exhibit I.

33.     "Direct Action Claims" means the same as "Tort Claims", except that they are asserted against any Settling Insurer, instead of any Protected Party or the Trust, for the recovery of insurance proceeds.

- 4 -

34.     "Disputed" when used with respect to a Claim against the Diocese or property of the Diocese, means a Claim:  (i) designated as disputed, contingent, or unliquidated in the Debtor's Schedules; (ii) which is the subject of an objection, appeal, or motion to estimate that has been or will be timely filed by a party in interest and which objection, appeal, or motion has not been determined by a Non-Appealable Order; or (iii) which during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such Claim, is in excess of the amount scheduled as other than disputed, unliquidated, or contingent. The processes for handling "Disputed Claims" do not apply to Class 3 Claims. The Reorganized Debtor shall have the ability to object to any Class 4B Claim.  The process for Class 3 Claims and (if not Disputed by the Reorganized Debtor or if allowed) Class 4B Claims will be addressed in the Trust Agreement.  In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the Debtor or the Reorganized Debtor, as applicable, and the holder thereof agree otherwise. To the extent the term "Disputed" is used in the Plan with respect to a specified class of Claims or an unclassified category of Claims (i.e., "Disputed [class designation/unclassified Claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified class or unclassified category of Claims.

35.     "Distribution Plan Claimants" are Tort Claimants who elect to receive a distribution in the amount determined by the Tort Claims Reviewer pursuant to the Trust Distribution Plan and who have released all their Tort Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable.

36.      "Distribution Plan Claims" are Tort Claims asserted by Distribution Plan Claimants.

37.     "District Court" means the United States District Court for the District of Minnesota.

38.     "DoW Entities" means, in their capacity as such:

(a)     the Diocese;

(b)     the Diocesan Parishes;

(c)     all Persons that are listed on Exhibit M, including Catholic schools and cemeteries located in the Diocese;

(d)     Each of the Affiliates of the Persons identified in the foregoing subsections (a)-(c);

(e)     Each of the successors and assigns of the Persons identified in the foregoing subsections (a)-(d); and,

- 5 -

(f)     Solely to the extent of and in their capacity as such, each of the Agents of the Persons identified in the foregoing subsections (a)-(e).

Notwithstanding the foregoing, an individual who perpetrated an act of Abuse that forms the basis for a Tort Claim is not a DoW Entity with respect to that Tort Claim.  No religious order, archdiocese or diocese, other than the Diocese, is a DoW Entity.

39.     "DoW Entity Insurer Policy" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Effective Date, and that actually, allegedly, or potentially, insures any DoW Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Tort Claim.

40.      "Effective Date" means the date upon which the conditions in Article XII of the Plan have been satisfied.

41.     "Enjoined Claim" means all Claims enjoined by the Supplemental Settling Insurer Injunction, which shall include all Barred Claims, Contribution Claims, Extra-Contractual Claims by any Person other than a Channeled Claimant, Medicare Claims, Unimpaired Unknown Tort Claims, and Unimpaired Unknown Contingent Claims.

42.     "Estate" means the estate created in this Chapter 11 case pursuant to Section 541 of the Bankruptcy Code.

43.     "Exculpated Parties" means collectively, (i) the Diocese, the Estate, and the UCC; (ii) the respective officers, directors, employees, members, attorneys, financial advisors, members of subcommittees of the board of directors, volunteers, and members of consultative bodies and councils formed under Canon Law of the persons identified in the preceding clause including with respect to their service or participation in an outside board on which they serve at the request of the Diocese or the Bishop, in their capacity as such; (iii) the Settling Insurers with respect to their Settling Insurer Policies; and (iv) professionals of a Person identified in the preceding clause (i) through (iii).

44.     "Extra-Contractual Claims" means any Claim against the Settling Insurers seeking any type of relief in connection with any alleged obligations of the Settling Insurers to the Protected Parties before the Effective Date (including compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs or any other type of relief) alleging any of the following: bad faith; failure to provide insurance coverage under any Settling Insurer Policy; failure or refusal to compromise and settle any Claim insured under any Settling Insurer Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; violation of any state insurance codes, state surplus lines statutes or similar codes or statutes;

- 6 -

violation of any unfair claims practices act or similar statute, regulation or code; any type of misconduct or any other act or omission of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy. The term "Extra-Contractual Claims" includes all Claims relating to the Settling Insurers' (i) handling of any request for insurance coverage for any Claim under the Settling Insurer Policies; (ii) conduct relating to the negotiation of the Insurance Settlement Agreements; and (iii) conduct relating to the settlement of any coverage Claim concerning the Settling Insurer Policies.

45.    "Fee Application" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

46.    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

47.    "Impaired Unknown Tort Claim" means any Tort Claim that arose prior to July 1, 2002, which was neither filed, nor deemed filed, by the Claims Filing Date, and is held by an individual (1) who, at the time of the Claims Filing Date, was under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3, or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4; or (2) who was barred by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any reason including the enactment of legislation; or (3) whom the Unknown Claims Representative identifies as having a Tort Claim as of July 1, 2002, and who was under a disability preventing such individual from filing a Claim in this case before and on the Claims Filing Date.

48.    "Impaired Unknown Tort Claimant" means the holder of an Impaired Unknown Tort Claim, the estate of a deceased individual who held an Impaired Unknown Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Impaired Unknown Tort Claim, as the case may be.

49.    "Impaired Unknown Tort Claim Reserve Fund" means the reserve established for the benefit of Impaired Unknown Tort Claimants pursuant to Section 6.3(b) of the Plan.

50.    "Inadvertently Titled Real Property" means that certain real property in which Debtor inadvertently holds bare legal title with no equitable or possessory interest, which is described on the attached Exhibit G.

51.    "Indirect Claim" means a Claim against a Protected Party or a Settling Insurer, asserted by any other Person that is not an Insurer for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or

- 7 -

reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any Protected Party's actual or alleged liability, for any Claim relating to Abuse that is not a Tort Claim.

52.     "Insolvent Insurers" means Northwestern National Insurance Company of Milwaukee Wisconsin (f/k/a Bellefonte Insurance Co.), Stronghold Insurance Co. Ltd., CNA Reinsurance of London, Ltd., CNA International Reinsurance Co. Ltd. and CX Reinsurance Company Ltd.; provided, however, notwithstanding anything to the contrary contained herein: (a) no Insolvent Insurer is an "Affiliate"; (b) no Insolvent Insurer is a London Market Insurers Entity, London Market Company, Lloyd's Underwriter or Underwriter Third Party Beneficiary; and (c) the LMI Insurance Policies shall not include any portion subscribed by an Insolvent Insurer.

53.     "Insurance Coverage Adversary Proceeding" means the Adversary Proceeding against United States Fire Insurance Company and others, removed by the Diocese from the State of Minnesota, County of Winona, Third Judicial District Court, to Minnesota Federal District Court and referred to the Bankruptcy Court as Adv. Proceeding No. 18-03094.

54.     "Insurance Litigation" means any actual or potential litigation as to any recoveries from any Non-Settling Insurer or any rights under any Non-Settling Insurer Policies.

55.     "Insurance Settlement Agreements" means the settlement agreements among the Diocese and the other Protected Parties and the Settling Insurers, which are included as Exhibit D to the Disclosure Statement.

56.     "Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, a DoW Entity Insurer Policy.

57.     "Interest" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

58.     "Interstate" means Interstate Fire & Casualty Company.

59.     "Interstate Entities" means:

(a)     Interstate;

(b)     each of Interstate's Affiliates (including Fireman's Fund Indemnity Company and National Surety Insurance Company);

(c)     each of the foregoing Persons' Agents, in their capacities as such; and

(d)     each of the foregoing Persons' respective Affiliates, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

60.     "Interstate Insurance Policies" means all insurance policies listed in Attachment A-2 to the LMI/Interstate Settlement Agrement. Notwithstanding the above, if an Interstate Insurance Policy that is not listed in Attachment A-2 was not issued to a DoW Entity, but provides coverage to a DoW Entity, then it is an Interstate Insurance Policy to the extent it insures such DoW Entity, but not to the extent it insures any other Person.

61.     "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of the Debtor as contemplated by Section 101(37) of the Bankruptcy Code.

62.     "Litigation Claimants" are Tort Claimants who elect to litigate their Tort Claims after the Effective Date for purposes of determining the Non-Settling Insurers' liability, if any, for such Tort Claims, including those Tort Claimants alleging Abuse during any period from July 1, 1967 to July 1, 1978.

63.     "Litigation Claims" are Tort Claims asserted by Litigation Claimants.

64.     "LMI" means certain Underwriters at Lloyd's, London, and certain London Market Companies (as defined in the LMI/Interstate Settlement Agreement).  "LMI" does not include the Insolvent Insurers.

65.     "LMI Insurance Policies" means (i) all insurance policies listed in Attachment A-1 to the LMI/Interstate Settlement Agreement; and (ii) all known and unknown insurance policies to the extent severally subscribed by one or more of the London Market Insurers in their capacity as London Market Insurers, which were in effect on or before the Effective Date, and providing insurance with respect to any Tort Claim; provided, however, if an LMI Insurance Policy that is not listed in Attachment A-1 was not subscribed on behalf of the Diocese but provides coverage to the Diocese or a Diocesan Parish and any other Person, then it is an LMI Insurance Policy to the extent it insures the Diocese or a Diocesan Parish, but not to the extent it insures any other Person.

The LMI Insurance Policies do not include: (i) a Cyber Liability policy subscribed in favor of the Non-Implicated Insurer and effected through NAS Insurance Services with Certain Underwriters at Lloyds, London under Master Policy No. 510641, which expires July 1, 2021; or (ii) a Malicious Attack Liability Coverage and Crisis Response policy subscribed in favor of the Non-Implicated Insurer and effected through Aon with

- 9 -

Certain Underwriters at Lloyds, London under Master Policy No. CMCTR2003035, which expires July 1, 2021.

66.    "LMI/Interstate" means collectively, the London Market Insurers and Interstate.

67.    "LMI/Interstate Entities" means, collectively, the London Market Insurers Entities and the Interstate Entities.

68.    "LMI/Interstate Settlement Agreement" means the Insurance Settlement Agreement among the Debtor, certain Catholic Entities, LMI and Interstate.

69.    "London Market Companies" means the companies doing business in the London Insurance Market, which severally subscribed, each in its own proportionate share, one or more of the LMI Insurance Policies (such insurers are identified in Attachment B to the LMI/Interstate Settlement Agreement). "London Market Companies" shall also include those companies doing business in the London Insurance Market that subscribed any LMI Insurance Policies (a) the existence of which has not presently been established but which provided insurance to any DoW Entity; or (b) the existence of which has been established but the identity of such company as a subscribing insurer is not presently known. As used herein, "London Market Companies" shall mean, in their capacity as such, the named corporate entity and all predecessors, successors, Affiliates, pool companies as such, and subsidiaries.

70.    "London Market Insurers" means, collectively, certain Underwriters at Lloyd's London and certain London Market Companies.

71.    "London Market Insurers Entities" means, with respect to each London Market Insurer:

   (a)    such London Market Insurer;

   (b)    each of such London Market Insurer's Affiliates;

   (c)    each of the foregoing Persons' Agents, in their capacities as such;

   (d)    each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

72.    "MAO" means Medicare Advantage Organizations under parts C & D of the MMSEA.

73.    "Medicare Claims" means any and all Claims by CMS against the Trust, any Settling Insurer, or any Protected Party, under MMSEA and under MSP, that relate to any payments in respect of any Tort Claims, including Claims

- 10 -

for reimbursement of payments made to Tort Claimants who recover or receive any distribution from the Trust and Claims by CMS relating to reporting obligations.

74. "Medicare Trust Fund" means a U.S. Treasury-held trust fund account from which Medicare is funded or from which Medicare disbursements are paid, including the Hospital Insurance Trust Fund and the Supplementary Medical Insurance (SMI) Trust Fund.

75. "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSPA.

76. "MSPA" means 42 U.S.C. § 1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

77. "Non-Abuse Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer, for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of any Claim against a Protected Party, which is not a Tort Claim.

78. "Non-Appealable Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and is final and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which, if such an appeal, writ of certiorari, review, reargument, or rehearing has been timely sought, then no order, judgment, or other decree is a Non-Appealable Order until (a) such appeal, certiorari, review, reargument, or rehearing has been denied or dismissed and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; or (b) such order has been affirmed by the highest court to or in which such order was appealed, reviewed, reargued, or reheard, or that granted certiorari, and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Non-Appealable Order."

79. "Non-Implicated Insurer" means Catholic Mutual Relief Society of America.

- 11 -

80.     "Non-Implicated Insurance Policy(ies)" means any known or unknown contracts, binders, certificates, or policies of insurance that the Non-Implicated Insurer issued, subscribed in any interest in, or has underwritten any risk in, in effect on or before the Effective Date, and that were issued to, allegedly issued to, or for the benefit of, or that otherwise actually, allegedly, or potentially insure, the Diocese, any Diocesan Parish or any other Catholic Entity or any of their predecessors in interest, successors, or assigns, and that actually, allegedly or could potentially afford coverage with respect to any Unimpaired Unknown Tort Claim, but as to which there are no Unimpaired Unknown Tort Claims for the applicable coverage periods that have been asserted as of the date of this Plan.

81.     "Non-Settling Insurer Policy(ies)" means any known or unknown contracts, binders, certificates, or policies of insurance that any Non-Settling Insurer issued, subscribed in any interest in, or has underwritten any risk in, in effect on or before the Effective Date, and that were issued to, allegedly issued to, or for the benefit of, or that otherwise actually, allegedly, or potentially insure, the Diocese or any Diocesan Parish or any of their predecessors in interest, successors, or assigns, and that actually, allegedly or could potentially afford coverage with respect to any Tort Claim.

82.     "Non-Settling Insurer Policy Claim" means any Claim for which insurance coverage is provided or allegedly provided by a Non-Settling Insurer Policy.

83.     "Non-Settling Insurer(s)" means any Insurer (other than the Non-Implicated Insurer) that is not a Settling Insurer by the Effective Date.  The "Non-Settling Insurers" include, but are not limited to, those Persons listed on Exhibit B.

84.     "Other Allegedly Insured Entity(ies)" means a Person that is not a DoW Entity, but was insured under a Settling Insurer Policy; provided however, that a Person is an "Other Allegedly Insured Entity" only to the extent it is insured under a Settling Insurer Policy that was issued or allegedly issued to the Diocese.

85.      "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof and any other individual or entity within the definition of (i) "person" in Section 101(41) of the Bankruptcy Code; or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

- 12 -

86.     "Petition Date" means November 30, 2018, the date on which the Diocese commenced the Chapter 11 case.

87.     "Plan" means this joint Chapter 11 plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

88.     "Plan Proponents" means the Diocese and the UCC.

89.     "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

90.     "Pro Rata" means, with respect to any distribution on account of any allowed Claim in any class, the ratio of the amount of such allowed Claim to the sum of (i) all allowed Claims in such class and (ii) the aggregate maximum of all Claims in such class that are not yet allowed Claims.

91.     "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

92.     "Professional Claim" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331, or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 case.

93.     "Proof of Claim" means a proof of Claim filed in the Chapter 11 case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

94.     "Protected Parties" means any of

(a)     the DoW Entities;

(b)     each of the foregoing Persons' respective successors and assigns;

(c)     solely to the extent of and in their capacity as such, each of the foregoing Persons' respective Agents, shareholders, and clergy and other Persons bound by monastic vows, in their capacity as such, of the Persons identified in the foregoing subsections (a)-(b); provided, however, nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the Diocese, or subject to its control.

An individual who perpetrated an act of abuse that forms the basis of a Tort Claim or an Unimpaired Unknown Tort Claim is not a Protected Party.  No religious order, archdiocese, or diocese, other than the Diocese, is a Protected Party.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

95.    "Redacted Information" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Tort Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

96.    "Released Claims" means Coverage Claims and Extra-Contractual Claims.

97.    "Reorganization Assets" means, collectively, all Assets of the Debtor and the Estate. For the avoidance of doubt, the Reorganization Assets do not include the Trust Assets.

98.    "Reorganized Debtor" means the Diocese, on and after the Effective Date. Unless otherwise expressly stated or the context otherwise requires, references to the "Diocese" and the "Reorganized Debtor" throughout various provisions of the Plan are an effort to anticipate whether an event may occur before or after the Effective Date. In this regard, and generally for purposes of the Plan, any written agreement signed after the Petition Date made by the Diocese as part of the Plan before the Effective Date (unless otherwise provided) will survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtor and every other party to such agreement (including, but not limited to, the provisions of the Plan if confirmed).

99.    "Settling Insurer Policies" means, collectively, all insurance policies that are the subject of the Insurance Settlement Agreements with the Settling Insurers, including the Interstate Insurance Policies and the LMI Insurance Policies.

100.   "Settling Insurers" means the Persons listed on Exhibit N whose Insurance Settlement Agreements are approved by the Approval Orders and such orders become Non-Appealable Orders. Solely in connection with insurance under any Settling Insurer Policies, Settling Insurers also includes each of their past, present and future parents, subsidiaries, affiliates, divisions, reinsurers, and retrocessionaires, including Persons released pursuant to the Insurance Settlement Agreements; each of the foregoing Persons' respective past, present and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions and acquired companies, including the Persons released pursuant to the respective Insurance Settlement Agreements; each of the foregoing Persons' respective past, present and future directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and Claims handling administrators; and each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them, except to the extent, if

- 14 -

any, such Person's actual or alleged rights, duties, obligations, or liabilities arise out of or relate to their status as, or conduct, acts or omissions on behalf of, a Non-Settling Insurer. Any Non-Settling Insurer who enters into a final and binding Insurance Settlement Agreement with the Trust after the Effective Date is also a Settling Insurer, except to the extent, if any, such Person's actual or alleged rights, duties, obligations or liabilities arise out of or relate to their status as, or conduct, acts or omissions on behalf of, a Non-Settling Insurer.

101.    "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Plan and filed with the Bankruptcy Court at least 14 days prior to the confirmation hearing.

102.    "Supplemental Settling Insurer Injunction" means the injunction imposed pursuant to Section 7.10 of the Plan.

103.    "Tort Claims" means all Claims relating to, in whole or in part, directly or indirectly, Abuse committed by any Person before the Effective Date for which a Protected Party is allegedly responsible, including any such Claim asserted against any Protected Party in connection with the Bankruptcy Case. The term "Tort Claims" does not include Contribution Claims, Medicare Claims or Unimpaired Unknown Tort Claims.

104.    "Tort Claimant" means the holder of a Tort Claim.

105.    "Tort Claims Reviewer" means the Person, including the designee of such Person, who will assess Class 3 and Class 4B Claims under the Trust Distribution Plan.

106.    "Transferred Insurance Interests" means the following rights and interests of the Protected Parties in Non-Settling Insurer Policies in respect of actual or potential coverage for any Class 3 Claim or Class 4B Claim: (1) the proceeds of such Non-Settling Insurer Policies and all claims for such proceeds, including the claims filed by the Diocese in the insolvency proceedings of Northwestern National Insurance Company of Milwaukee (f/k/a Bellefonte Insurance Co.), Wisconsin, Stronghold Insurance Co. Ltd. and CX Reinsurance Company Ltd.; and (2) all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim or Class 4B Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorneys' fees and costs.

- 15 -

107. "Trust" means the trust created for the benefit of certain Tort Claimants in accordance with the Plan and Confirmation Order and the Trust Agreement.

108. "Trust Agreement" or "Trust Documents" shall mean the trust agreement establishing the Trust, as it may be amended, together with such additional documents as may be executed in connection with the Trust Agreement.

109. "Trust Assets" means the cash, Transferred Insurance Interests and other assets and rights to be transferred to the Trust under Article V of the Plan.

110. "Trust Distribution Plan" means the Trust Distribution Plan established under the Trust Agreement.

111. "Trustee" means the Person appointed as Trustee of the Trust in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

112. "UCC" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 case, as such committee may be constituted from time to time.

113. "Unimpaired" means, with respect to a class of Claims, that such class is not impaired.

114. "Unimpaired Unknown Contingent Claims" means (i) any Claim for contribution, indemnity or reimbursement arising out of the Diocese's liability to pay or defend any Class 4A Claim, and (ii) the Claim of any insurers or other Persons who are subrogated to the Claims identified in the immediately preceding clause (i).

115. "Unimpaired Unknown Tort Claim" means any Claim against any of the Protected Parties or the Non-Implicated Insurer alleging Abuse that occurred prior to the Effective Date but after June 30, 2002, which Claim was neither filed, nor deemed filed, by the Claims Filing Date.

116. "Unimpaired Unknown Tort Claimant" means the holder of an Unimpaired Unknown Tort Claim.

117. "Unknown Claims Representative" means Judge Michael R. Hogan in accordance with the Bankruptcy Court's order dated May 28, 2021, and any successor or such other person appointed by the Bankruptcy Court or otherwise.

118. "Unsecured Claims" means Claims which are not secured by any property of the Debtor's Estate and which are not part of any other class defined in this Plan.

- 16 -

119.    "U.S. Trustee" means the Office of the United States Trustee for Region 12, which includes the District of Minnesota.

**1.2    INTERPRETATION**. For purposes of the Plan:

(a)    any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

(b)    the terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to";

(c)    whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine;

(d)    the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

(e)    unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules;

(f)    any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(g)    any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

(h)    unless otherwise specified, all references in the Plan to "Articles," "Sections," "Schedules" and "Exhibits" are references to Articles, Sections, Schedules and Exhibits of or to the Plan;

(i)    the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(j)    captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Plan or otherwise affect the interpretation of the Plan; and

(k)    the Plan supersedes all prior drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

**1.3     TIME PERIODS**. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

**1.4     EXHIBITS AND SCHEDULES**.

(a)     All Exhibits and Schedules to the Plan (including any Supplemental Plan Documents) (with the Plan, the "Plan Documents") are hereby incorporated by reference and made part of the Plan as if set forth fully herein.

(b)     The Exhibits to the Plan include the following:

| | |
|---|---|
| Exhibit A: | Unknown Claims Representative's Report and Recommendations |
| Exhibit B: | Non-Settling Insurers |
| Exhibit C: | Non-Settling Insurer Policies |
| Exhibit D: | Trust Agreement and Trust Distribution Plan |
| Exhibit E: | Tort Claim Release |
| Exhibit F: | Impaired Unknown Tort Claim Release |
| Exhibit G: | Inadvertently Titled Real Property |
| Exhibit H: | List of Current Parishes |
| Exhibit I: | Known Diocese Entity Insurance Policies |
| Exhibit J: | Officers and Directors of Reorganized Debtor |
| Exhibit K: | Child Protection Protocols |
| Exhibit L: | Other Allegedly Insured Entities |
| Exhibit M: | List of Catholic Entities |
| Exhibit N: | Settling Insurer Policies |

**ARTICLE II**
**TREATMENT OF UNCLASSIFIED CLAIMS**

**2.1     ADMINISTRATIVE CLAIMS**. As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims including Professional Claims, and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article.

(a)     **Treatment**. Each holder of an allowed Administrative Claim, excluding Professional Claims, against the Diocese shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Administrative Claim, unless the holder agrees in writing to other treatment of such Claim. Each holder of an Allowed Professional Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the allowed amount of such Professional Claim,

- 18 -

unless the holder agrees in writing to other treatment of such Claim and subject to the provisions of Section 5.2 of this Plan.

(b)     **Administrative Filing Deadline**.

1.   Except as otherwise set forth in this Plan, requests for allowance and payment of Administrative Claims, excluding Professional Claims, must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court (the "Administrative Claims Filing Deadline"). Administrative Claims holders, excluding Professional Claims, that do not file a request for payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such Claims against the Diocese, the Reorganized Debtor, any Settling Insurer (to the extent applicable), the Trust, or any of their property. Administrative Claims representing obligations incurred by the Diocese after the Effective Date (including, without limitation, Claims for professionals' fees and expenses) will not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. In addition, holders of Administrative Claims representing trade debt incurred after the Petition Date in the ordinary course of Debtor's operations are not required to file requests for allowance of an Administrative Claim and will be paid by the Debtor in the ordinary course.

2.   All objections to the allowance of Administrative Claims (excluding Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative Claim will be deemed allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by this subparagraph shall control over any contrary deadline set forth in any requests for payment of Administrative Claims.

(c)     **Professional Claim Filing Deadline**.

All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

**2.2     STATUTORY FEES**. All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid by the Reorganized Debtor as soon as practicable after the Effective Date. After the Effective Date, the Trust shall pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed, but in no event shall the payments made to the Trust

- 19 -

made pursuant to Article IV, V, or VI by any Person other than the Debtor be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930. The Reorganized Debtor shall file post-Effective Date quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and its Estate. The Reorganized Debtor shall remain responsible for any pre-Effective Date reporting and pre-Effective Date unpaid fees.

 2.3 **PRIORITY TAX CLAIMS**. With respect to each allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (i) pay such Claim in cash as soon as practicable after the Effective Date from its ongoing operations, or (ii) provide such other treatment agreed to by the holder of such allowed Priority Tax Claim and the Diocese or Reorganized Debtor, as applicable, in writing, provided such treatment is no less favorable to the Diocese than the treatment set forth in clause (i) of this sentence.

**ARTICLE III**
**CLASSIFICATION OF CLAIMS**

 3.1 **SUMMARY**. The categories of Claims listed below classify Claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation of the Plan, and distribution pursuant to the Plan.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Priority Claim | Unimpaired | No |
| 2 | Governmental Unit Claims | Unimpaired | No |
| 3 | Tort Claims Other Than Impaired Unknown Tort Claims | Impaired | Yes |
| 4A | Unimpaired Unknown Tort Claims | Unimpaired | No |
| 4B | Impaired Unknown Tort Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | No |
| 6 | Unimpaired Unknown Contingent Claims | Unimpaired | No |
| 7 | Secured Claim of Minnesota Department of Commerce | Unimpaired | No |
| 8 | Secured Claim of Community Bank of Mankato | Unimpaired | No |

 3.2 **CLASSIFICATION AND VOTING**.

 The Claims against the Debtor shall be classified as specified above (other than Administrative Claims and Priority Tax Claims, which shall be unclassified and treated in accordance with Article II). Consistent with Section 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular class only to the extent the Claim is within the description of the class, and a Claim is classified in a different class to the extent it is within the description of that different class.

- 20 -

**ARTICLE IV**
**TREATMENT OF CLASSIFIED CLAIMS**

**4.1      PRIORITY CLAIMS (CLASS 1)**.

(a)      **Definition**. A Class 1 Claim means an allowed Claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

(b)      **Treatment**. Unless the holder of an allowed Class 1 Claim and the Diocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

**4.2      GOVERNMENTAL UNIT CLAIMS (CLASS 2)**.

(a)      **Definition**. A "Class 2 Claim" means an allowed Claim of Governmental Units not otherwise included in Article II or Section 4.1 above.

(b)      **Treatment**. Unless the holder of an allowed Class 2 Claim and the Diocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such allowed Class 2 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 2 Claim becomes an allowed Claim (or as soon thereafter as is practicable).

**4.3      TORT CLAIMS OTHER THAN IMPAIRED UNKNOWN TORT CLAIMS (CLASS 3)**.

(a)      **Definition**. A Class 3 Claim means a Tort Claim other than an Impaired Unknown Tort Claim ("Class 3 Claim").  A "Class 3 Claimant" shall mean a holder of a Class 3 Claim.

**Summary**. The Plan creates a Trust to fund payments to Class 3 Claimants entitled to such payments under the Plan, Trust Agreement, and Trust Distribution Plan. The Trust shall be funded as provided in Articles IV ,V, and VI, including by contributions from the Diocese and others and the assignment of the Transferred Insurance Interests. The Trust shall make distributions to the Class 3 Claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan, which shall represent the sole recovery available to Class 3 Claimants in respect to any obligation owed by Settling Insurers. Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 3 Claimants against the Non-Settling Insurers.

No Class 3 Claimant shall receive any payment on any award unless and until such Class 3 Claimant has executed the Release attached as Exhibit E to this Plan. Each Class 3 Claimant must execute a release of all claims against the Settling Insurers and must release

- 21 -

all claims against the Diocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 3 Claimants specifically reserve, and do not release, any and all claims that they may have against the Diocese, the Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). The Class 3 Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Diocese, the Reorganized Debtor, any other Protected Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

Any release of Class 3 Claims, in whole or in part, will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 3 Claims. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim shall not be liable for any Protected Party's share of causal liability or fault. In no event may a Class 3 Claimant collect on that portion of any judgment or obtain any reallocation of any judgment based on the causal fault or share of liability of any Protected Parties. Any Person that is or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Class 3 Claim shall be provided by the Trustee with a copy of the executed Release upon reasonable request and provision of an appropriate, executed confidentiality agreement and shall not be liable for any Protected Parties' share of liability or fault. The Trust shall be obligated to provide copies of the Class 3 Claimants' releases and certifications to any of the Protected Parties or Settling Insurers upon request provided that such Protected Parties or Settling Insurers have signed a confidentiality agreement encompassing such information.

The Trust shall fund the defense of the Diocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 Claimants, but only to the extent that the Diocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust shall advance funding to the Diocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 Claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 3 Claims, and their obligations are not reduced by the fact that the Diocese is in bankruptcy or by the amount of distributions Class 3 Claimants receive, or are entitled to receive, based on the Trust Distribution Plan. For the avoidance of doubt, determinations by the Tort Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of any Protected Party's liability or damages for Class 3 Claims. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 3 Claims. Any such recoveries by the Trust from Non-Settling Insurers will likewise become Trust Assets to be distributed pursuant to the Trust Distribution Plan. To bar any argument by the Non-Settling Insurers that any provision of this Plan, including the assignment and transfer of the Transferred Insurance Interests to the Trust, results in a forfeiture of coverage, this Plan preserves the Non-Settling Insurers' rights to the extent required under their respective Non-Settling Insurer Policies and applicable law.

(b)     **Treatment**.  Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 3 Claimants shall be assigned to, assumed and treated by the Trust as further provided in Article VI, the Trust Agreement, and the Trust Distribution Plan. Class 3 Claims shall be paid in accordance with the provisions of the Trust and Trust Distribution Plan.

(c)     **Stipulated Judgments.** Certain Class 3 Claimants have entered into, or may enter into, agreements with the Diocese, the Reorganized Debtor, or any other Protected Party for settlement of a Tort Claim allocated by applicable non-bankruptcy law, including but not limited to settlements consistent with *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982) or *Drake v. Ryan*, 514 N.W.2d 785 (Minn. 1994). If a Class 3 Claimant enters into such an agreement with the Diocese, the Reorganized Debtor, or any other Protected Party, the Trust will pursue any judgment against the Non-Settling Insurer on behalf of the Class 3 Claimant. Any recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to the Trust Distribution Plan.

## 4.4     UNIMPAIRED UNKNOWN TORT CLAIMS (CLASS 4A).

(a)     **Definition**. A Class 4A Claim means an Unimpaired Unknown Tort Claim ("Class 4A Claim"). A "Class 4A Claimant" shall mean a holder of a Class 4A Claim.

(b)     **Treatment**. As of the date of this Plan, the Debtor is not aware of the existence of any Class 4A Claims.  The Reorganized Debtor will be responsible for defending any Class 4A Claim that is asserted and for payment of any amount determined to be owed on a Class 4A Claim upon settlement or adjudication of such Class 4A Claim.  The Trust will not be responsible for paying Class 4A Claims and will not have a role in the settlement or adjudication of Class 4A Claims.

## 4.5     IMPAIRED UNKNOWN TORT CLAIMS (CLASS 4B).

- 23 -

(a)      **Definition**. A Class 4B Claim means an Impaired Unknown Tort Claim ("Class 4B Claim"). A "Class 4B Claimant" shall mean a holder of a Class 4B Claim.

(b)      **Treatment**. The Plan creates a Trust to administer payments to Class 4B Claimants entitled to such payments under the Plan, Trust Agreement, and Trust Distribution Plan. The Trust shall be funded as provided in Articles IV, V, and VI, including from post-confirmation payments from the Reorganized Debtor and third parties. The Trust shall make distributions to the Class 4B Claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan, which shall represent the sole recovery available to Class 4B Claimants in respect to any obligation owed by Settling Insurers. Distribution from the Trust, however, does not preclude or affect claims or recoveries by Class 4B Claimants against the Non-Settling Insurers.

No Class 4B Claimant shall receive any payment on any award unless and until such Class 4B Claimant has executed the Release attached as <u>Exhibit F</u> to this Plan. Each Class 4B Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Diocese, the Reorganized Debtor, and any other Protected Party that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Class 4B claimants specifically reserve, and do not release, any and all claims that they may have against the Diocese, Reorganized Debtor, or any other Protected Party that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j). The Class 4B Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any other Protected Party for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Diocese, the Reorganized Debtor, or any other Protected Party, as applicable, and such Non-Settling Insurer or are fully adjudicated, resolved and subject to Final Order, but recourse is limited as described above.

The Trust shall fund the defense of the Diocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 4B Claimants, but only to the extent that the Diocese, the Reorganized Debtor, or any other Protected Party, as applicable, is not defended or otherwise reimbursed for its defense expenses on an advance basis by any Insurer. The Trust shall advance funding to the Diocese, the Reorganized Debtor, or any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 4B Claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

- 24 -

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 4B Claims. Any release of Class 4B Claims, in whole or in part, will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Class 4B Claimants will expressly reserve their rights against other Persons, including joint tortfeasors, who will remain severally liable on any Class 4B Claims. Nothing in this Article requires any Impaired Unknown Tort Claimant to release any Claims against any joint tortfeasor who is not a Protected Party or a Settling Insurer and such Claims are reserved. But in no event may a Class 4B Claimant collect on that portion of any judgment or obtain reallocation of any judgment based on the causal fault or share of liability of any Protected Party.

Responsibility for preserving and managing Trust Assets and distributing Trust Assets to Class 4B Claimants shall be assigned to, assumed, and treated by the Trust as further provided in Article V, the Trust Agreement, and the Trust Distribution Plan. Class 4B Claims shall be paid in accordance with the provisions of the Trust and Trust Distribution Plan. Class 4B Claimants shall provide sufficient information to allow the Tort Claims Reviewer to make an evaluation of the Class 4B Claim pursuant to the factors in the Trust Distribution Plan.

## 4.6    GENERAL UNSECURED CLAIMS (CLASS 5).

(a)    **Definition**. A Class 5 Claim means (1) any Claim arising out of the rejection of any executory contract, or (2) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case ("Debtor's Schedules") or as to which the holder of such Claim timely filed a Claim.

(b)    **Treatment**. Each holder of a Class 5 Claim shall receive, directly from the Reorganized Debtor, payment in full of such allowed Class 5 Claim, without interest, on the Effective Date.

## 4.7    UNIMPAIRED UNKNOWN CONTINGENT CLAIMS (CLASS 6).

(a)    **Class 6 Definition**. A Class 6 Claim means (i) any Claim for contribution, indemnity or reimbursement arising out of the Diocese's liability to pay or defend any Class 4A Claim, and (ii) the Claim of any insurers or other Persons who are subrogated to the Claims identified in Section 4.7(a) clause (i).

(b)    **Class 6 Treatment**. As of the date of this Plan, the Debtor is not aware of the existence of any Class 6 Claims. The Reorganized Debtor will be responsible for defending any Class 6 Claim that is asserted and for payment of any amount determined to be owed on a Class 6 Claim upon settlement or adjudication of such Class 6 Claim. The Trust will not be responsible for paying Class 6 Claims and will not have a role in the settlement or adjudication of Class 6 Claims.

## 4.8    MINNESOTA DEPARTMENT OF COMMERCE (CLASS 7).

- 25 -

(a)    **Class 7 Definition**. A Class 7 Claim means the claim of the Minnesota Department of Commerce against cash collateral posted at Merchants Bank that secures the Debtor's obligation for potential workers' compensation liability.

(b)    **Class 7 Treatment**. The cash collateral securing the Class 7 Claim shall vest in the Reorganized Debtor and shall continue to secure the Class 7 Claim.  The security interest of the holder of the Class 7 Claim shall remain in place and the holder of such claim may exercise any and all rights and remedies against the collateral posted at Merchants Bank that secures the Debtor's obligation for potential workers' compensation liability.

**4.9     COMMUNITY BANK OF MANKATO (CLASS 8)**.

(a)    **Class 8 Definition**. A Class 8 Claim means the claim of the Community Bank of Mankato under that certain mortgage and security agreement encumbering the real property known as 1502 Warren Street, Mankato, Minnesota.

(b)    **Class 8 Treatment**. The collateral securing the Class 8 Claim shall vest in the Reorganized Debtor, provided, however, that the Reorganized Debtor may transfer legal title to such collateral (subject to the mortgage and security agreement) to the equitable owner as set forth in Section 15.2 below, but in any case the collateral shall continue to secure the Class 8 Claim.  The mortgage and security interest of the holder of the Class 8 Claim shall remain in place and the holder of such claim may exercise any and all rights and remedies against the collateral referenced in such mortgage and security agreement, available to the holder.

## ARTICLE V
## MEANS OF IMPLEMENTATION OF THE PLAN

**5.1     TRUST FORMATION AND FUNDING**.

(a)    **Purpose, Formation, and Assets**. The Trust shall be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan and the Trust Distribution Plan. The proposed Trust Agreement and Trust Distribution Plan are attached hereto as Exhibit D.

(b)    **Funding**.

1.    **Summary**. This Plan will be funded from the sources and in the manner set forth in this Section. In addition to the contributions described herein, the Catholic Entities will waive certain Claims against the Diocese and Settling Insurers, as set forth below or in the LMI/Interstate Settlement Agreement.

2.    **Contributions**. Cash and other assets will be paid or transferred, as applicable, to the Trust Account as provided in the Plan and as described herein.

- 26 -

(i)      **Debtor Cash Contribution**. The Debtor will transfer (a) $13,560,000, less (A) Professional Claims (including fees and expenses of Insurance Archaeology Group), mediation fees and expenses (including the fees and expenses of John Vukelich, Paul Van Osselaer and Janice Symchych), certain other administrative expenses as agreed between the Debtor and the UCC (including the cost of publication of notice of any Insurance Settlement Agreements), the fees of the Unknown Claims Representative, and U.S. Trustee quarterly fees, in each case to the extent paid after February 29, 2020, and (B) counseling expenses for Tort Claimants (whether paid before or after the Petition Date) (collectively, the "Permitted Deductions"), to the Trust Account within five days after the Effective Date (which payment shall constitute substantial consummation of the Plan), plus (b) $7,746,000 as soon as practical after the sale or other monetization of certain assets of the Diocese, as well as a contribution from certain non-Diocesan entity resources, but in no event more than 12 months after the date the Confirmation Order becomes a Non-Appealable Order, plus (c) promptly after any Impaired Unknown Tort Claim is allowed and the Tort Claims Reviewer has determined the amount due to such claimant (a "Determined Claim"), an amount equal to the amount of the Determined Claim, but not to exceed $750,000 (the "Cap") in the aggregate for all Determined Claims (collectively, the "Debtor Cash Contribution"). The amounts paid by the Debtor to the Trust on account of Determined Claims shall be held by the Trustee in the Impaired Unknown Tort Claim Reserve Fund as set forth in Section 6.3(b) below. Debtor's obligation to fund the Impaired Unknown Tort Claim Reserve Fund shall continue until the later of (x) the date that the Debtor has fully funded the amount of the Determined Claims (up to the Cap), and (y) the occurrence of the fifth anniversary of the Effective Date.   In the event there are Permitted Deductions paid after the payment of the amount required under subparagraph 2(i)(a) above, then the Debtor may deduct any remaining Permitted Deductions from the $7,746,000 payment.  The Debtor Cash Contribution will be primarily comprised of funds from the following sources:

1.      non-restricted cash accounts held by the Diocese; and

2.      sale or other monetization of certain assets of the Diocese, as well as a contribution from certain non-Diocesan entity resources.

For clarity, the Debtor Cash Contribution is being made in respect of uninsured exposure of the Diocese for Tort Claims, and not in respect of any Tort Claims that may be covered under Non-Settling Insurer Policies. The Debtor Cash Contribution shall not be construed as a release of any Tort Claims that may be covered under Non-Settling Insurer Policies. The Debtor will not be released for any Abuse that may be covered under Non-

- 27 -

Settling Insurer Policies until such claims are settled with the Diocese, the Reorganized Debtor or any other Protected Party, as applicable, and such Non-Settling Insurer or are fully adjudicated, resolved and subject to Final Order, but recourse will be limited as set forth in Sections 4.3 and 4.5.

(ii)     **Settling Insurer Contributions**. LMI and Interstate shall pay to the Trust the sums set forth in the LMI/Interstate Settlement Agreement within the time set forth in the LMI/Interstate Settlement Agreement. In addition, all rights to receive payment of the amounts to be paid under the LMI/Interstate Settlement Agreement shall be assigned to the Trust. The total amount that will be paid to the Trust by LMI and Interstate is $6,500,000 (the "Additional Settlement Amounts").

3.     **Additional Trust Assets: All Rights and Recoveries Against Non-Settling Insurers.** In addition to the funds transferred to the Trust, the Transferred Insurance Interests of the Diocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date.  In addition, the Interests of the other Protected Parties in the Transferred Insurance Interests are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date. The foregoing assignment and transfer shall not be construed as an assignment and transfer of the Non-Settling Insurer Policies.

(c)     **Vesting**. On the Effective Date, all Trust Assets shall vest in the Trust, and the Diocese and other Protected Parties shall be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor, any other Protected Party, and Settling Insurers, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of control of Trust Assets in accordance with this paragraph, the Diocese, the other Protected Parties and the Settling Insurers shall have no further interest in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan.

**5.2     PAYMENT OF PROFESSIONAL FEES**. The Reorganized Debtor shall pay all unpaid Allowed Professional Claims accruing through the Effective Date, (i) within seven (7) days after the later of the Effective Date or the Bankruptcy Court's order on such Claims, or (ii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Professional Claim and the Debtor.

**5.3     PAYMENTS EFFECTIVE UPON TENDER**. Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment is due. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication

- 28 -

thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

## ARTICLE VI
## TRUST

**6.1     ESTABLISHMENT OF TRUST**. On or before the Confirmation Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

**6.2     PURPOSE, FORMATION AND ASSETS.** The Trust shall be established for the purposes described in this paragraph. The Trust shall receive the transfer and assignment of assets as provided in Articles IV and V, including the Debtor Cash Contribution, the Additional Settlement Amounts, and the Transferred Insurance Interests, of which the Trust is, and shall be deemed to be, the sole assignee. The Trust shall make distributions to the Class 3 and Class 4B claimants, as provided by this Plan, the Trust Agreement, and the Trust Distribution Plan. The Trust shall pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests. The Trust shall fund the defense of the Diocese, the Reorganized Debtor, and any other Protected Party as against any Litigation Claims brought by Class 3 and Class 4B claimants, but only to the extent that the Diocese, the Reorganized Debtor, or any other Protected Party are not defended or otherwise reimbursed for their defense expenses by any Non-Settling Insurer. The Trust shall advance funding to the Diocese, the Reorganized Debtor, and any other Protected Party, as applicable, with respect to any judgments or settlements of any Litigation Claims brought by Class 3 and Class 4B claimants, but only to the extent that such judgments or settlements are not funded by any Insurer. The Trust shall fund the costs and expenses in executing these functions, all such functions to be executed in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan, with the aim of preserving, managing, and maximizing Trust Assets to pay Class 3 and Class 4B claimants and with no objective to continue or engage in the conduct of a trade or business. The proposed Trust Agreement and Trust Distribution Plan are attached to this Plan as Exhibit D.

**6.3     ALLOCATIONS WITHIN AND DISTRIBUTIONS AND PAYMENTS FROM THE TRUST**.

(a)     **General Corpus**. The following distributions and payments will be made from the general corpus of the trust:

1.  **Distributions**. Distributions on Class 3 Claims and Class 4B Claims as determined by the Tort Claims Reviewer in accordance with this Plan, the Trust Agreement, and the Trust Distribution Plan.

- 29 -

2. **Tort Claims Reviewer**. The Trustee shall retain the Tort Claims Reviewer. Fees payable to the Tort Claims Reviewer for review of Class 3 and Class 4B Claims shall be paid from the Trust.

3. **Trust Administrative Fees**. All fees, costs, and expenses of administering the Trust as provided in the Plan and the Trust Agreement shall be paid by the Trust, including: (i) as reasonably necessary to meet current liabilities and to maintain the value of the respective Assets of the Trust; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Trust and any professional fees); and (iii) to satisfy other liabilities incurred by the Trust in accordance with the Plan or the Trust Agreement.

4. **Indemnity**. The Trust's obligations, if any, to defend, indemnify, or hold harmless any Person expressly set out in the Plan shall be made from the corpus of the Trust.

(b)     **IMPAIRED UNKNOWN TORT CLAIM RESERVE FUND**. The Trust shall establish an Impaired Unknown Tort Claim Reserve Fund for the benefit of Class 4B Claimants, as detailed in the Trust Agreement, in an amount equal to the amount that the Reorganized Debtor transfers to the Trust on account of Determined Claims under Section 5.1(b)(2)(i)(c) above. The Trust shall maintain the Impaired Unknown Tort Claim Reserve Fund until the later of (i) the date that the Impaired Unknown Tort Claim Reserve Fund has been exhausted or (ii) the occurrence of the fifth (5th) anniversary of the Effective Date.  Neither the Diocese, the Reorganized Debtor nor any other Protected Party shall have any obligation to make any contribution to the Trust to establish an Impaired Unknown Tort Claim Reserve Fund in excess of those contributions specified in Article V, Section 5.1(b) as the Debtor Cash Contribution and Transferred Insurance Interests.

**6.4    TAX MATTERS**. The Trust shall not be deemed to be the same legal entity as the Diocese, but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Minnesota law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**6.5    APPOINTMENT OF THE TRUSTEE**. The initial Trustee has been identified in Exhibit D to this Plan. The Trustee shall commence serving as the Trustee on the Confirmation Date; provided, however, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Diocese and the UCC, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

**6.6     RIGHTS AND RESPONSIBILITIES OF TRUSTEE.**

(a)     The Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights, powers, authority, responsibilities, and benefits specified in the Plan and the Trust Agreement, including (to the extent necessary to enforce those rights, powers, authority, responsibilities, and benefits only) the powers of a trustee under Sections 704, 108 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting Claims, defenses, offsets and privileges). If there is any inconsistency or ambiguity between the Plan and Confirmation Order, on the one hand, and the Trust Agreement, on the other hand, with respect to the Trustee's authority to act, the provisions of the Plan and Confirmation Order shall control. Among other things, the Trustee: (1) shall liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

(b)     Notwithstanding the foregoing, the Diocese, the Reorganized Debtor, and the Trust acting for itself and on behalf the Estate, shall be deemed to have waived, effective upon the Effective Date:

1.   Any and all Claims under Sections 547, 548, 549 and 550 of the Bankruptcy Code for the recovery of any sums paid to any Person who provided goods and services to the Diocese in the ordinary course of business prior to the Effective Date; and

2.   Any and all Claims and Causes of Action: (i) seeking the substantive consolidation of the Diocese and any other Person or an order deeming any such Person and the Diocese to be an "alter-ego" of the other or any other similar Claim or Cause of Action; (ii) to avoid, set aside or recover any payment or other transfer made to any Person under Sections 547, 548, 549, and 550 of the Bankruptcy Code; and (iii) any proceeding to avoid or set aside any interest of a Person in property under Section 544 of the Bankruptcy Code.

The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Trustee in its/his/her official capacity, with respect to its/his/her status, duties, powers, acts, or omissions as Trustee.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

**6.7**      **TRANSFERRED INSURANCE INTERESTS**.

(a)      **Enforcement of Transferred Insurance Interests Against Non-Settling Insurers.**

1.  As set forth in Article V, the Transferred Insurance Interests are assigned and transferred to the Trust. The Trust shall be entitled to all policy proceeds due by virtue of a judgment or settlement of a Class 3 Claim or a Class 4B Claim and will be entitled to assert and/or assign to any Tort Claimant all claims and causes of action that currently exist or may arise in the future against Non-Settling Insurers based on their conduct concerning insurance coverage for, or defense or settlement of, any Class 3 Claim or Class 4B Claim, including but not limited to all claims and causes of action for breach of the Non-Settling Insurer Policies, vexatious refusal, bad faith, wrongful failure to settle, and for any other similar claim or cause of action, including any and all such claims or causes of action providing for penalties, extra-contractual damages, punitive damages and attorneys' fees and costs. The Trust shall also have the right to pursue judgment against Non-Settling Insurers to determine the amount of coverage available for Protected Parties' liability for Tort Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. The Trust shall be fully authorized to act in its own name, or in the name of any Protected Party, to enforce any right, title, or interest of any Protected Party in the Transferred Insurance Interests. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact that the Diocese is in bankruptcy or by any distribution from the Trust to any Tort Claimant. The transfer of the Transferred Insurance Interests shall not affect any Non-Settling Insurer's duty to defend, but to the extent that a failure to defend or a separate agreement between the Diocese, the Reorganized Debtor, or any other Protected Party and any Non-Settling Insurer gives rise to a monetary obligation or policy proceeds to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds. Any recovery by the Trust on an action against a Non-Settling Insurer for a determination of coverage for Protected Parties' liability for Tort Claims shall become a Trust Asset and shall be distributed as provided in this Plan, the Trust Agreement, and the Trust Distribution Plan.  The Trust's recourse to the Diocese and the other Protected Parties shall be limited to the Transferred Insurance Interests and any other rights or interests expressly granted to the Trust under this Plan, including any indemnification obligations of the Reorganized Debtor for Covered Non-Tort Claims under section 16.4, or as otherwise provided by the Plan.  The Trust shall have no liability for Covered Non-Tort Claims and holders of Covered Non-Tort Claims shall have no recourse to the Trust with respect to such Claims.

2.  The Trust shall have full access to coverage issued by the Non-Settling Insurers to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as the Protected Parties prior to the confirmation

- 32 -

of the Plan and the transfer of the Transferred Insurance Interests to the Trust, subject to the assertion of any coverage defenses except any defense (a) regarding the assignment and transfer of the Transferred Insurance Interests; or (b) effected by operation of law because of confirmation of this Plan.

The assignment and transfer of the Transferred Insurance Interests to the Trust does not affect the Diocese's, the Reorganized Debtor's, other Protected Parties', or any Non-Settling Insurer's right to contest the Diocese's, or any other insured's, liability or the amount of damages in respect of any Tort Claims. Notwithstanding the assignment and transfer of the Transferred Insurance Interests, the Diocese, the Reorganized Debtor, and any other Protected Party shall not be relieved of any obligations or duties under any Non-Settling Insurer Policy (including without limitation any duty to cooperate) and shall continue to honor such duties and obligations as required by such applicable Non-Settling Insurer Policies and applicable law. The transfer and assignment of the Transferred Insurance Interests does not affect any insurers' rights, obligations, or duties under applicable Non-Settling Insurer Policies or applicable law. If the Trust brings an action against a Non-Settling Insurer to assert any claim or to determine the Non-Settling Insurer's obligation to provide coverage for any Tort Claim, the Non-Settling Insurer may raise any defense to coverage as if the action had been brought by the Diocese, the Reorganized Debtor, or any other Protected Party.

3.  The Bankruptcy Court shall determine at the Confirmation Hearing (i) whether the assignment of the Transferred Insurance Interests provided for in this Section is valid, and (ii) whether such transfer or the discharge and injunctions set forth in Sections 13.2 and 13.3, or any other term of the Plan, void, defeat, or impair the insurance coverage issued by the Non-Settling Insurers. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed assignment and transfer of the Transferred Insurance Interests to the Trust or other terms of the Plan related to the Non-Settling Insurer Policies by the date set to file such objections, that party in interest shall be deemed to have irrevocably consented to the assignment of Transferred Insurance Interests and other Plan terms related to such Non-Settling Insurer Policies and will be forever barred from asserting that the assignment of the Transferred Insurance Interests or other Plan terms affect the ability of the Trust or Tort Claimants to pursue the Non-Settling Insurers, or any of them, for insurance coverage.

4.  In the event that the Bankruptcy Court enters a Final Order determining that the assignment of the Transferred Insurance Interests is valid and does not defeat or impair coverage under the Non-Settling Insurer Policies, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese and other Protected Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests; provided, however, that the Protected Parties shall not be relieved of

- 33 -

any obligations the Protected Parties may have under Non-Settling Insurer Policies.

5. The Reorganized Debtor will cooperate and assist the Trust in enforcing any right or prosecuting any claim based on the Transferred Insurance Interests. This cooperation includes, but is not limited to, providing access to documents and electronic information and providing clergy, employees, agents, and volunteers to testify in depositions and at trial.

(b)  **Appointment of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries.**

1. If the Bankruptcy Court does not enter a Final Order approving the assignment and transfer of the Transferred Insurance Interests to the Trust, then the assignment shall not occur and pursuant to the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is hereby appointed as the representative of the Diocese's Estate for the purpose of retaining and enforcing all of the Diocese's and the Estate's Interests against the Non-Settling Insurers with respect to the Tort Claims. Any recoveries on such Interests by the Trustee will be paid to the Trust. The determination of whether the appointment of the Trustee as the Diocese's and the Estate's representative provided for in this Section 6.7(b)(1) is valid, and does not defeat or impair the insurance coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, shall be made by the Bankruptcy Court at the confirmation hearing. If a party in interest (which, for this purpose, shall include the Non-Settling Insurers) fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trustee to pursue Non-Settling Insurers, or any of them, for insurance coverage. In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat or impair coverage Non-Settling Insurers are responsible for under Non-Settling Insurer Policies, then, following the Effective Date, the Trustee shall assume responsibility for, and be bound by, only such obligations of the Diocese and other Protected Parties under Non-Settling Insurer Policies as are necessary to act as the representative of the Diocese and the Estate for the purpose of retaining and enforcing their Interests, if any, against the Non-Settling Insurers; provided, however, that the Trustee's appointment shall not relieve the Diocese, the Reorganized Debtor or the other Protected Parties from any obligation that such entities may have under the Non-Settling Insurer Policies. Nothing contained in this Section 6.7(b)(1) shall affect the rights and remedies of a Person who is not a Protected Party but is an insured or additional insured with the Diocese or is asserting rights under a Non-Settling Insurer Policy.

2. In the event that a Final Order is entered holding that: (a) the assignment of the Transferred Insurance Interests, or (b) the appointment of the Trustee as the

- 34 -

Diocese's and the Estate's representative are invalid or would defeat or impair the insurance coverage issued by the Non-Settling Insurers, then the assignment and/or appointment, as the case may be, will be deemed not to have been made, and the Diocese, the Reorganized Debtor, and each of the Protected Parties will retain their Interests under each Settling Insurer and Non-Settling Insurer Policy.

(i)       At the request of the Trust, the Reorganized Debtor and the other Protected Parties will assert their Interests against a Non-Settling Insurer, including, but not limited to, by filing a lawsuit for recovery of policy proceeds. All recoveries by the Reorganized Debtor and the other Protected Parties will be paid to the Trust. The Reorganized Debtor and the other Protected Parties will select and retain counsel to pursue their Interests against Non-Settling Insurers pursuant to this Section 6.7(b), subject to the Trustee's approval, which approval shall not be unreasonably withheld.

(ii)       The Trust shall pay the reasonable attorneys' fees, costs and expenses that are incurred by the Reorganized Debtor and the other Protected Parties in pursuing, pursuant to this Section 6.7(b), its Interests against Non-Settling Insurers.

(iii)       The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in this Section 6.7(b), reimburse the Reorganized Debtor and each of the Protected Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing its Interests against Non-Settling Insurers, but will not compensate the Reorganized Debtor or any other Protected Party for any time any of its employees expend. Upon receipt by the Reorganized Debtor or other Protected Party, all recoveries received by the Reorganized Debtor or other Protected Party from Non-Settling Insurers shall be deemed to be held in trust for the benefit of the Trust and shall be remitted by the Reorganized Debtor or other Protected Party to the Trust as soon as practicable following the Reorganized Debtor's or other Protected Party's receipt of such recoveries.

## 6.8    SPECIAL DISTRIBUTION CONDITIONS.

(a)       With respect to Class 3, the Trust shall maintain sufficient funds to pay any potential reimbursements to Medicare and shall complete the following "Medicare Procedures":

(1)       It is the position of DoW that none of DoW Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA.  Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United

- 35 -

States Department of Health and Human Services ("HHS") that none of the Trust, DoW Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the DoW Entities or Settling Insurers or payments by the Trust to Claimants.  Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Eighth Circuit or the United States Supreme Court), or a letter from the Secretary of confirming that none of the DoW Entities or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the DoW Entities and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the DoW Entities and Settling Insurers, and shall timely submit all reports that would be required to be made by any DoW Entity or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by a DoW Entity or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or any DoW Entity or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the DoW Entities and Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(2)      If the Trust is required to act as a reporting agent for any DoW Entity or Settling Insurer pursuant to Section 6.8(a)(1), the Trust shall provide a written certification to each DoW Entity and Settling Insurer within ten (10) Business Days following the end of each calendar quarter, confirming that all reports to CMS required by Section 6.8(a)(1) have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

(3)      With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any DoW Entity or Settling Insurer, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Trust may redact from such copies the Redacted Information.  With respect to any such reports, the Trust shall undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by any DoW Entity or Settling Insurer, provide each DoW Entity and Settling Insurer copies of such resubmissions; provided, however, that the Trust may redact the Redacted Information. If the Trust is unable to remedy its noncompliance, the provisions of Section 6.8(a)(7) shall apply.

- 36 -

(4)     If the Trust is required to act as a reporting agent for a DoW Entity or Settling Insurer pursuant to the provisions of Section 6.8(a)(1), with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any DoW Entity or Settling Insurer, promptly provide the Redacted Information and any other information that may be necessary in the reasonable judgment of any DoW Entity or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event any DoW Entity or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS.  All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

(5)     If the Trust is required to act as a reporting agent for any DoW Entity, or Settling Insurer pursuant to the provisions of Section 6.8(a)(1), the Trust shall make the reports and provide the certifications required by Sections 6.8(a)(1) and (2) until such time as such DoW Entity or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust.  Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 6.8(a)(1), and if any DoW Entity or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 6.8(a)(1) and (2).

(6)     Section 6.8(a)(1) is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the DoW Entities and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(7)     If CMS concludes that reporting done by the Trust in accordance with Section 6.8(a)(1) is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any DoW Entity or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any DoW Entity or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 6.8(a)(2), (3), or (4), or other credible information, then each DoW Entity and Settling Insurer shall have the right to submit its own reports to CMS

- 37 -

under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information as the electing party may require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 6.8(a)(1), without any redactions. The DoW Entities and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 6.8(a)(2) confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

(8)      Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 6.8(a) until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under (11) of this Section to such Person for any penalty, interest, or sanction with respect to a Claim that may arise solely on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each DoW Entity and Settling Insurer for any failure to report payments to Medicare eligible Tort Claimants on behalf of Persons who have supplied Medicare Reporting Numbers, if any exists.

(9)      Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trustee shall obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. The Trust shall withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Tort Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 6.8(a) to each DoW Entity and Settling Insurer, and permit reasonable audits by such Persons, no more often than quarterly, to confirm the Trust's compliance with this Section 6.8(a). For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 6.8(a) regardless of whether any DoW Entity or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 6.8(a)(7).

(10)     Compliance with the provisions of this Section 6.8(a) shall be a material obligation of the Trust under the Plan, in favor of the Settling Insurers under the Plan.

(11)     The Trust shall defend, indemnify, and hold harmless the DoW Entities and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under this Section.

- 38 -

(12)    The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing.  The Trustee shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

**6.9    INVESTMENT POWERS; PERMITTED CASH EXPENDITURES**. All funds held by the Trust shall be invested in cash or short-term highly liquid investments that are readily convertible to known amounts of cash as more particularly described in the Trust Agreement. The Trustee may expend the cash of the Trust.

**6.10    REGISTRY OF BENEFICIAL INTERESTS**. To evidence the beneficial interest in the Trust of each holder of such an interest, the Trustee shall maintain a registry of beneficiaries.

**6.11    NON-TRANSFERABILITY OF INTERESTS**. Any transfer of an interest in the Trust shall not be effective until and unless the Trustee receives written notice of such transfer.

**6.12    TERMINATION**. The Trust shall terminate after its liquidation, administration, and distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth herein or in the Trust Agreement. The Trust shall terminate no later than the sixth (6th) anniversary of the Effective Date.

**6.13    IMMUNITY; LIABILITY; INDEMNIFICATION**.

(a)    Neither the Reorganized Debtor or its respective members, designees, or professionals, nor the Trustee or any duly designated agent or representative of the Trustee, nor their respective employees, shall be liable for the acts or omissions of any other member, designee, agent, or representative of such Trustee, except that the Trustee shall be liable for his/her/its specific acts or omissions resulting from such Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Trustee may, in connection with the performance of his/her/its functions and in his/her/its sole and absolute discretion, consult with his/her/its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trustee shall not be under any obligation to consult with his/her/its attorneys, accountants, financial advisors, or agents, and his/her/its determination not to do so shall not result in the imposition of liability on the Trustee unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, or fraud.

(b)    No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney, accountant, or other professional retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument,

- 39 -

undertaking, obligation, covenant or Trust Agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or this Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for his/her/its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

(c)    The Trust shall defend, indemnify, and hold harmless the Trustee, his/her/its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Minnesota is entitled to indemnify and defend its directors, trustees, officers, and employees against any and all liabilities, expenses, Claims, damages or losses incurred by them in the performance of their duties hereunder.

1. Additionally, the Reorganized Debtor, and each of its respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of the Trust or Trustee or respective agents, with respect to: (i) the Chapter 11 case and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 3 and Class 4B Claims, (iii) the administration of the Trust and the implementation of the Trust Distribution Plan, or (iv) any and all activities in connection with the Trust Agreement, shall be indemnified and defended by the Trust, to the same extent that a corporation or trust organized under the laws of Minnesota is from time to time entitled to indemnify and defend its own officers, directors, trustees, and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor or Reorganized Debtor, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, provided that, with respect to amounts paid in settlement, the Trust has approved such amounts in advance, such approval not to be unreasonably withheld.

2. Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Trustee, the Debtor, the Reorganized Debtor, and their respective agents in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Trust, shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Trustee, the Debtor, the Reorganized Debtor, and their respective agents, to repay such amount in the event that it shall be determined ultimately by Non-Appealable Order that such Trustee, the Debtor, the Reorganized Debtor, and

- 40 -

their respective professionals, officers, and directors is not entitled to be indemnified by the Trust.

**6.14    TREATMENT OF TORT CLAIMS.**

(a)    **TRUST LIABILITY**. On the Effective Date, the Trust shall automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims, subject to section 16.4; (ii) the responsibility for preserving, managing and distributing Trust Assets pursuant to the Trust Distribution Plan; and (iii) the right to pursue the Transferred Insurance Interests.  Except as otherwise provided herein, the Trust does not assume any liabilities of the Diocese or Reorganized Debtor, in whole or in part, in regards to any Tort Claims that are not released, nor the liabilities of the Settling Insurers.

(b)    **ASSESSMENT OF TORT CLAIMS**.

1. Each Tort Claim will be assessed by the Tort Claims Reviewer in accordance with the Trust Distribution Plan to determine whether the Tort Claimant is entitled to a distribution under the Trust. The Diocese or the Reorganized Debtor shall reasonably cooperate with the Tort Claims Reviewer and the Trustee as requested by the Tort Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Trust Distribution Plan, but shall not be required to act in any way that violates any duty to cooperate with a Non-Settling Insurer. Under no circumstance shall the Tort Claims Reviewer's review of a Class 3 or Class 4B Claim or a determination regarding a distribution thereon have any effect on the rights of a Non-Settling Insurer.

2. Each Tort Claimant may elect, in lieu of assessment by the Tort Claims Reviewer, to have his Tort Claim treated pursuant to the convenience Claim process as provided by the Trust Distribution Plan ("Convenience Claim").

(c)    **ELECTION.** No later than thirty (30) days after a Tort Claimant is notified of the amount of the award under the Trust Distribution Plan, the Tort Claimant shall elect in writing one of the following treatment alternatives:

1. Receiving a payment from the Trust in the amount determined by the Tort Claims Reviewer pursuant to the Trust Distribution Plan ("Distribution Plan Claim"). A Tort Claimant who elects to receive a distribution for a Distribution Plan Claim (a "Distribution Plan Claimant") must execute the release of all his or her Tort Claims against the Settling Insurers and the Protected Parties as set forth in Exhibit E or Exhibit F, as applicable, and waives his right to pursue a direct action under Minn. Stat. § 60A.08, subd. 6 or other applicable law against any Non-Settling Insurer; or

2. Treatment of the Tort Claim as a Litigation Claim. A Tort Claimant electing treatment as a Litigation Claim ("Litigation Clamant") will have rights, to the extent set forth in the Trust Distribution Plan, to initial and future distributions

- 41 -

from the Trust. Each Litigation Claimant also retains the right to: (i) pursue his or her Tort Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of recovering against any Non-Settling Insurer that is or may be liable on the Tort Claim and (ii) proceed in a direct action against any Non-Settling Insurer to the extent allowed by applicable law, including Minn. Stat. § 60A.08, subd. 6 (each a "Litigation Claim"). A Litigation Claimant's recovery on a Litigation Claim is limited as provided herein. The Settling Insurers shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers shall not have any other duties or obligations to any Person in connection with a Litigation Claim. Under no circumstances will a Tort Claimant or any other Person be able to recover any amount from a Settling Insurer in connection with a Litigation Claim.

(d)    **MODIFICATION OF TREATMENT ELECTION.**

1.   If a Tort Claimant does not make one of the elections in Section 6.14(c), the Tort Claimant will be treated as a Litigation Claimant.

2.   Upon written notice to the Trustee, subject to the Trustee's sole and absolute discretion, a Tort Claimant may rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Plan Claimant. Notwithstanding the foregoing, the Trustee shall consent to a Tort Claimant's rescission if such written notice of rescission is given prior to entry of an order of dismissal or a final judgment on the Litigation Claim in favor of a Protected Party.

3.   No later than ten (60) days after a Tort Claimant is notified of the amount of the award under the Trust Distribution Plan, a Tort Claimant may rescind the election to be treated as a Distribution Plan Claimant in favor of being treated as a Litigation Claimant.

(e)    **Legal Effect of Estimation of Claims and Distributions under**

**Trust Distribution Plan**. The Tort Claims Reviewer's determinations are for estimation purposes only and shall not be a finding or fixing of the fact or liability or the amount payable for any Tort Claim with any binding legal effect, other than for distribution purposes by the Trust pursuant to the Trust Distribution Plan. The determination of qualification, estimation of claims, and payment of distributions is not an admission of liability by any Protected Party or the Trust with respect to any Tort Claims and has no res judicata or collateral estoppel effect on any Protected Party, the Trust, or any Non-Settling Insurer. Any payments by the Trust to Tort Claimants in connection with their Tort Claims is not a release of the Debtor nor an accord or novation of the Debtor's liability on account of the Class 3 and Class 4B Claims. The Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of the Diocese's, the Reorganized Debtor's, or any other Protected Party's liability for, or damages with respect to, any Class 3 or Class 4B Claim. The determination of

- 42 -

qualification, estimation of claims, and payment of distributions is not a settlement, release, accord, or novation of Class 3 or Class 4B Claims and cannot be used by any third party as a defense to any alleged joint liability. The determination of qualification, estimation of claims, and payment of partial distributions does not impair a Litigation Claimant's rights to obtain a judgment, including a judgment based on joint and several liability, against a Protected Party or any Non-Settling Insurer or other Person, for purposes of establishing the Protected Party's liability on the Tort Claim, but any such judgment awarded to a Litigation Claimant will be reduced by the amount of distributions already paid by the Trust to such Litigation Claimant on his or her Tort Claim(s). Neither the Tort Claims Reviewer's review of a Tort Claim and determination of qualification, nor the Trust's estimation of claims or payment of distributions shall (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Tort Claim, either individually or in the aggregate with other Tort Claims, in any coverage litigation with any Non-Settling Insurers. The Trust's estimation of claims and payment of distributions does not constitute a triggering event for liability under any Non-Settling Insurer Policy nor does it create an admission of the fact of liability or the extent of damages on behalf of the Protected Parties.

(f)      **RELEASE AND DISCHARGE OF TORT CLAIMS.** No Tort Claimant shall receive any payment on any award unless and until such Tort Claimant has executed the Release attached as Exhibit E or Exhibit F to this Plan, as applicable. Each Tort Claimant must execute a release of all claims against the Settling Insurers and must release all claims against the Diocese, the Reorganized Debtor, and the other Protected Parties that do not implicate insurance coverage under Non-Settling Insurer Policies. To preserve coverage under Non-Settling Insurer Policies, Tort Claimants specifically reserve, and do not release, any and all claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be handled in accordance with Sections 6.14(i) and (j).

(g)      The Tort Claims will not be released or enjoined as against the Protected Parties for any Abuse that may be covered under Non-Settling Insurer Policies until such claims are settled with the Protected Parties and their Non-Settling Insurers, or are fully adjudicated, resolved, and subject to Final Order, unless the Tort Claimant elects to proceed as a Distribution Plan Claimant, but recourse will be limited as described in Sections 4.3 and 4.5 above.

With respect to all other Claims, except as otherwise provided in the Plan, the Debtor's liability on account of such Claims shall be discharged pursuant to the provisions of 1141(d). The Tort Claimants' release, in whole or in part, of their Class 3 or Class 4B Claims will be pursuant to the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978). The Class 3 and Class 4B Claimants will expressly reserve their rights against other Persons (other than Protected Parties), including joint tortfeasors, who will remain severally liable on any Class 3 and Class 4B Claims. Any Person (other than a Protected Party) that is, or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of a Tort Claim shall not be liable for any Protected Party's share of causal liability or fault.

(h)    **TRUST RIGHTS AGAINST NON-SETTLING INSURERS**. The Trust retains the right to pursue Non-Settling Insurers for the Diocese's, the Reorganized Debtor's, and any other Protected Party's liability to Tort Claimants regardless of whether the Tort Claimants elect treatment as Distribution Plan Claimants or Litigation Claimants.

(i)    **DISTRIBUTIONS TO TORT CLAIMANTS**.  A Tort Claimant electing to be treated as a Distribution Plan Claimant, and who the Tort Claims Reviewer determines to be entitled to a distribution, will receive a distribution from the Trust in the amount(s) and at the time(s) provided for in the Trust Distribution Plan. Any payment on a Tort Claim constitutes payment for damages on account of personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

(j)    **LITIGATION CLAIMS**. If necessary in the Trustee's discretion, the Trustee may establish a reserve for payment of a claim held by a Litigation Claimant in the amount that would have been awarded to the Litigation Claimant if such Claimant had elected to proceed under the Trust Distribution Plan. The creation and existence of this reserve is not a settlement, release, accord or novation of the Litigation Claims and cannot be used by any third party as a defense to any alleged joint liability with any Protected Party. For avoidance of doubt, the creation and existence of this reserve does not affect, diminish or impair a Litigation Claimant's rights to collect a judgment, including a judgment based on joint and several liability, against any Non-Settling Insurer or Person that is not a Protected Party, except as expressly provided herein. The Trustee may establish one reserve for all of the Litigation Claims but no Litigation Claimant shall have any interest in any portion of the reserve in excess of the amount determined for that Litigation Claimant under the Trust Distribution Plan, and then only in the event that the Litigation Claimant prevails on his Litigation Claim. Neither the Trust's payment of, or reserving monies on account of, the Tort Claims nor the Tort Claims Reviewer's review of a Tort Claim, shall: (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Protected Parties, Non-Settling Insurers, or any other Person, or (2) constitute, or be deemed, a determination of the reasonableness of

- 44 -

the amount of any Tort Claim, either individually or in the aggregate with other Tort Claims, in any coverage litigation with any Non-Settling Insurers.

1.  In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of any reserve set for that Litigation Claimant's Litigation Claim plus an additional $1,000.

2.  In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust for handling pursuant to this Plan. Such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining shall be distributed in a manner consistent with the Trust Distribution Plan.

(k)     The Trust's payment to a Litigation Claimant that has recovered a judgment or settlement does not affect, diminish or impair the Trust's right to collect the policy proceeds respecting such Class 3 or Class 4B Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

(l)     If a Non-Settling Insurer has refused to defend a Protected Party with respect to any Litigation Claim, the Trust will advance or reimburse the Protected Party for reasonable and necessary attorneys' fees and other expenses incurred in defending the Litigation Claim. If any Non-Settling Insurer has refused to indemnify a Protected Party with respect to any settlement or judgment of a Litigation Claim, the Trust will advance or reimburse the Protected Party for any judgment or settlement incurred by the Protected Party on such Litigation Claim, provided the Trust has consented in advance to any such settlement, such consent not to be withheld unreasonably. If all insurers that could potentially have responsibility to defend and/or indemnify for a Tort Claim have denied coverage, that Litigation Claimant  must sign a covenant not to execute against  that Protected Party's assets (other than Non-Settling Insurer Policies or proceeds or other assigned rights or interests), under which the Litigation Claimant will agree to seek recovery only from Non-Settling Insurers for any judgment the Litigation Claimant obtains against any Protected Party, in exchange for a stipulated judgment and assignment of insurance rights, as authorized by law. If any judgment on any Tort Claim is within the retention of any Non-Settling Insurer Policy, and all insurers have denied indemnity for such judgment, then the Trust

- 45 -

will fund the judgment. The Trust's advancement or reimbursement of the Protected Party for such defense costs and/or judgment or settlement payments, and any distributions made by the Trust to the Litigation Claimant and other Class 3 Claimants, will not affect, diminish or impair the Trust's right to bring any claims against any Non-Settling Insurers for refusing to defend and/or indemnify the Protected Party, including but not limited to claims for payment of policy proceeds, bad faith, wrongful failure to settle, and extra-contractual damages authorized by law.

(m)     As of the Effective Date, the Trustee will be deemed to have the right to join or intervene into the Insurance Coverage Adversary Proceeding and to pursue recoveries against any Non-Settling Insurers.

(n)     Nothing in the Plan, Confirmation Order or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Tort Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, in connection with a Tort Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law. Nothing provided for in this Plan, the Trust Agreement, or the Trust Distribution Plan constitutes an endorsement of a Class 3 or Class 4B Claimant's right to pursue their remedies under Minn. Stat. § 60A.08.

(o)     If the Litigation Claimant fails to prosecute his Litigation Claim to final judgment or settlement of the claim, or a Final Order is entered finding that no Protected Party has liability to such Tort Claimant on account of his Tort Claim, any reserve maintained by the Trust on account of such Tort Claim shall revert to the non-reserved assets of the Trust and the Litigation Claimant shall have no recourse against the Trustee, the Trust, any Protected Party, or any Settling Insurer.

(p)     **OBJECTIONS AND LITIGATION AFTER THE EFFECTIVE DATE**.

1.  Regardless of whether a Class 3 or Class 4B Claimant elects treatment as a Distribution Plan Claimant or a Litigation Claimant, the Trustee may object to that Class 3 or Class 4B Claimant's Claim.  The Trustee's right to object to a Class 3 or Class 4B Claimant's Claim after the Effective Date will not affect or impair any right the Diocese, the Reorganized Debtor, other Protected Parties, and/or Non-Settling Insurers may have under the Non-Settling Insurer Policies or applicable law to object to such Class 3 and Class 4B Claims. In addition, the Reorganized Debtor may object to any Class 4B Claimant's Claim and reserves all of its rights and defenses with respect to such Claims.

2.  The Protected Parties will comply with all obligations under the Non-Settling Insurer Policies and applicable law. The Trustee, to the extent required by the

- 46 -

Non-Settling Insurer Policies implicated by such Tort Claims and applicable law, shall also cooperate with the Non-Settling Insurer in the defense of such judicial proceeding contemplated in Section 6.13(p)(1). In the event of a dispute between a Non-Settling Insurer and the Trustee regarding whether the Trustee must allow such Non-Settling Insurer to control the defense of such Tort Claim, or the extent of anyone's duty to cooperate, such dispute shall be resolved by the Bankruptcy Court and the Bankruptcy Court shall retain jurisdiction over such disputes. In the event the Non-Settling Insurer fails to seek a determination from the Bankruptcy Court over the existence and extent of the Trustee's obligation to cooperate, or the Non-Settling Insurer's right to control the defense, the Non-Settling Insurer shall be deemed to have waived such claim.

(q)    **CLAIM WITHDRAWAL**. A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall still be subject to Section 13.2 of the Plan, the Channeling Injunction, and the Supplemental Settling Insurer Injunction as provided by this Plan; and (b) any reserve maintained by the Trust on account of such Tort Claim shall revert to the Trust as a Trust Asset for distribution in accordance with the Plan and Trust Distribution Plan. Each Protected Party, Non-Settling Insurer, Settling Insurer, and the Trust shall retain any and all defenses that may exist in respect to such Tort Claim.

## ARTICLE VII
## SETTLING INSURERS

**7.1    SETTLING INSURER SETTLEMENT AGREEMENT**. Upon satisfaction of the conditions precedent to the LMI/Interstate Settlement Agreement becoming effective, including the Confirmation Order and the order approving the LMI/Interstate Settlement Agreement becoming Non-Appealable Orders, the LMI/Interstate Settlement Agreement will be fully binding on the Trust, Protected Parties, the Reorganized Debtor, the UCC, LMI and Interstate, the Tort Claimants, and parties in interest, and any of the foregoing Persons' successors.

**7.2    FREE AND CLEAR OF INTERESTS OF SETTLING INSURER POLICIES**. To the extent provided in the LMI/Interstate Settlement Agreement and effective on the later of (i) the Effective Date of the Plan or (ii) the payment by each Settling Insurer of the settlement payment(s) due under such agreement, each and every Settling Insurer Policy issued by LMI or Interstate shall be sold to the issuing Settling Insurer pursuant to Sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims and Interests, including those of the Diocese, Diocesan Parishes, and Tort Claimants.  As set forth in the LMI/Interstate Settlement Agreement and the corresponding Approval Order, LMI and Interstate are good faith purchasers of such insurance policies and certificates of insurance within the meaning of Section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to each such Settling Insurer Policy and constitutes reasonably equivalent value, the releases in the LMI/Interstate Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws, and each such Settling Insurer Policy shall be terminated and be of no further

- 47 -

force and effect with the issuing Settling Insurer having fully and completely performed any and all obligations under each such Settling Insurer Policy, including any performance owed to the Diocese and Diocesan Parishes, and all limits of liability of each such Settling Insurer Policy shall be exhausted.

**7.3    RESOLUTION OF CLAIMS INVOLVING SETTLING INSURERS**. The Confirmation Order shall provide that within 20 days after receipt of the settlement payment required by the LMI/Interstate Settlement Agreement, the Diocese, LMI and Interstate shall effect dismissal with prejudice of their Claims against each other in the Insurance Coverage Adversary Proceeding, and shall be prohibited from pursuing the claims therein against each other at any time, with each side to bear its own fees and costs. The Diocese shall not be required to dismiss the Insurance Coverage Adversary Proceeding as against any Non-Settling Insurers.

**7.4    THE SETTLING INSURERS' PAYMENTS**. LMI/Interstate will pay to the Trust the sums set forth in the LMI/Interstate Settlement Agreement within the time set forth in the LMI/Interstate Settlement Agreement.

**7.5    JUDGMENT REDUCTION**.

(a)    In any proceeding, suit, or action, including the Insurance Coverage Adversary Proceeding, to recover or obtain insurance coverage or proceeds from a Non-Settling Insurer for a Tort Claim, the following shall apply:

(1) If a Non-Settling Insurer has asserted, asserts, or could assert, any Contribution Claim against a Settling Insurer, then any judgment or award obtained by any Protected Party, the Trust, or a Tort Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that a court or arbitrator determine such Settling Insurer would have been liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("Reduction Amount"). In any action by a Protected Party, the Trust or a Tort Claimant against a Non-Settling Insurer to obtain insurance coverage or proceeds for a Tort Claim, where the Settling Insurers are not parties, the Non-Settling Insurers' Contribution Claim may be asserted as a defense, and to the extent the Non-Settling Insurers' Contribution Claim against a Settling Insurer is determined to be valid by the court presiding over such action, the liability of the Non-Settling Insurer will be reduced dollar for dollar by the amount so determined. In the event that a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any Settling Insurer will be determined by the court or arbitration proceeding in which such Contribution Claim is filed. To the extent possible, no Settling Insurer will be required to answer or otherwise respond to a complaint alleging a Contribution Claim against such Settling Insurer until such Reduction Amount is determined by such court or arbitrator(s). If, notwithstanding the foregoing, a court refuses to reduce the liability of the Non-Settling Insurer, then once the order establishing the Settling Insurer's liability for the Contribution Claim is a Final Order, the Trust shall promptly indemnify and hold harmless the Settling Insurer for such amount of any such Abuse-Related Contribution Claim.  In addition, to the extent that a judgment reduction as contemplated in this section does not satisfy an Abuse-Related Contribution Claim in its entirety, such Abuse-Related Contribution Claim (including for defense costs) shall attach to the proceeds of the sale of the Settling Insurer Policies with the same validity, priority, force and effect as such Abuse-Related Contribution Claim had in respect of the Settling Insurer

- 48 -

Policies prior to closing of the sale. Nothing herein is intended to nor shall be deemed to constitute a determination of the extent, validity or priority of any Claims or Interests (including any Abuse-Related Contribution Claim) that may be asserted against the proceeds of the sale.

(b)       As provided in the LMI/Interstate Settlement Agreement, each Settling Insurer agrees that it will not pursue any contribution claim that it might have against any other Insurer (a) whose Contribution Claim against LMI/Interstate is satisfied and extinguished entirely; or (b) that does not make a Contribution Claim against LMI/Interstate, or any of them. If, in the future, a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against Interstate and/or a London Market Insurer, then such released Settling Insurer shall release its Contribution Claims against such releasing Insurer. To the extent that the Trust indemnifies the Settling Insurers, or if any Insurer asserts a Claim directly against the Trust arising from or concerning the Settling Insurer Policies, any Contribution Claim of the Settling Insurers shall be transferred to the Trust, and the Trust shall be authorized to assert the Contribution Claims of such Settling Insurer against such other Insurer.

7.6       **FURTHER ASSURANCES; NON-MATERIAL MODIFICATIONS**. From and after the Effective Date, the Reorganized Debtor and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Article without further order of the Bankruptcy Court. The Reorganized Debtor and the Settling Insurers may make technical or immaterial alterations, amendments, modifications, waivers, or supplements to the terms of any Insurance Settlement Agreement. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

7.7       **INDEMNIFICATION OBLIGATIONS**.

(a)       With respect to the indemnification obligations of the Trust or the Reorganized Debtor, including with respect to Tort Claims made by Persons over whom the Diocese or Diocesan Parishes do not have control, including any other Person who asserts Tort Claims against or right to coverage under the Settling Insurer Policies, the Settling Insurers may undertake the defense of any Claim on receipt of such Claim without affecting such indemnification obligations. The Settling Insurers shall notify the Trust or Reorganized Debtor, as applicable, as soon as practicable of any such Claims identified in this section and of their choice of preferred counsel. The obligation of the Trust or Reorganized Debtor, as applicable, to indemnify the Settling Insurer under this Section 7.7 shall not exceed the settlement amount set forth in the Insurance Settlement Agreement as actually paid by the corresponding Settling Insurer. In defense of any such Claims, the Settling Insurers may settle or otherwise resolve a Claim consistent with the terms of this Plan and with the prior consent of the indemnifying party,

- 49 -

which consent shall not be unreasonably withheld. Any such indemnification obligations with respect to Tort Claims will be channeled to and paid by the Trust.

**7.8     WAIVER/CONSENT**.

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction, and other covenants set forth herein, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of the LMI/Interstate Settlement Agreement, and upon receipt by the Trust of the settlement payment required by the LMI/Interstate Settlement Agreement, each of the Protected Parties: (1) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims and/or Interests it has or might have now or in the future against the other Protected Parties with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to released Tort Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and (2) consents to the sale of the Protected Parties' Claims and/or Interests, if any, in the Settling Insurer Policies in accordance with the Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan. **(b)**   Nothing in this Section 7.8 shall be construed to bar either (i) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer or (ii) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (i) under an insurance policy other than the Settling Insurer Policies.

**7.9     DEBTOR WAIVER AND RELEASE OF CLAIMS**

In consideration of any payments to be made by the Settling Insurers and other consideration provided by each Settling Insurer, upon payment by the Settling Insurers of their respective settlement amounts under the corresponding Insurance Settlement Agreements, the Diocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future (i) under the Settling Insurer Policies issued by LMI and Interstate to the extent those Settling Insurer Policies are bought back under the LMI/Interstate Settlement Agreement and this Plan; (ii) against the Settling Insurers with respect to any Tort Claim; and (iii) against the other Protected Parties with respect to any Channeled Claim. For the avoidance of doubt, the Diocese irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Interests it has or might have now or in the future under the Settling Insurer Policies issued by, subscribed to, or underwritten by LMI and/or Interstate, which are bought back under the terms of LMI/Interstate Settlement Agreement and this Plan.

**7.10    SUPPLEMENTAL SETTLING INSURER INJUNCTION**

(a)      **Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurers. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including LMI's**

- 50 -

**and Interstate's purchases of insurance policies or Interests in insurance policies free and clear of all interests pursuant to Section 363(f) of the Bankruptcy Code:**

**Any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, or any other Person covered or allegedly covered under the Settling Insurer Policies, including (i) Claims relating to the Settling Insurer Policies, including Tort Claims, Direct Action Claims, Indirect Claims, and Released Claims; (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims; (iii) Extra-Contractual Claims; (iv) Unimpaired Unknown Tort Claims; and (v) Unimpaired Unknown Contingent Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers or the Settling Insurer Policies:**

1. **Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the property of the Settling Insurers;**

2. **Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;**

3. **Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the property of the Settling Insurers;**

4. **Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the property of the Settling Insurers; and**

5. **Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

For the avoidance of doubt, this Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Settling Insurer Policies but against no other person or thing. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

# ARTICLE VIII
## NON-SETTLING INSURERS

**8.1**    **PRESERVATION OF RIGHTS AND OBLIGATIONS**.

**(a)**    In the event: (i) a Tort Claim is pursued in state or federal court by a Tort Claimant against a Protected Party or Non-Settling Insurer, or (ii) the Trust or the Reorganized Debtor asserts an objection to or otherwise seeks a determination of liability as to a Tort Claim, then the Protected Parties, the Trust and each Non-Settling Insurer shall retain any and all legal and factual defenses that may exist in respect to such Tort Claim and, except as set forth in this Section 8.1, all coverage defenses. The rights, duties and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Tort Claims are not impaired, altered, reduced, or diminished by: (a) the discharge in bankruptcy of the Debtor; (b) any distribution to Tort Claimants pursuant to this Plan, the Trust Agreement, and the Trust Distribution Plan; (c) the transfer of the Protected Parties' Transferred Insurance Interests; (d) protections granted to Protected Parties and Settling Insurers under the Plan; or (e) any other provision of this Plan, the Trust Agreement, or the Trust Distribution Plan.  Non-Settling Insurers retain any defenses that they would be able to raise if the claim for coverage were brought by the Diocese, the Reorganized Debtor, or any other Protected Party, except any defense (1) related to the transfer of Transferred Insurance Interests to the Trust; or (2) effected by operation of bankruptcy law as a result of confirmation.

**(b)**    The rights and obligations of the Diocese, the Reorganized Debtor, and other insureds and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law (including without limitation any duty of an insured to cooperate) shall not be affected by the assessment of any Tort Claim, and shall be treated as if the Tort Claim had never been assessed for distribution purposes by the Trust.

**(c)**    Each Non-Settling Insurer shall be entitled to all rights as are provided under the terms of its Non-Settling Insurer Policies as if the Tort Claim had never been assessed for distribution purposes by the Trust.

**(d)**    After the Effective Date, upon consent of the Trustee, a Person may become a Settling Insurer if the Bankruptcy Court, after notice and hearing, approves the agreement between the Person, the Reorganized Debtor and the Trustee. After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such agreement. Upon the Bankruptcy Court's entry of a Final Order approving such agreement, Exhibit N shall be amended by the Trustee to include such Person. Any such Person shall have all of the rights, remedies and duties of a Settling Insurer notwithstanding that such Person originally may have been a Non-Settling Insurer under any provision of the Plan. Such rights, remedies and duties shall include the terms and conditions of the Channeling Injunction and Supplemental Settling Insurer Injunction. The Bankruptcy Court's retained jurisdiction to approve an agreement under this Article shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

**8.2**    **ESTIMATIONS/ASSESSMENTS ARE NOT BINDING**. Estimations of Class 3 and Class 4B Claims for purposes of voting, and the determination of qualification, assignment of points, and payment of distributions of Tort Claims under the Trust Distribution Plan:

(a)      Shall not (i) constitute an admission of liability by any Person with respect to such Claims; (ii) have any res judicata or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Claims; (iv) be used by any third-party as a defense to any alleged joint liability; or (v) otherwise prejudice any rights of the Trust, Protected Parties, Settling Insurers, Non-Settling Insurers, and Claimants in all other contexts or forums;

(b)      Shall be without prejudice to any and all rights of the Trust, the Diocese, the Reorganized Debtor, other Protected Parties, the Non-Settling Insurers and Tort Claimants in all other contexts and forums and shall not be deemed to be a determination of liability of the Diocese or a determination of whether, or the extent to which, such claim is covered under any Non-Settling Insurer Policy. The fact that a claim has been estimated for distribution purposes has no res judicata or collateral estoppel effect and is not a binding determination on any issue or the creation of a liquidated non-bankruptcy claim. The assessment by the Tort Claims Reviewer under the Trust Distribution Plan shall have no effect upon any "no action" provisions contained in any Non-Settling Insurer Policy to the extent any such provision remains enforceable by a Non-Settling Insurer under applicable law. Rather, the liability of the Diocese, the Reorganized Debtor, or any other Protected Party and the amount owed by the Diocese, the Reorganized Debtor, other Protected Parties, and any Non-Settling Insurer on any Class 3 or Class 4B Claim, shall be determined by: (i) the amount of any court judgment obtained by the Class 3 or Class 4B Claimant; or (ii) through a settlement agreement either to which such Non-Settling Insurer has consented or, if such Non-Settling Insurer has not consented, a settlement agreement which does not breach any duty of the Trust, Trustee, Diocese, the Reorganized Debtor, or any other Protected Party to the Non-Settling Insurer under the respective Non-Settling Insurer Policy or applicable law.

**8.3     RIGHTS UNDER INSURANCE SETTLEMENT AGREEMENTS.** The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement and those provisions of the Approval Order approving such Insurance Settlement Agreement, the Plan and the Confirmation Order.

**8.4     THE PLAN IS NEUTRAL AS TO NON-SETTLING INSURER POLICIES**. For the avoidance of doubt, solely with respect to the Non-Settling Insurers, nothing in the Plan, the Trust Agreement, the Trust Distribution Plan, the Confirmation Order, or any other order of the Bankruptcy Court to the contrary (including any other provision that purports to be preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and defenses of any Non-Settling Insurer, any Protected Party, the Trust, or any other insureds under Non-Settling Insurer Policies in any manner, including any defenses to any claim for insurance; (ii) shall constitute a settlement or resolution of any Protected Party's liability to a Tort Claimant; (iii) shall in any way operate to, or have the effect of, impairing or having any res judicata, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurer Policy; or (iv) shall otherwise determine the applicability or nonapplicability of any provision of any Non-Settling Insurer Policy and any such

- 53 -

rights and obligations shall be determined under the Non-Settling Insurer Policy and applicable law.

**8.5    THE DIOCESE'S OBLIGATIONS SURVIVE**. Notwithstanding the transfer of the Transferred Insurance Interests to the Trust, the Diocese shall not be relieved of its duties or obligations under any Non-Settling Insurer Policies (except as provided to the contrary in any subsequent Insurance Settlement Agreement), and shall continue to perform such duties as required by such Non-Settling Insurer Policies and applicable law.  If the Trust asserts any claim that the Diocese has breached such duties or obligations under the Non-Settling Insurer Policies resulting in a loss of coverage, it shall give the Diocese notice and an opportunity to cure any alleged breach, and in any event, the Diocese shall not be liable for any alleged breach resulting in a loss of coverage except to the extent that (i) the breach relates to post-Effective Date conduct of the Diocese, and (ii) the Diocese willfully or intentionally fails to comply with its continuing obligations under the Non-Settling Insurer Policies.  In addition, any such claim will not be automatically allowed; the Diocese will have the right to defend against such claim.

**8.6    TRUST POWERS WITH RESPECT TO TORT CLAIMS AND NON-SETTLING INSURERS**.

(a)    A Tort Claimant or the Trust, as applicable, may enter into a settlement of a Tort Claim allowed by applicable non-bankruptcy law including but not limited to settlements consistent with *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982) or *Drake v. Ryan*, 514 N.W.2d 785 (Minn. 1994), and may enter into an arrangement with Tort Claimant's counsel providing such counsel will receive reasonable compensation from any recovery from a Non-Settling Insurer as provided in Section 4.3

(b)    The Trustee may use the Trust Assets to prosecute litigation against the Non-Settling Insurers.

(c)    If the Trust successfully resolves an insurance coverage dispute with a Non-Settling Insurer or otherwise receives a recovery of insurance proceeds relating to Tort Claim(s) from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Tort Claims, pursuant to the Trust Distribution Plan. In such event, and on a periodic basis accumulating all such recoveries, the Trust shall make supplemental payments to Tort Claimants in accordance with the Trust Agreement and Trust Distribution Plan.

**ARTICLE IX**
**INSURANCE POLICIES**

**9.1    CONTINUATION OF INSURANCE POLICIES**. Except to the extent any Diocese Entity Insurance Policies are bought back as set forth in and pursuant to any Insurance Settlement Agreement or as otherwise provided by the terms of the Plan, all Diocese Entity Insurance Policies (including, without limitation, any Non-Implicated Insurance Policies) shall, as applicable, either be deemed assumed by the Reorganized Debtor pursuant to Sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Diocese Entity Insurance Policy is or was an executory contract of the Diocese, or continued in accordance with its terms

- 54 -

pursuant to Section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Diocese Entity
Insurance Policy is not an executory contract of the Diocese, such that each of the parties'
contractual, legal, and equitable rights under each such Diocese Entity Insurance Policy shall
remain unaltered. All known Diocese Entity Insurance Policies are listed on Exhibit I. To the extent
that any or all such Diocese Entity Insurance Policies are considered to be executory contracts,
then the Plan shall constitute a motion to assume such Diocese Entity Insurance Policies in
connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order
shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the
Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in
the best interest of the Debtor, the Estate, and all parties in interest in this Chapter 11 case. Unless
otherwise determined by the Bankruptcy Court pursuant to an order which becomes a Non-
Appealable Order or agreed to by the parties thereto prior to the Effective Date, no payments are
required to cure any defaults of the Diocese existing as of the Effective Date with respect to any
Diocese Entity Insurance Policy. The Diocese reserves the right to seek rejection of any Diocese
Entity Insurance Policy or other available relief prior to the Effective Date.

**9.2    THE PLAN IS NEUTRAL AS TO NON-IMPLICATED INSURANCE
POLICIES**. For the avoidance of doubt, solely with respect to the Non-Implicated Insurer, nothing
in the Plan, the Trust Agreement, the Trust Distribution Plan, the Confirmation Order, or any other
order of the Bankruptcy Court to the contrary (including any other provision that purports to be
preemptory or supervening or grants a release): (i) shall affect, impair, or prejudice the rights and
defenses of the Non-Implicated Insurer, any Protected Party, or any other insureds under Non-
Implicated Insurance Policies in any manner, including any defenses to any claim for insurance;
(ii) shall constitute a settlement or resolution of any Protected Party's liability to a Class 4A
Claimant; (iii) shall in any way operate to, or have the effect of, impairing or having any res
judicata, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or
contractual rights or obligations under any Non-Implicated Insurance Policy; or (iv) shall
otherwise determine the applicability or nonapplicability of any provision of any Non-Implicated
Insurance Policy and any such rights and obligations shall be determined under the Non-Implicated
Insurance Policy and applicable law.

**ARTICLE X**
**PROCEDURES FOR GENERAL CLAIMS ADMINISTRATION**

**10.1    RESERVATION OF RIGHTS TO OBJECT TO NON-TORT CLAIMS**. Unless
a Claim is expressly described as an allowed Claim pursuant to or under the Plan, or otherwise
becomes an allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized
Debtor or the Trustee, as applicable, shall be deemed to have a reservation of any and all rights,
Interests, and objections of the Diocese, the UCC, or the Estate to any and all Claims and motions
or requests for the payment of or on account of Claims, whether administrative expense, priority,
secured, or unsecured, including any and all rights, Interests and objections to the validity or
amount of any and all alleged Claims, Liens, and Interests, whether under the Bankruptcy Code,
other applicable law, or contract. The failure to object to any Claim in this Chapter 11 case shall
be without prejudice to the Reorganized Debtor's or the Trustee's, as applicable, right to contest
or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when
and if such Claim is sought to be enforced by the holder of such Claim.

**10.2    OBJECTIONS TO NON-TORT CLAIMS**. Prior to the Effective Date, the Diocese shall have the authority to pursue any objection to the allowance of any non-Tort Claim. From and after the Effective Date, the Reorganized Debtor will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to non-Tort Claims (including those Claims that are subject to objection by the Diocese as of the Effective Date); provided, however, that nothing in this Section shall affect the right of any party-in-interest (including the Reorganized Debtor and the Trustee) to object to any non-Tort Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to non-Tort Claims will be filed and served not later than thirty (30) days after the later of: (i) the Effective Date, or (ii) the date such Claim is filed. Such deadline or any Bankruptcy Court approved extension thereof, may be extended upon request by the Reorganized Debtor by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.  Notwithstanding the foregoing, there shall be no deadline for the Reorganized Debtor to object to Class 4A or Class 6 Claims.

**10.3    DETERMINATION OF CLAIMS**. From and after the Effective Date, any Claim that is not a Tort Claim, and as to which a Proof of Claim or motion or request for payment was timely filed in this Chapter 11 case, or deemed timely filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending)), liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Diocese, the Reorganized Debtor, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, Interests, or Causes of Action that the Debtor or the Reorganized Debtor may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.

**10.4    NO DISTRIBUTIONS PENDING ALLOWANCE**. No payments or distributions will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by an order which has become a Non-Appealable Order, and the Disputed Claim has become an allowed Claim.

**10.5    CLAIM ESTIMATION**. To effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 case, with respect to Disputed Claims, the Diocese (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed

- 56 -

Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to Section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.

## ARTICLE XI
## DISTRIBUTIONS UNDER THE PLAN

**11.1    PAYMENT DATE**. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a business day, such payment or distribution shall instead be made, without interest, on the immediately following business day.

**11.2    UNDELIVERABLE DISTRIBUTIONS**. If payment or distribution to the holder of an allowed non-Tort Claim under the Plan is returned for lack of a current address for the holder or otherwise, the Reorganized Debtor shall file with the Bankruptcy Court the name, if known, and last known address of the holder and the reason for its inability to make payment. All allowed Claims paid as provided in this Section shall be deemed addressed to the same extent as if payment or distribution had been made to the holder of the allowed Claim with no recourse to the Reorganized Debtor or property of the Reorganized Debtor. If, after the passage of six (6) months, the payment or distribution still cannot be made, the Reorganized Debtor shall make the payment to the Trust. All allowed Claims paid as provided in this Section shall be deemed satisfied and released, with no recourse to the Reorganized Debtor or property of the Reorganized Debtor upon payment to the Trust, to the same extent as if payment or distribution has been made to the holder of the allowed Claim.

**11.3    SETOFFS**. The Reorganized Debtor or the Trustee, as applicable, may, to the extent permitted under applicable law, set off against any allowed Claim and the distributions to be made pursuant to the Plan on account of such allowed Claim, the Claims, rights and Causes of Action of any nature that the Reorganized Debtor or the Trustee, as applicable, may hold against the holder of such allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor or the Trustee, as applicable, of any such Claims, rights, and Causes of Action that the Reorganized Debtor or the Trustee, as applicable, possesses against such holder.

**11.4    NO INTEREST ON CLAIMS**. Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between a claimant and the Diocese, the Reorganized Debtor, or the Trust, and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and claimants shall not be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order, or Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective

- 57 -

Date to the date a final distribution is made when and if such Disputed Claim becomes an allowed Claim.

**11.5    WITHHOLDING TAXES**. The Reorganized Debtor and the Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtor and the Trust may require that the holder of an allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

## ARTICLE XII
## EFFECTIVENESS OF THE PLAN

**12.1    CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE**. The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

(a)    **Entry of Confirmation Order**. The Confirmation Order has become a Non-Appealable Order;

(b)    **Plan Documents.** All Schedules and Exhibits to the Plan shall have been duly completed by the Plan Proponents and filed with the Court and all agreements and releases referred to in the Plan shall have been duly executed by all parties thereto and filed with the Court, in each case in form and substance satisfactory to the Debtor, the Committee, and LMI and Interstate; and

(c)    **The Trust**. The Trust shall have been formed.

**12.2    NOTICE OF EFFECTIVE DATE**. The Plan Proponents shall file a Notice of Effective Date with the Bankruptcy Court within three (3) days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**12.3    EFFECT OF NON-OCCURRENCE OF CONDITIONS**. If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the disclosure statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties or the Settling Insurers; (ii) prejudice in any manner the rights of the Protected Parties, the Trust or the Settling Insurers; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or the Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Debtor; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.

**ARTICLE XIII**
**EFFECTS OF CONFIRMATION**

**13.1   DISSOLUTION OF UCC**. On the Effective Date, the UCC shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in this Chapter 11 case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

**13.2   DISCHARGE AND INJUNCTION**.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Diocese will be discharged from, and its liability will be extinguished completely in respect to, any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, based on conduct occurring before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including all Claims and debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under the Bankruptcy Code Section 501, such Claim is allowed under Bankruptcy Code Section 502, or the holder of such Claim has accepted the Plan.

Tort Claimants and the Trust shall be permitted to name the Diocese in any proceeding to resolve whether the Diocese has liability for Tort Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers. The discharge hereunder does not apply to, and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Diocese's liability for Tort Claims under Non-Settling Insurer Policies. The limitations otherwise set forth in the Plan on a Tort Claimant's recovery will not in any way limit the Non-Settling Insurers' obligations under the Non-Settling Insurer Policies or the Tort Claimants' and/or Trust's recoveries against the Non-Settling Insurers for the Non-Settling Insurers' conduct in connection with the defense or settlement of a Tort Claim, including on any judgments in excess of the limits of a Non-Settling Insurer Policy.

**13.3   CHANNELING INJUNCTION**. **Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.**

      (a)      **In consideration of the undertakings of the Protected Parties and Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurers, and pursuant to Section 105 of the Bankruptcy Code:**

- 59 -

1. **any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and**

2. **all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:**

   (i) **commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;**

   (ii) **enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurers, or any other Person;**

   (iii) **creating, perfecting or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;**

   (iv) **asserting, implementing or effectuating any Channeled Claim of any kind against:**

      1. **any obligation due any of the Protected Parties or Settling Insurers;**

      2. **any of the Protected Parties or Settling Insurers; or**

      3. **the property of any of the Protected Parties or Settling Insurers.**

   (v) **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and**

   (vi) **asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an**

obligation due to any of the Protected Parties, the Settling Insurers, or the property of any of the Protected Parties or the Settling Insurers.

Notwithstanding anything to the contrary in this Article or the Plan, Tort Claimants and the Trust shall be permitted to name the Diocese and any other Protected Party in any proceeding to resolve whether the Diocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be turned over to the Trust for handling in accordance with Sections 6.14(i) and (j).

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims as provided in this Section 13.3 shall inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

The Channeling Injunction and Supplemental Insurer Injunction will not be for the benefit of Non-Settling Insurers, including the Insolvent Insurers. Nothing herein will be construed to authorize a violation of any stay that is applicable in light of the pending insolvency proceedings with respect to such Insolvent Insurers.

**13.4 EXCULPATION; LIMITATION OF LIABILITY.** From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim, Cause of Action or liability to any other Exculpated Party, to any holder of a Claim, or to any other party in interest, for any act or omission that occurred during and in connection with this Chapter 11 case or in connection with the preparation and filing of this Chapter 11 case, the formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, and the administration of the Plan or the property to be distributed under the Plan, except for Claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Non-Appealable Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the UCC and the Diocese and their respective officers, board and committee members, employees, attorneys, financial advisors, and other Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code and the Channeling Injunction.

- 61 -

**13.5     TIMING**. The injunctions, releases, and discharges (including the Channeling Injunction and Supplemental Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Approval Orders, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and the other conditions to effectiveness of the Insurance Settlement Agreement are fully met.

**13.6     NO BAR ON CERTAIN CLAIMS**. Notwithstanding the foregoing, nothing in this Plan shall be construed to bar (a) a Claim based on Abuse against a Person who is not a Protected Party or a Settling Insurer (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing clause under an insurance policy other than the Settling Insurer Policies; or (c) a Tort Claim against a Protected Party that is not released or enjoined under the Plan, to the extent set forth herein.

**ARTICLE XIV**
**INCORPORATION OF CHILD PROTECTION PROTOCOLS**

**14.1     CHILD PROTECTION PROTOCOLS**. The Child Protection Protocols are incorporated into the Plan.

**ARTICLE XV**
**THE REORGANIZED DEBTOR**

**15.1     CONTINUED CORPORATE EXISTENCE**. The Diocese will, as the Reorganized Debtor, continue to exist after the Effective Date as a separate entity in accordance with Minn. Stat. Section 315.16 having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

**15.2     VESTING OF ASSETS**. In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Reorganization Assets shall vest in the Reorganized Debtor (or such other entity or entities specified by the Debtor in a Supplemental Plan Document, and subject to approval by the Bankruptcy Court at the confirmation hearing) on the Effective Date free and clear of all liens, Claims, and Interests of creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order. The Reorganized Debtor is expressly authorized, as of the Effective Date, to transfer legal title to the Inadvertently Titled Real Property to the respective equitable title owners of such properties without further order of the Bankruptcy Court.

**15.3     IDENTITY OF OFFICERS OF REORGANIZED DEBTOR**. In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed

- 62 -

to serve as the corporate Members of the Reorganized Debtor and the persons proposed to serve as directors and officers of the Reorganized Debtor on and after the Effective Date are set forth on Exhibit J.

**15.4   FURTHER AUTHORIZATION**. The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, rulings, and other assistance as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

**16.1   RETENTION OF JURISDICTION**.

(a)   By the Bankruptcy Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Sections 1334 and 157, on and after the Effective Date, the Bankruptcy Court shall retain: (i) original and exclusive jurisdiction over this Chapter 11 case, (ii) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in this Chapter 11 case, and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to this Chapter 11 case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

1.  over disputes concerning the ownership of Claims;

2.  over disputes concerning the distribution or retention of assets under the Plan;

3.  over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims;

4.  over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Diocese, the Estate, or Trust, or property abandoned or transferred by the Diocese, the Estate, or the Trust;

5.  over motions to approve any Insurance Settlement Agreements entered into after the Effective Date by the Trustee;

6.  over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets;

7.  the removal of the Trustee and the appointment of a successor Trustee;

8.  over matters relating to the subordination of Claims;

- 63 -

9.  to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10. to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

11. to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to this Plan and any Insurance Settlement Agreement;

12. over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

13. over requests for allowance of payment of Claims entitled to priority under Sections 507(a)(2) and 503(b)(9) of the Bankruptcy Code and any objections thereto;

14. over all Fee Applications;

15. over matters concerning state, local, or federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

16. over conflicts and disputes among the Trust, the Reorganized Debtor, and holders of Claims, including holders of Class 3, Class 4A or Class 4B Claims;

17. over disputes concerning the existence, nature, or scope of the Diocese's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

18. to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Diocese or its property, the Reorganized Debtor or its property, the Estate or its property, the Trust or its property, Trustee, the Professionals, or the Confirmation Order;

19. to enter a Final Decree closing the Chapter 11 case;

20. to enforce all orders previously entered by the Bankruptcy Court; and

21. over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or the Plan, including, but not limited to, disputes arising out

- 64 -

of or related to the Transferred Insurance Interests or the rights and obligations of the Non-Settling Insurers on and after the Effective Date.

(b)      By the District Court. Pursuant to Sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. Section 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to this Chapter 11 case.

(c)      Actions to Collect Amounts Owed Pursuant to the Plan. Notwithstanding anything to the contrary in this Section, the Diocese, the Reorganized Debtor and the Trustee may, but are not required to, commence an adversary proceeding to collect amounts owed pursuant to the Plan for any settlements embodied in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with this Plan. Any such action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

(d)      Case Closure. The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing this Chapter 11 case. In an action involving the Trust, any costs incurred in reopening the Chapter 11 case, including any statutory fees will be paid by the Trustee from the Trust Assets in accordance with an order of the Bankruptcy Court.

**16.2   ASSUMPTION OF EXECUTORY CONTRACTS**. On the Effective Date, except for any executory contract: (i) that was previously rejected by an order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; or (ii) that is subject to a pending motion to reject before the Bankruptcy Court, and except as otherwise provided in the Plan, Confirmation Order, or Insurance Settlement Agreements, each executory contract entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be assumed pursuant to Sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date with no cure amount due. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**16.3   INDEMNIFICATION OF MEMBERS, MANAGERS, OFFICERS, AND EMPLOYEES**. The obligation of the Diocese to indemnify any individual serving at any time on or prior to the Effective Date, as one of its officers, employees, council members, or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the Diocese's constituent documents or by a written agreement with the Debtor or under the laws of the State of Minnesota pertaining to the Diocese, will be deemed and treated as executory contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code Section 365 as of the Effective Date, with no cure amount due. Notwithstanding the foregoing, under no circumstances will the Diocese, the Trust, or the Reorganized Debtor assume or be responsible for any alleged indemnification of any Person against whom the Diocese has determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

- 65 -

**16.4     DEFENSE AND INDEMNITY FOR COVERED NON-TORT CLAIMS**. After the Effective Date, the Reorganized Debtor will defend and indemnify any Protected Party with respect to any Covered Non-Tort Claim and, if so required by any Insurance Settlement Agreements, will defend and indemnify the Settling Insurers with respect to any Covered Non-Tort Claims.  As to any Claim against the Trust that qualifies as a Covered Non-Tort Claim, the Reorganized Debtor will also undertake on behalf of the Trust the enforcement of the injunctions set forth in Articles VII and XIII, will defend the Covered Non-Tort Claim, and, if judgment is entered on such Claim, will indemnify the Trust for any liability for such Claim.  The Reorganized Debtor may not seek insurance coverage for the Claims defended or indemnified under this Section from the Settling Insurers under any Settling Insurer Policy. Nothing in this provision or any other Plan provision is intended to suggest that any Person is entitled to obtain a judgment on a Covered Non-Tort Claim or Channeled Claim, that such judgment would be covered under any Settling Insurer Policy, or that any Person is entitled to seek coverage for such judgment against any Protected Party or Settling Insurer in violation of the discharge, Channeling Injunction, or Supplemental Settling Insurer Injunction, as applicable. For the avoidance of doubt, nothing contained in this Section or the Plan is intended to provide, expand, modify or add coverage for the Diocese or any other Protected Party under any Settling Insurer Policy to cover the Diocese's indemnification of any Covered Non-Tort Claims.

**16.5     RESERVATION OF RIGHTS**. In accordance with the provisions of this Plan, the Diocese reserves the right to sell property of the Estate or compromise Causes of Action on behalf of the Estate at any time prior to the Effective Date, subject to Bankruptcy Court approval. Notice of any such sale or compromise sought as part of the Plan shall be filed as a Supplemental Plan Document, and approval of such sale or settlement shall be considered at the confirmation hearing or as soon thereafter as is practicable.

**16.6     NON-APPEALABLE ORDER**. Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Non-Appealable Order may be jointly waived by the Plan Proponents upon written notice to the Bankruptcy Court provided that Plan Proponents first obtain the consent of all Diocesan Settling Insurers.

**16.7     AMENDMENTS AND MODIFICATIONS**. The Plan Proponents may jointly modify the Plan at any time prior to the confirmation hearing in accordance with Section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponents may jointly modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding any provision of this Plan to the contrary, the provisions of Article VII and Sections 13.2 through 13.4 are intended to be an integrated set of provisions that implement and supplement the Insurance Settlement Agreements that may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

**16.8     U.S. TRUSTEE REPORTS**. From the Effective Date until the case is closed, the Reorganized Debtor shall, within thirty (30) days of the end of each fiscal quarter, file with the Bankruptcy Court and submit to the U.S. Trustee, quarterly reports setting forth all receipts and

- 66 -

disbursements as required by the U.S. Trustee guidelines. The Reorganized Debtor will not be required to file monthly operating reports or provide copies of bank account statements.

**16.9   NO WAIVER**. The failure of the Diocese to object to any Claim for purposes of voting shall not be deemed a waiver of the Diocese's, the Reorganized Debtor's, or the Trustee's right to object to such Claim, in whole or in part.

**16.10   TAX EXEMPTION**. Pursuant to Section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under the Plan, including any such acts by the Diocese (if prior to the Effective Date), and the Reorganized Debtor (if on or after the Effective Date), including any subsequent transfers of property by the Reorganized Debtor, including without limitation the transfer by the Reorganized Debtor of title to the Inadvertently Titled Real Property as referenced in Section 15.2 above, and shall not be taxed under any law imposing a stamp tax, transfer tax, state deed tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp, tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**16.11   NON-SEVERABILITY**. Except as specifically provided herein, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of the Plan may be stricken, altered, or invalidated, except by amendment of the Plan by the Plan Proponents.

**16.12   REVOCATION**. The Plan Proponents reserve the right to revoke and withdraw the Plan prior to the Confirmation Date.

**16.13   CONTROLLING DOCUMENTS**. In the event and to the extent that any provision of the Plan or Trust Agreement is inconsistent with any provision of the disclosure statement, the provisions of the Plan or Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Agreement (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of this Plan, this Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.

**16.14   GOVERNING LAW**. Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), and unless specifically stated, the rights, duties, and obligations arising under the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) shall be governed by, and construed and enforced in accordance with, the laws of the State of Minnesota, without giving effect to conflicts of law principles.

**16.15   NOTICES**. Any notices or requests by parties in interest under or in connection with the Plan shall be in writing and served either by: (i) certified mail, return receipt requested,

- 67 -

postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to the Diocese or the Reorganized Debtor:

> Diocese of Winona-Rochester
> c/o Andrew D. Brannon, COO/CFO
> 55 West Sanborn Street
> Winona, MN 55987

> with a copy to:

> Restovich Braun & Associates
> c/o Thomas R. Braun
> 117 East Center Street
> Rochester, MN 55904

> and

> Bodman PLC
> c/o Robert J. Diehl, Jr.
> 6th Floor at Ford Field
> 1901 St. Antoine Street
> Detroit, MI 48226

If to the Trust or the Trustee:

> DW Harrow & Assoc., LLC
> 1880 State Highway 309
> Kerens, TX 75144

**16.16  FILING OF ADDITIONAL DOCUMENTS**. At any time before substantial consummation, the Diocese, the Trust, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

**16.17  POWERS OF OFFICERS**. The officers of the Diocese or the Reorganized Debtor, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**16.18  DIRECTION TO A PARTY**. On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

- 68 -

**16.19   SUCCESSORS AND ASSIGNS**. The Plan shall be binding upon and inure to the benefit of the Diocese and its successors and assigns, including the Reorganized Debtor. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator successor, or assign of such entity.

**16.20   CERTAIN ACTIONS**. By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Diocese under the Plan, including: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Diocese or organizational structure of the Diocese shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Diocese.

**16.21   FINAL DECREE**. Once the Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Reorganized Debtor, Trustee or such other party as the Bankruptcy Court may designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 case.

**16.22   PLAN AS SETTLEMENT COMMUNICATION**. The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and Causes of Action that are Disputed as to validity or amount (including Tort Claims and the Insurance Litigation), except as otherwise provided above. Accordingly, the Plan, the disclosure statement, and any communications regarding the Plan or the disclosure statement are subject in all respects to Federal Rule of Evidence 408 and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action. Nothing herein or in any confirmed Plan is intended to constitute a compromise of Tort Claims.

**16.23   OTHER RIGHTS**. Except as expressly set forth in this Plan, nothing in the Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Minnesota law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Tort Claims.

**ARTICLE XVII**
**BANKRUPTCY RULE 9019 REQUEST**

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents request approval of all compromises and settlements included in the Plan.

- 69 -

# ARTICLE XVIII
## CONFIRMATION REQUEST

The Plan Proponents request confirmation of the Plan under Section 1129 of the Bankruptcy Code with respect to any impaired class that does not accept the Plan or is deemed to reject the Plan.

CORE/3515029.0002/166654194.1
Bodman_17817138_4

[Signature page for Plan of Reorganization]

**THE DIOCESE OF WINONA-ROCHESTER**


/e/Very Rev. William D. Thompson
Very Rev. William D. Thompson


**RESTOVICH BRAUN & ASSOCIATES**

/e/Thomas R. Braun
Thomas R. Braun (#350631)
Christopher W. Coon (#390083)
117 East Center Street
Rochester, MN 55904
(507) 216-8652
thomas@restovichlaw.com
christopher@restovichlaw.com

and


**BODMAN PLC**

/e/Robert J. Diehl, Jr.
Robert J. Diehl, Jr. (P31264)
Brian R. Trumbauer (P57747)
Jaimee L. Witten (P70068)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
rdiehl@bodmanlaw.com
btrumbauer@bodmanlaw.com
jwitten@bodmanlaw.com

**ATTORNEYS FOR THE DIOCESE OF
WINONA-ROCHESTER**

[Signature page for Plan of Reorganization]

Respectfully submitted,

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**

/e/James W. Keenan
By: James W. Keenan
Its: Chairperson

and

/e/Robert T. Kugler
**STINSON, LLP**
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
FOR THE DIOCESE OF WINONA-
ROCHESTER**

# EXHIBIT A

## Unknown Claims Representative's Report and Recommendations

(see attached)

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

The Diocese of Winona-Rochester

Debtor.

Case No. 18-33707

Chapter 11

## UNKNOWN CLAIMS REPRESENTATIVE'S REPORT AND RECOMMENDATIONS

Michael R. Hogan, the Unknown Tort Claims Representative ("UCR"), makes the following Report and Recommendations.

I was appointed UCR on May 28, 2021 by the United States Bankruptcy Court for the District of Minnesota in the above-titled proceeding (Order Employing Unknown Claims Representative, 05/28/21, Doc. 280) (the "UCR Order"). This proceeding seeks to reorganize the Diocese of Winona-Rochester (the "Debtor") under Chapter 11 of the United States Bankruptcy Code. It was filed to resolve approximately 147 child sex abuse claims. On May 19, 2021, the Debtor and the Official Committee of Unsecured Creditors (the "Committee") filed their First Amended Joint Chapter 11 Plan of Reorganization of the Diocese of Winona-Rochester (the "Plan") (Doc. 269). The Debtor seeks, in part, to compensate any Unknown Tort Claimants who may assert sexual abuse claims after the claims filing deadline and who can also satisfy the other conditions for compensation under the Plan.

As the representative of Unknown Tort Claimants, and in accordance with the UCR Order, I have evaluated the likely number of unknown sexual abuse claimants, if any, who may come forward after the Plan is confirmed, and the likely value of the unknown claims they may assert against the Debtor. Specifically, in a comprehensive effort to anticipate the number of Unknown

Tort Claims (as defined in the Plan) and determine the fair and appropriate Unknown Tort Claims trust fund, I have, among other things:

1. Reviewed the experiences of other dioceses and religious orders that have reorganized under Chapter 11 of the Bankruptcy Code in response to large numbers of child sex abuse claims;

2. Reviewed the extensive outreach of principal claimants' counsel in Minnesota;

3. Reviewed the comprehensive actual notice and publication efforts concerning possible claims, as proposed by the Debtor and ordered by the Bankruptcy Court;

4. Studied the pattern of claims, the timing of claims in relation to incidents of abuse, and the relative dates of incidents of abuse;

5. Considered the number and pattern of pre-petition claims, the number and pattern of claims filed since the bankruptcy petition was filed, and the number of claims filed since the last date established by the Bankruptcy Court for creditors to file claims;

6. Considered the efforts of the Debtor to encourage potential abuse claimants to file claims;

7. Considered the nature and allegations of the 147 claims filed in the Chapter 11 proceeding;

8. Considered the 2004 and 2011 reports by the John Jay College of Criminal Justice concerning sexual abuse of minors; and

9. Considered possible affirmative defenses available to the Debtor for unknown claims, but which may not be available with regard to claimants with timely-filed claims in the bankruptcy proceeding.

In this case, a number of child sexual abuse lawsuits were filed against the Debtor before the bankruptcy petition was filed. One-hundred forty-three individual proofs of claim were filed *after* the bankruptcy petition was filed but by April 8, 2019, the last date allowed by the Bankruptcy

Court to file timely claims in this proceeding. A further four proofs of claim have been filed after that date.

Of those claimants who identified dates of initial abuse, approximately 97% occurred from the 1940s through the 1980s. More than 99% of the alleged abuse had occurred by the year 2000. There is only one allegation of initial abuse after that year, and that victim was an adult.

Finally, 21 of the total alleged abuse victims were female.

The Bankruptcy Court approved a claim form, established a deadline for filing proofs of claims, and ordered extensive notice to potential claimants in Orders filed December 7, 2018 (Doc. 51) and February 2, 2019 (Doc. 94). Counsel for the Debtor filed several certificates of service demonstrating compliance with those Orders (Docs. 74, 75, 77, 84 and 93).

Notice was given, as ordered, to relevant government officials and offices.

Notice was posted and published, as ordered, in all Diocesan facilities and publications.

The Debtor caused notices to be published, as ordered, in numerous print and electronic media.

Notice was posted, as ordered, on the websites of law firms Jeff Anderson and Associates PA, Stinson LLP and the Noaker Law Firm, LLC.

Notice was served, as ordered, on numerous medical and psychological treatment and therapy practitioners and groups.

Notice was also served on many other individuals named in the Order.

In addition, the law firm of Jeff Anderson and Associates PA, which represents 111 of the 147 claimants, has done extensive outreach regarding the claims filing date, and local media have extensively covered this proceeding as a result. The Minneapolis Star Tribune also covered the commencement of the case.

These outreach efforts by the Debtor and principal claimants' counsel are among the most extensive in my experience working with several other Catholic dioceses, including the Archdiocese of St. Paul and Minneapolis, the Diocese of Duluth, the Crosier Fathers and Brothers case, and the Diocese of St. Cloud. I do note that outreach to claimants was also extremely extensive in the similar cases in Montana, in part because there were three similar recent overlapping Chapter 11 proceedings in that state, which has a dispersed and relatively low population.

Studies conducted by the John Jay College of Criminal Justice in 2004 and 2011 also provide support for the position that most claims against the diocese have already been brought. "The Nature and Scope of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States 1950-2002" ("the 2004 Report") includes the following statistical findings:

1. Over 70% of sexual abuse allegations were made within 30 years after the alleged abuse began.

2. 75% of the events of alleged sexual abuse occurred between 1960 and 1984. [In this proceeding, approximately 85% of abuse initially occurred between 1960 and 1984.]

3. Four out of five victims were male. [Approximately 14% of the victims here are female.]

4. More abuse occurred in the 1970s than any other decade. [The abuse reported here surged in the 1960s and 1970s.]

5. As estimated from the study data, 2.7% of all priests in religious ministry were accused of alleged sexual abuse.

6. 89.5% of all alleged abusers were born before 1950.

7. Only 5.5% of all alleged abusers committed their first offense at the age of 60 or older.

8. The average age of a priest at the first allegation of abuse was 39, and the median age was 35.

9. 149 priests with 10+ victims accounted for 26% of all incidents reported in the study. [In this proceeding, sexual perpetrators with seven or more victims accounted for 78% of all reported abuse, including one priest with an astounding 46 claims naming him. All of these perpetrators have long ago been permanently removed from ministry, are incarcerated, or have died.]

10. A precipitous decline in incidents of abuse by year of occurrence took place in 1985. [Also true here.]

"The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2010" ("the 2011 Report") contains, among other points, the following relevant findings:

1. Researchers could not point to one single cause, as neither celibacy nor homosexuality were the causes of the abuse. Social and cultural changes in the 1960s and 1970s manifested in increased levels of deviant behavior in the general society and also among priests.

2. The count of incidents per year increased steadily from the mid-1960s through the late-1970s, then declined in the 1980s and continues to remain low.

3. New reports (post-2002) have confirmed initial estimates that the distribution of incidents is stable.

4. At the time of the peak and subsequent decline in sexual abuse incidents, there was a substantial increase in knowledge and understanding in American society about victimization and the harm of child sexual abuse. Changes were made in statutes related to rape and sexual abuse of children and in reporting requirements of child abuse and neglect,

an understanding of the cause of sexual offending advanced, and research related to the treatment of sexual abusers was expanded.

The allegations of initial abuse in this proceeding roughly follow the statistics in the John Jay reports. The allegations of initial abuse (where dates were given) by decade are as follows:

| | | |
|---|---|---|
| 1940s | - | 1 |
| 1950s | - | 11 |
| 1960s | - | 51 |
| 1970s | - | 55 |
| 1980s | - | 14 |
| 1990s | - | 3 |
| 2000s | - | 0 |
| 2010s | - | 1 |

Unknown Tort Claims may be subject to affirmative defenses that are not applicable to claims filed by April 8, 2019, the last date set by the Bankruptcy Court for creditors to file proofs of claim, because of the aggregate nature of resolution of the timely-filed claims. These include the following:

1. Potential liability on the basis of negligence may require proof of foreseeability. The following type of questions could be posed: Would a prudent person see abuse as likely to occur, possibly from a 1960s or 1970s perspective? Would liability be imposed only after a finding of custody or control?

2. Would respondeat superior liability require a finding that abuse has been committed in the course and scope of a special relationship?

3. Would there be joint-and-several liability for acts of persons in other religious orders?

4. Would a finding of Diocese control be required for liability of the Diocese?

5. Were claimants fully compensated by awards from other religious orders?

6. Does the doctrine of laches limit certain claims?

7. Did claimants mitigate damages?

8. Is some evidence of claims excluded under the First Amendment to the United States Constitution?

9. Is there sufficient admissible evidence to allow the estate of a deceased claimant to pursue a claim on their behalf under Minnesota law?

10. Has a claimant filed a bankruptcy petition in the past, which may result in an abuse claim for damages constituting an asset of the bankruptcy estate?

The Chapter 11 sexual abuse cases filed by religious orders responding to large numbers of sexual abuse claims certainly have similarities, but they also have significant differences. I was a principal mediator for a similar proceeding concerning the Diocese of Portland several years ago, which was handled differently than this proposed settlement in that most of the money to pay claims was recovered through the settlement of ten insurance coverage cases and each of approximately 150 abuse claims was settled individually. Although there was substantial news coverage in that case, outreach by plaintiffs' counsel to prospective claimants was less extensive than here. In addition, bankruptcy judges now often mandate broad public outreach, as is true here. More appropriate recent comparisons in determining an amount to be set aside for unknown claimants include:

1. The settlement of the Society of Jesus, Oregon Province, Chapter 11 proceeding, in which the unknown claims trust was for an amount representing approximately eight percent of the aggregate for filed claims;

2. In another example, the unknown claimant trust fund for a similar proceeding in Alaska represented approximately five percent of the amount available for tort claimants;

3. The unknown claimant trust fund for a similar proceeding in Helena, Montana represented approximately six percent of the claims trust;

4. The unknown claimant trust fund for three similar Crosier entities in Minnesota represented approximately five percent of the amount available for tort claimants;

5. The unknown claimant trust fund for a similar proceeding in Gallup, New Mexico was recommended to be approximately ten-and-a-half percent of the fund.

6. The unknown claimant trust fund for a similar proceeding for the Diocese of Great Falls/Billings represented approximately 5% of the amount available for tort claimants.

I also note that, serving as UCR, I recommended the size of the unknown claims reserve in the Helena, Gallup, Crosier, and Great Falls/Billings cases. I recommended a somewhat greater proportional reserve for the Gallup proceeding because there were so few timely-filed claims from the several Native American reservations in the diocese, and it was reasonable to conclude more would be filed. In addition, the statute of limitations in New Mexico was substantially different and the discovery rules more liberal than in the proceedings in Minnesota with regard to discovery guidelines.

This case is unique in several ways. First, there has been extremely extensive outreach to the possible claimant population.

The last-in-time priest abuse victim in this proceeding alleges abuse in 2011. This victim was an adult when she was abused.

There are also a notable group of claims involving questionable or minor abuse claims. The presence of this group of claims is some evidence that outreach to possible claimants has indeed been thorough.

Comparing other religious order cases to the factors involved here indicates that it is unlikely that many compensable unknown claims will be filed in the future. Only four claims have so far been filed after the last date within which a claim could be timely filed, and the last of those was filed March 21, 2021. This is an indication that outreach to potential claimants was broad and thorough.

By far the most significant factor in projecting the number and amount of unknown claims here is the Minnesota Statute of Limitations. Unlike some other jurisdictions, discovery rules in Minnesota are rather rigid and strictly enforced. The only compensable claims are those that are no longer barred for any reason including, for example, the passage of legislation that revives such claims, or when a claimant turns 18 on or after the date that is thirty days prior to the applicable Proof of Claim Deadline in the Reorganization Case, or if the statute of limitations has expired or been tolled as of thirty days prior to the applicable Proof of Claim Deadline in the Reorganization Case, or if the claimant submits a Proof of Claim in accordance with the procedures in the applicable Plan. This is my fifth Minnesota diocesan or religious order case as UCR, and I have yet to see an unknown claim survive the statute of limitations absent a contrary provision in the plan. The First Amended Joint Chapter 11 Plan of Reorganization provides that the Diocese of Winona-Rochester retains liability for Unimpaired Unknown Tort Claims, occurring after June 30, 2002.

As defined in the First Amended Plan, "Unimpaired Unknown Tort Claim" means any Claim against any of the Protected Parties or the Non-Implicated Insurer that arises out of, relates

to, results from, or is in connection with, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Effective Date but after June 30, 2002, including any such Claim that seeks monetary damages or any other relief, under any theory of liability, including vicarious liability; respondeat superior; any fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, supervision, retention or misrepresentation; any other theory based on misrepresentation, concealment, or unfair practice; contribution; indemnity; public or private nuisance; or any other theory, including any theory based on public policy or any acts or failures to act by any of the Protected Parties, the Non-Implicated Insurer or any other Person for whom any of the Protected Parties are allegedly responsible, including any such Claim asserted against any of the Protected Parties in connection with this Chapter 11 case, which Claim was neither filed, nor deemed filed by the Claims Filing Date. [Class 4A claims]

I have been advised by the Debtor and the Committee that they intend to amend the First Amended Plan to provide that the Debtor will be responsible for funding into the Trust an additional amount as needed for Impaired Unknown Tort Claims, up to the Cap (defined below).

As defined in the First Amended Plan, "Impaired Unknown Tort Claim" means any Tort Claim that arose prior to July 1, 2002 that was neither filed, nor deemed filed by the Claims Filing Date, and is held by (i) an individual who has a Tort Claim that was barred by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any reason as of the Effective Date, including the enactment of legislation that revises previously time-barred Tort Claims; (ii) an individual who was incapable of knowing of the existence of his or her Tort Claim as of the Effective Date for any reason, including memory repression or memory suppression; or (iii) any other individual or class of individuals the

Unknown Tort Claims Representative can identify that would have a Tort Claim on or prior to the Effective Date. [Class 4B claims]

Experience also teaches that the settlement value of unknown claims may be substantially less than earlier-filed claims.

**Recommendations:**

I make the following recommendations with regard to establishing the Impaired Unknown Claims Trust, the estimate of unknown claims, and other parameters. I specifically reserve the right to revise these recommendations and to modify them after full review of any changes to the Disclosure Statement and Plan containing the provisions concerning any such unknown claims **trust**:

1.       I recommend that the Impaired Unknown Claims Trust fund be established in a trust similar in nature and substance to the Trust established to pay timely-filed claims.

2.       I recommend that, promptly after any Impaired Unknown Tort Claim is allowed and the Tort Claims Reviewer has determined the amount due to such claimant (a "Determined Claim"), the Diocese shall pay to the Trust an amount equal to the amount of the Determined Claim, but not to exceed $750,000 (the "Cap") in the aggregate for all Determined Claims.

3.       I recommend that the Diocese's obligation to fund the Impaired Unknown Claims Trust continue until the later of (i) the date that the Diocese has fully funded the Impaired Unknown Claims Trust (up to the Cap) or (ii) the occurrence of the fifth anniversary of the Effective Date.

4.       I recommend that, on the Effective Date, the Impaired Unknown Claims Trust will assume all liability for and pay all Impaired Unknown Tort Claims pursuant to the provisions of the Plan, Plan documents, Confirmation Order, Trust Distribution Plan, and Trust documents. From and after the Effective Date, neither the Reorganized Debtor nor any of the other Protected

Parties will have any liability for any Impaired Unknown Tort Claims, except for the Diocese's obligation to fund the Impaired Unknown Claims Trust up to the Cap.

Respectfully submitted this 21st day of June, 2021.

MICHAEL R. HOGAN

**EXHIBIT B**

**Non-Settling Insurers**

21st Century Centennial Insurance Company (f/k/a Colonial Penn Insurance Company)

CX Reinsurance Company Ltd.[1]

Northwestern National Insurance Company of Milwaukee, Wisconsin (f/k/a Bellefonte Insurance Co.)

Stronghold Insurance Co. Ltd.

United States Fire Insurance Company

State Farm Fire and Casualty Company

Insurance Company of North America

Liberty Mutual Insurance Company

Federated Mutual of Owatonna

The Hartford

Travelers Casualty and Surety Company (f/k/a Aetna Casualty & Surety Company)

Maryland Casualty Company

---

[1]   CX Reinsurance Company Ltd. acquired responsibility for certain policies issued to the Diocese by CNA Reinsurance of London, Ltd. and CNA International Reinsurance Co. Ltd.

**EXHIBIT C**

**<u>Non-Settling Insurer Policies</u>**

(see attached)

## Exhibit C

## Non-Settling Insurer Policies[1]

### 21st Century Centennial Insurance Company (f/k/a Colonial Penn Insurance Company)

Upon information and belief, Colonial Penn Insurance Company issued at least the following policies to the Diocese:

1. A liability insurance policy with a policy period from July 1, 1985 to July 1, 1986, which the Diocese believes bears Policy No. XL 150023; and
2. A liability insurance policy with a policy period from July 1, 1986 to July 1, 1987, which the Diocese believes bears Policy No. XL 150049.

### CX Reinsurance Company Ltd.[2]

Upon information and belief, CNA Reinsurance of London, Ltd. and/or CNA International Reinsurance Co. Ltd. underwrote a portion of the risk covered by at least the following policies issued to the Diocese:[3]

1. A liability insurance policy with a policy period from July 1, 1982 to July 1, 1983, which the Diocese believes bears Policy No. SLC 5975;
2. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1986, which the Diocese believes bears Policy No. ICO 4049;
3. A liability insurance policy with a policy period from July 1, 1986 to July 1, 1987, which the Diocese believes bears Policy No. ICO 5357;
4. A liability insurance policy with a policy period from July 1, 1987 to July 1, 1988, which the Diocese believes bears Policy No. ICO 5522;
5. A liability insurance policy with a policy period from July 1, 1988 to July 1, 1989, which the Diocese believes bears Policy No. ICO 5633;
6. A liability insurance policy with a policy period from July 1, 1989 to July 1, 1990, which the Diocese believes bears Policy No. ICO 5862;
7. A liability insurance policy with a policy period from July 1, 1990 to July 1, 1991, with an unknown policy number, but which appears to form part of Cover Note No. ISL 4569;
8. A liability insurance policy with a policy period from July 1, 1992 to July 1, 1993, which the Diocese believes bears Policy No. ICO 6964;
9. A liability insurance policy with a policy period from July 1, 1993 to July 1, 1994, which the Diocese believes bears Policy No. ICO 7315;

---

[1]   This Exhibit C is based on the Diocese's present knowledge, information, and belief, as informed by information and documents currently available to the Diocese. Exhibit C is meant to be illustrative only and does not in any way limit the definition of Non-Settling Insurer Policy(ies) contained in the Plan. Moreover, certain Non-Settling Insurers dispute the existence and/or terms of certain of the policies referenced herein.

[2]   CX Reinsurance Company Ltd. acquired responsibility for certain policies issued to the Diocese by CNA Reinsurance of London, Ltd. and CNA International Reinsurance Co. Ltd.

[3]   The CX Reinsurance Company Ltd. policies are Non-Settling Insurer Policies to the extent of the risk insured by the Non-Settling Insurers.

10. A liability insurance policy with a policy period from July 1, 1994 to July 1, 1995, which the Diocese believes bears Policy No. ICO 7541; and

11. A liability insurance policy with a policy period from July 1, 1999 to July 1, 2000, which the Diocese believes bears Policy No. ICO 7893.

## Northwestern National Insurance Company of Milwaukee, Wisconsin (f/k/a Bellefonte Insurance Co.)

Upon information and belief, Bellefonte Insurance Co. underwrote a portion of the risk covered by at least the following policies issued to the Diocese:[4]

1. A liability insurance policy with a policy period from July 1, 1978 to July 1, 1981, which the Diocese believes bears Policy No. SLC 5421/SL 3402.

## Stronghold Insurance Co. Ltd.

Upon information and belief, Stronghold Insurance Company, Ltd. underwrote a portion of the risk covered by at least the following policies issued to the Diocese:[5]

1. A liability insurance policy with a policy period from July 1, 1982 to July 1, 1983, which the Diocese believes bears Policy No. SLC 5975;

2. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1986, which the Diocese believes bears Policy No. ICO 4049.

## United States Fire Insurance Company

Upon information and belief, United States Fire Insurance Company issued at least the following policies to the Diocese:

1. A primary liability insurance policy with a policy period from July 1, 1967 to July 1, 1970, which the Diocese believes bears Policy No. ML 42768;

2. An excess liability insurance policy with a policy period from July 1, 1967 to July 1, 1970, which the Diocese believes bears Policy No. DCL 176017;[6]

3. A primary liability insurance policy with a policy period from July 1, 1970 to July 1, 1973, which the Diocese believes bears Policy No. ML 76766;

4. An excess liability insurance policy with a policy period from July 1, 1970 to July 1, 1973, which the Diocese believes bears Policy No. DCL 536095;

5. A primary liability insurance policy with a policy period from July 1, 1973 to July 1, 1976, which the Diocese believes bears Policy No. ML 145245;

6. An excess liability insurance policy with a policy period from July 1, 1973 to July 1, 1976, which the Diocese believes bears Policy No. DCL 0861307;

---

[4]  The Bellefonte Insurance Co. policy is a Non-Settling Insurer Policy to the extent of the risk insured by the Non-Settling Insurers.

[5]  The Stronghold Insurance Co. Ltd. policies are Non-Settling Insurer Policies to the extent of the risk insured by the Non-Settling Insurers.

[6]  US Fire disputes the existence of any excess liability insurance policies before July 1, 1976.

7. A primary liability insurance policy with a policy period from July 1, 1976 to July 1, 1977, which the Diocese believes bears Policy No. ML 236050;

8. An excess liability insurance policy with a policy period from July 1, 1976 to July 1, 1977, which the Diocese believes bears Policy No. 520-004686 5;

9. A primary liability insurance policy with a policy period from July 1, 1977 to July 1, 1978, which the Diocese believes bears Policy No. ML 237409; and

10. An excess liability insurance policy with a policy period from July 1, 1977 to July 1, 1978, which the Diocese believes bears Policy No. 520-277405 4.

## Insurance Company of North America

1. Policy(ies) issued to certain parishes and/or schools located within the Diocese of Winona- Rochester.

## State Farm Fire & Casualty Company

1. Liability policies issued for the policy years July 1, 1973 through June 30, 1974, July 1, 1974 through June 30, 1975, July 1, 1975 through June 30, 1976, and July 1, 1976 through June 30, 1977, to the parish of St. Charles Borromeo Catholic Church, St. Charles.

## Liberty Mutual Insurance Company

1. A primary liability insurance policy issued by Western Casualty and Surety Co., to which Liberty Mutual is the successor, to the parish of St. Peter, Hokah.

2. A liability insurance policy with a policy period from March 15, 1971 to March 15, 1972, issued to the parish of St. Pius X, Rochester.

## Federated Mutual of Owatonna

1. A primary liability policy issued by Federated Mutual of Owatonna to the parish of St. Peter, Hokah.

## The Hartford

1. A primary liability policy issued by The Hartford to the parish of St. Ignatius, Spring Valley with a policy period expiring November 1952.

## Travelers Casualty & Surety Company (f/k/a Aetna Casualty & Surety Company)

1. A primary liability policy issued by Aetna Casualty & Surety Company to the parish of Sacred Heart, Waseca.

## Maryland Casualty Company

1.     A primary liability policy issued by Maryland Casualty Company to the parish of St. Mary's Church, Winona.

2.     A liability policy with a policy period March 1, 1968 to March 1, 1971, issued to the parish of St. Pius X, Rochester.

# EXHIBIT D

## __Trust Agreement and Trust Distribution Plan__

(see attached)

## THE DIOCESE OF WINONA-ROCHESTER SETTLEMENT TRUST AGREEMENT

This trust agreement (the "Trust Agreement") is made and entered into by and between the Diocese of Winona-Rochester, a Minnesota religious corporation (the "Reorganized Debtor") and DW Harrow & Assoc., LLC (the "Trustee") pursuant to the Joint Chapter 11 Plan of Reorganization (together with any and all amendments, exhibits, and schedules, the "Plan") filed in the Reorganized Debtor's chapter 11 bankruptcy case, case no. 18-33707 (the "Bankruptcy Case"), before the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). Unless otherwise stated in this Trust Agreement, capitalized terms used in this Trust Agreement shall have the meanings as ascribed to them in the Plan, Confirmation Order, and Bankruptcy Code.

## RECITALS

A.     On the Petition Date, the debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Reorganized Debtor continues to operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.     It is anticipated that in 2021, the Bankruptcy Court will enter an order confirming the Plan (the "Confirmation Order").

C.     The Plan anticipates the existence of the Trust and the transfer and assignment to the Trust of the Trust Assets.

D.     Pursuant to the Plan, the Trust is to use the Trust Assets to pay the Class 3 and Class 4B Claims and carry out the purposes of the Plan.

E.     The Trust is established for the benefit of the Beneficiaries of the Trust, as defined in Section 1.6 of this Trust Agreement, and is intended to qualify as a "Designated" or "Qualified Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated under the Internal Revenue Code and codified at 26 C.F.R. §§ 1.468B-1 to -5.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises and provisions in the Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

## DECLARATION OF TRUST

Subject to the occurrence of the Effective Date, the Reorganized Debtor hereby absolutely assigns to the Trust, and to its successors in trust and its successors and assigns, all rights, title, and interest of the Reorganized Debtor in and to the Trust Assets;

TO HAVE AND TO HOLD unto the Trust and its successors in trust and its successors and assigns forever;

IN TRUST NEVERTHELESS upon the terms and subject to the conditions set forth in this Trust Agreement and for the benefit of the Beneficiaries, as defined below, as and to the extent provided in the Plan, and for the performance of, and compliance with, the terms of this Trust Agreement, the Plan, and the Confirmation Order;

PROVIDED, HOWEVER, that upon termination of the Trust in accordance with Article IV of this Trust Agreement, this Trust Agreement shall cease, terminate, and be of no further force and effect; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED that the Trust Assets are to be held and applied by the Trustee upon the further covenants and terms and subject to the conditions set forth in this Trust Agreement.

## ARTICLE I

## AGREEMENT OF TRUST

1.1    Creation and Name. The Reorganized Debtor hereby creates the Trust known as "The Diocese of Winona-Rochester Settlement Trust," which is the Trust provided for in the Plan. In the event of any inconsistency between the Plan and this Trust Agreement, the terms of the Plan shall govern.

1.2    Purpose. The purpose of the Trust is to assume responsibility for preserving, managing, and distributing Trust Assets to Class 3 Claimants and Class 4B Claimants, in accordance with the Trust Agreement and the requirements of the Plan and Confirmation Order, to receive assignment of the Transferred Insurance Interests from the Diocese, and to pursue recoveries against any Non-Settling Insurers in respect of the Transferred Insurance Interests.

1.3    Transfer of Trust Assets. Pursuant to the Plan and upon the occurrence of the Effective Date, the Reorganized Debtor will irrevocably transfer, absolutely grant, assign, convey, set over and deliver to the Trust at all times as set forth in the Plan, all of the Reorganized Debtor's rights, titles, and interests in and to the Trust Assets to be held in trust and for the uses and purposes stated in this Trust Agreement and in the Plan. The Trustee is hereby authorized to file with the proper governmental authorities any and all documents necessary or helpful to establish the Trust.

1.4    Transfer of Confidential Information. The Trustee shall maintain the confidentiality of all documents and follow the confidentiality procedures provided for in the Bankruptcy Court's Order (I) GRANTING EXPEDITED RELIEF; (II) ESTABLISHING DEADLINES FOR FILING PROOFS OF CLAIM; (III) APPROVING SEXUAL ABUSE PROOF OF CLAIM FORM; (IV) APPROVING FORM AND MANNER OF NOTICE; AND (V) APPROVING CONFIDENTIALITY PROCEDURES [Docket No. 51].

1.5     <u>Irrevocability</u>. The Trust shall be irrevocable. The Reorganized Debtor shall not alter, amend, revoke, or terminate the Trust. The Reorganized Debtor shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Reorganized Debtor.

1.6     <u>Beneficiaries</u>. The beneficiaries of the Trust are Class 3 Claimants and Class 4B Claimants under the Plan whose Claims are allowed by the Tort Claims Reviewer (the "<u>Beneficiaries</u>").

1.7     <u>Acceptance of Assets and Assumption of Liabilities</u>.

1.7.1 In furtherance of the purposes of the Trust, the Trustee hereby accepts the role of trustee of the Trust and accepts the grant, assignment, transfer, conveyance, and delivery of the Trust Assets to the Trust, subject to the terms and conditions set forth in this Trust Agreement, the Plan, and the Confirmation Order.

1.7.2 In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assumes all responsibility for preserving, managing, and distributing Trust Assets to the Beneficiaries in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order. The Claims of the Beneficiaries will be evaluated by the Tort Claims Reviewer in accordance with the Trust Distribution Plan, attached as Exhibit 2 to this Trust Agreement.

1.7.3 The Trustee shall have all of the rights, powers, and duties set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, and available under applicable law, for accomplishing the purposes of the Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the applicable provisions of the Plan, the purpose of the Trust, and applicable law. The Trustee shall have the authority to bind the Trust within the limitations set forth in this Trust Agreement, but shall be acting in the capacity as Trustee, and not individually, for all purposes contained in this Trust Agreement.

1.7.4 In furtherance of the purposes of the Trust, the Trustee assumes responsibility for (a) making payments to the Beneficiaries; (b) receiving, collecting, liquidating, maintaining, and distributing the Trust Assets; and (c) fulfilling all other obligations of the Trust under this Trust Agreement, the Plan, and the Confirmation Order. The Trust will be administered consistent with the purpose of the Trust and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve the value of the Trust Assets or as otherwise provided in the Plan or Confirmation Order.

1.7.5 All Trust expenses and all liabilities of the Trust with respect to the Beneficiaries shall be payable solely by the Trustee out of the Trust Assets.

**ARTICLE II**

## CORPUS OF THE TRUST

2.1    <u>Trust Composition</u>. The Trust Assets shall include all property transferred to the Trust pursuant to the Plan, Confirmation Order, and any future orders of the Bankruptcy Court, including without limitation all rights of every kind, nature, and description transferred to the Trust pursuant the Plan.

2.2    <u>Transfer to Trust</u>. After the Effective Date, pursuant to the Plan and Confirmation Order, title to and all rights and interests in the Trust Assets shall be transferred to the Trust free and clear of all Liens, claims, encumbrances or Interests of any kind in the Trust Assets of any other Person (including all Liens, claims, encumbrances or Interests of creditors of, or holders of claims against or Interests in the Reorganized Debtor) in accordance with Sections 1123, 1141, and 1146(a) of the Bankruptcy Code, except as otherwise provided for in the Plan. The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Trust.

2.3    <u>Trustee's Right to and Title and Interest in Trust Assets</u>. Upon the transfer of the Trust Assets, the Trust succeeds to all of the Reorganized Debtor's and the Estate's right to and title and Interest in the Trust Assets, and the Reorganized Debtor and the Estate shall have no further right to, or title or Interest in or with respect to, the Trust Assets or this Trust, except as provided in this Trust Agreement, the Plan, or the Confirmation Order.

2.4    <u>No Tax on Transfers to Trust</u>. Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale, or assignments executed in connection with any transfer to the Trust or receipt or disposition/sale of assets by the Trust contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or similar tax.

2.5    <u>Spendthrift Provision</u>. To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or in part, shall be subject to (a) any legal or equitable claims of creditors of any Beneficiary or others, (b) legal process, or (c) voluntary or involuntary transfer, assignment, anticipation, pledge, or other form of alienation or encumbrance except as may be ordered by the Bankruptcy Court.

2.6    <u>Trust Corpus</u>. Subject to the terms of the Plan, the entirety of the Trust's corpus shall be available to pay the Beneficiaries and authorized expenses. The Trust Corpus shall be allocated, administered, and distributed as provided in the Trust Distribution Plan, the Plan, and the Confirmation Order.

2.7    <u>Unknown Tort Claims</u>. Promptly after any Impaired Unknown Tort Claim is allowed and the Tort Claims Reviewer has determined the amount due to such claimant (a "Determined Claim"), the Debtor will transfer to the Trust an amount equal to the amount of the Determined Claim, but not to exceed $750,000 (the "Cap") in the aggregate for all Determined Claims. The amounts paid by the Debtor to the Trust on account of Determined Claims shall be distributed by the Trustee to the holder of the Determined Claim as set forth in the Trust Distribution Plan. Debtor's obligation to fund the Impaired Unknown Tort Claim Reserve Fund shall continue until the later of (x) the date that the Debtor has fully funded the amount of the

Determined Claims (up to the Cap), and (y) the occurrence of the fifth anniversary of the Effective Date.  Payment to holders of Impaired Unknown Tort Claims shall be made in accordance with the Trust Distribution Plan. The Impaired Unknown Tort Claim Reserve Fund shall be the sole source of recovery from the Trust for all Impaired Unknown Tort Claimants who elect to be treated as Distribution Plan Claimants. The Trust shall maintain the Impaired Unknown Tort Claim Reserve Fund until the later of (i) the date that the Impaired Unknown Tort Claim Reserve Fund has been exhausted or (ii) the occurrence of the fifth (5th) anniversary of the Effective Date.

## ARTICLE III

## POWERS AND DUTIES OF TRUSTEE

3.1    <u>Trustee's Bond</u>. The Trustee shall not be required to post any bond, surety, or other security for the performance of the Trustee's duties unless otherwise ordered by the Bankruptcy Court and, in the event the Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any bond or surety shall be borne by the Trust and paid for from the Trust Assets.

3.2    <u>Powers and Duties</u>. The Trustee shall have, in addition to any other powers and duties conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable bankruptcy law, the Plan, and the Confirmation Order), the Plan, and the other provisions in this Trust Agreement, the following powers and duties:

3.2.1    To act as custodian of, and to receive, control, manage, liquidate, monetize, and dispose of, all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Trust, in accordance with the terms contained in this Trust Agreement, the Plan, and the Confirmation Order.

3.2.2    To abandon any property which the Trustee determines in the Trustee's reasonable discretion to be of *de minimus* value or of more burden than value to the Trust.

3.2.3    To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate, including without limitation by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity.

3.2.4    To enter into contracts in the course of administering the Trust Assets for liquidation and in conjunction with their disposition under this Trust Agreement and the Plan.

3.2.5    To open and maintain bank accounts on behalf of the Trust, deposit funds in the bank accounts, and draw checks on the bank accounts, as appropriate under this Trust Agreement, the Plan, and the Confirmation Order.

3.2.6    To obtain all reasonably necessary insurance coverage with respect to any property that is, or may in the future become, a Trust Asset.

3.2.7    To incur on behalf of the Trust, and pay from the assets of the Trust, all fees, costs, and expenses of administering the Trust as provided in this Trust Agreement and the Plan. These fees, costs, and expenses include: (a) the fees of bankruptcy claims and/or distribution agents, (b) the fees and costs of professionals employed by the Trustee (the "Professionals"), including without limitation the Tort Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries, or auditors, (c) the premiums charged by insurers, including without limitation professional liability insurers, (d) reimbursement of any statutory fees and court costs incurred by the Reorganized Debtor (i) in the event the Trustee opposes the closure of the Bankruptcy Case, from the date of the filing of any such opposition through the closure of the Bankruptcy Case or (ii) should the Trustee reopen the Bankruptcy Case in the future.

3.2.8    In accordance with the evaluation of the Tort Claims Reviewer pursuant to the Trust Distribution Plan, to make distributions, in accordance with the Trust Distribution Plan and Plan to Beneficiaries who have provided signed copies of all required releases and forms.

3.2.9    In the Trustee's discretion, to rely on the authenticity of the signature of the Tort Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Tort Claims Reviewer in the administration of the Trust Distribution Plan and assessment of the Class 3 and Class 4B Claims without any verification or confirmation.

3.2.10  In the Trustee's discretion, as a party in interest, to seek enforcement of any provision of the Plan pertaining to the Trust.

3.2.11  To retain any attorney-at-law, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence. In no event, however, shall the Trustee incur fees from any professional, except (i) the Trustee's primary legal counsel or (ii) special insurance counsel, in excess of $50,000.00 without prior approval of the Bankruptcy Court.

3.2.12  Kramer Law LLC shall serve as the Tort Claims Reviewer for the Trustee on the terms approved by the Bankruptcy Court. The Trustee may subsequently remove any Tort Claims Reviewer for cause. For purposes of this Trust Agreement, "cause" shall mean (a) the willful and continued refusal by the Tort Claims Reviewer to perform the Tort Claims Reviewer's duties as set forth in this Trust Agreement, the Trust Distribution Plan, and the Plan, (b) gross negligence, gross misconduct, fraud, embezzlement, or theft, (c) a serious breach of fiduciary duty, or (d) other cause as the Trustee shall in good faith determine. In the event the Tort Claims Reviewer resigns, is removed, or is otherwise unable to perform the Tort Claims Reviewer's obligations, the Trustee shall have exclusive authority to appoint a new Tort Claims Reviewer. Nothing contained in this Trust Agreement shall prohibit the Trustee from also serving as the Tort Claims Reviewer if the Trustee determines that serving as both the Trustee and the Tort Claims Reviewer is in the best interest of the Trust and the Beneficiaries.

3.2.13  To make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Plan or the Trust or to maintain and administer the Trust.

3.2.14  To seek the examination of any Person under, and subject to, the provisions of the Bankruptcy Rules, including without limitation Bankruptcy Rule 2004.

3.2.15  To amend, modify, or alter the Trust Agreement by filing a motion with the Bankruptcy Court, with notice to the Beneficiaries, the Reorganized Debtor, and any or all other parties in interest. For the avoidance of doubt, the amendments, modifications, or alterations may not be inconsistent with the terms of the Plan, the terms of the Confirmation Order, or the purpose of the Trust, as identified in Section 1.2 of this Trust Agreement.

3.2.16  Upon any event terminating the Trust, to defer distribution of Trust Assets for a reasonable time needed to wind up the affairs of the Trust, including time needed to provide for payment of debts and expenses, although the Beneficiaries' rights to distributions shall vest immediately.

3.2.17  To comply with Section 345 of the Bankruptcy Code with regard to the investment of the Trust Assets. The Trustee is relieved of any obligation to diversify.

3.2.18  To establish the accounts, funds, and reserves, as required by the Plan, for ease of administration. Nothing in this provision shall restrict the Trustee's authority to pool the accounts, funds, or reserves for investment purposes or require separate bank accounts for the accounts, funds, or reserves.

3.2.19  To be responsible for only the Trust Assets delivered to the Trust and have no duty to make, nor incur any liability for failing to make, any search for unknown property or liabilities.

3.2.20  The Trust will assume all duties, obligations, and indemnification responsibilities outlined in the Plan.

3.2.21  To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity, including prosecuting, compromising, settling and collecting on the Insurance Litigation.

3.3     Limitations on the Trustee. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

3.3.1   Guaranty any debt other than as provided for in this Trust Agreement or as required by the Plan;

3.3.2   Loan Trust Assets;

3.3.3   Make any transfer or distribution of Trust Assets other than those authorized in this Trust Agreement, the Plan, or the Confirmation Order;

3.3.4   Engage in any trade or business; or

3.3.5   Engage in any investments or activities inconsistent with the treatment of the Trust as a "Designated" or "Qualified Settlement Trust."

## ARTICLE IV

## TERMINATION OF THE TRUST

4.1     Pre-Confirmation Termination. The Trustee shall terminate the Trust if (a) the Effective Date does not occur within one year from the date the Trust Agreement is executed by the Reorganized Debtor and the Trustee or (b) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code prior to confirmation of the Plan (the "Pre-Confirmation Termination"). Upon the Pre-Confirmation Termination of the Trust, the Trust Agreement shall be null and void and of no force and effect, with the Trustee and the Reorganized Debtor both discharged from any and all duties and obligations provided for in this Trust Agreement.

4.2     Post-Confirmation Termination. The Trustee shall terminate the Trust after (a) the Trustee's liquidation, administration, and distribution of the Trust Assets in accordance with this Trust Agreement and the Plan and (b) the Trustee's full performance of all other duties and

functions set forth in this Trust Agreement and the Plan (the "Post-Confirmation Termination"). The Trust shall terminate no later than the fifth anniversary of the Effective Date.

4.3     Post-Confirmation Termination Procedures.     After the Post-Confirmation Termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until the Trustee's duties in this Trust Agreement and Plan have been fully performed. The Trustee shall retain the books, records, documents, and files that shall have been delivered to, or created by, the Trustee until distribution of all the Trust Assets. For purposes of this provision, the Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $100,000.00. At the Trustee's discretion, all of the books, records, documents, and files may be destroyed at any time following the later of: (a) the first anniversary of the final distribution of the Trust Assets or (b) the date until which the Trustee is required by applicable law to retain the books, records, documents, and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents, or files relating to the Trust without giving the Reorganized Debtor and the Beneficiaries reasonable prior written notice.

4.4     Post-Confirmation Termination Distribution.     Upon Post-Confirmation Termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Trustee will deliver all funds and other investments in the Trust, if any, including any investment earnings to a charity supporting survivors of childhood sexual abuse as set forth in the Confirmation Order.

4.5     Discharge, Exculpation, and Exoneration. Upon Post-Confirmation Termination of the Trust and accomplishment of all activities described in this Article, the Trustee and the Trustee's Professionals shall be discharged and exculpated from liability, and the Trustee's bond (if any), shall be exonerated except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or his designated agents or representatives. The Trustee may, at the expense of the Trust, seek an order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in this Section.

## ARTICLE V

## IMMUNITY, LIABILITY, AND INDEMNIFICATION OF TRUSTEE

5.1     Limitations on Liability. Neither the Trustee nor any of the Trustee's duly designated agents, representatives, or Professionals shall be liable for any act or omission taken or omitted by the Trustee in good faith, other than acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or the Trustee's designated agents, representatives, or Professionals. The Trustee may, in connection with the performance of the Trustee's functions, and in the Trustee's sole and absolute discretion, consult with the Trustee's Professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with the advice or opinions rendered by the Trustee's Professionals. Notwithstanding this authority, the Trustee shall be under no obligation to consult with the Trustee's Professionals, and the Trustee's good faith determination not to

consult with the Trustee's Professionals shall not result in the imposition of liability on the Trustee, unless the determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

  5.2 <u>No Recourse Against the Trustee Personally</u>. No recourse shall be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, or Professional retained by the Trustee in accordance with the terms of this Trust Agreement, Plan, or Confirmation Order, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement executed by the Trustee in implementation of this Trust Agreement or the Plan or by reason of the creation of any indebtedness by the Trustee under the Plan for any purposes authorized by this Trust Agreement or the Plan, it being expressly understood and agreed that any promise, contract, instrument, undertaking, obligation, covenant, or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against, and be satisfied only out of, the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets. The Trustee may be held liable for the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability for these grounds is established, recourse may be had directly against the Trustee. The Trust will not be covered by a bond.

  5.3 <u>Indemnification</u>. The Trustee, using Trust Assets, shall defend, indemnify, and hold harmless the Trustee, the Trustee's officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of the state of Minnesota is entitled to defend, indemnify, and hold harmless its trustees, officers, directors, agents, representatives, and employees against any and all costs (including attorneys' fees and costs), judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement; provided that neither the Trustee nor the Trustee's officers, directors, agents, representatives, or employees shall be defended, indemnified, or held harmless in any way for any liability, expense, claim, damage, or loss for which they are ultimately held liable under Section 5.1 of this Trust Agreement.

## ARTICLE VI

## COMPENSATION AND EXPENSE REIMBURSEMENT OF TRUSTEE <u>AND ITS AGENTS</u>

  6.1 <u>Trustee Compensation</u>. The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in Exhibit 1.

6.2     <u>Compensation of the Trustee's Professionals</u>. Any Professional retained by the Trustee pursuant to this Trust Agreement or the Plan will be entitled to reasonable compensation for services rendered paid by the Trustee from the Trust Assets.

6.3     <u>Reimbursement of Expenses</u>. Any and all reasonably necessary costs and expenses incurred by the Trustee and any Professional retained by the Trustee, in performing their respective duties under this Trust Agreement and the Plan, will be reimbursed by the Trustee from the Trust Assets.

## ARTICLE VII

## <u>SUCCESSOR TRUSTEE</u>

7.1     <u>Vacancy Caused by the Trustee's Resignation or Removal.</u>

7.1.1 The Trustee may resign at any time upon 30-days written notice to be filed with the Bankruptcy Court. The outgoing trustee (the "<u>Outgoing Trustee</u>") shall, within 30 days after the Outgoing Trustee's resignation takes effect, deliver to the successor trustee (the "<u>Successor Trustee</u>") all of the Trust Assets which were in the possession of the Outgoing Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Outgoing Trustee while serving as the Trustee.

7.1.2 Any Tort Claimant may petition the Bankruptcy Court to remove the Trustee.

7.1.3 The Bankruptcy Court may remove a Trustee for cause, which cause shall include, but shall not be limited to, the factors listed in Minnesota Statute § 501C.076(b). The removal will take effect upon the date the Bankruptcy Court specifies. In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, or at some earlier date as the Bankruptcy Court may specify, deliver to the Successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such**.**

7.2     <u>Outgoing Trustee Obligations</u>. In the event of the resignation or the removal of the Trustee, the Outgoing Trustee, in addition to the duties imposed under Sections 7.1.1 or 7.1.2, shall:

7.2.1 Execute and deliver by the effective date of the resignation or removal the documents, instruments, records, and other writings as may be reasonably requested by the Successor Trustee to effect the resignation or removal of the Outgoing Trustee and the conveyance of the Trust Assets to the Successor Trustee.

7.2.2 Deliver to the Successor Trustee all documents, instruments, records, and other writings relating to the Trust Assets as may be in the possession or under the control of the Outgoing Trustee.

7.2.3 Otherwise assist and cooperate in effecting the assumption of the Outgoing Trustee's obligations and functions by the Successor Trustee.

The Outgoing Trustee hereby irrevocably appoints the Successor Trustee (and any interim trustee) as the Outgoing Trustee's attorney-in-fact and agent with full power of substitution for the Outgoing Trustee and in the Outgoing Trustee's name, place, and stead to do any and all acts that the Outgoing Trustee is obligated to perform under this Trust Agreement. The appointment of the Successor Trustee as the Outgoing Trustee's attorney-in-fact and agent shall not be affected by the subsequent disability or incompetence of the Outgoing Trustee. The Bankruptcy Court may also enter any order necessary to effect the termination of the appointment of the Outgoing Trustee and the subsequent appointment of the Successor Trustee.

7.3    <u>Appointment of Successor Trustee</u>. Any vacancy in the office of the Trustee shall be filled by the nomination of a majority of the members of the UCC (notwithstanding dissolution of the UCC on the Effective Date), subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and the Reorganized Debtor and a hearing. If at least three (3) members of the UCC do not participate in the nomination of the Successor Trustee within 10 days after the Outgoing Trustee resigns, is removed, or otherwise becomes unable to serve, the counsel for the majority of Tort Claimants shall designate a successor, subject to the approval of the Bankruptcy Court, after notice to Beneficiaries and the Reorganized Debtor and a hearing.

7.4    <u>Preservation of Record of Changes in Trustees</u>. A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

# **ARTICLE VIII**

## **TRUSTEE REPORTING AND DISCHARGE**

8.1    <u>Annual Accountings</u>. The Trustee shall prepare, at least annually, a written accounting of the administration of the Trust listing the current assets with fair market values and detailing all transactions that occurred during the period covered by the accounting. Each accounting may be filed with the Bankruptcy Court for as long as the Bankruptcy Case remains open and pending before the Bankruptcy Court. Copies of the accounting shall be available to the Beneficiaries upon request. However, the Trustee shall redact any and all confidential and personal identifying information from any and all accountings or reports filed with the Bankruptcy Court or provided to any Beneficiary.

8.2     Approval of Accountings and Discharge of the Trustee. At any time when the Bankruptcy Case is open, the Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1 of this Trust Agreement. Upon the entry of an order of the Bankruptcy Court approving the accounting, the Trustee shall be discharged from all liability to the Trust, any Beneficiary, or any Person who has or may have a claim against the Trustee or Trust for acts or omissions in the Trustee's capacity as Trustee with respect to all assets listed and transactions detailed in the accounting.

## ARTICLE IX

## SECTION 468B SETTLEMENT FUND

9.1     Qualification. In accordance with the Plan, the Trustee shall take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of Section 468B of the Internal Revenue Code of 1986 (as amended, the "Tax Code") and the regulations promulgated pursuant the Tax Code (the "Treasury Regulations"). The Reorganized Debtor shall be the "Transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "Administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

9.2     All Events Test and Economic Performance Requirement. It is intended that the transfer of the Trust Assets to the Trust shall satisfy the "All Events Test" and the "Economic Performance" requirement of Section 461(h)(1) of the Tax Code and Treasury Regulation Section 1.461-1(a)(2).

9.3     Employer Identification Number. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

9.4     Relation-Back Election. If applicable, the Trustee and the Reorganized Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2) to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

9.5     Filing Requirements. The Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The Reorganized Debtor shall file an election statement satisfying the requirements of Treasury Regulation Section 1.468B-1(k)(2)(ii) so that the Trust is treated as a grantor trust under Section 671 of the Tax Code and the Treasury Regulations. The election statement shall be included with the Trust's first timely filed trust income tax return. The Reorganized Debtor shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15 of the year following each calendar year in which the Reorganized Debtor makes a transfer to the Trust.

9.6     <u>Broad Powers of the Trustee</u>. The Trustee is empowered to take all actions, including any action consistent with those expressly set forth in Article IX of this Trust Agreement, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "Designated" or "Qualified" settlement fund under Section 468B of the Tax Code and the Treasury Regulations. Further, the Trustee may, unilaterally and without order from the Bankruptcy Court, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with Article IX of this Trust Agreement, provided such amendment does not create any tax liabilities or administrative responsibilities for the Reorganized Debtor.

**ARTICLE X**

**<u>BENEFICIARIES</u>**

10.1 <u>Register</u>. The Trustee shall keep a register (the "<u>Register</u>") in which the Trustee shall at all times maintain the (i) names and addresses of the Beneficiaries and the actual distributions made to the Beneficiaries pursuant to the Plan. The Trustee may rely upon the Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of a Claim as set forth in a proof of claim filed by the holder, or proper notice of a name or address change, which has been delivered by the Beneficiary to the Trustee. The Trustee shall be obligated to maintain the confidentiality of all names, addresses, and any and all other personally identifying information of the Beneficiaries provided to the Trustee.

10.2 <u>Rights of Beneficiaries</u>. The rights of a Beneficiary under this Trust Agreement shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of the Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets. Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to the Beneficiaries under this Trust Agreement, the Plan, the Confirmation Order, and the Trust Distribution Plan.

10.3 <u>Tax Identification Numbers</u>. The Trustee shall require any Beneficiary to furnish to the Trustee the Beneficiary's employer or taxpayer identification number or social security number as assigned by the IRS, and other records or documents necessary to satisfy the Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The Trustee shall condition the payment of any distribution to any Beneficiary upon receipt of the number and records or documents.

**ARTICLE XI**

**<u>MISCELLANEOUS PROVISIONS</u>**

11.1 <u>Plan Incorporation</u>. The terms of the Plan and the Confirmation Order are incorporated into and made part of this Trust Agreement as if fully set forth herein. In the event of any conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall govern.

11.2 <u>Notices</u>. All notices or deliveries required or permitted under this Trust Agreement shall be given as directed in the Plan, to the following:

If to the Trust or Trustee:

DW Harrow & Assoc., LLC
1880 State Highway 309
Kerens, TX 75144

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented Beneficiary, to the address for the Beneficiary provided in the Proof of Claim.

If to the Reorganized Debtor:

Diocese of Winona-Rochester
c/o Very Rev. William D. Thompson
55 West Sanborn Street
Winona, MN 55987

with a copy to:

Thomas R. Braun
Restovich Braun & Associates
117 East Center Street
Rochester, MN 55904

and

Robert J. Diehl, Jr.
Bodman PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, MI 48226

11.3 <u>Waiver</u>. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect the right or remedy or constitute a waiver by the party of any right or remedy pursuant to this Trust Agreement. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

11.4 <u>Reimbursement of Costs</u>. If the Trustee, the Trust or the Reorganized Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement

or the enforcement of a provision of this Trust Agreement, the Trustee, the Trust or the Reorganized Debtor, as the case may be, shall be entitled to collect from the non-prevailing party any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, incurred in connection with the dispute or enforcement action.

11.5 <u>Entirety of Trust Agreement</u>. Except with respect to the Plan and Confirmation Order, this Trust Agreement supersedes any and all prior oral discussions and agreements with respect to the subject matter in this Trust Agreement. This Trust Agreement, together with the Exhibits to the Trust Agreement, the Plan, and the Confirmation Order, contain the sole and entire Trust Agreement and understanding with respect to the matters addressed in the Trust Agreement. It is acknowledged that there are no communications or oral understandings that are contrary to, or that in any way restrict, this Trust Agreement and that all prior agreements or understandings within the scope of the subject matter of this Trust Agreement are, upon execution and delivery of this Trust Agreement, superseded, null, and void.

11.6 <u>Counterparts</u>. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on the counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.

11.7 <u>Captions</u>. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

11.8 <u>Representation</u>. It is acknowledged that each of the parties to this Trust Agreement has reviewed this Trust Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing this Trust Agreement. Each of the parties to this Trust Agreement relied upon its own judgment and that of its counsel in executing this Trust Agreement and has not relied on, or been induced by, any representation, statement, or act by any party that is not referred to in this instrument. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of America. Each of the parties entered into this Trust Agreement voluntarily, with full knowledge of its significance, and the Trust Agreement is, in all respects, complete and final.

11.9 <u>Interpretation</u>. This Trust Agreement has been reached through negotiations between the parties to this Trust Agreement. Each of the parties to this Trust Agreement acknowledges that the party has participated in the drafting of this Trust Agreement and reviewed the terms of the Trust Agreement and, as such, no rule of construction shall apply which might result in this Trust Agreement being construed in favor or against any of the parties, including without limitation, any rule of construction to the effect that ambiguities ought to be resolved against the drafting party. The parties to this Trust Agreement have used their own judgment in entering into this Agreement.

11.10 <u>Savings Clause</u>. If any clause or provision of this Trust Agreement shall for any reason be held invalid or unenforceable by the Bankruptcy Court or any other court with competent jurisdiction, such invalidity or unenforceability shall not affect any other clause or provision in this Trust Agreement, but this Trust Agreement shall be construed, insofar as reasonable to effectuate the purpose of this Trust Agreement, as if the invalid or unenforceable provision had never been contained in the Trust Agreement.

11.11 <u>Applicable Law</u>. This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Minnesota applicable to contracts and trust agreements made and to be performed in this Trust Agreement, except that all matters of federal tax law and the Trust's compliance with Section 468B of the Tax Code and any Treasury Regulations shall be governed by federal tax law and all matters of federal bankruptcy law shall be governed by the Bankruptcy Code and federal bankruptcy law.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Reorganized Debtor and the Trustee execute this Trust Agreement as of the ___ of _____, 2021.

**TRUSTEE:**

DW Harrow & Assoc., LLC

By: _____

Title: _____

**DIOCESE OF WINONA-ROCHESTER**, a Minnesota religious corporation, as Reorganized Debtor

By: _____

Title: _____

**EXHIBIT 1**

**TRUSTEE COMPENSATION**

DW Harrow & Assoc., LLC will charge an average hourly rate of $385.00.

**EXHIBIT 2**

(See attached)

**EXHIBIT 2**

**DIOCESE OF WINONA-ROCHESTER**
**SURVIVOR CLAIM DISTRIBUTION PLAN**

**ARTICLE I**
**DEFINITIONS**

1.1    **Capitalized Terms**.

Capitalized terms used in this Distribution Plan shall have the meanings given them in the Plan, the Trust Agreement, or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Distribution Plan by reference.

**ARTICLE II**
**RULES OF INTERPRETATION AND GENERAL GUIDELINES**

**2.1.    Purpose**

This Distribution Plan is designed to provide guidance to the Tort Claims Reviewer in determining the amount of each Class 3 Claim and Class 4B Impaired Unknown Tort Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

**2.2.    General Principles**

As a general principle, this Distribution Plan intends to set out a procedure that provides substantially the same treatment to holders of similar Class 3 Claims and Class 4B Impaired Unknown Tort Claims. The range of values set forth in the Evaluation Factors below and the discretion given to the Tort Claims Reviewer to determine and to adjust the value to be assigned to a particular Class 3 Claim and Class 4B Impaired Unknown Tort Claim are intended to reflect the relative values of Class 3 Claims or Class 4B Impaired Unknown Tort Claims.

**2.3.    Sole and Exclusive Method**

The Evaluation Factors set forth below shall be the sole and exclusive method by which the holder of a Class 3 Claim or Class 4B Impaired Unknown Tort Claim may seek allowance and distribution of such Claim. Although the factors collectively comprise the methodology that must be applied in reviewing Claims, the Tort Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating a Claim within the parameters of the delineated factors.

**2.4.    Interpretation**

The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of these Procedures.

### 2.5.    Confidentiality and Privilege

All information that the Tort Claims Reviewer receives from any source about any Class 3 Claimant or Impaired Unknown Tort Claimant shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of such Claimant (or such Claimant's counsel of record). All information the Tort Claims Reviewer receives from any Class 3 Claimant or Impaired Unknown Tort Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Tort Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

### 2.6.    Tort Claims Reviewer

Kramer Law LLC is the Tort Claims Reviewer. The Tort Claims Reviewer shall conduct a review of each of the Class 3 Claims and Class 4B Impaired Unknown Tort Claims, according to the guidelines set forth below, and shall make determinations upon which individual monetary distributions will be made subject to the Plan and the Trust Agreement.

## ARTICLE III
## PROCEDURE

### 3.1.    Allowance of a Class 3 Claim

A Class 3 Claim shall be allowed if the Tort Claims Reviewer determines the Class 3 Claimant proved his or her claim by a preponderance of the evidence. If necessary, the Tort Claims Reviewer can ask for additional information to make this determination. The Class 3 Claimant may refuse such a request at his or her own risk.

### 3.2.    Claim Amount Determination

If a Class 3 Claim is allowed, the Tort Claims Reviewer shall determine the amount of such Class 3 Claim by assigning such Class 3 Claim a value pursuant to the Evaluation Factors. The Tort Claims Reviewer shall consider all of the facts and evidence presented by the Class 3 Claimant in the Class 3 Claimant's filed proof of claim. Class 3 Claimants may supplement their filed proof of claims to provide additional information to the Tort Claims Reviewer until a plan is confirmed. Class 3 Claimants shall have no later than ten (10) days from the Confirmation Date to provide the Tort Claims Reviewer with any additional information. The Tort Claims Reviewer may consider the credibility of the Class 3 Claimant and the facts alleged in support of the Claim and, in the Class 3 Claims Reviewer's sole discretion, reduce or deny the Class 3 Claim. After all Class 3 Claims have been evaluated pursuant to the Evaluation Factors, the Trustee shall determine the dollar value for each Class 3 Claim based on the Class 3 Claimant's pro rata share of the total points assigned to all Class 3 Claimants and the available funds for distribution after accounting for necessary holdbacks.

### 3.3.    Determinations by the Tort Claims Reviewer

The Tort Claims Reviewer or the Trustee shall notify each Class 3 Claimant in writing of the expected monetary distribution with respect to the Class 3 Claimant's claim, which

distribution may be greater or smaller than the actual distribution to be received based on the outcome of any reconsideration claims. The Class 3 Claims Reviewer's determination shall be final unless the Class 3 Claimant makes a timely request for the point award to be reconsidered by the Class 3 Claims Reviewer. The Class 3 Claimant shall not have a right to any other appeal of the Class 3 Claims Reviewer's point award.

### 3.4. Requests for Reconsideration

The Class 3 Claimant may request reconsideration by delivering a written request for reconsideration to the Tort Claims Reviewer within ten (10) calendar days after the date of mailing of the notice of the preliminary monetary distribution. Each written request must be accompanied by a non-refundable check for the reconsideration fee, five hundred dollars ($500.00). The Class 3 Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Class 3 Claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Tort Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Class 3 Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

### 3.5. Distribution

Once the Tort Claims Reviewer has made all reconsideration determinations, the Trustee shall determine the dollar value of each Survivor's actual distribution based on the Class 3 Claimant's pro rata share of the total final points assigned and the available funds for distribution. The Trustee shall then make payment to Class 3 Claimants in accordance with the Trustee's powers and duties under Section 3.2.8 of the Trust Agreement.

### 3.5. Deceased Abuse Survivors

The Tort Claims Reviewer shall review the claim of a deceased Class 3 Claimant without regard to the Claimant's death, except that the Tort Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

### 3.6 Determination of Status as Impaired Unknown Claim

If an Impaired Unknown Tort Claim is allowed, the Tort Claims Reviewer shall determine the amount due to such claimant, and shall immediately notify the Trustee, who shall in turn notify the Debtor for the purposes of obtaining payment from the Debtor so that the Trustee may fund the Impaired Unknown Tort Claim Reserve Fund. The Debtor shall have the ability to object to any Impaired Unknown Tort Claim. If the Debtor so objects, such claim shall not be deemed allowed without an order of the Bankruptcy Court or written consent of the Debtor.

### 3.7 Allowance and Distribution to Impaired Unknown Tort Claimants

When an Impaired Unknown Tort Claim is allowed and received by the Trustee and after it has been qualified by the Tort Claims Reviewer, the Tort Claims Reviewer shall assign a total

point value to each Impaired Unknown Tort Claim pursuant to the factors set forth in Article IV. After the Tort Claims Reviewer assigns points to the Impaired Unknown Tort Claim, such Claim is an allowed Claim. Holders of Impaired Unknown Tort Claims shall receive a pro rata distribution from the Impaired Unknown Tort Claim Reserve Fund established by the Trustee. The distribution to each Impaired Unknown Tort Claimant shall be determined by taking the points assigned to each Impaired Unknown Tort Claim, divided by the combined total points assigned to all Impaired Unknown Tort Claims, multiplied by the amount held in the Impaired Unknown Tort Claim Reserve Fund. No Impaired Unknown Tort Claimant shall receive more than he or she would have as a Class 3 Claimant. The Trustee shall make an immediate distribution of up to $20,000 to the holders of allowed Impaired Unknown Tort Claims immediately upon determination by the Tort Claims Reviewer, with the remaining portion of the Claim paid at the termination of the Impaired Unknown Tort Claim Reserve Fund as provided for in the Trust Agreement.

### 3.8 Establishing A Reserve for Litigation Claims

The following procedure is the sole and exclusive method by which any Class 3 Claimant who elects treatment as a Litigation Claimant may seek allowance and distribution of such Litigation Claim. Each Litigation Claimant shall submit to all of the policies and procedures set forth in this Survivor Claim Distribution Plan, except as expressly set forth in this Section 3.8. The Trust shall establish a reserve for each Litigation Claim in the amount that would have been allocated to the Claim if the Litigation Claimant had elected treatment as a Distribution Plan Claimant. The Trustee may, in his discretion, and at the same time as the Trustee makes the initial distribution to Distribution Plan Claimants, make an initial distribution to each Litigation Claimant in an amount based on and not to exceed the reserve set for each Litigation Claim.

a)      In the event that a Litigation Claimant obtains a judgment against any Protected Party and no Non-Settling Insurer is implicated by the Litigation Claim, then the judgment will be satisfied by the Trust in the amount of such judgment against such Protected Party, up to the amount of the reserve set for that Litigation Claimant's Litigation Claim plus an additional $1,000.

b)      In the event that any Non-Settling Insurer is implicated by the Litigation Claim, and either a settlement is achieved with such Non-Settling Insurer(s) as to such Litigation Claim or the Litigation Claimant obtains a judgment against a Protected Party and either the Trust or the Litigation Claimant obtains a recovery from any such Non-Settling Insurer(s) as to such judgment, then such recovery shall be turned over to the Trust. Such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining of any such recovery after such reimbursement shall be divided as follows:

1)      If a settlement is obtained with the Diocese, Reorganized Debtor, or Non-Settling Insurer(s) on the Litigation Claim before any judgment was obtained in the Litigation Claim, then the Litigation Claimant is entitled to receive a portion of such

settlement up to a maximum amount of the total amount of the reserve set for the Litigation Claim, plus 15% of the total settlement, with the remainder to go to the Trust. The 15% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the total amount of the reserve set for that Litigation Claimant's Claim, plus the 15%.

2)    If a judgment is obtained on the Litigation Claim and the resolution with or judgment against the Diocese, Reorganized Debtor, or Non-Settling Insurer is obtained thereafter, then the Litigation Claimant is entitled to receive a portion of such judgment or settlement up to a maximum amount of: the total amount of the reserve set for the Litigation Claim, plus 30% of the total settlement or judgment, with the remainder to go to the Trust. The 30% will be payable by the Trust only if the settlement or judgment is in an amount sufficient to pay the reserve set for that Litigation Claimant's Claim, plus the 30%.

**3.9 Distribution of Litigation Claim Proceeds**

If any amounts are recovered by the Trust on any Litigation Claim after the distributions to the Litigation Claimant are made pursuant to Section 3.8(b), the Trust shall distribute the proceeds of such Litigation Claim to all Class 3 claimants pursuant to Section 3.5. The Trust shall calculate each Litigation Claimant's pro rata distribution based on the points assigned for the purpose of establishing the reserve on his or her Litigation Claim.

**ARTICLE IV**
**GUIDELINES FOR ALLOCATION FOR ABUSE CLASS 3 CLAIMS**

**4.1.    Evaluation Factors**

Each Tort Claim will be evaluated by the Tort Claims Reviewer. Each Claim will be assigned points according to the following system.

**(a)    Nature of Abuse & Circumstances**. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive. <u>A point value ranging from 0 to 45 should be allocated for this section.</u>

(1)    The duration and/or frequency of the abuse;

(2)    Type of abuse: e.g. penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk;

(3)    Circumstances of abuse:

(i)    grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with Claimant, opportunity to experience

sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Claimant or use of or exposure to pornography;

(ii)    coercion or threat or use of force or violence, stalking;

(iii)    relationship of Claimant to perpetrator including but not limited to whether Claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to Claimant, and whether Claimant valued relationship with perpetrator;

(iv)    location of abuse, including but not limited to isolated location, Tort Claimant's home, rectory, church, cabin, orphanage, boarding school, trip.

**(b)    Impact of the Abuse**. Overall, this category looks to how the abuse impacted the Claimant. This includes how the abuse impacted the Claimant's mental health, physical health, spiritual well-being, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the abuse at issue resulted in legal difficulties for the Claimant. Some of these considerations may include the below factors, but the below list is not intended to be exhaustive. <u>A point value ranging from 0 to 45 should be allocated for this section.</u>

The Tort Claims Review should consider, along with any and all other relevant factors, whether the abuse at issue manifested, or otherwise led the Claimant to experience, or engage in behaviors resulting from:

(1)    Mental Health Issues: This includes but is not limited to anxiety, depression,  post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

(2)    Physical Health Issues: This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

(3)    Spiritual Wellbeing: This includes but is not limited to loss of faith in God, loss of faith and trust in religion and spiritual distress.

(4)    Interpersonal Relationships: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired

relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.

(5)   Vocational Capacity: This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

(6)   Academic Capacity: This includes but is not limited to school behavior problems.

(7)   Legal Difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.

(8) Prevention/Knowledge: Was the abuse known about by other members of the establishment?

(c)   **Claimant Involvement**. The Tort Claims Reviewer shall consider that all Claimants have benefited from the work and cost incurred by those Claimants who have previously asserted claims against the Diocese and have participated in the legal and factual development of claims against the Diocese. <u>A point value ranging from 0 to 10 should be allocated for this section.</u>

The Tort Claims Reviewer should consider factors including but not limited to whether the Claimant has filed a lawsuit; whether the Claimant and/or the Claimant's family has been subject to a deposition, mediation or interview; whether the Claimant has participated on the committee representing survivors; and whether the Claimant participated in publicizing the issue of clergy sex abuse which has benefitted all Claimants.

## ARTICLE V
## <u>ADDITIONAL PROVISIONS</u>

**5.1   Reductions.**

(a) If a Tort Claimant is also a clergy abuser in another allowed Class 3 Claim, then his points will be reduced by the number of points allocated to his victim(s).

(b) If a Tort Claimant did not commence a civil lawsuit against the Diocese or one of its affiliated parishes or schools on or before May 25, 2016, his or her final monetary distribution shall be capped at Fifty Thousand dollars ($50,000.00).

**EXHIBIT E**

**Tort Claim Release**

(see attached)

---

**TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST EXECUTE AND DELIVER THIS RELEASE.**

---

1.       All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

2.       In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

a.       Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers with respect to the Settling Insurer Policies from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Contribution Claims; iii) Extra-Contractual Claims; iv) Settling Insurer Policies; and v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Diocese's Chapter 11 case.

b.       Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims that do not implicate coverage under Non-Settling Insurer Policies.

c.       Expressly reserve, and do not release, any Claims (including Tort Claims) against Protected Parties (including the Reorganized Debtor) for any Abuse that may implicate coverage under Non-Settling Insurer Policies.

d.       Agree that, with respect to any Claims that I do not release hereunder that may implicate coverage under Non-Settling Insurer Policies, my recourse will be limited to the proceeds of the Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim.

e.       Agree that, if I recover on any judgment, award or settlement of my Tort Claim against a Protected Party for any allegations of Abuse that implicate coverage under a Non-Settling Insurer Policy, including any recovery for insurer conduct described in paragraph 2(d), the recovery will be handled in accordance with Sections 6.14(i) and (j) of the Plan and will be turned over to the Trust for handling pursuant to the terms of the Plan.

f.       With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release, covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with the Abuse which is by trial or other disposition determined to be the causal fault or

responsibility, if any, of any Protected Party with respect to released Tort Claims; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Tort Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Tort Claims; and (vi) this Release extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who has been or may be held liable to me for any released Tort Claim.

3.      I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release. The undersigned has read and understands and the undersigned's lawyer has read and explained to the undersigned, the Disclosure Statement, the Plan, and the exhibits thereto, and this Release.

4.      I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as released under this Release, and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s).

5.      I intend the foregoing undertakings to comply with the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).

6.      I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust or any Protected Party, Settling Insurer or Non-Settling Insurer.

7.      I understand and agree that any payment by the Trust to me does not constitute a determination of the amount of my Tort Claim  in any litigation with any Protected Parties, Non-Settling Insurers, or other Person, and that any such payment cannot be used as evidence of a Protected Party's liability for my Tort Claim, or of the amount of my damages, in any litigation on my Tort Claim. I understand that any Protected Party's liability for, and the amount of my damages on, any Tort Claim that I am reserving and not releasing under paragraph 2(b) – (c) of this release, will be determined only by: (i) the amount of any court judgment obtained on my Tort Claim; or (ii) through a settlement agreement that does not breach the duty of any Protected Party to a Non-Settling Insurer under any applicable insurance policy or law.

8.      I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Articles 7.10 and 13.3 for the benefit of the Settling Insurers and those injunctions contained in Article 13.3 for the benefit of the Protected Parties.

Bodman_17817138_4

9.      I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

10.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

11.      I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**"), its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents.  I understand that I may revoke this "consent to release information" at any time, in writing.  I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my released Tort Claim(s), from the Social Security Administration and CMS.  I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate.  I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000.

12.      This Release will bind my successors, heirs, assigns, agents, and representatives.

Bodman_17817138_4

TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF TORT CLAIMANT'S ESTATE:

DATED: _____

|  |  |
|---|---|
| Name of Holder: | _____ |
| Proof of Claim No. (if known): | _____ |
| John/Jane Doe No. (if known): | _____ |
| Signature: | _____ |
| Address: | _____ |
|  | _____ |
|  | _____ |
| Telephone No. (optional): | _____ |
| E-mail (optional): | _____ |

4

**EXHIBIT F**

**Impaired Unknown Tort Claim Release**

(see attached)

---

**TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN, YOU MUST
EXECUTE AND DELIVER THIS RELEASE.**

---

1.      All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

2.      In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

        a.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers with respect to the Settling Insurer Policies from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the i) Tort Claims; ii) Contribution Claims; iii) Extra-Contractual Claims; iv) Settling Insurer Policies; and v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Diocese's Chapter 11 case.

        b.      Hereby fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims that do not implicate coverage under Non-Settling Insurer Policies.

        c.      Expressly reserve, and do not release, any Claims (including Tort Claims) against Protected Parties (including the Reorganized Debtor) for any Abuse that may implicate coverage under Non-Settling Insurer Policies.

        d.      Agree that, with respect to any Claims that I do not release hereunder that may implicate coverage under Non-Settling Insurer Policies, my recourse will be limited to the proceeds of the Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim.

        e.      Agree that, if I recover on any judgment, award or settlement of my Tort Claim against a Protected Party for any allegations of Abuse that implicate coverage under a Non-Settling Insurer Policy, including any recovery for insurer conduct described in paragraph 2(d), the recovery will be handled in accordance with Sections 6.14(i) and (j) of the Plan and will be turned over to the Trust for handling pursuant to the terms of the Plan.

        f.      With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release, covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with the Abuse which is by trial or other disposition determined to be the causal fault or

responsibility, if any, of any Protected Party with respect to released Tort Claims; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Tort Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Tort Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Tort Claims; and (vi) this Release extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who has been or may be held liable to me for any released Tort Claim.

3.      I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release. The undersigned has read and understands and the undersigned's lawyer has read and explained to the undersigned, the Disclosure Statement, the Plan, and the exhibits thereto, and this Release.

4.      I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as released under this Release, and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Tort Claim(s).

5.      I intend the foregoing undertakings to comply with the principles set forth in *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963) and *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn. 1978).

6.      I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust or any Protected Party, Settling Insurer or Non-Settling Insurer.

7.      I understand and agree that any payment by the Trust to me does not constitute a determination of the amount of my Tort Claim in any litigation with any Protected Parties, Non-Settling Insurers, or other Person, and that any such payment cannot be used as evidence of a Protected Party's liability for my Tort Claim, or of the amount of my damages, in any litigation on my Tort Claim. I understand that any Protected Party's liability for, and the amount of my damages on, any Tort Claim that I am reserving and not releasing under paragraph 2(b) – (c) of this release, will be determined only by: (i) the amount of any court judgment obtained on my Tort Claim; or (ii) through a settlement agreement that does not breach the duty of any Protected Party to a Non-Settling Insurer under any applicable insurance policy or law.

8.      I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Articles 7.10 and 13.3 for the benefit of the Settling Insurers and those injunctions contained in Article 13.3 for the benefit of the Protected Parties.

2

9.      I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

10.     I represent and warrant that I have not assigned or otherwise transferred any interest in my Tort Claim(s).

11.     I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**"), its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents.  I understand that I may revoke this "consent to release information" at any time, in writing.  I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my released Tort Claim(s), from the Social Security Administration and CMS.  I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate.  I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000.

12.     This Release will bind my successors, heirs, assigns, agents, and representatives.

Bodman_17817138_4

TO BE COMPLETED BY TORT CLAIMANT OR AUTHORIZED REPRESENTATIVE OF TORT CLAIMANT'S ESTATE:

DATED: _____

| | |
|---:|---|
| Name of Holder: | _____ |
| Proof of Claim No. (if known): | _____ |
| John/Jane Doe No. (if known): | _____ |
| Signature: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone No. (optional): | _____ |
| E-mail (optional): | _____ |

4

**EXHIBIT G**

**Inadvertently Titled Real Property**

St. Thomas Moore Student Parish
1502 Warren Street
Mankato, Minnesota 56001
Blue Earth County
Parcel #: R01.09.19.277.003

St. Casimir's Cemetery - Wells
SW corner of 1st St. NW and Half Moon Rd.
Wells, MN 56097
Faribault County
Parcel #: 300081130, 300080140, 300080150

St. Mary's Cemetery - Geneva
W. end of Twp. Rd. No. T-269A
Ellendale, MN 56026
Freeborn County
Parcel #: 160190030

Agricultural parcel on east side of street
St. Mary's Geneva
Ellendale, MN 56026
Freeborn County
Parcel #: 160180060, 169180010

St. Patrick Cemetery
east of Kubitz Rd. on County Rd. 5
northwest of New Albin, IA
Houston County
Parcel #: 070174000

Cavalry Cemetery-Caledonia
West end of County Rd. 249 near S. Winnebago St.
Caledonia, MN 55921
Houston County
Parcel #: 211122000, 211127000

Sts. Peter & Paul Cemetery
22032 County Rd 18
Kellogg, MN 55945
Wabasha County
Parcel #: R06.00095.00

St. Joseph Cemetery
26185 627th St.
Theilman, MN 55945
Wabasha County
Parcel #: R16.00339.00, R16.00390.00, R16.00385.00

St. Joseph's Church (closed)
62683 261St. Ave.
Theilman, MN 55945
Wabasha County
Parcel #: R16.00375.03

Condominium
600 4th St. SW, #535
Rochester, MN 55902
Olmsted County
Parcel #: 64.02.21.064175

Holy Redeemer Cemetery
2451 110th Ave SE
Eyota, MN 55934
Olmsted County
Parcel #: 62.16.14.032722

Holy Spirit Parish (parsonage)
4916 Wild Grass Ln NW
Rochester, MN 55901
Olmsted County
Parcel #: 74.17.22.055483

St. Bernard Cemetery - Stewartville
460 10th St. NW
Stewartville, MN 55976
Olmsted County
Parcel #: 54.34.22.030559

Corpus Christi Church
9052 66th St. NW
Deerfield MN 55049
Steele County
Parcel #: 130083301

2

St. Joachim Cemetery
10th St. NW and 7th Ave. NW
Plainview, MN 55964
Wabasha County
Parcel #: R26.00003.00

St. Agnes Catholic Church
135 W. Belvidere
Kellogg, MN 55945
Wabasha County
Parcel #: R21.00017.00, R21.00018.03

All Saint's Church
307 1st St SW
New Richland, MN 56072
Waseca County
Parcel #: 157770180

Calvary Cemetery - Waseca
NE Corner of 336th Ave. & 128th St.
Waseca, MN 56093
Waseca County
Parcel #: 120301000

St. Mary's Cemetery - Preble
18441 455th Ave.
Preble Township, MN 55345
Fillmore County
Parcel #: 030265010

St. Kilian Cemetery - Wykoff
19675 County Rd. 117
Wykoff, MN 55990
Fillmore County
Parcel #: 290333010 (1/2 portion of parcel)

St. Nicholas Cemetery - Freeburg
N of residence located at 5588 County Rd. 249
approx. 6 miles E of Caledonia, MN
Houston County Parcel #: 040179000
(1/5 portion of parcel)

3

St. Patrick Cemetery - Ridgeway
S corner of County Rd. 8 and County Rd. 11
1.5 miles S of Ridgeway, MN
Winona County
Parcel #:100002120

Ss. Peter and Paul Cemetery - Hart
24898 Hartwood Dr.
appox. 5 miles N of Rushford, MN
Winona County
Parcel #:040000530

4

# EXHIBIT H

## List of Current Parishes

The Church of the Sacred Heart of Adams, Minnesota
412 W Main St.
Adams, MN 55909-0352

The Church of St. Adrian of Adrian, Minnesota
512 Maine Ave
Adrian, MN 56110-0475

The Church of St. Theodore of Albert Lea, Minnesota
315 E. Clark St.
Albert Lea, MN 56007-0604

St. Anthony of Altura, Minnesota
119 1st St. NE
Altura, MN 55910

Church of Queen of Angels of Austin, Minnesota
1001 E Oakland Ave
Austin, MN 55912-3896

The Church of St. Augustine of Austin, Minnesota
405 4th St NW
Austin, MN 55912-3091

The Church of St. Edward of Austin, Minnesota
2000 West Oakland Ave
Austin, MN 55912-1599

The Church of St. Columbanus of Blooming Prairie, Minnesota
114 E. Main St.
Blooming Prairie, MN 55917-1427

The Church of Saints Peter and Paul of Blue Earth, Minnesota
214 S. Holland St.
Blue Earth, MN 56013-1331

Church of Sacred Heart of Brewster, Minnesota
516 10th St.
Brewster, MN 56119-0187

Saint Patrick's Church, of Brownsville
604 Adams St.
Brownsville, MN 55919-0155

Church of Christ the King of Byron, Minnesota
202 4th St. NW
Byron, MN 55920-1000

Church of St. Mary
513 S. Pine St.
Caledonia, MN 55921-0406

Assumption, a/k/a Assumption Catholic Church
207 N. May St.
Canton, MN 55922

The Church of St. Mary of Chatfield, Minnesota
405 Bench St SW
Chatfield, MN 55923

Immaculate Conception Church
22032 County Rd. 18
Plainview, MN 55945

The Church of the Immaculate Heart of Mary, of Currie, Minnesota
510 Mill St
Currie, MN 56123

The Church of Holy Cross of Dakota, Minnesota
180 Washington St
Dakota, MN 55925

St. John Baptiste de la Salle a/k/a Church of St. John Baptists[sic] De La Salle
20 2nd St NE
Dodge Center, MN 55927-0310

The Holy Family Catholic Church a/k/a Holy Family
2481 50th St.
East Chain, MN 56031-3098

Church of Our Lady of Mount Carmel of Easton, Minnesota
27 Main St.
Easton, MN 56025-0008

2

The Church of St. Aloysius of Elba, Minnesota
150 N. Main St.
Elba, MN 55910

The Church of Holy Redeemer a/k/a Holy Redeemer
22 E. 2nd St.
Eyota, MN 55934

Saint John Vianney Catholic Church of Fairmont, Minnesota
901 S. Prairie Ave.
Fairmont, MN 56031-3098

The Church of St. Gabriel of Fulda, Minnesota
309 W Lake Ave
Fulda, MN 56131-9402

The Church of St. Joseph of Good Thunder, Minnesota
130 N Ewing St
Good Thunder, MN 56037

Church of St. Finbarr, of the County of Mower, Minnesota
504 1st St. SW
Grand Meadow, MN 55936

Church of the Nativity of the Blessed Virgin Mary of Harmony, Minnesota
640 1st Ave. SW
Harmony, MN 55939

Sacred Heart Church of Hayfield, Minnesota
150 2nd St. NE
Hayfield, MN 55940-0027

The Church of the Sacred Heart of Heron Lake, Minnesota
321 9th St.
Heron Lake, MN 56137

St. Peter a/k/a St. Peter's
34 Main St.
Hokah, MN 55941-0355

St. Mary a/k/a St. Mary's
202 S. Sheridan
Houston, MN 55943

The Church of St. Columba of Iona a/k/a The Church of ST. [sic] Columba of Iona, Minnesota
451 McDonnell Ave.
Iona, MN 56141

The Church of the Good Shepherd of Jackson, Minnesota
311 Sverdrup Ave S
Jackson, MN 56143

The Church of St. Ann of Janesville, Minnesota
307 W. 2nd St.
Janesville, MN 56048-0218

St. Joseph a/k/a The Church of St. Joseph of Jasper, Minnesota
415 2nd St. E.
Jasper, MN 56144-1212

St. John the Baptist
10343 640th Ave.
Johnsburg, MN 55909

Holy Family Catholic Church
1904 N. Mantorville Ave.
Kasson, MN 55944-0171

The Church of St. Agnes of Kellogg, Minnesota
125 Belvidere Ave.
Kellogg, MN 55945

The Church of the Crucifixion of La Crescent a/k/a Crucifixion
423 S 2nd St
La Crescent, MN 55947-1326

Saint Mary's Church of Lake City a/k/a St. Mary's Church of Lake City, Minnesota a/k/a Saint Mary's Church of Lake CitySpec Laws 1879 Chap 232
419 W. Lyon Ave.
Lake City, MN 55041-1649

Church of the Holy Family
201 N. Hunt
Lake Crystal, MN 56055

Church of St. Mary of the Village of Lake Wilson
320 Paul Ave
Lake Wilson, MN 56151

St. Joseph's
410 Broadway
Lakefield, MN 56150

The Church of St. Patrick of Lanesboro, Minnesota
100 Ridgeview Lane South
Lanesboro, MN 55949

St. Patrick a/k/a St. Patrick Catholic Church
436 W. Main St.
LeRoy, MN 55951

St. Rose of Lima Catholic Church of Lewiston, Minnesota
180 S. Fremont St.
Lewiston, MN 55952-0727

The Church of St. Anthony of Lismore, Minnesota
310 S 3rd Ave
Lismore, MN 56155-0158

Holy Trinity Church of Litomysl
9946 SE 24th Ave.
Litomysl, MN 55060

The Church of St. Catherine of Luverne a/k/a The Church of St. Catharine [sic] of
Luverne, Minnesota a/k/a St. Catherine
203 E. Brown
Luverne, MN 56156-1599

Church of Queen of Peace of the Village of Lyle, Minnesota
303 3rd Street
Lyle, MN 55953

St. Olaf Catholic Church a/k/a St. Olaf
114 N. Locust
Mabel, MN 55954

The Church of Saint Mary of Madelia, Minnesota
19 Crosby Ave NE
Madelia, MN 56062-1702

All Saints Parish of Madison Lake, Inc. a/k/a All Saints Parish of Madison Lake.Inc. [sic]
605 4th St.
Madison Lake, MN 56063-0217

Bodman_17817138_4

The Church of St. Peter and St. Paul of Mankato a/k/a The Church of St. Peter and
St.Paul [sic] of Mankato, Minnesota
105 N. 5th St.
Mankato, MN 56001-4442

The Church of St. John the Baptist of Mankato
632 S Broad St
Mankato, MN 56001

Church of St. Joseph the Worker
423 W. 7th St.
Mankato, MN 56001-2197

St. Thomas More Catholic Newman Center Parish of Mankato, Minnesota a/k/a Newman
Center, Diocese of Winona a/k/a St. Thomas More Catholic Newman Center of Mankato
1502 Warren Street
Mankato, MN 56001-4948

The Church of St. Theresa of Mapleton, Minnesota a/k/a St. Teresa
104 Silver St W
Mapleton, MN 56065-0305

Ss. Peter and Paul
222 1st Ave. S.
Mazeppa, MN 55956-0224

The Church of Christ the King of Medford, Minnesota
205 NW 2nd Ave
Medford, MN 55049

St. Mary
424 Bennett Ave.
Minneiska, MN 55910

Church of St. Paul, of the Village of Minnesota City, Minnesota
132 Anderson St.
Minnesota City, MN 55959

The Church of St. John the Baptist, of Minnesota Lake, Minnesota
100 Park St. N.
Minnesota Lake, MN 56068-1399

The Church of All Saints, New Richland
307 SW First St.
New Richland, MN 56072-0185

The Church of the Sacred Heart of Owatonna, Minnesota
810 S Cedar Ave.
Owatonna, MN 55060-3297

St. Joseph Church a/k/a St. Joseph
512 S Elm St
Owatonna, MN 55060-3399

The Church of St. Leo of Pipestone, Minnesota
415 S. Hiawatha Ave.
Pipestone, MN 56164-0036

The Church of St. Joachim of Plainview, Minnesota
900 W Broadway
Plainview, MN 55964-1039

St. Columban a/k/a St. Columban's Preston a/k/a The Church of St. Columbanus of
Preston, Minnesota
408 NW Preston St.
Preston, MN 55965

Co-Cathedral of St. John the Evangelist
11 4th Ave SW
Rochester, MN 55902-3098

Holy Spirit Catholic Church a/k/a Holy Spirit
5455 50th Ave. NW
Rochester, MN 55901

Pax Christi Church of Rochester, Minnesota
4135 18th Ave NW
Rochester, MN 55901-0460

Church of the Resurrection of Rochester, Minnesota
1600 11th Ave SE
Rochester, MN 55904-5499

The Church of St. Francis of Assisi of Rochester, Minnesota
1114 3rd St. SE
Rochester, MN 55904-7209

St. Pius X Catholic Church of Rochester, Minnesota
1315 12th Ave NW
Rochester, MN 55901-1744

Bodman_17817138_4

The Church of the Holy Trinity, Rollingstone, Minnesota
83 Main St.
Rollingstone, MN 55969

The Church of St. Peter of Rose Creek
302 Maple St. SW
Rose Creek, MN 55970

The Church of St. Joseph of Rushford, Minnesota
103 N. Mill St.
Rushford, MN 55971-0577

The Church of St. Luke of Sherburne
303 S Lake St
Sherburn, MN 56171

St. Bridget
2123 Cty Rd 16 SE
Simpson, MN 55976

Church of St. Ann a/k/a The Church of St. Anne, Slayton, Minnesota
2747 29th St.
Slayton, MN 56172-1485

The Church of St. Ignatius of Spring Valley, Minnesota
213 W. Franklin St.
Spring Valley, MN 55975-1312

St. Charles Borromeo
1900 E 6th St.
St. Charles, MN 55972-1426

Church of the Immaculate Conception of St. Clair, Minnesota
101 Church St.
St. Clair, MN 56080-0100

The Church of St. James of St. James a/k/a THe [sic] Church of St. James of St. James, Minnesota
707 4th St. S
St. James, MN 56081-1808

St. Bernard's Parish
116 4th Ave SE
Stewartville, MN 55976

8

St. James
106 W Main St.
Twin Lakes, MN 56007

The Church of St. Matthew of Vernon Center, Minnesota
200 Kendall St
Vernon Center, MN 56090-0156

St. Felix Church of Wabasha, Minnesota
117 3rd St. W
Wabasha, MN 55981-1201

St. Joseph a/k/a St. Joseph Catholic Church
225 3rd Ave N.
Waldorf, MN 56091

The Church of the Sacred Heart of Waseca, Minnesota
111 4th St NW
Waseca, MN 56093-2413

The Church of St. Casimir of Wells, Minnesota
320 2nd Ave. SW
Wells, MN 56097-1399

The Church of St. Anthony
1153 1st Ave
Westbrook, MN 56183

The Church of Our Lady of Good Counsel of Wilmont Minnesota
605 4th Ave
Wilmont, MN 56185

Immaculate Conception
Hwy 43
Wilson Township, MN 55987

The Church of St. Francis Xavier of Windom
548 17th St.
Windom, MN 56101-1217

The Church of St. Mary of Winnebago City, Minnesota
32 1st St. NE
Winnebago, MN 56098

9

St. Stanislaus Church of Winona a/k/a The Church of St. Stanislaus of Winona,
Minnesota a/k/a Basilica of St. Stanislaus Kostka
625 E. 4th St.
Winona, MN 55987

The Cathedral of the Sacred Heart
360 Main St.
Winona, MN 55987

St. Casimir
624 W. Broadway
Winona, MN 55987

St. John Nepomucene
560 E. Broadway
Winona, MN 55987

St. Mary's Church of Winona, Minnesota
1303 W Broadway
Winona, MN 55987

The Church of St. Martin of Woodstock, Minnesota
101 Smith St. N.
Woodstock, MN 56186-1075

The Church of St. Mary of Worthington
1215 7th Ave.
Worthington, MN 56187-2297

10

# EXHIBIT I

## Known Diocese Entity Insurance Policies[1]

**Workers' Compensation**

Upon information and belief, the Diocese has the following workers' compensation policies:

3. The Diocese is self-insured as authorized by the Minnesota Department of Commerce to self-insure for liabilities under Certificate of Authority W-007.
4. The Diocese has an excess workers' compensation policy issued by Berkley RE America under Policy No. WCB300021, which expires January 1, 2022.
5. The Diocese has an additional excess workers' compensation policy issued by the Workers Compensation Reinsurance Association under Policy No. 30238-2021, which expires January 1, 2022.

**General Liability**

Upon information and belief, the Diocese has the following general liability policies:

1. A general liability policy issued by Catholic Mutual Relief Society of America under Policy No.8933, which expires July 1, 2021; and
2. An excess general liability policy issued by Catholic Mutual Relief Society of America under Policy No. 8933, which expires July 1, 2021.

**Property**

Upon information and belief, the Diocese has the following property policies:

1. A property policy issued by Catholic Mutual Relief Society of America under Policy No.8933, which expires July 1, 2021.

**Vehicle**

Upon information and belief, the Diocese has the following vehicle policies:

1. A business auto policy issued by Church Mutual Insurance Company under Policy No. 0307149 09-118032, which expires July 1, 2021.
2. An excess automobile liability policy issued by the National Catholic Risk Retention Group under Policy No. RRG 10199-23, which expires July 1, 2021.

---

[1] This Exhibit I is based on the Diocese's present knowledge, information, and belief, as informed by information and documents currently available to the Diocese.

**Directors and Officers**

Upon information and belief, the Diocese has the following directors' and officers' policies:

1. A directors & officers policy issued by Catholic Mutual Relief Society of America under Policy No.8933, which expires July 1, 2021; and
2. An excess directors & officers policy issued by Catholic Mutual Relief Society of America, under Policy No.8933, which expires July 1, 2021.
3. An excess errors and omissions liability policy issued by The National Catholic Risk Retention Group under Policy No. RRG 10199-23, which expires July 1, 2021.

**Crime**

Upon information and belief, the Diocese has the following crime policies:

1. A crime policy issued by Catholic Mutual Relief Society of America under Policy No.8933, which expires July 1, 2021; and
2. An excess crime policy issued by Federal Insurance Company under Policy No.8235-1927, which expires July 1, 2021.

**Other**

Upon information and belief, the Diocese has the following additional insurance policies:

1. A Builder's Risk policy issued by Catholic Mutual Relief Society of America under Policy No.8933, which expires July 1, 2021;
2. An Equipment Breakdown policy issued by Travelers Indemnity Company under Policy No.8933, which expires July 1, 2021; and
3. A Priest/Religious policy covering both property and liability issued by Catholic Mutual Relief Society of America under Policy No. 8933, which expires July 1, 2021.
4. A Sexual Misconduct policy issued by Catholic Mutual Relief Society of America under Policy No. 8933, which expires July 1, 2021.
5. An excess sexual misconduct policy issued by The National Catholic Risk Retention Group under Policy No. RRG 10199-23, which expires July 1, 2021.
6. A Cyber Liability policy issued to Catholic Mutual and effected through NAS Insurance Services with Certain Underwriters at Lloyds, London under Master Policy No. 510641, which expires July 1, 2021.
7. An excess cyber liability policy issued by The National Catholic Risk Retention Group under Policy No. RRG 10199-23, which expires July 1, 2021.
8. A Foreign Casualty policy issued by AIG under Policy No. WS11009022, which expires July 1, 2021.
9. A Malicious Attack Liability Coverage and Crisis Response policy issued to Catholic Mutual and effected through Aon with Certain Underwriters at Lloyds, London under Master Policy No. CMCTR2003035, which expires July 1, 2021.

Bodman_17817138_4

**EXHIBIT J**

## Officers and Directors of Reorganized Debtor

| Name | Title |
|---|---|
| Most Rev. John M. Quinn | Bishop and President of Diocese Civil Corporation |
| Very Rev. William D. Thompson | Vicar General and Vice President of Diocese Civil Corporation |
| Very Rev. Glenn K. Frerichs | Chancellor, Judicial Vicar and Secretary of Diocese Civil Corporation |
| Mr. Andrew D. Brannon | Chief Operating Officer, Chief Financial Officer and Treasurer of Diocese Civil Corporation |
| Mr. Timothy McManimon | Director At-Large of Diocese Civil Corporation |

**EXHIBIT K**

**<u>Child Protection Protocols</u>**

(see attached)

# CHILD PROTECTION PROTOCOLS

The following writing (the "Child Protection Protocols") is intended to be a single, integrated document with each portion of such document, including each definition, constituting an essential, integrated part of the whole. These Child Protection Protocols are not intended or understood to be comprehensive such that they would reduce or minimize existing limits of duties or obligations that may be owed by the Diocese of Winona-Rochester to any party or parties.

## DEFINITIONS

A.     The term "active ministry" includes any activity connected to providing priestly ministry to the faithful within the geographic area of the Diocese.

B     A "credible claim" is one that is not implausible, and with respect to which there exists a reasonable suspicion, supported by circumstances that would justify a reasonable person's belief, that the allegation at issue may be true.

C.     The term "Diocese" shall mean the Diocese of Winona-Rochester.

D.     The term "Effective Date" shall carry the meaning assigned to it in the plan of reorganization confirmed by the Diocese in the U.S. Bankruptcy Court for the District of Minnesota in the year 2021.

E.     A "substantiated claim" is one for which sufficient credible evidence exists that a reasonable person might accept as adequate to substantiate the allegation or support the conclusion that the allegation can be substantiated.

## TERMS

1.     The Diocese shall not recommend or otherwise place any member of the clergy into a position in active ministry if such person (i) has a credible claim of sexual abuse pending against him;[1] (ii) had a previous, credible claim of sexual abuse or misconduct asserted against him; or (iii) is otherwise reasonably unsuitable for active ministry due to accusations of, or acts of sexual misconduct of any kind, including but not limited to the pursuing of, or engaging in any form of sexual or sexualizing activity with a minor.

2.     The Diocese shall not recommend or otherwise place any layperson, and shall direct its clergy not to recommend or otherwise place any layperson, into any position or role that provides such layperson with access to minors, if such

layperson: (i) has a credible claim of sexual abuse pending against him or her;[1] (ii) had a previous, credible claim of sexual abuse or misconduct asserted against him or her; or (iii) is otherwise reasonably unsuitable for the position at issue due to accusations of sexual misconduct of any kind, including but not limited to the pursuing of, or engaging in any form of sexual or sexualizing activity with a minor.

3.      Determinations of unsuitability for active ministry and layperson positions with access to minors shall be made, in every instance, by the Bishop of the Diocese of Winona-Rochester after receipt of written recommendations from two sources: the Vicar General and the Diocesan Review Board. The Vicar General and the Diocesan Review Board shall be provided all details and information relevant to each unsuitability determination with a sufficient time period for meaningful review of such materials. The written recommendations received from the Vicar General and the Diocesan Review Board shall be maintained indefinitely and protected from destruction and spoliation by the Diocese.

4.      The Diocese shall disclose any accusation of sexual abuse of a minor to any Diocese, Catholic entity or secular employer who inquires about the existence of any accusation of sexual abuse of a minor with regard to a past or present Diocesan clergy member to the extent that communication is allowed by federal and state law. The Diocese shall also disclose the status or resolution of that claim as reflected in its records as allowed by federal and state law. This policy does not apply to ministerial assignments within the Diocese.

5.      Upon the request of a survivor, the Bishop and Vicar General shall meet with any survivor and/or his or her chosen support person in a supervised setting, with due respect for the needs of the survivor. Meetings shall be private and may involve, and be interrupted or delayed, by a mutually-agreeable facilitator if the discussion becomes overly difficult for the survivor.

6.      The Diocese shall publish in *The Courier* four times per year for five (5) years, and one time per year for an additional five (5) years thereafter, a statement urging those with information regarding the sexual abuse of a minor to contact law enforcement to make a report of such abuse.

7.      Upon request of a survivor, the Bishop, on behalf of the Diocese, will send a personally-signed letter of apology to any survivor with a credible claim of sexual abuse in the context of a Rule 408 settlement communication.

Bodman_17817138_4

8.     The Diocese shall routinely and consistently encourage, in writing, each of its parishes and schools to maintain all programs and efforts necessary to prevent child sexual abuse and to train all clergy and laypersons within each parish and school to identify signs of child sexual abuse. The Diocese will also provide all forms of financial and logistical support reasonably necessary for its parishes and schools to accomplish these goals. In connection with the foregoing efforts, the Diocese will provide a copy of these Child Protection Protocols to each of its schools and parishes annually along with a letter urging thorough and consistent compliance with the same. In addition, the Diocese will periodically (at least twice per year) send each of its parishes and schools affirmative, written statements encouraging the reporting of abuse to: (i) the parents or guardians of children alleging credible abuse, (ii) police and prosecuting authorities, (iii) the Diocese, and (iv) the Diocesan Review Board.

9.     The Diocese shall continue to provide VIRTUS training or equivalent safe environment training to all new Diocese employees and agree to provide updated VIRTUS training or equivalent safe environment training to all Diocese employees every five years. If significant changes are made to the Diocese's training materials, the Diocese shall provide updated training to all Diocese employees within a reasonable time after these changes are adopted. The Diocese will provide a copy of all above-referenced training materials currently in use to the Diocesan Review Board annually.

10.     All mandated reporters, as defined in applicable statutes, at the Diocese shall receive specific training regarding reporting obligations every five (5) years and within thirty (30) days of their retention if newly-hired. The Diocese will provide a copy of all mandatory-reporter training materials currently in use to the Diocesan Review Board annually.

11.     The Diocese shall adopt a whistleblower policy concerning the reporting of abuse. The Diocese will provide a copy of its current whistleblower policy concerning the reporting of abuse to the Diocesan Review Board annually.

12.     On or before 20 days after the Effective Date, the Vicar General shall make a good faith effort to obtain, from each clergy member working within the Diocese, a signed and dated written statement affirming that the clergy member (1) has not sexually abused any minor at any time, and (2) has no knowledge of any abuse of a minor by another priest of the Diocese or employee of the Diocese that has not been reported to law enforcement and the Diocese. The Vicar General shall also make a good faith effort to obtain from any visiting priest who is given open-ended faculties to minister in the Diocese or has an assignment in a parish or related Diocesan entity (this does not include clergy visiting for a single event or over a time period of less than

3

twenty-one (21) days) a signed and dated statement under this paragraph no later than thirty (30) days after assignment or open-ended faculties are given. The written statements provided under this paragraph shall not require any clergy to disclose knowledge of sexual abuse of minors obtained in the course of confession or where a person seeks religious or spiritual advice, aid, or comfort pursuant to specific applicable statutes. Copies of all statements obtained under this paragraph will be provided timely to the Diocesan Review Board.

13.     The Diocese will prohibit its employees and volunteers from being alone *(i.e.* out of sight of at least one other adult) with any unrelated minor while serving as an employee or volunteer of the Diocese or any related parish or school subject to common sense exceptions, such as emergency situations, interactions with a minor that are incidental and not extended, parents transporting their children or related individuals, and employees or volunteers transporting the children of friends and neighbors. Priests will be prohibited from being alone *(i.e.* out of sight of at least one other adult) with any unrelated minor except when the clergy member is hearing confession in a confessional and except for exceptional, common sense exceptions, such as emergency situations and circumstances where interaction with a minor is incidental and brief, such as a priest's incidentally walking past a child in the hallway of a school when the priest and child are on their way to separate destinations.

14.     The Diocese will prohibit any member of clergy from traveling alone with, or taking any overnight trip alone with any unrelated minor. If a clergy member travels with any unrelated minor(s), then there must be at least one other adult present and actively supervising the minor(s) at all times. Clergy members are strictly prohibited from sleeping in the same space *(e.g.,* room, bedroom, hotel room, tent, bed, etc.) with any unrelated minor and no exceptions to this prohibition shall apply.

15.     The Diocese will prohibit priests from having an unrelated child or children in their automobile unless such activity is supervised by at least one other adult throughout the activity's duration.

16.     Public disclosure of substantiated claims of sexual abuse of minors by clergy and those facing pending credible claims that are under investigation shall be ongoing. The disclosures will be updated when a claim is determined to be substantiated, whether from the review of clergy files by the Diocesan Review Board, outside experts, or otherwise. In every such case, the Diocese will add the name of the clergy member to the disclosure section of its website. The Diocese will also disclose the names of clergy deemed unsuitable for ministry under circumstances that arise, in whole or in part, out of accusations or risk of sexual abuse of a minor (per the review and consultation

4

outlined above in these Child Protection Protocols). Public disclosures under this paragraph shall be made as soon as reasonably practicable but, in any event, no later than forty-five (45) days after the relevant determination. The Diocese will also share this information with the public by issuing and posting a press release on its website.

17.     With regard to a substantiated claim of sexual abuse of a minor, at the conclusion of the canonical process for determination of clerical status, documents pertaining to the accusation of sexual abuse of a minor and the Diocese's response to the claim will be made accessible to the public.

18.     The Diocese shall remove photos and any visible honors (such as a plaque honoring that cleric individually or naming of a building or hall in that cleric's honor) from public display for each priest with a substantiated claim of sexual abuse of a minor. This does not prevent the Diocese from displaying photos of priests with a substantiated claim of abuse if that photo or the words accompanying it clearly indicate that the priest had a substantiated claim of sexual abuse of a minor asserted against him.

19.     When the Diocese receives a report of child sexual abuse it will, without delay or alteration, communicate such report along with all related details to law enforcement in a manner consistent with applicable statutes and any other requirements or guidelines that apply under civil law. The Diocese shall not conduct an internal investigation of such incidents, and will not interfere in any way with law enforcement's investigation of such incidents, until law enforcement concludes its investigation, closes its file without an investigation, or affirmatively authorizes the Diocese in writing to proceed with its own internal investigation. In the event that the Diocese learns of any effort(s) to hide or delay discovery of one or more incidents of child sexual abuse, or to hinder discovery of any related fact(s), the Diocese will provide a detailed report of such efforts or activity to law enforcement.

20.     To the maximum extent permitted by applicable federal and state civil law, and notwithstanding any provision of Canon Law to the contrary, the Diocese shall disclose any and all accusations of sexual abuse of a minor involving members of its clergy or former members of its clergy to any potential employer who inquires about the existence of such accusations. The Diocese shall also disclose the status or resolution of any and all related claims as reflected in its records to the maximum extent permitted by federal and state civil law.

21.     The Diocese will send written statements to each of its parishes and schools, at least annually, stating that survivors of child sexual abuse are not at fault for their abuse

or enemies of the church, but are instead God's children and valued members of the flock who deserve the Catholic's community's empathy, care, and protection.

22.     The Diocese will take all steps within its control to discontinue financial remuneration of any kind being paid to any member of clergy within its authority against whom a substantiated claim of sexual abuse or sexual misconduct has been asserted.

Bodman_17817138_4

**Record Keeping**

12.1. Within 30 days after the Effective Date of the Plan, the Diocese shall formulate policies for the acceptable use of Diocese computers and electronic devices, the screening of electronic devices, and the retention of documents and electronically stored information. The policies shall address the following:

a.  The Diocese shall maintain a record of electronic devices (computers, laptops, tablets, etc.) that are Diocese property in the possession of clergy, employees, or Adult Volunteers.
b.  When the Diocese has reasonable cause to believe that a cleric, a Diocese employee, or volunteer has violated policies relating to electronic devices or their usage in a manner that involves sexual misconduct with a minor, the Diocese shall secure the electronic device for evidentiary value.
c.  If the Diocese learns of the existence of a computer or other electronic communications device that may have relevance to, or possible evidentiary value in, a law enforcement investigation of clergy sexual abuse of a minor, the Director shall promptly notify the appropriate law enforcement agency having jurisdiction.
d.  The Diocese shall develop a written policy regarding the handling of evidence, including computers or electronic devices that relates to any internal Diocese Safe Environment investigation.

12.2. The Office of the Director shall maintain records relating to clergy and the Safe Environment Program

12.3. The Office of the Director shall maintain records of the training sessions and educational requirements required under the Policies.

12.4. The Diocese shall maintain files for all clergy.

12.5. The Diocese shall have a policy to not destroy clergy files.

12.6. Files may be maintained electronically.

12.7. Clergy files shall contain the following records:

a.  signed documents as required under the Policies;
b.  copies of all returned background checks;
c.  internal memoranda or documentation regarding clergy misconduct;
d.  records of any allegation of sexual abuse of a minor;
e.  records of any mandatory report made to law enforcement about the cleric;
f.  records of any internal investigation;
g.  records relating to review by the Ministerial Review Board; and
h.  information pertaining to the POMS Program, if applicable.

## EXHIBIT L

## <u>Other Allegedly Insured Entities</u>

None

## EXHIBIT M

### List of Catholic Entities

### Parishes in the Diocese of Winona-Rochester

The Church of the Sacred Heart of Adams, Minnesota
412 W Main St.
Adams, MN 55909-0352

The Church of St. Adrian of Adrian, Minnesota
512 Maine Ave
Adrian, MN 56110-0475

The Church of St. Theodore of Albert Lea, Minnesota
315 E. Clark St.
Albert Lea, MN 56007-0604

St. Anthony of Altura, Minnesota
119 1st St. NE
Altura, MN 55910

Church of Queen of Angels of Austin, Minnesota
1001 E Oakland Ave
Austin, MN 55912-3896

The Church of St. Augustine of Austin, Minnesota
405 4th St NW
Austin, MN 55912-3091

The Church of St. Edward of Austin, Minnesota
2000 West Oakland Ave
Austin, MN 55912-1599

The Church of St. Columbanus of Blooming Prairie, Minnesota
114 E. Main St.
Blooming Prairie, MN 55917-1427

The Church of Saints Peter and Paul of Blue Earth, Minnesota
214 S. Holland St.
Blue Earth, MN 56013-1331

Church of Sacred Heart of Brewster, Minnesota
516 10th St.
Brewster, MN 56119-0187

Saint Patrick's Church, of Brownsville
604 Adams St.
Brownsville, MN 55919-0155

Church of Christ the King of Byron, Minnesota
202 4th St. NW
Byron, MN 55920-1000

Church of St. Mary
513 S. Pine St.
Caledonia, MN 55921-0406

Assumption, a/k/a Assumption Catholic Church
207 N. May St.
Canton, MN 55922

The Church of St. Mary of Chatfield, Minnesota
405 Bench St SW
Chatfield, MN 55923

Immaculate Conception Church
22032 County Rd. 18
Plainview, MN 55945

The Church of the Immaculate Heart of Mary, of Currie, Minnesota
510 Mill St
Currie, MN 56123

The Church of Holy Cross of Dakota, Minnesota
180 Washington St
Dakota, MN 55925

St. John Baptiste de la Salle a/k/a Church of St. John Baptists[sic] De La Salle
20 2nd St NE
Dodge Center, MN 55927-0310

The Holy Family Catholic Church a/k/a Holy Family
2481 50th St.
East Chain, MN 56031-3098

Church of Our Lady of Mount Carmel of Easton, Minnesota
27 Main St.
Easton, MN 56025-0008

2

The Church of St. Aloysius of Elba, Minnesota
150 N. Main St.
Elba, MN 55910

The Church of Holy Redeemer a/k/a Holy Redeemer
22 E. 2nd St.
Eyota, MN 55934

Saint John Vianney Catholic Church of Fairmont, Minnesota
901 S. Prairie Ave.
Fairmont, MN 56031-3098

The Church of St. Gabriel of Fulda, Minnesota
309 W Lake Ave
Fulda, MN 56131-9402

The Church of St. Joseph of Good Thunder, Minnesota
130 N Ewing St
Good Thunder, MN 56037

Church of St. Finbarr, of the County of Mower, Minnesota
504 1st St. SW
Grand Meadow, MN 55936

Church of the Nativity of the Blessed Virgin Mary of Harmony, Minnesota
640 1st Ave. SW
Harmony, MN 55939

Sacred Heart Church of Hayfield, Minnesota
150 2nd St. NE
Hayfield, MN 55940-0027

The Church of the Sacred Heart of Heron Lake, Minnesota
321 9th St.
Heron Lake, MN 56137

St. Peter a/k/a St. Peter's
34 Main St.
Hokah, MN 55941-0355

St. Mary a/k/a St. Mary's
202 S. Sheridan
Houston, MN 55943

Bodman_17817138_4

The Church of St. Columba of Iona a/k/a The Church of ST. [sic] Columba of Iona,
Minnesota
451 McDonnell Ave.
Iona, MN 56141

The Church of the Good Shepherd of Jackson, Minnesota
311 Sverdrup Ave S
Jackson, MN 56143

The Church of St. Ann of Janesville, Minnesota
307 W. 2nd St.
Janesville, MN 56048-0218

St. Joseph a/k/a The Church of St. Joseph of Jasper, Minnesota
415 2nd St. E.
Jasper, MN 56144-1212

St. John the Baptist
10343 640th Ave.
Johnsburg, MN 55909

Holy Family Catholic Church
1904 N. Mantorville Ave.
Kasson, MN 55944-0171

The Church of St. Agnes of Kellogg, Minnesota
125 Belvidere Ave.
Kellogg, MN 55945

The Church of the Crucifixion of La Crescent a/k/a Crucifixion
423 S 2nd St
La Crescent, MN 55947-1326

Saint Mary's Church of Lake City a/k/a St. Mary's Church of Lake City, Minnesota a/k/a
Saint Mary's Church of Lake CitySpec Laws 1879 Chap 232
419 W. Lyon Ave.
Lake City, MN 55041-1649

Church of the Holy Family
201 N. Hunt
Lake Crystal, MN 56055

Church of St. Mary of the Village of Lake Wilson
320 Paul Ave
Lake Wilson, MN 56151

4

St. Joseph's
410 Broadway
Lakefield, MN 56150

The Church of St. Patrick of Lanesboro, Minnesota
100 Ridgeview Lane South
Lanesboro, MN 55949

St. Patrick a/k/a St. Patrick Catholic Church
436 W. Main St.
LeRoy, MN 55951

St. Rose of Lima Catholic Church of Lewiston, Minnesota
180 S. Fremont St.
Lewiston, MN 55952-0727

The Church of St. Anthony of Lismore, Minnesota
310 S 3rd Ave
Lismore, MN 56155-0158

Holy Trinity Church of Litomysl
9946 SE 24th Ave.
Litomysl, MN 55060

The Church of St. Catherine of Luverne a/k/a The Church of St. Catharine [sic] of
Luverne, Minnesota a/k/a St. Catherine
203 E. Brown
Luverne, MN 56156-1599

Church of Queen of Peace of the Village of Lyle, Minnesota
303 3rd Street
Lyle, MN 55953

St. Olaf Catholic Church a/k/a St. Olaf
114 N. Locust
Mabel, MN 55954

The Church of Saint Mary of Madelia, Minnesota
19 Crosby Ave NE
Madelia, MN 56062-1702

All Saints Parish of Madison Lake, Inc. a/k/a All Saints Parish of Madison Lake.Inc. [sic]
605 4th St.
Madison Lake, MN 56063-0217

Bodman_17817138_4

The Church of St. Peter and St. Paul of Mankato a/k/a The Church of St. Peter and
St.Paul [sic] of Mankato, Minnesota
105 N. 5th St.
Mankato, MN 56001-4442

The Church of St. John the Baptist of Mankato
632 S Broad St
Mankato, MN 56001

Church of St. Joseph the Worker
423 W. 7th St.
Mankato, MN 56001-2197

St. Thomas More Catholic Newman Center Parish of Mankato, Minnesota a/k/a Newman
Center, Diocese of Winona a/k/a St. Thomas More Catholic Newman Center of Mankato
1502 Warren Street
Mankato, MN 56001-4948

The Church of St. Theresa of Mapleton, Minnesota a/k/a St. Teresa
104 Silver St W
Mapleton, MN 56065-0305

Ss. Peter and Paul
222 1st Ave. S.
Mazeppa, MN 55956-0224

The Church of Christ the King of Medford, Minnesota
205 NW 2nd Ave
Medford, MN 55049

St. Mary
424 Bennett Ave.
Minneiska, MN 55910

Church of St. Paul, of the Village of Minnesota City, Minnesota
132 Anderson St.
Minnesota City, MN 55959

The Church of St. John the Baptist, of Minnesota Lake, Minnesota
100 Park St. N.
Minnesota Lake, MN 56068-1399

The Church of All Saints, New Richland
307 SW First St.
New Richland, MN 56072-0185

The Church of the Sacred Heart of Owatonna, Minnesota
810 S Cedar Ave.
Owatonna, MN 55060-3297

St. Joseph Church a/k/a St. Joseph
512 S Elm St
Owatonna, MN 55060-3399

The Church of St. Leo of Pipestone, Minnesota
415 S. Hiawatha Ave.
Pipestone, MN 56164-0036

The Church of St. Joachim of Plainview, Minnesota
900 W Broadway
Plainview, MN 55964-1039

St. Columban a/k/a St. Columban's Preston a/k/a The Church of St. Columbanus of
Preston, Minnesota
408 NW Preston St.
Preston, MN 55965

Co-Cathedral of St. John the Evangelist
11 4th Ave SW
Rochester, MN 55902-3098

Holy Spirit Catholic Church a/k/a Holy Spirit
5455 50th Ave. NW
Rochester, MN 55901

Pax Christi Church of Rochester, Minnesota
4135 18th Ave NW
Rochester, MN 55901-0460

Church of the Resurrection of Rochester, Minnesota
1600 11th Ave SE
Rochester, MN 55904-5499

The Church of St. Francis of Assisi of Rochester, Minnesota
1114 3rd St. SE
Rochester, MN 55904-7209

St. Pius X Catholic Church of Rochester, Minnesota
1315 12th Ave NW
Rochester, MN 55901-1744

The Church of the Holy Trinity, Rollingstone, Minnesota
83 Main St.
Rollingstone, MN 55969

The Church of St. Peter of Rose Creek
302 Maple St. SW
Rose Creek, MN 55970

The Church of St. Joseph of Rushford, Minnesota
103 N. Mill St.
Rushford, MN 55971-0577

The Church of St. Luke of Sherburne
303 S Lake St
Sherburn, MN 56171

St. Bridget
2123 Cty Rd 16 SE
Simpson, MN 55976

Church of St. Ann a/k/a The Church of St. Anne, Slayton, Minnesota
2747 29th St.
Slayton, MN 56172-1485

The Church of St. Ignatius of Spring Valley, Minnesota
213 W. Franklin St.
Spring Valley, MN 55975-1312

St. Charles Borromeo
1900 E 6th St.
St. Charles, MN 55972-1426

Church of the Immaculate Conception of St. Clair, Minnesota
101 Church St.
St. Clair, MN 56080-0100

The Church of St. James of St. James a/k/a THe [sic] Church of St. James of St. James,
Minnesota
707 4th St. S
St. James, MN 56081-1808

St. Bernard's Parish
116 4th Ave SE
Stewartville, MN 55976

St. James
106 W Main St.
Twin Lakes, MN 56007

The Church of St. Matthew of Vernon Center, Minnesota
200 Kendall St
Vernon Center, MN 56090-0156

St. Felix Church of Wabasha, Minnesota
117 3rd St. W
Wabasha, MN 55981-1201

St. Joseph a/k/a St. Joseph Catholic Church
225 3rd Ave N.
Waldorf, MN 56091

The Church of the Sacred Heart of Waseca, Minnesota
111 4th St NW
Waseca, MN 56093-2413

The Church of St. Casimir of Wells, Minnesota
320 2nd Ave. SW
Wells, MN 56097-1399

The Church of St. Anthony
1153 1st Ave
Westbrook, MN 56183

The Church of Our Lady of Good Counsel of Wilmont Minnesota
605 4th Ave
Wilmont, MN 56185

Immaculate Conception
Hwy 43
Wilson Township, MN 55987

The Church of St. Francis Xavier of Windom
548 17th St.
Windom, MN 56101-1217

The Church of St. Mary of Winnebago City, Minnesota
32 1st St. NE
Winnebago, MN 56098

9

St. Stanislaus Church of Winona a/k/a The Church of St. Stanislaus of Winona,
Minnesota a/k/a Basilica of St. Stanislaus Kostka
625 E. 4th St.
Winona, MN 55987

The Cathedral of the Sacred Heart
360 Main St.
Winona, MN 55987

St. Casimir
624 W. Broadway
Winona, MN 55987

St. John Nepomucene
560 E. Broadway
Winona, MN 55987

St. Mary's Church of Winona, Minnesota
1303 W Broadway
Winona, MN 55987

The Church of St. Martin of Woodstock, Minnesota
101 Smith St. N.
Woodstock, MN 56186-1075

The Church of St. Mary of Worthington
1215 7th Ave.
Worthington, MN 56187-2297

### **Closed Parishes in the Diocese of Winona-Rochester**

St. Rose of Lima – Closed
Avoca, MN 56114
Murray County

Our Lady of Loretto –  Merged into Queen of Angels Catholic Church, Austin
404 W. Main Street
Brownsdale, MN 55918
Mower County

St. John the Baptist – Closed
Caledonia, MN  55921
Houston County

St. Peter – Closed
Caledonia, MN 55921
Houston County

St. Ligouri – Closed
Carimona, MN 55965
Fillmore, County

St. Francis de Sales – Closed
326 2nd St
Claremont, MN 55924
Dodge County

St. John's Catholic Church – Closed
Danville, MN 94506
Blue Earth County

Mater Delorosa– Closed
Delavan, MN 56023
Faribault County

Corpus Christi – Closed
8914 NW 66th St
Deerfield, MN 56093
Steele County

St. Mary Catholic Church – Closed
Dundee, MN 56131
Nobles County

St. Mary – Merged into Church of St. Catherine of Luverne, Minnesota
204 N. Broadway St. SW
Ellsworth, MN 56129
Nobles County

The Church of St. Aidan – Closed
218 5th Ave W
Ellendale, MN 56026
Steele County

St. Lawrence O'Toole Catholic Church – Closed
Fountain, MN 55935
Fillmore, County

11

St. Nicholas Catholic Church – Closed
Freeburg, MN 55921
Houston County

The Church of St. Mary – Closed
Geneva, MN
Freeborn County

Our Lady of Mercy – Closed
Guckeen, MN 56013
Faribault County

St. Clement Catholic Church – Closed
Hammond, MN 55991
Wabasha County

Ss. Peter and Paul Catholic Church – Closed
Hart, MN 55952
Winona County

St. Jarlath – Closed
Iosco, MN 56048
Waseca County

St. Augustine – Closed
Jeffers, MN 56145
Cottonwood County

St. Patrick – Closed
Jefferson, MN 55921
Houston County

St. Olaf – Closed
Kasson, MN 55944
Dodge County

St. Mary – Closed
Kenneth, MN 56147
Rock County

Precious Blood – Closed
La Moille, MN 55987
Winona County

12

St. Margaret – Closed
Mantorville, MN 55955
Dodge County

St. John the Baptist – Closed
Minneota, MN 56264
Jackson County

St. Wenceslaus – Closed
Moravia, MN 55060
Steele County

Immaculate Conception– Closed
Oak Ridge, MN 55910
Winona County

St. James – Closed
Oakwood, MN 55957
Wabasha County

St. Hyacinth – Closed
Owatonna, MN 55060
Steele County

St. Mary – Closed
Preble, MN 55949
Houston County

St. Patrick – Closed
Ridgeway, MN 55925
Winona County

St. Kilian – Closed
14034 Emerald Ave
St. Kilian, MN 56185
Nobles County

St. Joseph – Closed
Theilman, MN 55945
Wabasha County

St. Joseph – Closed
Trimont, MN 56176
Martin County

13

St. Katherine – Closed
518 E 2nd St. S.
Truman, MN 56088
Martin County

St. Mary – Closed
Waseca, MN 56093
Waseca County

St. Mary – Closed
Wisner's Grove, MN 56025
Faribault, MN
Faribault County

St. Joseph – Closed
Winona, MN 55987
Winona County

St. Vincent de Paul – Closed
720 1st St
West Concord, MN 55985
Dodge County

St. Thomas Pro-Cathedral – Closed
Winona County

St. Kilian – Closed
Wykoff, MN 55990
Fillmore County

## Catholic Schools in the Diocese of Winona-Rochester

Sacred Heart School
11 SW Fifth Street
Adams, MN 55909

Saint Theodore School
323 E Clark Street
Albert Lea, MN 56007

Pacelli Jr/Sr High School
311 NW Fourth Street
Austin, MN 55912

Bodman_17817138_4

Pacelli Elementary School
511 NW 4th Avenue
Austin, MN 55912

Saint Mary School
308 E South Street
Caledonia, MN 55921

Saint John Vianney School
911 S Prairie Avenue
Fairmont, MN 56031

Saint Peter School
34 Main Street
Hokah, MN 55941

Crucifixion School
420 S Second Street
La Crescent, MN 55947

Saint Mary School
223 NE First Street
Madelia, MN 56062

Loyola High School / Loyola Primary School
145 Good Counsel Drive
Mankato, MN 56001

Loyola Intermediate School
110 North Fifth St
Mankato, MN 56001

Saint Mary School
730 S Cedar Avenue
Owatonna, MN 55060

Noah's Ark Preschool
415 S Hiawatha Avenue
Pipestone, MN 56164-0036

Holy Spirit School
5455 NW 50th Avenue
Rochester, MN 55901

15

Lourdes High School of Rochester, Inc. a/k/a Lourdes Catholic High School
2800 NW 19th Street
Rochester, MN 55901

Saint Francis of Assisi School
318 SE 11th Avenue
Rochester, MN 55904

Saint John Evangelist School
424 W Center Street
Rochester, MN 55902

Saint Pius X School
1205 NW 12th Avenue
Rochester, MN 55901

Saint Felix School
130 E Third Street
Wabasha, MN 55981

Sacred Heart Children's House
400 NW Second Avenue
Waseca, MN 56093

Sacred Heart School
308 W Elm Avenue
Waseca, MN 56093

Saint Casimir School
330 Second Avenue
Wells, MN 56097

Cotter Jr/Sr High School
1115 W. Broadway Street
Winona, MN 55987

Winona Area Catholic Schools Inc.
1315 West Broadway
Winona, MN 55987

WACS Primary School
St. Mary's Educare
1315 West Broadway
Winona, MN 55987

16

Saint Mary's School
1206 Eighth Avenue
Worthington, MN 56187

Mankato Area Catholic Schools, Inc.
145 Good Counsel Dr.
Mankato, MN 56001

Rochester Catholic Schools
2800 19th St NW
Rochester, MN 55901

Immaculate Heart of Mary Seminary, Inc.
750 Terrace Hts.
Winona, MN 55987

Blessed Jose´ Sanchez Del Rio High School Seminary
Institute of the Incarnate Word
512 E. Mulberry St.
Mankato, MN 56001

## Cemeteries in the Diocese of Winona-Rochester

Sacred Heart Cemetery
Southern terminus of Lions Street
Adams, MN 55909

St Adrian Cemetery
SW corner of Dillman Ave. and 250th St.
Adrian, MN 56110

St Theodore Cemetery
Lakewood Ave
Albert Lea, MN 56007

Calvary Cemetery
4th Dr. SW, between 17th and 19th Aves.
Austin, MN 55912

St Rose of Lima Cemetery
925 SW 2nd St
Avoca, MN 56114

St Columbanus Cemetery (Main)
707 Hwy. Ave. S.
Blooming Prairie, MN 55917

17

St Columbanus Cemetery (Rural)
Corner of 755th St. & 115th Ave.
Blooming Prairie, MN 55917

Calvary Cemetery
N. side of Riverside Rd.
Blue Earth, MN 56013

Sacred Heart Cemetery
On Frontier Rd., Brewster, 1/2way between 11th St. and 210th St.
Brewster, MN 56119

St Patrick Cemetery
Cork Hollow Dr., North of County Rd. 3, W. of Brownsville
Brownsville, MN 55919

Calvary Cemetery
W. end of County Rd. 249, near S. Winnebago St
Caledonia, MN 55921

Calvary Cemetery
12747 County Rd. 21
Canton, MN 55922

St Liguori Cemetery
22620 County. Rd. 14
Preston, MN 55965

Calvary Cemetery
33030 County Rd. 5
Chatfield, MN 55923

St. Mary Cemetery
32769 US-52
Chatfield, MN 55923

St Francis de Sales Cemetery
12872 610th Street
Claremont, Minnesota 55924

Ss Peter & Paul Cemetery
22032 County Rd 18
Kellogg, MN 55945

18

Calvary Cemetery
510 Mill. St.
Currie, MN

Holy Cross Cemetery
SW of intersection of Center St. and W. Frontage Rd.
Dakota, MN 55925

Corpus Christi Cemetery
Corner of 755th St. & 115th Ave.
Blooming Prairie, MN 55917

Calvary Cemetery
40985 180th St.
Delavan, Minnesota 56023

St Mary Cemetery
W. side of Whigam Ave., S. of 4th St.
Dundee, MN 56131

Holy Family Cemetery
400-001 196th Street
Lake Crystal, MN 56055

Our Lady of Mount Carmel Cemetery
NE of Cty Rd 17 and 160th St.
Barber Twp., MN, 55328

St Aloysius Cemetery
Co Hwy 26 and Kieffer Dr.
Elba, MN 55910

St Aidan Cemetery
SE corner of 740th Ave. and 325th St.
Bath, MN 56042

St Mary Cemetery
Intersection of 325th St. and Ahlers Ave.
Ellsworth, MN 56129

Holy Redeemer Cemetery
2451 110th Ave SE
Eyota, MN 55934

Calvary Cemetery
1405 Albion Ave.
Fairmont, MN 56031

Carrolton Cemetery
29057 County Rd. 8
Fountain, MN 55935

St Nicholas Cemetery
N of old church, between Pleasant Valley Rd. and Crazy Corners Rd.
N of Cty Rd. 249
Freeburg, MN 55921

St Gabriel Cemetery
191 240th Ave.
Fulda, MN 56131

St Mary Cemetery
W. end of Twp. Rd. No. T-269A
Ellendale, MN 56026

St Joseph (Calvary) Cemetery
15524 555th Ave.
Good Thunder, Minnesota 56037

St Finbarr Cemetery
NE Corner of 730th Ave. and 255th St.
Grand Meadow MN 55936

St Clement Cemetery
557 Main St E
Hammond, MN 55991

Ss Peter & Paul Cemetery
24898 Hartwood Dr.
Rushford, MN 55971

Sacred Heart Cemetery
At intersection of 375th Ave (or County Rd 9) and 920th St.
Heron Lake, MN 56137

Mount Calvary Cemetery
N. of Hwy 16, between 10th St. and 8th St.
Hokah, MN 55941

Bodman_17817138_4

St Joseph Convent Cemetery
NE of Hokah, N of Hwy 16 and Cty Rd 21, at N end of Pfeffer Valley Rd.
Hokah, MN 55941

St Mary Cemetery
N. of County Rd. 9, 1 mile E of Hwy 76
Houston, MN. 55943

St Columba Cemetery
1456 46th St.
Iona, MN  56141

St Jarlath Cemetery
At intersection of CR 22 and CR 35
Waterville, MN 56096

St Wenceslaus Cemetery
300 U.S. 71
Jackson, MN 56143

St Ann Cemetery
37459 35th St.
Janesville, MN 56048

St Joseph Cemetery
146th St., Hwy 269
Jasper, MN 56144

St Patrick Cemetery
Intersection of County Rd. 8, County Rd. 11, and County Rd. 13
Ridgeway, MN 55987

St John Cemetery
County road 7
Adams, MN 55909

St Agnes Cemetery
63558 170th Ave.
Kellogg, MN 55945

Crucifixion Cemetery
Intersection of Cty 6 & 25
La Crescent, Minnesota 55947

Bodman_17817138_4

Pine Creek Cemetery
Intersection of Beckman Rd. and County Rd. 6
La Crescent, MN 55947

Precious Blood Cemetery
23337 Lamoille Rd.
Winona, MN 55987

St Mary Cemetery
W. of Hwy 63 and Cross St.
Lake City, MN 55041

Holy Family Cemetery
400-001 196th Street, Lake Crystal
Lake Crystal, MN 56055

St Joseph Cemetery
44605 740th St.
Lakefield, MN 56150

Holt Cemetery (St Patrick Cemetery)
W. side of S. terminus of Auburn Ave
Lanesboro, MN 55949

St Patrick Cemetery
SW of intersection of Cemetery Rd. N. and 115th St.
Leroy, MN 55951

St Rose of Lima Cemetery
925 SW 2nd St
Avoca, MN 56114

St Anthony Cemetery
NE corner of Dayton Ave., and 170th St.
Lismore, MN

Holy Trinity Cemetery
9687 24th Ave. SE
Owatonna MN 55060

St Catherine Cemetery
NE portion of intersection of James St. and Hwy 75
Luverne, MN 56156

22

Calvary Cemetery
73383 345th St.
St. James, MN 56081

Calvary Cemetery
62286 State Highway 60
Madison Lake, MN 56063

Calvary Cemetery
200 Goodyear Avenue
Mankato, MN 56001

St Margaret Cemetery
598 Cemetery Rd.
Mantorville, MN 55955

Calvary Cemetery
301-020 Troendele Street
Mapleton, MN  56065

Ss Peter & Paul Cemetery
1/10th of a mile N. of Oak St. NE on County Rd. 1
Mazeppa, MN 55956

Resurrection Cemetery
2913 66th St. NW
Medford, MN 55049

St Patrick Cemetery (West Albany)
30932 Hwy. 60
Millville, MN 55957

St Mary Cemetery
56677 116th Ave.
Altura, MN 55910

St John the Baptist Cemetery
44605 740th St. Minneota Township
Minneota Township, MN

St Paul Cemetery
133 Homer Rd.
Winona, MN 55987

Bodman_17817138_4

St John the Baptist Cemetery
320 Cemetery Road
Minnesota Lake (Danville Township), MN 56068

Calvary Cemetery
SE corner of the intersection at 240th Ave. and 136th St.
New Richland, MN, 56072

Immaculate Conception of St Mary Cemetery
15163 County Rd 31
Altura, MN 55910

Sacred Heart Cemetery
9687 24th Ave. SE
Owatonna MN 55060

Seco Cemetery (St. Wenceslaus of Moravia)
5778 SW 32nd Ave.
Owatonna, MN 55060

St Leo Cemetery
657 115th St.
Pipestone, MN 56164

St Joachim Cemetery
10th St. NW
Plainview, MN 55964

St Mary Cemetery
18441 455the Ave.
Preble, MN 55954

Calvary Cemetery
22620 County. Rd. 14
Preston, MN 55965

St Patrick Cemetery
Intersection of County Rd. 8, County Rd. 11, and County Rd. 13
Ridgeway, MN 55987

Calvary Cemetery
500 11th Ave. NE
Rochester, MN 55906

Bodman_17817138_4

Holy Trinity Cemetery
83 Main St.
Rollingstone, MN 55969

St Peter Cemetery
410 Maple St. SW
Rose Creek, MN 55970

St Joseph Cemetery
44332 County Rd. 27
Rushford, MN 55971

St Luke Cemetery
803 120th St.
Sherburn, MN 56171

St Bridget Cemetery
2003 Co. Hwy 20
Rochester, MN 55904

St Ann Cemetery
1597 101St St.
Slayton, MN  56172

St Ignatius Cemetery
13665 County Rd. 12
Spring Valley, MN 55975

Calvary Cemetery
20050 25th St. SE
St. Charles, MN 55972

Immaculate Conception Cemetery
15163 County Rd 31
Altura, MN 55910

St Kilian Cemetery
313 4th Ave.
Wilmont, MN 56185

St Bernard Cemetery
460 10th St. NW
Stewartville, MN 55976

Bodman_17817138_4

St Joseph Cemetery
26185 627th St.
Theilman, MN

St James Cemetery
E. Corner of 125th St. & 725th Ave.
Twin Lakes, MN 56029

St Matthew Cemetery
52900 Firefly Rd.
Vernon Center, MN 56090

St Felix Cemetery
1210 Rustic Lane E.
Wabasha, MN 55981

St Joseph Cemetery
Intersection of Main St. and Hwy. 83
Waldorf, MN 56091

Calvary Cemetery
N. of intersection of 336th Ave. & 128th St.
Waseca, MN 56093

St Mary Cemetery
St Mary Cemetery Road
Waseca, MN 56093

St Casimir Cemetery
SW corner of 1st St. NW and Half Moon Rd.
Wells, MN 56097

St Vincent de Paul Cemetery
720 1st St
West Concord, MN 55985

Calvary Cemetery
22412-22000 State Hwy. 266
Wilmont, MN 56185

Immaculate Conception Cemetery
25124 MN-43
Winona, MN 55987

26

St Francis Xavier Cemetery
Co. Rd. 26 at S. 1st St.
Windom, MN 56101

St Mary Cemetery
At the W. terminus of 6th Ave SW
Winnebago, MN, 56098

St Mary Cemetery
1333 Homer Road
Winona, MN 55987

St Martin Cemetery
1091 160th Ave.
Woodstock, MN 56186

St Mary Cemetery
W. Side of Read Ave, between 260th St. and E. Clary St.
Worthington, MN 56187

St Kilian Cemetery
19675 County Rd. 117
Wykoff, MN 55990

## **Miscellaneous Organizations**

Catholic Charities of the Diocese of Winona-Rochester
a/k/a Catholic Charities of Southern Minnesota f/k/a The Lamberton Home, Winona
111 Market Street, Suite 2
P.O. Box 379
Winona, MN 55987

Vision 2020 Education Foundation
1165 6th Street West
Winona, MN 55987

St. Thomas Aquinas Catholic Newman Center
Winona State University Campus Ministry
475 Huff St.
Winona, MN 55987

27

## Exhibit N

## Settling Insurer Policies[1]

### Interstate Fire & Casualty Company

Upon information and belief, Interstate Fire & Casualty Company issued the following policies to the Diocese:

1. A liability insurance policy with a policy period from July 1, 1978 to July 1, 1979, which the Diocese believes bears Policy No. 183-152609, and which was renewed under the same Policy No. with a policy period July 1, 1979 to July 1, 1980;
2. A liability insurance policy with a policy period from July 1, 1980 to July 1, 1981, which the Diocese believes bears Policy No. 183-152609/1;
3. A liability insurance policy with a policy period from July 1, 1981 to July 1, 1982, which the Diocese believes bears Policy No. 183-152609/2;
4. A liability insurance policy with a policy period from July 1, 1982 to July 1, 1983, which the Diocese believes bears Policy No. 183-152609/3;
5. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1984, which the Diocese believes bears Policy No. 183-0169196;
6. A liability insurance policy with a policy period from July 1, 1984 to July 1, 1985, which the Diocese believes bears Policy No. 183-0169196/1; and
7. A liability insurance policy with a policy period from July 1, 1985 to July 1, 1986, which the Diocese believes bears Policy No. 83-0172436.

### National Surety Corporation[2]

Upon information and belief, National Surety Corporation issued the following policies to the Diocese:

1. A liability insurance policy with a policy period from July 1, 1984 to July 1, 1985, which the Diocese believes bears Policy No. 3-46 XLX-1395238.

### London Market Insurers[3]

Upon information and belief, certain London Market Insurers issued and/or underwrote risk covered by the following policies issued to the Diocese:[4]

---

[1]   This Exhibit N is based on the Diocese's present knowledge, information, and belief, as informed by information and documents currently available to the Diocese.

[2]   National Surety Corporation is an affiliate of Interstate Fire & Casualty Company.

[3]   The term "London Market Insurers" means certain Underwriters at Lloyd's, London and certain London Market Companies (as defined in the LMI/Interstate Settlement Agreement).

[4]   The policies listed in this Exhibit N are "Settling Insurer Policies" only to the extent of the risk insured by the Settling Insurers. For the avoidance of doubt, none of the policies listed in this Exhibit N are "Settling Insurer Policies" to the extent of the risk insured by any Non-Settling Insurers, including, without limitation, (1) CNA Reinsurance of London, Ltd.; (2) CNA International Reinsurance Co. Ltd.; (3) CX Reinsurance Company Ltd.;

1. A liability insurance policy with a policy period from July 1, 1978 to July 1, 1980, which the Diocese believes bears Policy No. SLC 5421;

2. A liability insurance policy with a policy period from July 1, 1978 to July 1, 1980, which the Diocese believes bears Policy No. SL 3402;

3. A liability insurance policy with a policy period from July 1, 1978 to July 1, 1981, which the Diocese believes bears Policy No. SLC 5422;

4. A liability insurance policy with a policy period from July 1, 1978 to July 1, 1981, which the Diocese believes bears Policy No. SL 3403;

5. A liability insurance policy with a policy period from July 1, 1980 to July 1, 1983, which the Diocese believes bears Policy No. SLC 5527;

6. A liability insurance policy with a policy period from July 1, 1980 to July 1, 1983, which the Diocese believes bears Policy No. SL 3703;

7. A liability insurance policy with a policy period from July 1, 1982 to July 1, 1983, which the Diocese believes bears Policy No. SLC 5975;

8. A liability insurance policy with a policy period from July 1, 1982 to July 1, 1983, which the Diocese believes bears Policy No. SL 3986;

9. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1986, which the Diocese believes bears Policy No. ICO 4049;

10. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1986, which the Diocese believes bears Policy No. ISL 3089;

11. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1986, which the Diocese believes bears Policy No. ICO 4047;

12. A liability insurance policy with a policy period from July 1, 1983 to July 1, 1986, which the Diocese believes bears Policy No. ISL 3087;

13. A liability insurance policy with a policy period from July 1, 1986 to July 1, 1987, which the Diocese believes bears Policy No. ICO 5357;

14. A liability insurance policy with a policy period from July 1, 1986 to July 1, 1987, which the Diocese believes bears Policy No. ISL 3520;

15. A liability insurance policy with a policy period from July 1, 1986 to July 1, 1987, which the Diocese believes bears Policy No. ICO 5359;

16. A liability insurance policy with a policy period from July 1, 1986 to July 1, 1987, which the Diocese believes bears Policy No. ISL 3522;

17. A liability insurance policy with a policy period from July 1, 1987 to July 1, 1988, which the Diocese believes bears Policy No. ICO 5522;

18. A liability insurance policy with a policy period from July 1, 1987 to July 1, 1988, which the Diocese believes bears Policy No. ISL 3822;

19. A liability insurance policy with a policy period from July 1, 1988 to July 1, 1989, which the Diocese believes bears Policy No. ICO 5633;

---

(4) Northwestern National Insurance Company of Milwaukee, Wisconsin; (5) Bellefonte Insurance Co.; (6) Stronghold Insurance Co. Ltd.; (7) United States Fire Insurance Company; (8) 21st Century Centennial Insurance Company (f/k/a Colonial Penn Insurance Company); (9) State Farm Fire and Casualty Company; (10) Insurance Company of North America; (11) Liberty Mutual Insurance Company; (12) Federated Mutual of Owatonna; (13) The Hartford; (14) Travelers Casualty and Surety Company (f/k/a Aetna Casualty & Surety Company); and/or (15) Maryland Casualty Company.

20. A liability insurance policy with a policy period from July 1, 1988 to July 1, 1989, which the Diocese believes bears Policy No. ISL 4060;

21. A liability insurance policy with a policy period from July 1, 1989 to July 1, 1990, which the Diocese believes bears Policy No. ICO 5862;

22. A liability insurance policy with a policy period from July 1, 1989 to July 1, 1990, which the Diocese believes bears Policy No. ISL 4282;

23. A liability insurance policy with a policy period from July 1, 1990 to July 1, 1991, with an unknown policy number, but which appears to form part of Cover Note No. ISL 4569;

24. A liability insurance policy with a policy period from July 1, 1990 to July 1, 1991, which the Diocese believes bears Policy No. ISL 4569

25. A liability insurance policy with a policy period from July 1, 1991 to July 1, 1992, which the Diocese believes bears Policy No. ICO 6520;

26. A liability insurance policy with a policy period from July 1, 1991 to July 1, 1992, which the Diocese believes bears Policy No. ISL 4907;

27. A liability insurance policy with a policy period from July 1, 1992 to July 1, 1993, which the Diocese believes bears Policy No. ICO 6964;

28. A liability insurance policy with a policy period from July 1, 1992 to July 1, 1993, which the Diocese believes bears Policy No. ISL 5286;

29. A liability insurance policy with a policy period from July 1, 1993 to July 1, 1994, which the Diocese believes bears Policy No. ICO 7315;

30. A liability insurance policy with a policy period from July 1, 1993 to July 1, 1994, which the Diocese believes bears Policy No. ISL 5605;

31. An additional liability insurance policy with a policy period from July 1, 1994 to July 1, 1995, with an unknown policy number, but which appears to form part of Cover Note No. No. 5833;

32. A liability insurance policy with a policy period from July 1, 1994 to July 1, 1995, which the Diocese believes bears Policy No. 5833;

33. A liability insurance policy with a policy period from July 1, 1999 to July 1, 2000, which the Diocese believes bears Policy No. ICO 7893; and

34. A liability insurance policy with a policy period from July 1, 1999 to July 1, 2000, which the Diocese believes bears Policy No. ISL 6304.

Bodman_17817138_4