UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 18-33707 |
| Diocese of Winona-Rochester, | Chapter 11 |
| Debtor. | |

## NOTICE OF HEARING AND VERIFIED JOINT MOTION UNDER SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 9019 FOR AN ORDER (I) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, THE OTHER DOW ENTITIES AND THE LMI/INTERSTATE ENTITIES AND (II) AUTHORIZING THE DEBTOR TO SELL INSURANCE POLICIES AND GRANT RELATED RELEASES

To:     The parties specified in Federal Rule of Bankruptcy Procedure 2002(a) and Local Rule 9013-3:

1.      The Diocese of Winona-Rochester (the "Diocese") and the Official Committee of Unsecured Creditors (the "UCC") respectfully move (this "Motion") the Court for the relief requested below and give notice of hearing.

2.      The Court will hold a hearing on the Motion at **9:30 a.m. on Thursday, September 23, 2021**, before the Honorable William J. Fisher in Courtroom 2A at the United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.

3.      Under Local Rule 9006-1(c), any response to this Motion must be filed and served no later than **Friday, September 17, 2021**, which is five (5) days before the time set for the hearing (including Saturdays, Sundays, and holidays). **UNLESS A RESPONSE OPPOSING THIS MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rule 1070-1. This is a core proceeding.

5.      This Motion arises under Sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"). This Motion is filed under Fed. R. Bankr. P. 6004, 9014, and 9019 and Local Rules 2002-1, 6004-1, 9013-1, 9013-2, and 9019-1.

## RELIEF REQUESTED

6.      By this Motion, the Diocese and UCC request an order: (i) approving the Settlement Agreement and Release, a copy of which is attached as Exhibit A (the "Settlement Agreement") between the Diocese, the other DoW Entities[1] named therein (the "DoW Entities"), and the following insurers: certain Underwriters at Lloyd's, London, and certain London Market Companies (collectively, "London Market Insurers") and Interstate Fire & Casualty Company ("Interstate" and collectively with the London Market Insurers, "LMI/Interstate"); (ii) authorizing the Diocese to sell certain insurance policies free and clear of all liens, claims, interests, and encumbrances and grant related releases; (iii) waiving the stay imposed by Fed. R. Bank. P. 6004(h); and (iv) granting such other relief as is just and proper.

7.      Under the terms of the Settlement Agreement and at the request of LMI/Interstate, the Diocese and UCC request that the Court enter an order approving the Settlement Agreement in substantially the same form as the proposed order filed with this Motion.

## GENERAL BACKGROUND

8.      The Diocese filed its voluntary petition on November 30, 2018 (the "Petition

---

[1] All capitalized terms not specifically defined in this Motion will have the meaning given to them in the Settlement Agreement.

2

Date"), under chapter 11 of the Bankruptcy Code and has been operating as a debtor-in-possession since that time under Sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On December 19, 2018, the Office of the United States Trustee appointed the UCC.

10.      On July 13, 2021, the Diocese and the UCC filed a Corrected Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). [Doc. 316]  A confirmation hearing on the Plan is set for September 23, 2021.

## BACKGROUND SPECIFIC TO THE MOTION

11.      As an integral part of their proposed Plan, the Diocese and UCC have reached a Settlement Agreement with LMI/Interstate regarding certain of the Diocese's insurance policies, or alleged policies, and certain certificates providing or allegedly providing coverage to the Diocese and various DoW Entities (collectively, the "Policies").

12.      The Plan provides for a Channeling Injunction and Supplemental Settling Insurer Injunction in favor of LMI/Interstate. The confirmation of the Plan and the approval of the Channeling Injunction and Supplemental Settling Insurer Injunction are material conditions of the Settlement Agreement.

13.      Under the Settlement Agreement, the London Market Insurers and Interstate will, collectively (on a several basis), pay $6.5 million to repurchase and/or obtain injunctions and releases of coverage in connection with their respective insurance contracts, alleged contracts, and certificates.

14.      Prior to the Petition Date, the Diocese purchased from LMI/Interstate certain insurance policies that it now believes should provide funds to pay claims filed by the survivors of sexual abuse in this chapter 11 case.

3

15.     LMI/Interstate generally dispute their obligations, if any, to provide coverage under the Subject Insurance Policies related to the Tort Claims and further contest the extent of their liability, if any, under the Subject Insurance Policies.

16.     To resolve the dispute over the alleged obligations of LMI/Interstate under the Subject Insurance Policies, the parties have conferred and have reached an agreement in principle that is formalized in final form as the Settlement Agreement.

17.     The settlement is the result of arms-length negotiations among the Diocese, the UCC, counsel representing the vast majority of survivors who are creditors of the Diocese, the DoW Entities, and LMI/Interstate.

18.     The material provisions of the Settlement Agreement are summarized as follows:

- The LMI Insurance Policies and the Interstate Insurance Policies shall be sold, conveyed, transferred, and assigned to the London Market Insurers and Interstate, respectively, free and clear of all Interests of all Persons, including the Tort Claimants and the Protected Parties;

- LMI/Interstate, on the one hand, and the Diocese and other DoW Entities, on the other hand, shall exchange global releases of claims, except as otherwise provided in the Settlement Agreement;

- A Channeling Injunction and a Supplemental Settling Insurer Injunction shall be in the Diocese's plan of reorganization;

- LMI/Interstate shall pay the following amounts, which amounts shall be paid to the Trust that is to be established under the Plan to make distributions to Tort Claimants:

Bodman_17599390_3

| Insurer | Amount |
|---|---|
| Certain Underwriters at Lloyd's, London | $2,952,534.96 |
| Excess Insurance Company | $124,435.59 |
| Terra Nova Insurance Company | $114,987.33 |
| Sphere Drake Insurance Company | $23,611.03 |
| Yasuda Fire & Marine Insurance Company (U.K.) Ltd. | $34,427.09. |
| Dominion Insurance Company Ltd. | $1.00 |
| British National Life Insurance Society Ltd. | $1.00 |
| Assicurazioni Generali S.p.A. | $1.00 |
| St. Katherine Insurance Company PLC | $1.00 |
| Interstate | $3,250,000 |
| **TOTAL** | **$6,500,000** |

- Each of the above amounts shall be paid in two separate payments in an amount equal to 50% of the above amounts, one of which payments is in consideration for the buy-back of the respective Subject Insurance Policies and the other of which payments is in consideration for the entry of the Channeling Injunction and the Supplemental Settling Insurer Injunction described in the Settlement Agreement and the Plan. The payments shall be made no later than sixty (60) days after the later of (i) the dates on which the Confirmation Order and the Approval Order become Final Orders; and (ii) the date on which LMI and Interstate receive notice from DoW or the Trustee that the Plan Effective Date has occurred;

- The Trust will indemnify and hold harmless the LMI/Interstate Entities from and against any and all Channeled Claims and the Diocese will indemnify and hold harmless the LMI/Interstate Entities from and against any and all Enjoined Claims, except for Channeled Claims;

- Effective as of the date the Trust receives the Settlement Amount, all Persons will be barred, estopped, and permanently enjoined from asserting any Barred Claims against the LMI/Interstate Entities. The Barred Claims include all Tort, Direct

5

Action, and Released Claims, each as defined in the Settlement Agreement.

- The Settlement Agreement is contingent and conditioned on the following: (i) the Dissolved Entities have been reinstated by the Minnesota Secretary of State and remain reinstated; (ii) the Parties have executed the Settlement Agreement; (iii) the Court has issued the Approval Order and the Settlement Approval Findings and Conclusions, and the Approval Order has become a Final Order; and (iv) the Court has issued the Confirmation Order and the Confirmation Findings and Conclusions, and the Confirmation Order has become a Final Order.

19.    The Diocese, in consultation with the UCC, has determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the disputes with LMI/Interstate for the reasons that follow.

20.    First, the Diocese and UCC believe that there exists a meaningful possibility that any litigation against LMI/Interstate could result in returns less than the proposed settlement amounts listed above, net of litigation costs and the time value of money.

21.    Second, even successful actions against LMI/Interstate would result in appeals and protracted litigation that would delay the return to creditors for several years.

22.    Third, any litigation with LMI/Interstate would involve the interpretation of historic insurance policies and center on the resolution of complex, time-consuming and disputed coverage questions. Not only does this complexity add to the cost of any potential litigation, but it also makes the outcome of lawsuits against LMI/Interstate uncertain.

23.    Fourth, the Diocese and UCC believe a prompt resolution to these disputes will provide the best outcome for creditors in this case.

24.    Finally, the Settlement Agreement provides the estate with value in excess of

Bodman_17599390_3

what the Diocese and UCC believe is the lowest possible return to creditors.

25.     Notice of this settlement will be sent to (i) all holders of Claims against the DoW Entities, including Tort Claims, and their attorneys, if any, who are known to the DoW Entities; (ii) the Official Committee of Unsecured Creditors; (iii) the Unknown Claims Representative; (iv) all insurers of the DoW Entities that provide coverage for or are alleged to provide coverage for Tort Claims; (v) the Secretary of the Department of Health and Human Services ("Secretary"); (vi) CMS; (vii) the United States Attorney for the District of Minnesota; (viii) all Persons who, in the opinion of any Party, might reasonably be expected to be affected by the sale; and (ix) all other Persons as directed by the Bankruptcy Court.  Notice, paid fifty percent (50%) by DoW, and 50% by LMI/Interstate, will also be given by (a) publication in the national editions of the USA Today – National Edition; National Catholic Reporter; and the National Catholic Register (National Catholic Publication); and (b) local publication in the (i) Minneapolis Star Tribune; (ii) St. Paul Pioneer Press; (iii) The Minnesota Daily; (iv) Post-Bulletin (Rochester); (v) Winona Daily News; (vi) The Free Press (Mankato); (vii) Independent (Marshall); (viii) Waseca County News; (ix) Owatonna Peoples Press; (x) Albert Lea Tribune; (xi) Worthington Globe; (xii) Spring Valley News / Bluff Country Newspaper Group; (xiii) Argus Leader (Sioux Falls); (xiv) La Crosse Tribune; (xv) Austin Daily Herald; (xvi) Nobles County Review; (xvii) Steele County Times; (xviii) Faribault County Register; (xix) The Caledonia Argus; (xx) Fairmont Sentinel; (xxi) Fulda Free Press; (xxii) Jackson County Pilot; (xxiii) Houston County News; (xxiv) Winona Post; (xxv) Lake City Graphic; (xxvi) Wabasha County Herald; (xxvii) Plainview News; (xxviii) The St. Charles Press; (xxix) Lewiston Journal; (xxx) Rock County Star Herald; (xxxi) Maple River Messenger (Mapleton area); (xxxii) Tri-County Record (Bluff Country News – Rushford area); (xxxiii) St. James Plaindealer; (xxxiv)

7

Stewartville Star; (xxxv) Wells Mirror; (xxxvi) Cottonwood County Citizen (Windom); and

(xxxvii) Pipestone County Star.  The Diocese and UCC believe, and request that the Court enter

findings and conclusions, that the foregoing constitutes due and adequate notice of the (a) sale

of the Subject Insurance Policies; (b) terms and conditions of the Settlement Agreement; and (c)

hearing on the sale of the Subject Insurance Policies.

26.     Under Local Rule 9013-2(a), this Motion is verified and is accompanied by a

Memorandum, Proposed Order, and proof of service.

27.     In accordance with Local Rule 9011-4(f), the parties authorize the filer to submit

this Motion with the electronic signature of any non-filing party.

WHEREFORE, the Diocese and UCC respectfully request that the Court, under

Bankruptcy Code Sections 363 and 105(a), issue findings and conclusions in the form attached

and enter an order: (i) approving the Settlement Agreement; (ii) authorizing the Diocese to sell

the Subject Insurance Policies free and clear of all liens, claims, interests, and encumbrances

and grant related releases; (iii) to the extent it applies, waiving any stay imposed by Bankruptcy

Rule 6004(h); and (iv) granting such other and further relief as the Court deems just and

equitable.

Respectfully submitted,

Dated:  August 17, 2021                    **RESTOVICH BRAUN & ASSOCIATES**

/e/Thomas R. Braun
Thomas R. Braun (#350631)
Christopher W. Coon (#390083)
117 East Center Street
Rochester, MN 55904
(507) 216-8652
thomas@restovichlaw.com
christopher@restovichlaw.com

and

8

**BODMAN PLC**

/e/Robert J. Diehl, Jr.
Robert J. Diehl, Jr. (P31264)
Brian R. Trumbauer (P57747)
Jaimee L. Witten (P70068)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
rdiehl@bodmanlaw.com
btrumbauer@bodmanlaw.com
jwitten@bodmanlaw.com

**ATTORNEYS FOR THE DIOCESE OF
WINONA-ROCHESTER**


**STINSON, LLP**

/e/Robert T. Kugler
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
FOR THE DIOCESE OF WINONA-
ROCHESTER**

Bodman_17599390_3

## VERIFICATION

I, the Very Reverend William D. Thompson, am the Vicar General of The Diocese of Winona-Rochester. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding *Notice of Hearing and Verified Joint Motion Under Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 for an Order (i) Approving Settlement Agreement Between the Debtor, the Other DoW Entities and the LMI/Interstate Entities and (ii) Authorizing the Debtor to Sell Insurance Policies and Grant Related Releases* are true and correct according to the best of my knowledge, information, and belief.

Dated: August 17, 2021

_____
Very Reverend William D. Thompson

[Signature page to Verification of LMI/Interstate Settlement Motion]

**EXHIBIT A**

Bodman_17599390_3

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter the "**Agreement**") is made this ___ day of August, 2021, by and between the Diocese of Winona-Rochester ("**DoW**"[1]), and the other "**DoW Entities**", including the "**Dissolved Entities**", on the one hand, and certain Underwriters at Lloyd's, London, and certain London Market Companies (collectively, "**London Market Insurers**"), and "**Interstate**" on the other hand (collectively with the London Market Insurers, "**LMI/Interstate**"). (The aforementioned parties are referred to hereinafter collectively as the "Parties" or individually as a "Party").

## WITNESSETH THAT:

WHEREAS, the "**CVA**" suspended the statute of limitations for a three-year window for all **Actions** pending on or commenced between May 25, 2013, and May 25, 2016;

WHEREAS, as a result of the suspension of the statute of limitations pursuant to the CVA, "**Tort Claims**" were brought against certain DoW Entities;

WHEREAS, certain **"Protected Parties"** incurred, and may incur in the future, liabilities, expenses, and losses arising out of the Tort Claims;

WHEREAS, to address its liabilities for the Tort Claims, on the "**Petition Date**", DoW filed the "**Bankruptcy Case**" in the "**Bankruptcy Court**";

WHEREAS, each of the London Market Insurers severally subscribed the "**LMI Insurance Policies**", and Interstate issued the "**Interstate Insurance Policies**", allegedly providing insurance to certain Protected Parties, including the "**Dissolved Entities**";

WHEREAS, the LMI Insurance Policies listed on Attachment A-1, and the Interstate Insurance Policies listed on Attachment A-2, are property of DoW's bankruptcy estate;

WHEREAS, certain Protected Parties tendered "**Coverage Claims**" to the London Market Insurers and Interstate to seek insurance coverage for certain Tort Claims;

WHEREAS, LMI/Interstate dispute the Coverage Claims;

WHEREAS, on June 27, 2018, DoW filed the "**Insurance Coverage Action**";

WHEREAS, several London Market Insurers and Interstate are named defendants in the Insurance Coverage Action, and dispute the substantive allegations and Coverage Claims asserted against them in the Insurance Coverage Action;

WHEREAS, the Insurance Coverage Action was removed to the "**District Court**", referred to the Bankruptcy Court on December 3, 2018, and stayed by the Bankruptcy Court;

---

[1] Terms in bold, inside quotation marks, are defined in Section 1, "Definitions".

DM3\7939915.1
Bodman_17918802_2

WHEREAS, on May 16, 2019, certain Persons filed the "**Mediation Stipulation**" to the appointment of John E. Vukelich as mediator;

WHEREAS, on May 21, 2019, the Bankruptcy Court (i) approved the Mediation Stipulation, appointing John E. Vukelich, as mediator; and (ii) ordered the "**Mediation Parties**" to mediate the Tort Claims and the Coverage Claims;

WHEREAS, whether or not they (i) were subject to the Tort Claims; or (ii) asserted Coverage Claims against the London Market Insurers or Interstate, the DoW Entities are settling with and releasing the "**LMI/Interstate Entities**" pursuant to this Agreement;

WHEREAS, it is the intention of the Parties that the DoW Entities shall sell, assign, and transfer (i) the LMI Insurance Policies to the London Market Insurers, and the London Market Insurers shall buy back the LMI Insurance Policies by payment of the "**LMI Buy-Back Payment**"; and (ii) the Interstate Insurance Policies to Interstate, and Interstate shall buy back the Interstate Insurance Policies by payment of the "**Interstate Buy-Back Payment**";

WHEREAS, the LMI Buy-Back Payment and the Interstate Buy-Back Payment shall be paid to the "**Trust**" to be administered and distributed as provided in the "**Plan**", the "**Trust Agreement**" and the "**Trust Distribution Plan**" including to make payments to "**Tort Claimants**";

WHEREAS, it is the intention of the Parties that any and all "**Interests**" in or to the "**Subject Insurance Policies**" be extinguished, ended, and forever terminated;

WHEREAS, it is the intention of the Parties that (i) the DoW Entities shall (a) not retain any right, title, or Interest in or to the "Subject Insurance Policies" and (b) release the LMI/Interstate Entities from all "**Released Claims**"; and (ii) none of the LMI/Interstate Entities shall have any remaining duty or obligation of any nature whatsoever to any DoW Entity except as set forth in this Agreement;

WHEREAS, each of the London Market Insurers is making the "**LMI Plan Payment**" and Interstate is making the "**Interstate Plan Payment**" to support the Plan and the transactions contemplated thereunder, and in exchange, each of the LMI/Interstate Entities will be protected by the "**Supplemental Settling Insurer Injunction**" and the "**Channeling Injunction**", pursuant to the Plan;

WHEREAS, DoW is not aware of, and has determined not to seek a discharge of, any Tort Claims alleging **"Abuse"** that occurred on or after July 1, 2002; such Claims are not impaired by the Plan, but shall proceed in state court, if any such Claims exist, to be defended and/or resolved by the DoW Entity defending such Claims and the Catholic Mutual Relief Society of America ("**Catholic Mutual**");

WHEREAS, DoW agrees to obtain the Supplemental Settling Insurer Injunction for the benefit of the "**Settling Insurers**", transfer the LMI Plan Payment and the Interstate Plan Payment to the Trust, and obtain the Channeling Injunction, pursuant to the Plan.; and

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or

2

adjudication of any issues of fact or law, and without LMI/Interstate's admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates all Interests of the LMI/Interstate Entities, and the DoW Entities, with respect to the Subject Insurance Policies, including all rights, obligations and liabilities of the LMI/Interstate Entities relating to the "Barred Claims" and "Enjoined Claims," without prejudice to their respective positions on policy wordings or any other issues relating to the Insurance Coverage Action, the Coverage Claims, or otherwise.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

**1.**     **Definitions**

The following definitions and the definitions used above apply to this Agreement as well as any exhibits or attachments hereto. Where the listed terms are further defined in the body of this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms. Each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other. The words "include", "includes", or "including" shall be deemed to be followed by the words "without limitation", and the phrase "relating to" means "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with". (The words "include", "includes", and "including", and the phrase "relating to" are not capitalized herein.) This Agreement incorporates all attachments hereto to the same extent as if fully set forth herein. All references to "Sections" are references to sections of this Agreement unless otherwise specified. The inclusion of any defined term from the Plan into this Settlement Agreement does not, and shall not be construed to, impose any obligation on LMI or Interstate that is not set forth herein.

**a.**     **Abuse**

The term "Abuse" means (i) any actual or alleged sexual conduct, misconduct, abuse, or molestation, including actual or alleged "sexual abuse" as that phrase is defined in Minnesota Statutes Section 541.073(1); (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; or (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, intimidation or sexual misconduct.

**b.**     **Action**

The term "Action" means any lawsuit, proceeding, or other action in a court, or any arbitration.

3

c.    **Affiliates**

The term "Affiliates" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

d.    **Agents**

The term "Agents" means all past and present employees, officers, directors, agents, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy, Persons bound by monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in their capacities as such.

e.    **Approval Order**

The term "Approval Order" means an order entered by the Court, upon a hearing following Bankruptcy Notice, containing all of the following provisions but no provision that is contrary to or inconsistent with the following provisions. The wording of the Approval Order submitted to the Court for entry shall be mutually acceptable to DoW and LMI/Interstate and the entered order shall be substantially in the form submitted. The Approval Order shall contain provisions:

(i)    approving this Agreement in its entirety, pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy Rules 6004 and 9019;

(ii)    authorizing the sale of the LMI Insurance Policies to the London Market Insurers, and the Interstate Insurance Policies to Interstate, free and clear of all Interests of all Persons, including all Interests, if any, arising under Minn. Stat. Chapter 60A, to be effective as of the date the Trust receives the Settlement Amount;

(iii)    issuing the Bar Order, to be effective as of the date the Trust receives the Settlement Amount;

(iv)    authorizing and directing the Parties to perform their respective obligations under this Agreement;

(v)    ordering that, as of the date the Trust receives the Settlement Amount, all Claims against, and Interests in and to, the Subject Insurance Policies be fully extinguished without reservation;

(vi)    ordering that, as of the date the Trust receives the Settlement Amount, all Barred Claims and other Interests that any Person, including CMS, might have in, or against, the Subject Insurance Policies attach to the proceeds of the sale of the Subject Insurance Policies;

(vii)    ordering the Trustee, upon the Trustee's appointment under the Plan, to perform the obligations, if any, imposed upon the Trustee by this Agreement; and

4

(viii) providing that the effectiveness of the Approval Order is contingent upon it becoming a Final Order, the entry of the Confirmation Order, and the Confirmation Order becoming a Final Order.

Subject to the Court's approval, the Approval Order shall be submitted to the Court as a document to be entered separately from the Settlement Approval Findings and Conclusions.

### f.    Bankruptcy Case

The term "Bankruptcy Case" means the bankruptcy case filed by DoW, entitled *In re Diocese of Winona-Rochester*, Case Number 18-33707.

### g.    Bankruptcy Code

The term "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

### h.    Bankruptcy Court

The term "Bankruptcy Court" means the Bankruptcy Court for the District of Minnesota.

### i.    Bankruptcy Notice

The term "Bankruptcy Notice" means notice as required under Bankruptcy Rules 2002, 6004(a), and (c), and applicable local rules, sent to (i) all holders of Claims against the DoW Entities, including Tort Claims, and their attorneys, if any, who are known to the DoW Entities; (ii) the Official Committee of Unsecured Creditors; (iii) the Unknown Claims Representative; (iv) all insurers of the DoW Entities that provide coverage for or are alleged to provide coverage for Tort Claims; (v) the Secretary of the Department of Health and Human Services ("Secretary"); (vi) CMS; (vii) the United States Attorney for the District of Minnesota; (viii) all Persons who, in the opinion of any Party, might reasonably be expected to be affected by the sale; and (ix) all other Persons as directed by the Bankruptcy Court. Notice, paid fifty percent (50%) by DoW, and 50% by LMI/Interstate, shall also be given by (a) publication in the national editions of the USA Today – National Edition; National Catholic Reporter; and the National Catholic Register (National Catholic Publication); and (b) local publication in the (i) Minneapolis Star Tribune; (ii) St. Paul Pioneer Press; (iii) The Minnesota Daily; (iv) Post-Bulletin (Rochester); (v) Winona Daily News; (vi) The Free Press (Mankato); (vii) Independent (Marshall); (viii) Waseca County News; (ix) Owatonna Peoples Press; (x) Albert Lea Tribune; (xi) Worthington Globe; (xii) Spring Valley News / Bluff Country Newspaper Group; (xiii) Argus Leader (Sioux Falls); (xiv) La Crosse Tribune; (xv) Austin Daily Herald; (xvi) Nobles County Review; (xvii) Steele County Times; (xviii) Faribault County Register; (xix) The Caledonia Argus; (xx) Fairmont Sentinel; (xxi) Fulda Free Press; (xxii) Jackson County Pilot; (xxiii) Houston County News; (xxiv) Winona Post; (xxv) Lake City Graphic; (xxvi) Wabasha County Herald; (xxvii) Plainview News; (xxviii) The St. Charles Press; (xxix) Lewiston Journal; (xxx) Rock County Star Herald; (xxxi) Maple River Messenger (Mapleton area); (xxxii) Tri-County Record (Bluff Country News – Rushford area); (xxxiii) St. James Plaindealer; (xxxiv) Stewartville Star; (xxxv) Wells Mirror; (xxxvi) Cottonwood County Citizen (Windom); and (xxxvii) Pipestone County Star.

DM3\7939915.1
Bodman_17918802_2

**j.**     **Bankruptcy Orders**

The term "Bankruptcy Orders" means the Approval Order and the Confirmation Order.

**k.**     **Bankruptcy Rules**

The term "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as such may be amended from time to time.

**l.**     **Bar Order**

The term "Bar Order" means those provisions within the Approval Order, effective as of the date the Trust receives the Settlement Amount, barring, estopping, and permanently enjoining all Persons from asserting any Barred Claims against the LMI/Interstate Entities.  The terms of the Bar Order must be in any motion or brief seeking approval of this Agreement and entry of the Approval Order.

**m.**     **Business Day**

The term "Business Day" means any day that is not a Saturday, Sunday, or legal holiday in the State of Minnesota or the United Kingdom.

**n.**     **Channeling Injunction**

The term "Channeling Injunction" means an order of the Bankruptcy Court, effective as of the date the Trust receives the Settlement Amount, channeling the Channeled Claims, which states, *verbatim*:

> **Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.**
>
> **(a) In consideration of the undertakings of the Protected Parties and Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor and to further preserve and promote the agreements between and among the Protected Parties and any Settling Insurers, and pursuant to Section 105 of the Bankruptcy Code:**
>
> **1.  any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims; and**
>
> **2.  all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting,**

6

enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

(i)        commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;

(ii)       enforcing, attaching, collecting, or recovering, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties, Settling Insurers, or any other Person;

(iii)      creating, perfecting, or enforcing any lien of any kind relating to any Channeled Claim against any of the Protected Parties or the Settling Insurers, or the property of the Protected Parties or the Settling Insurers;

(iv)      asserting, implementing, or effectuating any Channeled Claim of any kind against:

      1.   any obligation due any of the Protected Parties or Settling Insurers;

      2.   any of the Protected Parties or Settling Insurers; or

      3.   the property of any of the Protected Parties or Settling Insurers.

(v)        taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

(vi)      asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of any of the Protected Parties or the Settling Insurers.

Notwithstanding anything to the contrary in this Article or the Plan, Tort Claimants and the Trust shall be permitted to name the Diocese and any other Protected Party in any proceeding to resolve whether the Diocese or such other Protected Party has liability for a Tort Claim, and the amount of any such liability, for the purpose of obtaining insurance coverage from Non-Settling Insurers under the Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including

7

**extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Tort Claim, and any such judgments or awards will be turned over to the Trust for handling in accordance with Sections 6.14(i) and (j).**

**The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  It is intended that the channeling of the Channeled Claims as provided in this Section 13.3 shall inure to the benefit of the Protected Parties and Settling Insurers. In a successful action to enforce the injunctive provisions of this Section in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

The Channeling Injunction and Supplemental Insurer Injunction will not be for the benefit of Non-Settling Insurers, including the Insolvent Subscribing Insurers. Nothing herein will be construed to authorize a violation of any stay that is applicable in light of the pending insolvency proceedings with respect to such Insolvent Subscribing Insurers.

o.      <u>Claim</u>

The term "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any claim, interest, Action, assertion of right, complaint, cross-complaint, counterclaim, liabilities, obligations, rights, request, allegation, mediation, litigation, direct action, administrative proceeding, cause of action, lien, encumbrances, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, Proof of Claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, whether past, present or (to the extent it arises prior to the Effective Date) future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty or otherwise, whether currently known or unknown, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise. A Person who holds a Claim is a "**Claimant**".  The term "Claim" includes all of the following:

8

**(i)      Abuse-Related Contribution Claims**

The term "Abuse-Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any LMI/Interstate Entity for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Tort Claim against a Protected Party.

**(ii)      Barred Claims**

The term "Barred Claims" means all Claims enjoined by the Bar Order, which shall include all Tort, Direct Action, and Released Claims.

**(iii)      Channeled Claims**

The term "Channeled Claims" means all (a) Tort, Direct Action, and Indirect Claims, except for any portion of such Claims that is a Non-Settling Insurer Policy Claim; (b) Abuse-Related Contribution Claims; (c) Medicare Claims; and (d) Extra-Contractual Claims relating to the Claims listed in subsections (a) – (c) of this sentence; *provided, however*, that the following are not Channeled Claims: (i) a Claim against an individual who committed the Abuse from which a Tort Claim arises; (ii) a Claim against any religious order, diocese or archdiocese (other than a DoW Entity); (iii) Unimpaired Unknown Abuse Claims; and (iv) Unimpaired Unknown Contingent Claims.

**(iv)      Contribution Claims**

The term "Contribution Claims" means Abuse-Related Contribution Claims and Non-Abuse Related Contribution Claims.  "Contribution Claims" do not include LMI/Interstate Insurer Claims.

**(v)      Coverage Claims**

The term "Coverage Claims" means all Claims against LMI/Interstate (or any of them) under or relating to the Subject Insurance Policies or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

**(vi)      Direct Action Claims**

The term "Direct Action Claims" means the same as "Tort Claims", except that they are asserted against any LMI/Interstate Entity, instead of any Protected Party or the Trust, for the recovery of insurance proceeds.

**(vii)      Enjoined Claims**

The term "Enjoined Claim" means all Claims enjoined by the Supplemental Settling Insurer Injunction, which shall include all Barred Claims, Non-Abuse Related Contribution Claims, –Extra-Contractual Claims by any Person other than a Channeled

9

Claimant, Medicare Claims, Unimpaired Unknown Abuse Claims, and Unimpaired Unknown Contingent Claims.

**(viii)    Extra-Contractual Claims**

The term "Extra-Contractual Claims" means all Claims against LMI/Interstate (or any of them) in their capacity as Insurers, seeking any type of relief other than coverage or benefits under the Subject Insurance Policies. "Extra-Contractual Claims" include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs, or any other type of relief, alleging: bad faith; failure to provide insurance coverage under any Subject Insurance Policy; failure or refusal to compromise and settle any Claim alleged to be insured under any Subject Insurance Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; violation of any unfair claims practices act or similar statute, regulation or code; any type of misconduct or any other act or omission of any type. The term "Extra-Contractual Claims" also includes all Claims relating to LMI/Interstate's (a) handling of any request for insurance coverage for any Claim, in LMI/Interstate's capacity as Insurers; (b) conduct relating to the negotiation of this Agreement; and (c) conduct relating to the settlement of any Coverage Claim.

**(ix)    Indirect Claims**

The term "Indirect Claims" means Claims against a Protected Party or a Settling Insurer, asserted by any other Person that is not an Insurer, for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any Protected Party's actual or alleged liability, for any Claim relating to Abuse that is not a Tort Claim.

**(x)    LMI/Interstate Insurer Claims**

The term "LMI/Interstate Insurer Claims" means any and all Claims for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery that LMI/Interstate might have arising from the payment of the Settlement Amount.

**(xi)    Medicare Claims**

The term "Medicare Claims" means any and all Claims by CMS against the Trust, any Settling Insurer, or any Protected Party, under MMSEA and under MSP, that relate to any payments in respect of any Tort Claims, including Claims for reimbursement of payments made to Tort Claimants who recover or receive any distribution from the Trust and Claims by CMS relating to reporting obligations.

**(xii)    Non-Abuse Related Contribution Claims**

The term "Non-Abuse Related Contribution Claims" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative

10

recovery, by an Insurer against any LMI/Interstate Entity, for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of any Claim against a Protected Party, which is not a Tort Claim.

**(xiii)   Non-Settling Insurer Policy Claims**

The term "Non-Settling Insurer Policy Claim" means any Claim for which insurance coverage is provided or allegedly provided by a Non-Settling Insurer Policy.

**(xiv)   Released Claims**

The term "Released Claims" means Coverage Claims and Extra-Contractual Claims.

**(xv)   Tort Claims**

(A)    The term "Tort Claims" means all Claims relating to, in whole or in part, directly or indirectly, Abuse committed by any Person before the Plan Effective Date for which a Protected Party is allegedly responsible, including any such Claim asserted against any Protected Party in connection with the Bankruptcy Case.  The term "Tort Claims" does not include Contribution Claims, Medicare Claims, or Unimpaired Unknown Abuse Claims.

(B)  The term "Impaired Unknown Tort Claim" means any Tort Claim that arose prior to July 1, 2002, which was neither filed, nor deemed filed, by the Claims Filing Deadline, and is held by an individual (1) who, at the time of the Claims Filing Deadline, was under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3, or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4; (2) who was barred by the statute of limitations as of the Claims Filing Deadline but is no longer barred by the applicable statute of limitations for any reason including the enactment of legislation; or (3) whom the Unknown Claims Representative identifies as having a Tort Claim as of July 1, 2002, and who was under a disability preventing such individual from filing a Claim in the Bankruptcy Case before and on the Claims Filing Deadline.

(C)  The term "Unimpaired Unknown Abuse Claims" means any Claims against any of the Protected Parties alleging Abuse that occurred prior to the Plan Effective Date but after June 30, 2002, which Claims were neither filed, nor deemed filed, by the Claims Filing Deadline.

**(xvi)   Unimpaired Unknown Contingent Claims**

The term "Unimpaired Unknown Contingent Claims" means any (i) Claims for contribution, indemnity or reimbursement arising out of DoW's liability to pay or defend any Unimpaired Unknown Abuse Claim and (ii) Claims of any Insurer or other Person who is subrogated to the Claims identified in the immediately preceding Clause (i).

11

**p.**    <u>**Claims Filing Deadline**</u>

The term "Claims Filing Deadline" means April 8, 2019, pursuant to the Bankruptcy Court's order, ECF No. 51.

**q.**    <u>**CMS**</u>

The term "CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any Agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

**r.**    <u>**Committee**</u>

The term "Committee" means the Official Committee of Unsecured Creditors appointed by the Bankruptcy Court in the Bankruptcy Case.

**s.**    <u>**Confirmation Findings and Conclusions**</u>

The term "Confirmation Findings and Conclusions" means the findings of fact and conclusions of law required under §§ 1129(a), and, to the extent applicable, 105(a) and 1129(b), of the Bankruptcy Code, which are to be entered concurrently with, but separately from, the Confirmation Order, as necessary to confirm the Plan and dismiss with prejudice the Insurance Coverage Action as against LMI/Interstate, including the following:

(i)    This Agreement is the fruit of long-term negotiations amongst the Parties, which began in May 2019, following the Bankruptcy Court's entry of the order approving the Mediation Stipulation;

(ii)    The LMI Plan Payment and Interstate Plan Payment provide good and valuable consideration to DoW's bankruptcy estate, and enable distributions from the Trust;

(iii)    Approval of this Agreement is therefore necessary to the Plan because it provides significant funding for the Plan;

(iv)    DoW's interests in the Subject Insurance Policies are property of DoW's bankruptcy estate and are therefore subject to the *in rem* jurisdiction of the Court;

(v)    The Tort Claims are within the jurisdiction of the Court because they seek property of DoW's bankruptcy estate;

(vi)    Because it would be impractical to divide the Subject Insurance Policies amongst DoW and the other DoW Entities, it was necessary for DoW to obtain the participation of the other DoW Entities in this Agreement;

(vii)    The DoW Entities, other than DoW, would not release their Interests in the Subject Insurance Policies unless they obtained the benefits of the Channeling Injunction,

DM3\7939915.1
Bodman_17918802_2

because to do so would have left them exposed to Tort Claims, whether or not such Claims be valid, and whether or not coverage exists under the Subject Insurance Policies for such Claims;

(viii)   Therefore, the Channeling Injunction is necessary to the Agreement;

(ix)   The Channeling Injunction is narrowly tailored because it requires only Channeled Claims against the Protected Parties and the Settling Insurers to be brought against the Trust;

(x)   The Coverage Claims are within the jurisdiction of the Bankruptcy Court because such claims could enhance the estate;

(xi)   LMI/Interstate required that they obtain the benefits of the Supplemental Settling Insurer Injunction, as a condition of entering into the Agreement and contributing the LMI Plan Payment and Interstate Plan Payment;

(xii)   Therefore, the Supplemental Settling Insurer Injunction is necessary to this Agreement and the Plan;

(xiii)   The Supplemental Settling Insurer Injunction is narrowly tailored because it only enjoins the Enjoined Claims against the Settling Insurers;

(xiv)   LMI/Interstate are repurchasing the Subject Insurance Policies, pursuant to this Agreement. LMI/Interstate are not purchasing any other assets of the DoW Entities and are not a continuation of the DoW Entities, nor engaging in a continuation of the DoW Entities' businesses. LMI/Interstate shall not have any responsibility or liability with respect to any of the DoW Entities' other assets; and

(xv)   LMI/Interstate are not, and shall not be deemed to be, successors to the DoW Entities, or any of them, by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in this Agreement, the Plan, or otherwise. LMI/Interstate shall not assume, or be deemed to have assumed, any liabilities or other obligations of the DoW Entities.

Subject to the Court's approval, the Confirmation Order shall be submitted to the Court as a document to be entered separately from the Confirmation Findings and Conclusions.

t.   **Confirmation Order**

The term "Confirmation Order" means an order entered by the Court after a confirmation hearing upon Bankruptcy Notice confirming the Plan, in a form and substance as required by this Agreement, which order has not been stayed. The wording of the Confirmation Order submitted to the Court for entry shall be mutually acceptable to DoW and LMI/Interstate, and the entered order shall be substantially in the form submitted. The Confirmation Order shall contain all of the following provisions but no provision that is contrary to or inconsistent with this Agreement:

(i)   confirming the Plan;

13

(ii)     specifically, and individually, ordering all Persons, as set forth in the Plan, to act or refrain from acting as specified in the Plan;

(iii)     incorporating, as of the date the Trust receives the Settlement Amount, the terms and provisions of the Bar Order as though fully set forth therein;

(iv)     issuing the Channeling Injunction and the Supplemental Settling Insurer Injunction, to be effective as of the date the Trust receives the Settlement Amount;

(v)     ordering all Tort Claimants who have pending state court actions against any DoW Entity, to dismiss such pending actions, except to the extent their pending state court actions allege any Non-Settling Insurer Policy Claims, such order to be effective as of the date the Trust receives the Settlement Amount;

(vi)     ordering that the Reduction Clause set forth in Section 8 be applied to all Coverage Claims and Direct Action Claims against the Non-Settling Insurers, such order to be effective as of the date the Trust receives the Settlement Amount; and

(vii)     discharging DoW from all Claims other than Non-Settling Insurer Policy Claims, Unimpaired Unknown Abuse Claims and Unimpaired Unknown Contingent Claims.

Subject to the Court's approval, the Confirmation Order shall be submitted to the Court as a document to be entered separately from the Confirmation Findings and Conclusions.

u.     **Court**

The term "Court" means the Bankruptcy Court, or the District Court, as applicable.

v.     **CVA**

The term "CVA" means the Minnesota Child Victims Act, Min. Stat. 541.073, which went into effect on May 25, 2013, and provided for a three-year window for all Actions pending on, or commenced between, May 25, 2013, and May 25, 2016, during which the statute of limitations for Tort Claims was suspended.

w.     **Dissolved Entities**

The term "Dissolved Entities" means, collectively (i) Calvary Cemetery of Mankato; (ii) Church of Sacred Heart of Brewster, Minnesota; (iii) Sacred Heart Cemetery of Owatonna, Minnesota; (iv) School Sisters De Notre Dame, Incorporated/School Sisters of Notre Dame at Mankato, Minnesota, Inc./School Sisters of Notre Dame at Mankato, Minnesota, Inc./School Sisters of Notre Dame, Incorporated; (v) St. Mary's of Caledonia School Endowment Fund, Inc.; (vi) St. Peter & Paul Church of Mazeppa, Minnesota; (vii) The Church of St. Bernard of Stewartville, Minnesota; (viii) The Church of St. Joseph of Lakefield, Minnesota; (ix) The Church of St. Joseph of Theilman, Minnesota; (x) The Church of St. Mary of Lake City, Minnesota; (xi) The Church of St. Patrick of Brownsville, Minnesota; and (xii) any other Persons potentially or allegedly insured by Interstate or the London Market Insurers, which have been involuntarily

14

dissolved by the Minnesota Secretary of State prior to entry of the Approval Order, but remain in operation.

### x.      District Court

The term "District Court" means the United States District Court for the District of Minnesota.

### y.      DoW

The term "DoW" means the Diocese of Winona-Rochester, which is the diocesan corporation formed pursuant to Minnesota Statutes Section 315.16, and which is the public juridic person of the Roman Catholic Diocese of Winona-Rochester, as now constituted or as it may have been constituted. The term "DoW" also applies anywhere the term "Reorganized Debtor" is used, and "Reorganized Debtor" applies anywhere the term "DoW" is used, as is necessary to effectuate the terms of the Agreement.  Furthermore, in the event of any Action naming any Affiliate or Agent of the Diocese of Winona-Rochester, which Person also qualifies as a Protected Party under the Plan of Reorganization, such Action shall be considered an Action against DoW, the insurance coverage for which is released pursuant to Section 4 hereof.

### z.      DoW Entity Insurer Policy

The term "DoW Entity Insurer Policy" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Plan Effective Date, ,and that actually, allegedly, or potentially, insures any DoW Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Tort Claim.

### aa.      DoW Entities

The term "DoW Entities" means, in their capacity as such:

(i)      DoW;

(ii)      the DoW Parishes;

(iii)      all Persons that are listed on Attachment E, including Catholic schools and cemeteries located in the Diocese;

(iv)      Each of the Affiliates of the Persons identified in the foregoing subsections (i)-(iii);

(v)      Each of the successors and assigns of the Persons identified in the foregoing subsections (i)-(iv); and,

(vi)      Solely to the extent of and in their capacity as such, each of the Agents of the Persons identified in the foregoing subsections (i)-(v).

DM3\7939915.1
Bodman_17918802_2

Notwithstanding the foregoing, an individual who perpetrated an act of Abuse that forms the basis for a Tort Claim is not a DoW Entity with respect to that Tort Claim. No religious order, archdiocese or diocese, other than DoW, is a DoW Entity.

**bb.**     **DoW Parishes**

The term "DoW Parishes" means all past and present parishes of or in DoW, in their capacity as such.

**cc.**     **Effective Date**

The term "Effective Date" means the day following the date on which all of the following have occurred: the (i) Dissolved Entities have been reinstated by the Minnesota Secretary of State and remain reinstated; (ii) Parties have executed this Agreement; (iii) Court has issued the Approval Order and the Settlement Approval Findings and Conclusions, and the Approval Order has become a Final Order; and (iv) Court has issued the Confirmation Order and the Confirmation Findings and Conclusions, and the Confirmation Order has become a Final Order.

**dd.**     **Entities' Release**

The term "Entities' Release" means the following:

(i)     The remising, release, covenant not to sue, and permanent discharge by the Protected Parties, and any subsequently appointed trustee or representative acting for any Protected Party, without further action by any Person, from and against all Released Claims that the Protected Parties ever had, now have, or hereafter may have, from the beginning of time to the Effective Date, of: (1) the Interstate Entities; and (2) the respective heirs, executors, administrators, successors, assigns and reinsurers (as such) of any of the Persons identified in clause (1) hereof in their capacity as such; and

(ii)     The remising, release, covenant not to sue, and permanent discharge by the Protected Parties, and any subsequently appointed trustee or representative acting for any Protected Party, without further action by any Person, from and against all Released Claims that the Protected Parties ever had, now have, or hereafter may have, from the beginning of time to the Effective Date, of: (1) each paying London Market Insurer and its London Market Insurer Entities; (2) the respective heirs, executors, administrators, successors, assigns and reinsurers (as such) of any of the Persons identified in clause (1) hereof in their capacity as such.

**ee.**     **Equitas Entities**

The term "Equitas Entities" means Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Policyholders Trustee Limited, and any other Person from time to time in the Equitas group.

DM3\7939915.1
Bodman_17918802_2

### ff.    Final Order

The term "Final Order" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, review, reargue, or rehear shall have been waived in writing in form and substance satisfactory to DoW and LMI/Interstate, and their counsel or, in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or *certiorari* or review shall have been denied, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order". For the avoidance of doubt, if the Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("Substantial Consummation"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order.

### gg.    Insolvent Subscribing Insurers

The term "Insolvent Subscribing Insurers" means those insurers listed on Attachment C; provided, however, notwithstanding anything to the contrary contained herein,

(a) no Insolvent Subscribing Insurer is an "Affiliate";

(b) the Entities' Release shall not extend to the Insolvent Subscribing Insurers;

(c) no Insolvent Subscribing Insurer is a London Market Insurers Entity, London Market Company, Lloyd's Underwriter, or Underwriter Third Party Beneficiary; and

(d) the LMI Insurance Policies shall not include any portion subscribed by an Insolvent Subscribing Insurer.

### hh.    Insurance Coverage Action

The term "Insurance Coverage Action" means the case entitled *Diocese of Winona-Rochester v. U.S. Fire Insurance Co., et al.*, filed in the Minnesota District Court, Third Judicial District, which was removed to the District Court, and referred to the Bankruptcy Court on December 3, 2018, as Adversary Proceeding Number 18-03094.

### ii.    Insurer

The term "Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, a DoW Entity Insurer Policy.

17

**jj.** **Interests**

The term "Interests" means all Claims and other rights of any nature, whether at law or in equity, including "interests" as that term is used in 11 U.S.C. 363.

**kk.** **Interstate**

The term "Interstate" means Interstate Fire & Casualty Company.

**ll.** **Interstate Buy-Back Payment**

The term "Interstate Buy-Back Payment" means the payment by Interstate to the Trust of a sum equal to fifty percent (50%) of the Interstate Settlement Amount, for the buy-back of all Interstate Insurance Policies.

**mm.** **Interstate Entities**

The term "Interstate Entities" means:

      (i)     Interstate;

      (ii)    each of Interstate's Affiliates (including Fireman's Fund Indemnity Company and National Surety Insurance Company);

      (iii)   each of the foregoing Persons' Agents, in their capacities as such; and

      (iv)   each of the foregoing Persons' respective Affiliates, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

**nn.** **Interstate Insurance Policies**

The term "Interstate Insurance Policies" means all insurance policies listed in Attachment A-2 hereto. Notwithstanding the above, if an Interstate Insurance Policy that is not listed in Attachment A-2 was not issued to a DoW Entity, but provides coverage to a DoW Entity, then it is an Interstate Insurance Policy to the extent it insures such DoW Entity, but not to the extent it insures any other Person.

**oo.** **Interstate Plan Payment**

The term "Interstate Plan Payment" means the payment by Interstate to the Trust of a sum equal to fifty percent (50%) of the Interstate Settlement Amount, for the entry of the Channeling Injunction and the Supplemental Settling Insurer Injunction.

**pp.** **Interstate Settlement Amount**

The term "Interstate Settlement Amount" means the net sum of Three Million, Two Hundred and Fifty Thousand United States Dollars ($3,250,000), which comprises the Interstate

18

Buy-Back Payment and the Interstate Plan Payment.  Interstate shall pay the Interstate Settlement Amount pursuant to the terms of Section 2.

**qq.** **Lloyd's Underwriters**

The term "Lloyd's Underwriters" means:

(i)     All underwriters, members, or Names at Lloyds, London (including former underwriters, members, or Names) who through their participation in syndicates (including those identified on Attachment B) severally subscribed, each in his or her own proportionate share, one or more of the LMI Insurance Policies.  Lloyd's Underwriters shall also include all underwriters, members, or Names at Lloyd's, London (including former underwriters, members, and Names), whether or not they participated in the syndicates identified in Attachment B, who, through their participation in syndicates (including those identified on Attachment B) severally subscribed any of the LMI Insurance Policies in favor of any DoW Entity: (a) the existence of which has not presently been established; or (b) the existence of which has been established but as to which identities of Names, members, or syndicates are not presently known.  Further, it is expressly understood that "Lloyd's Underwriters" are "Lloyd's Underwriters" only with respect to policies subscribed by them, and obtained through a London broker;

(ii)     All of the Agents of the Persons set forth in Section 1.qq.(i), and their respective predecessors and successors, if any, solely in such capacity;

(iii)     All the respective heirs, executors, successors (including Equitas Insurance Limited ("EIL") to the extent EIL is a successor to any of the Persons identified in Section 1.qq.(i) with respect to the subject matter of this Agreement), assigns (including any administrator, receiver, trustee, personal representative, or equivalent appointee/s under relevant insolvency law), reinsurers, and retrocessionaires (as such) of any of the Persons identified in Section 1.qq.(i), if any, solely in their capacity as such; and

(iv)     For the avoidance of doubt, the Underwriter Third-Party Beneficiaries, who receive certain specified benefits under this Agreement, are not Lloyd's Underwriters for the purpose of this definition.

**rr.** **LMI/Interstate Entities**

The term "LMI/Interstate Entities" means, collectively, the London Market Insurers Entities and the Interstate Entities.

**ss.** **LMI Buy-Back Payment**

The term "LMI Buy-Back Payment" means the payment by the London Market Insurers to the Trust of a net sum equal to fifty percent (50%) of their respective, several, allocated shares of the LMI Settlement Amount, as set forth on Attachment D, for the buy-back of all of the LMI Insurance Policies.

19

tt.    **LMI Insurance Policies**

The term "LMI Insurance Policies" means (i) all insurance policies listed in Attachment A-1 hereto; and (ii) all known and unknown insurance policies to the extent severally subscribed by one or more of the London Market Insurers in their capacity as London Market Insurers, which were in effect prior to July 1, 2021, and providing insurance with respect to any Tort Claim; *provided, however*, if an LMI Insurance Policy that is not listed in Attachment A-1 was not subscribed on behalf of the DoW but provides coverage to the DoW or a DoW Parish and any other Person, then it is an LMI Insurance Policy to the extent it insures the DoW or a DoW Parish, but not to the extent it insures any other Person.

The LMI Insurance Policies do not include: (i) a Cyber Liability policy subscribed in favor of Catholic Mutual and effected through NAS Insurance Services with Certain Underwriters at Lloyds, London under Master Policy No. 510641; or (ii) a Malicious Attack Liability Coverage and Crisis Response policy subscribed in favor of Catholic Mutual and effected through Aon with Certain Underwriters at Lloyds, London under Master Policy No. CMCTR2003035.

uu.    **LMI Plan Payment**

The term "LMI Plan Payment" means the payment by the London Market Insurers to the Trust of a net sum equal to fifty percent (50%) of their respective, several allocated shares of the LMI Settlement Amount, as set forth on Attachment D, for the entry of the Channeling Injunction and the Supplemental Settling Insurer Injunction.

vv.    **LMI Settlement Amount**

The term "LMI Settlement Amount" means the net sum of Three Million, Two Hundred and Fifty Thousand United States Dollars ($3,250,000), which comprises the LMI Buy-Back Payment and the LMI Plan Payment. Each London Market Insurer shall pay its several, respective, allocated share of the LMI Settlement Amount pursuant to the terms of Section 2. Each London Market Insurer's respective, several, allocated share of the LMI Settlement Amount is set forth on Attachment D.

ww.    **London Market Companies**

The term "London Market Companies" means the companies doing business in the London Insurance Market, which severally subscribed, each in its own proportionate share, one or more of the LMI Insurance Policies (such insurers are identified in Attachment B to this Agreement). "London Market Companies" shall also include those companies doing business in the London Insurance Market that subscribed any LMI Insurance Policies (a) the existence of which has not presently been established but which provided insurance to any DoW Entity; or (b) the existence of which has been established but the identity of such company as a subscribing insurer is not presently known. As used herein, "London Market Companies" shall mean, in their capacity as such, the named corporate entity and all predecessors, successors, Affiliates, pool companies as such, and subsidiaries.

DM3\7939915.1
Bodman_17918802_2

xx.   **London Market Insurers**

The term "London Market Insurers" means Lloyd's Underwriters and the London Market Companies.

yy.   **London Market Insurers Entities**

The term "London Market Insurers Entities" means, with respect to each London Market Insurer:

> (i)   such London Market Insurer;
>
> (ii)   each of such London Market Insurer's Affiliates;
>
> (iii)   each of the foregoing Persons' Agents, in their capacities as such; and
>
> (iv)   each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

zz.   **Mediation**

The term "Mediation" means the mediation by the Mediation Parties, as ordered by the Bankruptcy Court, on May 21, 2019.

aaa.   **Mediation Parties**

The term "Mediation Parties" means, collectively; (a) DoW; (b) the Committee; (c) all counsel for the Tort Claimants; (d) the defendants in the Insurance Coverage Action; (e) The National Catholic Risk Retention Group; (f) any other DoW Entity, which, with the consent of the mediator, chose to participate in the mediation; and (g) any other DoW Entity, which by order of the Bankruptcy Court was required to participate in the Mediation.

bbb.   **Mediation Stipulation**

The term "Mediation Stipulation" means the stipulation filed to appoint the Mediator by (i) DoW; (ii) the Committee; (iii) counsel for certain Tort Claimants, including Jeff Anderson and Associates, P.A., the Noaker Law Firm LLC, and Bradshaw & Bryant PLLC; (iv) The National Catholic Risk Retention Group; and (v) each of the defendants in the Insurance Coverage Action.

ccc.   **Medicare**

The term "Medicare" means Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, enacted July 1, 1966, including all subsequent amendments thereto.

ddd.   **Medicare Beneficiary**

The term "Medicare Beneficiary" means any individual who has received or is eligible to receive benefits under Medicare and is the holder of a Channeled Claim.

DM3\7939915.1
Bodman_17918802_2

**eee.** **MSP or Medicare Secondary Payor Act**

The term "Medicare Secondary Payor Act" or "MSP" means 42 U.S.C. § 1395y *et seq*, or any other similar statute or regulation, and any related rules, regulations or guidance issued in connection therewith or amendments thereto.

**fff.** **MMSEA**

The term "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSP.

**ggg.** **Non-Settling Insurer**

The term "Non-Settling Insurer" means any Insurer (other than Catholic Mutual Relief Society of America) that is not a Settling Insurer by the Plan Effective Date.

**hhh.** **Non-Settling Insurer Policy**

The term Non-Settling Insurer Policy means a DoW Entity Insurer Policy, which a Non-Settling Insurer issued, subscribed any interest in, or has underwritten any risk in.

**iii.** **Other Allegedly Insured Entity**

The term "Other Allegedly Insured Entity" means any Person that is not a DoW Entity, but was insured under a Subject Insurance Policy; *provided, however*, that a Person is an "Other Allegedly Insured Entity" only to the extent that it is insured under a Subject Insurance Policy.

**jjj.** **Person**

The term "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof, and any other individual or entity within the definitions of (i) "person" in Section 101(41) of the Bankruptcy Code or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

**kkk.** **Petition Date**

The term "Petition Date" means November 30, 2018.

**lll.** **Plan**

The term "Plan" means a plan of reorganization proposed by DoW, which (a) contains all of the following provisions, but no provision that is contrary to or inconsistent with this

DM3\7939915.1
Bodman_17918802_2

Agreement; (b) allows all of the acts and transactions under, and envisioned by, this Agreement to occur with binding legal effect; (c) does not materially and adversely affect the rights, duties, or interests of the Protected Parties or the LMI/Interstate Entities under this Agreement; (d) shall have wording mutually acceptable to DoW and LMI/Interstate; (e) includes all papers, exhibits, attachments, appendices, or other documents filed with or in support of the Plan and necessary for its implementation, and any documents relating to the establishment and operation of the Trust; and (f) shall include the following provisions:

    (i)    prohibiting DoW from continuing to pursue the Insurance Coverage Action as against LMI/Interstate, requiring DoW and LMI/Interstate to effect dismissal with prejudice of their Claims against each other in the Insurance Coverage Action within twenty (20) days after the Trust's receipt of the Settlement Amount, with each side to bear its own fees and costs, and prohibiting any DoW Entity from asserting any Coverage Claims against LMI/Interstate;

    (ii)    specifying that, as of the date the Trust receives the Settlement Amount, the Channeling Injunction and the Supplemental Settling Insurer Injunction shall be effective;

    (iii)    establishing the Trust, appointing the Trustee, and binding both of them to perform those requirements imposed upon them by this Agreement;

    (iv)    describing the role of the UCR and seeking the continued appointment of the UCR to continue in his or her duties;

    (v)    specifying that, effective as of the date the Trust receives the Settlement Amount, the Confirmation Order shall channel all Channeled Claims to the Trust;

    (vi)    denominating, as of the date the Trust receives the Settlement Amount, each London Market Insurer, and Interstate, as Settling Insurers;

    (vii)    requiring, as of the date the Trust receives the Settlement Amount, each Tort Claimant receiving a payment from the Trust to sign a Perringer release of all Claims against LMI/Interstate and of all Claims against the Protected Parties that are not Non-Settling Insurer Policy Claims;

    (viii)    containing the following provisions *verbatim*:

    (1)    It is the position of DoW that none of DoW Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("HHS") that none of the Trust, DoW Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the DoW Entities or Settling Insurers or payments by the Trust to Claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of

23

Appeals for the Eighth Circuit or the United States Supreme Court), or a letter from the Secretary of confirming that none of the DoW Entities or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the DoW Entities and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the DoW Entities and Settling Insurers, and shall timely submit all reports that would be required to be made by any DoW Entity or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by a DoW Entity or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or any DoW Entity or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the DoW Entities and Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(2)    If the Trust is required to act as a reporting agent for any DoW Entity or Settling Insurer pursuant to Section 1.lll.(x)(1), the Trust shall provide a written certification to each DoW Entity and Settling Insurer within ten (10) Business Days following the end of each calendar quarter, confirming that all reports to CMS required by Section 1.lll.(x)(1) have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

(3)    With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any DoW Entity or Settling Insurer, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Trust may redact from such copies the Redacted Information. With respect to any such reports, the Trust shall undertake to remedy any issues of noncompliance identified by CMS, and, resubmit such reports to CMS, and, upon request by any DoW Entity or Settling Insurer, provide each DoW Entity and Settling Insurer copies of such resubmissions; provided, however, that the Trust may redact the Redacted Information. If the Trust is unable to remedy its noncompliance, the provisions of Section 1.lll.(x)(7) shall apply.

(4)    If the Trust is required to act as a reporting agent for a DoW Entity or Settling Insurer pursuant to the provisions of Section 1.lll.(x)(1), with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any DoW Entity or Settling Insurer, promptly provide the Redacted Information and any other information that may be necessary in the reasonable judgment of any DoW Entity or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the

DM3\7939915.1
Bodman_17918802_2

Trust's failure to report the payment.  In the event any DoW Entity or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS.  All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

(5)     If the Trust is required to act as a reporting agent for any DoW Entity, or Settling Insurer pursuant to the provisions of Section 1.lll.(x)(1), the Trust shall make the reports and provide the certifications required by Sections 1.lll.(x)(1) and (2) until such time as such DoW Entity or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust.  Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 1.lll.(x)(1), and if any DoW Entity or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 1.lll.(x)(1) and (2).

(6)     Section 1.lll.(x)(1) is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the DoW Entities and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(7)     If CMS concludes that reporting done by the Trust in accordance with Section 1.lll.(x)(1) is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any DoW Entity or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any DoW Entity or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 1.lll.(x)(2), (3), or (4), or other credible information, then each DoW Entity and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information as the electing party may require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 1.lll.(x)(1), without any redactions.  The DoW Entities and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 1.lll.(x)(2) confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

(8)     Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 1.lll.(x) until the Person on whose

25

behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under (11) of this Section to such Person for any penalty, interest, or sanction with respect to a Claim that may arise solely on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each DoW Entity and Settling Insurer for any failure to report payments to Medicare eligible Tort Claimants on behalf of Persons who have supplied Medicare Reporting Numbers, if any exists.

(9)     Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trustee shall obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. The Trust shall withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Tort Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 1.lll.(x) to each DoW Entity and Settling Insurer, and permit reasonable audits by such Persons, no more often than quarterly, to confirm the Trust's compliance with this Section 1.lll.(x). For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 1.lll.(x) regardless of whether any DoW Entity or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 1.lll.(x)(7).

(10)     Compliance with the provisions of this Section 1. lll.(x) shall be a material obligation of the Trust under the Plan, in favor of the Settling Insurers under the Plan.

(11)     The Trust shall defend, indemnify, and hold harmless the DoW Entities and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under this Section.

(12)     The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing. The Trustee shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

mmm. <u>**Plan Effective Date**</u>

The term "Plan Effective Date" means the effective date of the Plan, as noticed on the Bankruptcy Case docket.

DM3\7939915.1
Bodman_17918802_2

**nnn.**    **Protected Parties**

The term "Protected Parties" means any of

     (i)     the DoW Entities;

     (ii)    each of the foregoing Persons' respective successors and assigns;

     (iii)   solely to the extent of and in their capacity as such, each of the foregoing Persons' respective Agents, shareholders, and clergy and other Persons bound by monastic vows, in their capacity as such, of the Persons identified in the foregoing subsections (i)-(iii); *provided, however,* nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the DoW, or subject to its control.

An individual who perpetrated an act of abuse that forms the basis of a Tort Claim or an Unimpaired Unknown Abuse Claim is not a Protected Party. No religious order, archdiocese, or diocese, other than DoW, is a Protected Party.

**ooo.**    **Redacted Information**

The term "Redacted Information" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Tort Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

**ppp.**    **Reorganized Debtor**

The term "Reorganized Debtor" means DoW, on and after the Plan Effective Date.

**qqq.**    **Resolute**

The term "Resolute" means Resolute Management Services Ltd. (formerly known as Equitas Management Services Limited).

**rrr.**    **Settlement Amount**

The term "Settlement Amount" means, collectively, the Interstate Settlement Amount and the LMI Settlement Amount.

**sss.**    **Settlement Amount Payment Date**

The term "Settlement Amount Payment Date" means the date sixty (60) days after the later of (i) the dates on which the Confirmation Order and the Approval Order become Final Orders; and (ii) the date on which LMI and Interstate receive notice from DoW or the Trustee that the Plan Effective Date has occurred.

DM3\7939915.1
Bodman_17918802_2

ttt.    **Settlement Approval Findings and Conclusions**

The term "Settlement Approval Findings and Conclusions" means the findings of fact and conclusions of law required under 11 U.S.C. §§ 363(b), (f), and (m) and Bankruptcy Rule 9019, entered concurrently with, but separately from  the Approval Order, as necessary for the Court to approve this Agreement, including the following:

(i)     DoW demonstrated sound business reasons for the sale of the LMI Insurance Policies to the London Market Insurers and the Interstate Insurance Policies to Interstate;

(ii)     The Parties mediated their disputes over the Tort Claims and the Coverage Claims pursuant to the order approving the Mediation Stipulation, beginning in May, 2019;

(iii)     In the Mediation, the Parties negotiated extensively, at arms-length, and in good faith.  The London Market Insurers are purchasers in good faith of the LMI Insurance Policies and Interstate is a good faith purchaser of the Interstate Insurance Policies, within the meaning of Bankruptcy Code § 363(m), and are entitled to all of the protections of that statute;

(iv)     LMI/Interstate are *bona fide* good faith purchasers of the Subject Insurance Policies, for value;

(v)     The terms of the transactions contemplated by this Agreement, as well as the genesis and background of this Agreement, have been disclosed to the Court;

(vi)     The terms and conditions of this Agreement (including the consideration to be realized by DoW's bankruptcy estate) are fair and reasonable;

(vii)     The transactions contemplated by this Agreement are in the best interests of DoW's bankruptcy estate, its creditors, and other stakeholders;

(viii)    The only potential holders of Interests in or against the Subject Insurance Policies are the DoW Entities, the Other Allegedly Insured Entities and Persons who hold Claims against the DoW Entities, which are allegedly covered by the Subject Insurance Policies;

(ix)     The DoW Entities are Parties, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

(x)     The Barred Claims are subject to *bona fide* dispute, hence the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

(xi)     All holders of Coverage Claims could be compelled, in a legal or equitable Action, to accept a money satisfaction of such Claims, therefore the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

28

(xii)   The compromises and settlements embodied in the Agreement have been negotiated in good faith, and are reasonable, fair, and equitable;

(xiii)   In light of the: (a) probability of success in the litigation of the Insurance Coverage Action; (b) difficulties, if any, to be encountered in the matter of collection; (c) complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending thereto; and (d) paramount interest of the creditors and a proper deference to their reasonable views, this Agreement is fair and equitable and in the best interest of DoW's bankruptcy estate and its creditors;

(xiv)   This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies, an admission concerning the amount of a reasonable settlement of any Claim, an admission concerning the liability of or damages caused by the DoW Entities with respect to any Tort Claim (including the reasonableness of any such damages), nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies. This Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by the London Market Insurers and Interstate with regard to other insureds, and without prejudice with regard to positions taken by any DoW Entity with regard to other insurers;

(xv)   The LMI Buy-Back Payment is fair, adequate, and reasonable consideration for (a) the sale by the DoW Entities and the buy-back by the London Market Insurers of the LMI Insurance Policies; and (b) the Entities' Release;

(xvi)   The Interstate Buy-Back Payment is fair, adequate, and reasonable consideration for (a) the sale by the DoW Entities and the buy-back by Interstate of the Interstate Insurance Policies; and (b) the Entities' Release;

(xvii)   DoW provided due and adequate notice of the (a) sale of the Subject Insurance Policies; (b) terms and conditions of this Agreement; and (c) hearing on the sale of the Subject Insurance Policies, in accordance with Bankruptcy Rules 2002 and 6004 to all known and unknown Claimants;

(xviii)  It would be impractical to divide the Subject Insurance Policies amongst the DoW Entities and the holders of Tort Claims, therefore, to realize the value of the Subject Insurance Policies for DoW's bankruptcy estate and the Tort Claimants requires the sale of the Subject Insurance Policies;

(xix)   The sale of the Subject Insurance Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b);

(xx)   The sale of the Subject Insurance Policies free and clear of the Interests of all Persons satisfies the requirements of Bankruptcy Code § 363(f);

DM3\7939915.1
Bodman_17918802_2

(xxi) The Claims that allegedly would be covered by the Subject Insurance Policies, which policies are being acquired by LMI/Interstate pursuant to this Agreement, are deemed to be (a) "interests" as that term is used in Bankruptcy Code § 363(f); and (b) "Interests" herein; and

(xxii) The Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

Subject to the Court's approval, the Approval Order shall be submitted to the Court as a document to be entered separately from the Settlement Approval Findings and Conclusions.

### uuu. Settling Insurers

The term "Settling Insurers" means, collectively, Interstate and the London Market Insurers.

### vvv. Subject Insurance Policies

The term "Subject Insurance Policies" means, collectively, the Interstate Insurance Policies and the LMI Insurance Policies.

### www. Supplemental Settling Insurer Injunction

The term "Supplemental Settling Insurer Injunction" means an order of the Bankruptcy Court, effective as of the date the Trust receives the Settlement Amount, which states, *verbatim*:

**(a) Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurers. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including LMI's and Interstate's purchases of insurance policies or Interests in insurance policies free and clear of all interests pursuant to Section 363(f) of the Bankruptcy Code:**

**1. Any and all Persons who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, or any other Person covered or allegedly covered under the Subject Insurance Policies, including (i) Claims relating to the Subject Insurance Policies, including Tort Claims, Direct Action Claims, Indirect Claims, and Released Claims; (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims; (iii) Extra-Contractual Claims; (iv) Unimpaired Unknown Abuse Claims; and (v) Unimpaired Unknown Contingent Claims, are hereby permanently stayed, enjoined, barred, and restrained**

30

**from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers or the Subject Insurance Policies:**

2.    **Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the property of the Settling Insurers;**

3.    **Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;**

4.    **Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the property of the Settling Insurers;**

5.    **Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the property of the Settling Insurers; and**

6.    **Taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

For the avoidance of doubt, this Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Subject Insurance Policies, but against no other Person or thing. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.

### xxx.    <u>Termination Event</u>

The term "Termination Event" means that any one of the orders, to wit, (i), (ii), or (iii) below in this paragraph, has been entered and either (a) it has become a Final Order or (b) DoW has sought appellate review of such order by all available means, legal or equitable, and such review has been denied by all applicable appellate courts, and six months has elapsed since the final attempt to obtain review has been denied: an order that (i) is contrary to or inconsistent with the Approval Order, or that denies approval of this Agreement; (ii) is contrary to or inconsistent with the Confirmation Order, or that denies confirmation of the Plan; or (iii) confirms a plan of reorganization other than the Plan.

### yyy.    <u>Trust</u>

The term "Trust" means the trust to be established under the Plan, which will assume liability for, and be established, pursuant to the Plan and, if applicable, Bankruptcy Code § 105, to

31

make distributions pursuant to the Plan, the Trust Agreement, and the Trust Distribution Plan including payments to Tort Claimants.

### zzz.   Trust Agreement

The term "Trust Agreement" means, collectively, any agreement establishing the Trust and the requirements for its administration, and any agreement setting forth procedures for the Trust to make distributions pursuant to the Plan and the Trust Distribution Plan including payments to Tort Claimants.

### aaaa.   Trust Distribution Plan

The term "Trust Distribution Plan" means the Trust Distribution Plan established under the Trust Agreement, which sets forth the procedures by which Tort Claimants are paid.

### bbbb.  Trustee

The term "Trustee" means the Person appointed to administer the Trust, in accordance with the terms of the Plan.

### cccc.   Underwriter Third-Party Beneficiaries

The term "Underwriter Third-Party Beneficiaries" means:

(i)      Resolute and the Equitas Entities;

(ii)     Equitas Insurance Limited to the extent it is not a successor to the Persons identified in Section 1.cccc.(i) with respect to the subject matter of this Agreement;

(iii)    Any Person from time to time retained by or on behalf of Lloyd's Underwriters to act as their claims handling agent and/or service provider, solely in such capacity;

(iv)    The past, present and future reinsurers and retrocessionaires of the Equitas Entities or any of them, including National Indemnity Company and any other Person from time to time controlled (whether directly or indirectly), by Berkshire Hathaway, Inc., that provides retrocessional reinsurance to any one or more of the Equitas Entities, solely in such capacity;

(v)     All past, present and future Affiliates and Agents of the Persons set forth in Sections 1. cccc.(i) to (iv) (inclusive), if any, solely in such capacity; and

(vi)    The respective heirs, executors, successors and assigns (including any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise), or equivalent appointee/s under relevant insolvency law), of any of the Persons identified in Sections 1.cccc.(i) to (v) (inclusive) above, solely in their capacity as such.

32

dddd.  **Unknown Claims Representative**

The term "Unknown Claims Representative" or "UCR" means the individual appointed to represent Impaired Unknown Tort Claimants.

**2.**    **Payment of the Settlement Amount**

a.    This Agreement is effective on the Effective Date.  The occurrence of the Settlement Amount Payment Date is a condition precedent to (i) each London Market Insurer's several, respective obligation to pay its share of the LMI Buy-Back Payment and the LMI Plan Payment; and (ii) Interstate's obligation to pay the Interstate Buy-Back Payment and the Interstate Plan Payment.

b.    On the Settlement Amount Payment Date, in full and final settlement of all obligations under and relating to the Subject Insurance Policies, and in consideration of the sale of the LMI Insurance Policies to the London Market Insurers and the Interstate Insurance Policies to Interstate, free and clear of all Interests of any Person, and the releases provided herein, the London Market Insurers shall pay to the Trust the LMI Settlement Amount, and Interstate shall pay to the Trust the Interstate Settlement Amount, in accordance with the payment instructions provided by the Trust.

c.    The London Market Insurers will pay the LMI Settlement Amount in two separate payments, the LMI Buy-Back Payment and the LMI Plan Payment.  Interstate will pay the Interstate Settlement Amount in two separate payments, the Interstate Buy-Back Payment and the Interstate Plan Payment.

d.    Upon the Trust's receipt of each Settling Insurer's several, respective share of the Settlement Amount, the sale, assignment, and transfer of such share of (i) the LMI Insurance Policies to the London Market Insurers; and (ii) the Interstate Insurance Policies to Interstate, free and clear of all Interests of all Persons, including the Tort Claimants and the Protected Parties, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies.

e.    If, before the Settlement Amount has been paid in full, a DoW Entity other than DoW becomes a debtor in a bankruptcy case or insolvency Action, under the Bankruptcy Code or otherwise, and Interstate, or any London Market Insurer, has not satisfied its respective several payment obligation, then Interstate or such London Market Insurer shall be excused from performance under this Agreement until such time as such DoW Entity obtains, subject to the limitations imposed by the Bankruptcy Code, and subject to the equitable powers of the court in which such Action is pending, an order from such court approving this Agreement under Bankruptcy Code § 363(b), (f), and (m) and Bankruptcy Rule 9019, authorizing the assumption by such DoW Entity (or any successor thereto) of this Agreement under Bankruptcy Code § 365 ("Assumption"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof.  Each DoW Entity agrees that in the event it files a bankruptcy or other insolvency Action, it will not present any Claim for payment under this

DM3\7939915.1
Bodman_17918802_2

Agreement to Interstate or any London Market Insurer, until the Assumption has been approved by an order of the applicable court and such order has become a Final Order.

**3.**     **Several Liability**

Interstate's and each London Market Insurer's obligations are several and not joint. Neither Interstate, nor any London Market Insurer entitled to the benefits of this Agreement, shall be liable for any settlement amount allocable to any other Person. Accordingly, Interstate agrees to pay only the Interstate Settlement Amount and each identified London Market Insurer listed in Attachment B agrees to pay only its individual, respective, allocated share of the LMI Settlement Amount, which amount is set forth in Attachment D, as applicable. No DoW Entity shall seek to recover from Interstate any amount in excess of the Interstate Settlement Amount, or from any individual London Market Insurer an amount in excess of its stated, respective, allocated share of the LMI Settlement Amount, as set forth in Attachment D. Upon receipt of payment from Interstate and each respective London Market Insurer, the DoW Entities shall be deemed to have released such Person, pursuant to Section 4 of this Agreement.

**4.**     **Mutual Releases**

     **a.**     **By DoW Entities**

          (i)     Upon the Trust's receipt of each London Market Insurer's several, respective, allocated share of the LMI Buy-Back Payment and the LMI Plan Payment, the Entities' Release shall become immediately effective for such Person and its Affiliates without further action by any Person. Those London Market Insurers entitled to the Entities' Release but not identified on Attachment B to this Agreement, namely, those London Market Insurers that subscribed an LMI Insurance Policy either not presently known, or known but to which the identity of the subscribers is not presently known, shall be entitled to all of the terms of the Entities' Release (and to the Indemnity set forth in Section 5), one-hundred twenty (120) days after the Trust's first receipt of a Buy-Back Payment.

          (ii)     Upon the Trust's receipt of Interstate's Buy-Back Payment and Interstate's Plan Payment, the Entities' Release shall become immediately effective for Interstate and the Interstate Entities without further action by any Person.

          (iii)     It is the intention of the DoW Entities to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies and to assure LMI/Interstate their peace and freedom from such Interests and from all assertions of rights in connection with such Interests, *provided, however,* the Entities' Release does not release, and nothing in this Agreement shall affect the right of the DoW Entities, or the Trust, as applicable, to assert and pursue, Claims against and to collect from (a) insurers other than LMI/Interstate; (b) any London Market Insurer or Interstate if it does not pay its respective, several share of the Settlement Amount; and (c) the Insolvent Subscribing Insurers, and no Claims are released with respect to such Persons.

          (iv)     The Trust's receipt of the Interstate Buy-Back Payment and Interstate Plan Payment, terminates any and all rights, duties, responsibilities, and obligations of Interstate

34

created by or in connection with the Interstate Insurance Policies, and the DoW Entities shall have no insurance coverage under the Interstate Insurance Policies after such date. The Trust's receipt of each London Market Insurer's several, respective, allocated share of the LMI Buy-Back Payment and LMI Plan Payment, terminates any and all rights, duties, responsibilities, and obligations of such London Market Insurer created by or in connection with the LMI Insurance Policies, and the DoW Entities shall have no insurance coverage under the LMI Insurance Policies from such London Market Insurer after such date. The Entities' Release shall operate as though Interstate had never issued the Interstate Insurance Policies and the London Market Insurers had never subscribed the LMI Insurance Policies.

(v)     The Entities' Release extends to all those (a) London Market Insurers that subscribed any of the LMI Insurance Policies; and (b) the Underwriter Third-Party Beneficiaries, all of which are third-party beneficiaries of the Entities' Release.

(vi)     Each DoW Entity signing this Agreement, is, among other things, (i) releasing all Released Claims, including Claims that it does not know or suspect to exist in its favor, which, if known by such DoW Entity, might have materially affected its settlement with LMI/Interstate, and (ii) expressly waiving all rights it might have under any federal, state, local, or other law or statute that would in any way limit, restrict, or prohibit such general release.

(vii)     Each DoW Entity expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist. Each DoW Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

(viii)     Nothing in the foregoing shall release Interstate or the London Market Insurers from their obligations under this Agreement.

b.     **By LMI/Interstate**

(i)     At the same time the Entities' Release becomes effective, Interstate, each London Market Insurer so released, and any subsequently appointed trustee or representative acting for such London Market Insurer or Interstate shall be deemed to remise, release, covenant not to sue, and forever discharge the Protected Parties from and against all Claims relating to the Subject Insurance Policies, which Interstate and each such London Market Insurer ever had, now have or hereinafter may have, from the beginning of time to the Effective Date.

(ii)     Each Person released under the Entities' Release shall reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies.

DM3\7939915.1
Bodman_17918802_2

5.    **Indemnification**

a.    This Section 5 is effective upon the Trust's receipt of the Settlement Amount.  The Trust shall indemnify and hold harmless the LMI/Interstate Entities from and against any and all Channeled Claims; the Reorganized Debtor shall indemnify the LMI/Interstate Entities from and against all Enjoined Claims except for Channeled Claims.  These indemnifications include Claims made by Persons over whom the Trust and/or the Reorganized Debtor does not have control, including the Protected Parties, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who holds a Claim that the Trust and/or the Reorganized Debtor is indemnifying.

b.    LMI/Interstate shall have the right to defend, with counsel of their choice, all Claims identified under Section 5.a.  LMI/Interstate may begin the defense of any Claim upon receipt of such a Claim.  LMI/Interstate agree to notify the Trust and/or the Reorganized Debtor, as applicable, as soon as practicable of Claims identified under Section 5.a. and of its choice of counsel.

c.    The Trust and/or the Reorganized Debtor, as applicable, shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by LMI/Interstate in defending or indemnifying Claims identified under Section 5.a.  LMI/Interstate shall defend any such Claim in good faith.  The indemnity obligations set forth in Section 5.a., hereof, to indemnify each London Market Insurer and Interstate shall not exceed the respective portion of the Settlement Amount actually paid by each of them.  In defense of any such Claim, LMI/Interstate may settle or otherwise resolve a Claim with the prior consent of the Trust and/or the Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.

d.    It is the understanding of the Parties that the London Market Insurers are paying the LMI Settlement Amount, and Interstate is paying the Interstate Settlement Amount, in respect of the DoW Entities' contentions regarding the London Market Insurers' and Interstate's insurance coverage obligations with respect to the Claims under Minnesota law and that, as a result, no Non-Settling Insurer should have, or claim to have, any Contribution Claim against either LMI or Interstate.  Nevertheless, and to the extent the reduction language included in paragraph 8 below is deemed unenforceable or does not extinguish the Contribution Claim completely, then the Trust shall indemnify and hold harmless Interstate and the London Market Insurers from and against any and all Abuse-Related Contribution Claims, and the Reorganized DoW shall indemnify Interstate and the London Market Insurers from and against any Non-Abuse Related Contribution Claims asserted against Interstate or the London Market Insurers by any Non-Settling Insurer.

e.    This indemnification and hold harmless undertaking (Sections 5.a., b., c. and d.) also extends to the benefit of the Underwriter Third-Party Beneficiaries, in their capacity as such, all of which are third-party beneficiaries of the terms of this indemnification and hold harmless undertaking.

6.    **Bankruptcy Obligations**

a.    DoW shall provide to LMI/Interstate an initial draft of the proposed Approval Order, and the accompanying proposed findings of fact and conclusions of law in support of the

36

Approval Order, and the proposed Bar Order ten (10) Business Days before DoW submits a motion for approval of this Agreement to the Bankruptcy Court, so that LMI/Interstate may provide comments and suggestions.  In the event that DoW makes material revisions to any of the foregoing documents, then, as soon as possible, DoW shall provide a copy of such material revisions to LMI/Interstate.  LMI/Interstate reserve the right to object to, inter alia, (i) any proposed approval order or findings of fact and conclusions of law in support thereof that do not satisfy all of the requirements of the definition of "Approval Order" set forth in Section 1.e., (ii) any proposed bar order that does not satisfy all of the requirements of the definition of "Bar Order" set forth in Section 1.l; and (ii) any proposed findings and conclusions that do not satisfy all of the requirements of the definition of "Settlement Approval Findings and Conclusions" set forth in Section 1.ttt.

      b.      DoW shall provide to LMI/Interstate an initial draft of the proposed confirmation order and proposed findings of fact and conclusions of law in support of the Confirmation Order ten (10) Business Days before DoW submits the foregoing to the Bankruptcy Court, so that LMI/Interstate may provide comments and suggestions.  In the event that DoW makes material revisions to any of the foregoing documents, then, as soon as possible, DoW shall provide a copy of such material revisions to LMI/Interstate.  LMI/Interstate reserve the right to object to, inter alia, any proposed confirmation order that does not satisfy all of the requirements of the definition of "Confirmation Order" set forth in Section 1.t, or any proposed findings of fact and conclusions of law that does not satisfy all the requirements of the definition of "Confirmation Findings and Conclusions" in Section 1.s.

      c.      DoW provided to LMI/Interstate a draft of its initial proposed plan of reorganization before DoW filed the plan with the Bankruptcy Court (**"Initial Proposed Plan"**), so that LMI/Interstate could provide comments and suggestions.  To the extent that the Initial Proposed Plan does not meet the requirements set forth in the definition of "Plan" set forth in Section 1.lll. above, DoW shall modify such Initial Proposed Plan to assure that the filed plan of reorganization submitted to the Bankruptcy Court for confirmation comports with such definition, and LMI/Interstate shall have the right to approve all modifications that affect their rights or obligations in any way under this Agreement.  Furthermore, in the event that DoW makes any other material revisions to the filed plan of reorganization, then, as soon as possible, DoW shall provide a copy of such material revisions to LMI/Interstate.  In addition to their rights under Section 9, LMI/Interstate reserve the right to object to, *inter alia*, any proposed plan of reorganization that does not satisfy all of the requirements of the definition of "Plan" set forth in Section 1.lll. ("**Non-Compliant Plan**").  If DoW proposes a Non-Compliant Plan, then LMI/Interstate may contest such plan, and DoW shall not request a hearing date on confirmation of a Non-Compliant Plan less than thirty (30) days after the date such plan is filed in the Bankruptcy Court.

      d.      DoW will seek entry of the Confirmation Order, as set forth in Section 1.t., together with the Confirmation Findings and Conclusions, as set forth in Section 1.s., including any required findings and conclusions under the Bankruptcy Code.

      e.      DoW shall serve Bankruptcy Notice of the hearing(s) on confirmation of the Plan and approval of this Agreement and the time for filing objections thereto.  The proposed form of

DM3\7939915.1
Bodman_17918802_2

notice shall be submitted to LMI/Interstate for their approval no later than ten (10) days prior to the actual service of notice, such approval not to be unreasonably withheld.

f.        In the event that any Person attempts to prosecute a Barred Claim, before the Effective Date, against LMI/Interstate (or any of them), then promptly following notice from LMI/Interstate, or against any DoW Entity, then promptly following notice from such DoW Entity, DoW shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code §§ 105(a) and/or 362(b), as applicable, staying such Claims until the date that the Approval Order and Confirmation Order have each become a Final Order, or, alternatively, this Agreement is terminated under Section 9.  However, if DoW is unable to obtain a stay of such Claim then LMI/Interstate may, to the extent feasible, and subject to the terms, conditions and any applicable limits and retentions of the Subject Insurance Policies, defend such Claims and either settle them or litigate them to judgment, and the applicable DoW Entities shall fully assist and cooperate with LMI/Interstate in such defense.  If after such a Claim is brought, and if,

(i)       the Effective Date occurs, then any payment by Interstate and/or the London Market Insurers to resolve such Barred Claim, including defense costs paid to an insured's counsel, shall be deducted equally from the applicable Buy-Back Payment and Plan Payment, and Interstate and/or the London Market Insurers, as applicable, shall pay the balance of their respective Settlement Amounts; if the payments by Interstate and/or the London Market Insurers to resolve such Barred Claim equals or exceeds either the Interstate Settlement Amount or the LMI Settlement Amount, then Interstate and/or London Market Insurers, as applicable, shall automatically, and without further action by any Person, be relieved of any further obligations under this Agreement and entitled to all the benefits hereunder, including the Entities Release; or

(ii)      the Effective Date does not occur, before this Agreement is terminated under Section 9, then any amounts paid by LMI/Interstate shall be credited against their obligations, if any exist, under the Subject Insurance Policies.

**7.    Representations and Warranties**

a.        DoW represents and warrants that the notice required under the definition of Bankruptcy Notice includes all Claimants whose names and addresses are known to DoW or are readily ascertainable to such Claimants' current, or most recent, counsel of record.

b.        Each DoW Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation.

c.        Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

d.        Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity, and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

38

8.    **Reduction Clause.**

The Plan shall include the following:

a.    **Litigation/Settlement Between an Alleged Insured or Tort Claimant and Non-Settling Insurers**

(i)    In any Action, including the Insurance Coverage Action, involving a DoW Entity, the Reorganized Debtor, or the Trust (collectively, "**Alleged Insured**") or a Tort Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert, any Contribution Claim against an LMI/Interstate Entity, then, provided such LMI/Interstate Entity has paid its share of the Settlement Amount, any judgment or award obtained by such Alleged Insured or Tort Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such LMI/Interstate Entity would have been liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely (**"Reduction Amount"**).  In any Action involving an Alleged Insured or Tort Claimant against a Non-Settling Insurer, where such an LMI/Interstate Entity is not a party, the Non-Settling Insurer's Contribution Claim may be asserted as a defense and, to the extent the Non-Settling Insurer's Contribution Claim against a Settling Insurer is determined to be valid by a court presiding over such action, the liability of the Non-Settling Insurer shall be reduced dollar for dollar by the amount so determined. In the event that such a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any LMI/Interstate Entity shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed.  No LMI/Interstate Entity shall be required to answer or otherwise respond to the complaint in the Contribution Claim Action until such Reduction Amount is determined by such court or arbitrator(s).

(ii)    If an Alleged Insured or Tort Claimant and a Non-Settling Insurer enter into an agreement settling one or more Claims relating to Abuse, such agreement shall include a provision whereby such Non-Settling Insurer releases Contribution Claims against LMI/Interstate so long as LMI/Interstate release LMI/Interstate Insurer Claims against such Non-Settling Insurer.  If such settlement agreement fails to include such a release provision, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount.  In such event, the Non-Settling Insurer shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount.  If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Contribution Claim by any Non-Settling Insurer against any LMI/Interstate Entity shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed.  No LMI/Interstate Entity shall be required to answer or otherwise respond to the complaint in the Contribution Claim Action until such Reduction Amount is determined by such court or arbitrator(s).

DM3\7939915.1
Bodman_17918802_2

b. **Treatment of Contribution Claims That Are Not Fully Reduce**d

(i)     LMI/Interstate shall not pursue any LMI/Interstate Insurer Claim against any Insurer (A) that asserts an Abuse-Related Contribution Claim solely against the Trust; (B) whose Contribution Claim is satisfied and extinguished entirely by the application of paragraph 8.a., *supra*, or (C) that does not assert a Contribution Claim.

(ii)     If, in the future, a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against Interstate and/or a London Market Insurer, then such released Settling Insurer shall release its LMI/Interstate Insurer Claims against such releasing Insurer.

(iii)     The Channeling Injunction channels all Abuse-Related Contribution Claims to the Trust.

(1)     If an Insurer asserts its Abuse-Related Contribution Claim only against the Trust, then LMI/Interstate shall assign any LMI/Interstate Insurer Claims against such Insurer to the Trust, and the Trust shall be free to assert the LMI/Interstate Insurer Claim against such other Insurer.

(2)     If, for some reason, a court allows an Insurer to assert its Abuse-Related Contribution Claim against LMI/Interstate or any of them, and the Trust fully indemnifies LMI/Interstate, then LMI/Interstate shall assign their LMI/Interstate Insurer Claims to the Trust.

(3)     If the Trust partially, but not fully, indemnifies LMI/Interstate for such Claim, then LMI/Interstate shall retain their LMI/Interstate Insurer Claim and assert it against the Insurer asserting the Abuse-Related Contribution Claim.  Any recovery by LMI/Interstate exceeding the amount necessary to satisfy the Trust's full indemnity obligation shall be turned over to the Trust.

(iv)     The Supplemental Settling Insurer Injunction enjoins all Non Abuse-Related Contribution Claims.

(1)     If, for some reason, a court allows an Insurer to assert its Non Abuse-Related Contribution Claim against LMI/Interstate or any of them, and the Reorganized Debtor fully indemnifies LMI/Interstate, then LMI/Interstate shall assign their LMI/Interstate Insurer Claims to the Reorganized Debtor.

(2)     If the Reorganized Debtor partially, but not fully, indemnifies LMI/Interstate for such Claim, then LMI/Interstate shall retain their LMI/Interstate Insurer Claim and assert it against the Insurer asserting the Non Abuse-Related Contribution Claim.  Any recovery by LMI/Interstate exceeding the amount necessary to satisfy the Reorganized Debtor's full indemnity obligation shall be turned over to the Reorganized Debtor.

DM3\7939915.1
Bodman_17918802_2

c.      To ensure that the reduction contemplated in this Section 8 is accomplished, the LMI/Interstate Entities shall be entitled to: (i) notice, pursuant to Section 19, within a reasonable time of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer that could give rise to the possibility of a Contribution Claim against any LMI/Interstate Entity, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations without objection by any party thereto, but only to the extent necessary to accomplish the reduction contemplated in this Section 8; (iii) the cooperation of the applicable Alleged Insured so that the LMI/Interstate Entities can assert this Section as a defense in any Action against any of them for any Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect the LMI/Interstate Entities from any Contribution Claim.  The notice required above shall be given by (A) the Alleged Insured that is a party to such Action or settlement negotiations; or (B) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (C) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Tort Claimant bound by the Plan.

d.      The Trust shall use its best efforts to obtain, from all Settling Insurers, agreements similar to those contained in **Section 8(b)**.

9.      <u>**Termination of Agreement**</u>

a.      The Parties may terminate this Agreement in writing upon mutual assent.

b.      Any Party may terminate this Agreement upon thirty (30) days' notice to the other Parties if a Termination Event occurs.

c.      In the event of termination, this Agreement shall be void *ab initio* and the Parties shall retain all of their Interests relating to the Subject Insurance Policies as if this Agreement never existed.

d.      If any London Market Insurers or Interstate does not pay its allocated share of the Settlement Amount (each a **"Non-Paying Insurer"**), DoW, at its option, may by written notice to the other parties to this Agreement, either terminate this Agreement in its entirety or terminate this Agreement solely as it relates to such Non-Paying Insurer (**"Partial Termination"**).  In the event of a Partial Termination, (i) such Non-Paying Insurer shall not be a Settling Insurer; (ii) such Non-Paying Insurer shall not have the benefit of the Entities' Release, the Channeling Injunction, or the Supplemental Settling Insurer Injunction; (iii) the Subject Insurance Policies shall not include that portion of any insurance policies to the extent issued or subscribed by such Non-Paying Insurer; (iv) this Agreement shall be void *ab initio* solely as it relates to such Non-Paying Insurer; and (v) the Parties shall retain all of their Interests relating to that portion of any insurance policies to the extent issued or subscribed by such Non-Paying Insurer, as if this Agreement never existed.

10.     <u>**Treatment of Perpetrators**</u>

Nothing in this Agreement overrides the treatment in the Plan of individuals who perpetrated an act of Abuse that forms the basis for a Tort Claim.

DM3\7939915.1
Bodman_17918802_2

11. **Reasonably Equivalent Value**

a.    This Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations;

b.    Based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of maintaining the Insurance Coverage Action, the payments received by the DoW Entities pursuant to this Agreement constitute a fair and reasonable settlement of the Released Claims;

c.    The payments and other benefits received under this Agreement by the DoW Entities constitute reasonably equivalent value for the Entities' Release, indemnity, and other benefits received by LMI/Interstate under this Agreement; and

d.    This Agreement constitutes a full and final resolution of all issues in the Insurance Coverage Action as it relates to LMI/Interstate.

12. **Confidentiality**

a.    Except as necessary to obtain approval of this Agreement in the Bankruptcy Court, the Parties agree that all matters relating to the negotiation of this Agreement shall be confidential and are not to be disclosed except by order of court, or written agreement of the Parties.  The Agreement itself is not confidential.

b.    In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this Section from a Party, such Party shall decline to provide the requested information on the ground that this Agreement prohibits such disclosure.  In the event such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue or Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall immediately give written notice by facsimile, overnight mail, email or hand-delivery to the other Parties, and shall immediately provide copies of all notice papers, orders, requests, or other documents in order to allow each Party to take such protective steps as may be appropriate.  Notice shall be made under this paragraph to the persons identified in Section 19.

c.    Material protected by this Section shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

13. **Third-Party Beneficiaries**

The Underwriter Third-Party Beneficiaries, the Trust, and the Trustee are intended third-party beneficiaries of this Agreement. Except as set forth in the preceding sentence, there are no other third-party beneficiaries of this Agreement.

42

14. **Co-operation**

The DoW Entities will undertake all reasonable actions to co-operate with LMI/Interstate in connection with their respective reinsurers, including responding to reasonable requests for information and meeting with representatives of reinsurers. Furthermore, the Parties shall use their reasonable best efforts and cooperate as necessary or appropriate to effect the objectives of this Agreement.

15. **Non-Prejudice and Construction of Agreement**

a.     This Agreement is intended to be and is a compromise between the Parties and neither this Agreement nor any provision hereof shall be construed as (i) an admission of coverage under the Subject Insurance Policies; (ii) an admission concerning the amount of a reasonable settlement of any Claim; (iii) an admission concerning the liability of or damages caused by the DoW Entities with respect to any Tort Claim (including the reasonableness of any such damages); or (iv) a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies.

b.     This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by the London Market Insurers and Interstate with regard to other insureds, and without prejudice with regard to positions taken by any DoW Entity with regard to other insurers. Except for the express references to the Third-Party Beneficiaries, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

c.     This Agreement is the jointly drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will assert that any ambiguity in this agreement shall be construed against another Party.

d.     If any provision of the Plan, the Trust Agreement, or trust distribution procedures proposed thereunder conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control. Neither the Plan nor the Trust Agreement shall be construed or interpreted to modify or affect any rights or obligations of LMI/Interstate under this Agreement.

16. **No Modification**

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties. Any change or modification of this Agreement that affects the rights of the Tort Claimants or the Trust shall require the consent of the Official Committee of Unsecured Creditors or the Trustee, as applicable, which consent shall not be unreasonably withheld. Any attempted change or modification in violation of this Section shall be void *ab initio*.

DM3\7939915.1
Bodman_17918802_2

17. **Execution**

There will be three signed originals of this Agreement.

18. **Governing Law**

This Agreement shall be governed by and shall be construed in accordance with the laws of Minnesota.

19. **Notices**

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent to the Persons listed on Attachment F.

20. **Integration**

This Agreement, including the attachments, constitutes the entire Agreement amongst Interstate, the London Market Insurers, and the DoW Entities, with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, amongst the Parties with respect thereto.  The Parties intend that this Agreement and the Plan shall be consistent in all respects, with no conflict or discrepancies between them.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement by their duly authorized representatives.

The London Market Insurers identified in Attachment B have respectively designated Clyde & Co US LLP, as their attorneys-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

[Signature Pages Follow]

44

Signed: _____

Diocese of Winona-Rochester

Name Printed: _____

Title: _____

Date: _____ 2021


Signed: _____

London Market Insurers

Name Printed: _____

Title: _____

Date: _____ 2021


Signed: _____

London Market Insurers

Name Printed: _____

Title: _____

Date: _____ 2021


[DoW Entity Signatures to be added here]

DM3\7939915.1
Bodman_17918802_2

## SCHEDULE OF ATTACHMENTS TO

## SETTLEMENT AGREEMENT AND RELEASE

| | |
|---|---|
| Attachment A-1 | List of known LMI Insurance Policies |
| Attachment A-2 | List of known Interstate Insurance Policies |
| Attachment B | List of London Market Insurers |
| Attachment C | List of Insolvent Insurers |
| Attachment D | List of Solvent London Market Insurers allocated shares of the Settlement Amount |
| Attachment E | List of DoW Entities |
| Attachment F | Notice Names and Addresses |

46

**ATTACHMENT A-1**

**Known LMI Insurance Policies**

| Periods | Policy Numbers |
| --- | --- |
| July 1, 1978-1979 | SL3402 / SLC5421 |
| July 1, 1979-1980 | SL3402 / SLC5421 |
| July 1, 1980-1981 | SL3703 / SLC5527 |
| July 1, 1981-1982 | SL3703 / SLC5527 |
| July 1, 1982-1983 | SL3703 / SLC5527 and SL3986 / SLC5975 |
| July 1, 1983-1984 | ISL3087 / ICO4047 and ISL3089 / ICO4049 |
| July 1, 1984-1985 | ISL3087 / ICO4047 and ISL3089 / ICO4049 |
| July 1, 1985-1986 | ISL3087 / ICO4047 and ISL3089 / ICO4049 |
| July 1, 1986-1987 | ISL3526 / ICO5357 and ISL3522 / ICO5359 |
| July 1, 1987-1988 | ISL3822 / ICO5522 |
| July 1, 1988-1989 | ISL4060/ ICO5633 |
| July 1, 1989-1990 | ISL4282/ ICO5862 |
| July 1, 1990-1991 | ISL4569 / ICO6138 |
| July 1, 1991-1992 | ISL4907 / ICO6520 |
| July 1, 1992-1993 | ISL5286 / ICO6964 |
| July 1, 1993-1994 | ISL5605 / ICO7315 |
| July 1, 1994-1995 | ISL5834 / ICO7541 |

47

## ATTACHMENT A-2

### Known Interstate Insurance Policies

| Periods | Policy Numbers |
|---|---|
| July 1, 1978-1979 | 183-152609 |
| July 1, 1979-1980 | 183-152609/1 |
| July 1, 1980-1981 | 183-152609/1 |
| July 1, 1981-1982 | 183-152609/2 |
| July 1, 1982-1983 | 183-152609/3 |
| July 1, 1983-1984 | 183-0169196 |
| July 1, 1984-1985 | 183-0169196/1 |
|  | XLX-139-52-38 |
| July 1, 1985-1986 | 183-0172436 |

48

**ATTACHMENT B**

**<u>List of London Market Insurers</u>**

Certain Underwriters at Lloyd's, London

Excess Insurance Company Ltd.

Terra Nova Insurance Company Ltd.

Yasuda Fire & Marine Insurance Company (U.K.) Ltd.

Dominion Insurance Company Ltd.

Sphere Drake Insurance Company Ltd.

British National Life Insurance Society Ltd.

Assicurazioni Generali S.p.A.

St. Katherine Insurance Company PLC

DM3\7939915.1
Bodman_17918802_2

**ATTACHMENT C**

LIST OF ALL KNOWN **INSOLVENT** OR **NON-PARTICIPATING**
SUBSCRIBERS TO THE INSURANCE POLICIES ALLEGEDLY
SUBSCRIBED BY LONDON MARKET INSURERS AND AT ISSUE IN
THE DECLARATORY JUDGMENT ACTION

1. CNA Reinsurance of London, Ltd.

2. CNA International Reinsurance Co. Ltd.

3. CX Reinsurance Company Ltd.

4. Stronghold Insurance Co. Ltd.

5. Northwestern National Insurance Company of Milwaukee Wisconsin,
   *fka* Bellefonte Insurance Co.

6. Pine Top Insurance Co., Ltd.

50

**ATTACHMENT D**

**Solvent London Market Insurer Shares of the Settlement Amount**

| London Market Insurer | Amount |
|---|---|
| Certain Underwriters at Lloyd's, London | $2,952,534.96 |
| Excess Insurance Company | $124,435.59 |
| Terra Nova Insurance Company | $114,987.33 |
| Sphere Drake Insurance Company | $23,611.03 |
| Yasuda Fire & Marine Insurance Company (U.K.) Ltd. | $34,427.09. |
| Dominion Insurance Company Ltd. | $1.00 |
| British National Life Insurance Society Ltd. | $1.00 |
| Assicurazioni Generali S.p.A. | $1.00 |
| St. Katherine Insurance Company PLC | $1.00 |
| **Total** | **$3,250,000** |

| | |
|---|---|
| **Net to Solvent LMI** | **$3,250,000.00** |

Note:  The names of the LMI insurance companies listed above are the ones used when the insurance policies were placed.

51

**ATTACHMENT E**

**LIST OF DOW ENTITIES**

**Parishes in the Diocese of Winona-Rochester**

The Church of the Sacred Heart of Adams, Minnesota
412 W Main St.
Adams, MN 55909-0352

The Church of St. Adrian of Adrian, Minnesota
512 Maine Ave
Adrian, MN 56110-0475

The Church of St. Theodore of Albert Lea, Minnesota
315 E. Clark St.
Albert Lea, MN 56007-0604

St. Anthony of Altura, Minnesota
119 1st St. NE
Altura, MN 55910

Church of Queen of Angels of Austin, Minnesota
1001 E Oakland Ave
Austin, MN 55912-3896

The Church of St. Augustine of Austin, Minnesota
405 4th St NW
Austin, MN 55912-3091

The Church of St. Edward of Austin, Minnesota
2000 West Oakland Ave
Austin, MN 55912-1599

The Church of St. Columbanus of Blooming Prairie, Minnesota
114 E. Main St.
Blooming Prairie, MN 55917-1427

The Church of Saints Peter and Paul of Blue Earth, Minnesota
214 S. Holland St.
Blue Earth, MN 56013-1331

Church of Sacred Heart of Brewster, Minnesota
516 10th St.
Brewster, MN 56119-0187

52

Saint Patrick's Church, of Brownsville
604 Adams St.
Brownsville, MN 55919-0155

Church of Christ the King of Byron, Minnesota
202 4th St. NW
Byron, MN 55920-1000

Church of St. Mary
513 S. Pine St.
Caledonia, MN 55921-0406

Assumption, a/k/a Assumption Catholic Church
207 N. May St.
Canton, MN 55922

The Church of St. Mary of Chatfield, Minnesota
405 Bench St SW
Chatfield, MN 55923

Immaculate Conception Church
22032 County Rd. 18
Plainview, MN 55945

The Church of the Immaculate Heart of Mary, of Currie, Minnesota
510 Mill St
Currie, MN 56123

The Church of Holy Cross of Dakota, Minnesota
180 Washington St
Dakota, MN 55925

St. John Baptiste de la Salle a/k/a Church of St. John Baptists[sic] De La Salle
20 2nd St NE
Dodge Center, MN 55927-0310

The Holy Family Catholic Church a/k/a Holy Family
2481 50th St.
East Chain, MN 56031-3098

Church of Our Lady of Mount Carmel of Easton, Minnesota
27 Main St.
Easton, MN 56025-0008

DM3\7939915.1
Bodman_17918802_2

The Church of St. Aloysius of Elba, Minnesota
150 N. Main St.
Elba, MN 55910

The Church of Holy Redeemer a/k/a Holy Redeemer
22 E. 2nd St.
Eyota, MN 55934

Saint John Vianney Catholic Church of Fairmont, Minnesota
901 S. Prairie Ave.
Fairmont, MN 56031-3098

The Church of St. Gabriel of Fulda, Minnesota
309 W Lake Ave
Fulda, MN 56131-9402

The Church of St. Joseph of Good Thunder, Minnesota
130 N Ewing St
Good Thunder, MN 56037

Church of St. Finbarr, of the County of Mower, Minnesota
504 1st St. SW
Grand Meadow, MN 55936

Church of the Nativity of the Blessed Virgin Mary of Harmony, Minnesota
640 1st Ave. SW
Harmony, MN 55939

Sacred Heart Church of Hayfield, Minnesota
150 2nd St. NE
Hayfield, MN 55940-0027

The Church of the Sacred Heart of Heron Lake, Minnesota
321 9th St.
Heron Lake, MN 56137

St. Peter a/k/a St. Peter's
34 Main St.
Hokah, MN 55941-0355

St. Mary a/k/a St. Mary's
202 S. Sheridan
Houston, MN 55943

DM3\7939915.1
Bodman_17918802_2

The Church of St. Columba of Iona a/k/a The Church of ST. [sic] Columba of Iona, Minnesota
451 McDonnell Ave.
Iona, MN 56141

The Church of the Good Shepherd of Jackson, Minnesota
311 Sverdrup Ave S
Jackson, MN 56143

The Church of St. Ann of Janesville, Minnesota
307 W. 2nd St.
Janesville, MN 56048-0218

St. Joseph a/k/a The Church of St. Joseph of Jasper, Minnesota
415 2nd St. E.
Jasper, MN 56144-1212

St. John the Baptist
10343 640th Ave.
Johnsburg, MN 55909

Holy Family Catholic Church
1904 N. Mantorville Ave.
Kasson, MN 55944-0171

The Church of St. Agnes of Kellogg, Minnesota
125 Belvidere Ave.
Kellogg, MN 55945

The Church of the Crucifixion of La Crescent a/k/a Crucifixion
423 S 2nd St
La Crescent, MN 55947-1326

Saint Mary's Church of Lake City a/k/a St. Mary's Church of Lake City, Minnesota a/k/a Saint Mary's Church of Lake CitySpec Laws 1879 Chap 232
419 W. Lyon Ave.
Lake City, MN 55041-1649

Church of the Holy Family
201 N. Hunt
Lake Crystal, MN 56055

Church of St. Mary of the Village of Lake Wilson
320 Paul Ave
Lake Wilson, MN 56151

DM3\7939915.1
Bodman_17918802_2

St. Joseph's
410 Broadway
Lakefield, MN 56150

The Church of St. Patrick of Lanesboro, Minnesota
100 Ridgeview Lane South
Lanesboro, MN 55949

St. Patrick a/k/a St. Patrick Catholic Church
436 W. Main St.
LeRoy, MN 55951

St. Rose of Lima Catholic Church of Lewiston, Minnesota
180 S. Fremont St.
Lewiston, MN 55952-0727

The Church of St. Anthony of Lismore, Minnesota
310 S 3rd Ave
Lismore, MN 56155-0158

Holy Trinity Church of Litomysl
9946 SE 24th Ave.
Litomysl, MN 55060

The Church of St. Catherine of Luverne a/k/a The Church of St. Catharine [sic] of
Luverne, Minnesota a/k/a St. Catherine
203 E. Brown
Luverne, MN 56156-1599

Church of Queen of Peace of the Village of Lyle, Minnesota
303 3rd Street
Lyle, MN 55953

St. Olaf Catholic Church a/k/a St. Olaf
114 N. Locust
Mabel, MN 55954

The Church of Saint Mary of Madelia, Minnesota
19 Crosby Ave NE
Madelia, MN 56062-1702

All Saints Parish of Madison Lake, Inc. a/k/a All Saints Parish of Madison Lake.Inc. [sic]
605 4th St.
Madison Lake, MN 56063-0217

DM3\7939915.1
Bodman_17918802_2

The Church of St. Peter and St. Paul of Mankato a/k/a The Church of St. Peter and
St.Paul [sic] of Mankato, Minnesota
105 N. 5th St.
Mankato, MN 56001-4442

The Church of St. John the Baptist of Mankato
632 S Broad St
Mankato, MN 56001

Church of St. Joseph the Worker
423 W. 7th St.
Mankato, MN 56001-2197

St. Thomas More Catholic Newman Center Parish of Mankato, Minnesota a/k/a Newman
Center, Diocese of Winona a/k/a St. Thomas More Catholic Newman Center of Mankato
1502 Warren Street
Mankato, MN 56001-4948

The Church of St. Theresa of Mapleton, Minnesota a/k/a St. Teresa
104 Silver St W
Mapleton, MN 56065-0305

Ss. Peter and Paul
222 1st Ave. S.
Mazeppa, MN 55956-0224

The Church of Christ the King of Medford, Minnesota
205 NW 2nd Ave
Medford, MN 55049

St. Mary
424 Bennett Ave.
Minneiska, MN 55910

Church of St. Paul, of the Village of Minnesota City, Minnesota
132 Anderson St.
Minnesota City, MN 55959

The Church of St. John the Baptist, of Minnesota Lake, Minnesota
100 Park St. N.
Minnesota Lake, MN 56068-1399

The Church of All Saints, New Richland
307 SW First St.
New Richland, MN 56072-0185

DM3\7939915.1
Bodman_17918802_2

The Church of the Sacred Heart of Owatonna, Minnesota
810 S Cedar Ave.
Owatonna, MN 55060-3297

St. Joseph Church a/k/a St. Joseph
512 S Elm St
Owatonna, MN 55060-3399

The Church of St. Leo of Pipestone, Minnesota
415 S. Hiawatha Ave.
Pipestone, MN 56164-0036

The Church of St. Joachim of Plainview, Minnesota
900 W Broadway
Plainview, MN 55964-1039

St. Columban a/k/a St. Columban's Preston a/k/a The Church of St. Columbanus of
Preston, Minnesota
408 NW Preston St.
Preston, MN 55965

Co-Cathedral of St. John the Evangelist
11 4th Ave SW
Rochester, MN 55902-3098

Holy Spirit Catholic Church a/k/a Holy Spirit
5455 50th Ave. NW
Rochester, MN 55901

Pax Christi Church of Rochester, Minnesota
4135 18th Ave NW
Rochester, MN 55901-0460

Church of the Resurrection of Rochester, Minnesota
1600 11th Ave SE
Rochester, MN 55904-5499

The Church of St. Francis of Assisi of Rochester, Minnesota
1114 3rd St. SE
Rochester, MN 55904-7209

St. Pius X Catholic Church of Rochester, Minnesota
1315 12th Ave NW
Rochester, MN 55901-1744

DM3\7939915.1
Bodman_17918802_2

The Church of the Holy Trinity, Rollingstone, Minnesota
83 Main St.
Rollingstone, MN 55969

The Church of St. Peter of Rose Creek
302 Maple St. SW
Rose Creek, MN 55970

The Church of St. Joseph of Rushford, Minnesota
103 N. Mill St.
Rushford, MN 55971-0577

The Church of St. Luke of Sherburne
303 S Lake St
Sherburn, MN 56171

St. Bridget
2123 Cty Rd 16 SE
Simpson, MN 55976

Church of St. Ann a/k/a The Church of St. Anne, Slayton, Minnesota
2747 29th St.
Slayton, MN 56172-1485

The Church of St. Ignatius of Spring Valley, Minnesota
213 W. Franklin St.
Spring Valley, MN 55975-1312

St. Charles Borromeo
1900 E 6th St.
St. Charles, MN 55972-1426

Church of the Immaculate Conception of St. Clair, Minnesota
101 Church St.
St. Clair, MN 56080-0100

The Church of St. James of St. James a/k/a THe [sic] Church of St. James of St. James,
Minnesota
707 4th St. S
St. James, MN 56081-1808

St. Bernard's Parish
116 4th Ave SE
Stewartville, MN 55976

59

St. James
106 W Main St.
Twin Lakes, MN 56007

The Church of St. Matthew of Vernon Center, Minnesota
200 Kendall St
Vernon Center, MN 56090-0156

St. Felix Church of Wabasha, Minnesota
117 3rd St. W
Wabasha, MN 55981-1201

St. Joseph a/k/a St. Joseph Catholic Church
225 3rd Ave N.
Waldorf, MN 56091

The Church of the Sacred Heart of Waseca, Minnesota
111 4th St NW
Waseca, MN 56093-2413

The Church of St. Casimir of Wells, Minnesota
320 2nd Ave. SW
Wells, MN 56097-1399

The Church of St. Anthony
1153 1st Ave
Westbrook, MN 56183

The Church of Our Lady of Good Counsel of Wilmont Minnesota
605 4th Ave
Wilmont, MN 56185

Immaculate Conception
Hwy 43
Wilson Township, MN 55987

The Church of St. Francis Xavier of Windom
548 17th St.
Windom, MN 56101-1217

The Church of St. Mary of Winnebago City, Minnesota
32 1st St. NE
Winnebago, MN 56098

DM3\7939915.1
Bodman_17918802_2

St. Stanislaus Church of Winona a/k/a The Church of St. Stanislaus of Winona,
Minnesota a/k/a Basilica of St. Stanislaus Kostka
625 E. 4th St.
Winona, MN 55987

The Cathedral of the Sacred Heart
360 Main St.
Winona, MN 55987

St. Casimir
624 W. Broadway
Winona, MN 55987

St. John Nepomucene
560 E. Broadway
Winona, MN 55987

St. Mary's Church of Winona, Minnesota
1303 W Broadway
Winona, MN 55987

The Church of St. Martin of Woodstock, Minnesota
101 Smith St. N.
Woodstock, MN 56186-1075

The Church of St. Mary of Worthington
1215 7th Ave.
Worthington, MN 56187-2297

## Closed Parishes in the Diocese of Winona-Rochester

St. Rose of Lima – Closed
Avoca, MN 56114
Murray County

Our Lady of Loretto –  Merged into Queen of Angels Catholic Church, Austin
404 W. Main Street
Brownsdale, MN 55918
Mower County

St. John the Baptist – Closed
Caledonia, MN  55921
Houston County

61

St. Peter – Closed
Caledonia, MN 55921
Houston County

St. Ligouri – Closed
Carimona, MN 55965
Fillmore, County

St. Francis de Sales – Closed
326 2nd St
Claremont, MN 55924
Dodge County

St. John's Catholic Church – Closed
Danville, MN 94506
Blue Earth County

Mater Delorosa– Closed
Delavan, MN 56023
Faribault County

Corpus Christi – Closed
8914 NW 66th St
Deerfield, MN 56093
Steele County

St. Mary Catholic Church – Closed
Dundee, MN 56131
Nobles County

St. Mary – Merged into Church of St. Catherine of Luverne, Minnesota
204 N. Broadway St. SW
Ellsworth, MN 56129
Nobles County

The Church of St. Aidan – Closed
218 5th Ave W
Ellendale, MN 56026
Steele County

St. Lawrence O'Toole Catholic Church – Closed
Fountain, MN 55935
Fillmore, County

DM3\7939915.1
Bodman_17918802_2

St. Nicholas Catholic Church – Closed
Freeburg, MN 55921
Houston County

The Church of St. Mary – Closed
Geneva, MN
Freeborn County

Our Lady of Mercy – Closed
Guckeen, MN 56013
Faribault County

St. Clement Catholic Church – Closed
Hammond, MN 55991
Wabasha County

Ss. Peter and Paul Catholic Church – Closed
Hart, MN 55952
Winona County

St. Jarlath – Closed
Iosco, MN 56048
Waseca County

St. Augustine – Closed
Jeffers, MN 56145
Cottonwood County

St. Patrick – Closed
Jefferson, MN 55921
Houston County

St. Olaf – Closed
Kasson, MN 55944
Dodge County

St. Mary – Closed
Kenneth, MN 56147
Rock County

Precious Blood – Closed
La Moille, MN 55987
Winona County

DM3\7939915.1
Bodman_17918802_2

St. Margaret – Closed
Mantorville, MN 55955
Dodge County

St. John the Baptist – Closed
Minneota, MN 56264
Jackson County

St. Wenceslaus – Closed
Moravia, MN 55060
Steele County

Immaculate Conception– Closed
Oak Ridge, MN 55910
Winona County

St. James – Closed
Oakwood, MN 55957
Wabasha County

St. Hyacinth – Closed
Owatonna, MN 55060
Steele County

St. Mary – Closed
Preble, MN 55949
Houston County

St. Patrick – Closed
Ridgeway, MN 55925
Winona County

St. Kilian – Closed
14034 Emerald Ave
St. Kilian, MN 56185
Nobles County

St. Joseph – Closed
Theilman, MN 55945
Wabasha County

St. Joseph – Closed
Trimont, MN 56176
Martin County

DM3\7939915.1
Bodman_17918802_2

St. Katherine – Closed
518 E 2nd St. S.
Truman, MN 56088
Martin County

St. Mary – Closed
Waseca, MN 56093
Waseca County

St. Mary – Closed
Wisner's Grove, MN 56025
Faribault, MN
Faribault County

St. Joseph – Closed
Winona, MN 55987
Winona County

St. Vincent de Paul – Closed
720 1st St
West Concord, MN 55985
Dodge County

St. Thomas Pro-Cathedral – Closed
Winona County

St. Kilian – Closed
Wykoff, MN 55990
Fillmore County

## **Catholic Schools in the Diocese of Winona-Rochester**

Sacred Heart School
11 SW Fifth Street
Adams, MN 55909

Saint Theodore School
323 E Clark Street
Albert Lea, MN 56007

Pacelli Jr/Sr High School
311 NW Fourth Street
Austin, MN 55912

DM3\7939915.1
Bodman_17918802_2

Pacelli Elementary School
511 NW 4th Avenue
Austin, MN 55912

Saint Mary School
308 E South Street
Caledonia, MN 55921

Saint John Vianney School
911 S Prairie Avenue
Fairmont, MN 56031

Saint Peter School
34 Main Street
Hokah, MN 55941

Crucifixion School
420 S Second Street
La Crescent, MN 55947

Saint Mary School
223 NE First Street
Madelia, MN 56062

Loyola High School / Loyola Primary School
145 Good Counsel Drive
Mankato, MN 56001

Loyola Intermediate School
110 North Fifth St
Mankato, MN 56001

Saint Mary School
730 S Cedar Avenue
Owatonna, MN 55060

Noah's Ark Preschool
415 S Hiawatha Avenue
Pipestone, MN 56164-0036

Holy Spirit School
5455 NW 50th Avenue
Rochester, MN 55901

DM3\7939915.1
Bodman_17918802_2

Lourdes High School of Rochester, Inc. a/k/a Lourdes Catholic High School
2800 NW 19th Street
Rochester, MN 55901

Saint Francis of Assisi School
318 SE 11th Avenue
Rochester, MN 55904

Saint John Evangelist School
424 W Center Street
Rochester, MN 55902

Saint Pius X School
1205 NW 12th Avenue
Rochester, MN 55901

Saint Felix School
130 E Third Street
Wabasha, MN 55981

Sacred Heart Children's House
400 NW Second Avenue
Waseca, MN 56093

Sacred Heart School
308 W Elm Avenue
Waseca, MN 56093

Saint Casimir School
330 Second Avenue
Wells, MN 56097

Cotter Jr/Sr High School
1115 W. Broadway Street
Winona, MN 55987

Winona Area Catholic Schools Inc.
1315 West Broadway
Winona, MN 55987

WACS Primary School
St. Mary's Educare
1315 West Broadway
Winona, MN 55987

DM3\7939915.1
Bodman_17918802_2

Saint Mary's School
1206 Eighth Avenue
Worthington, MN 56187

Mankato Area Catholic Schools, Inc.
145 Good Counsel Dr.
Mankato, MN 56001

Rochester Catholic Schools
2800 19th St NW
Rochester, MN 55901

Immaculate Heart of Mary Seminary, Inc.
750 Terrace Hts.
Winona, MN 55987

Blessed José Sanchez Del Rio High School Seminary
Institute of the Incarnate Word
512 E. Mulberry St.
Mankato, MN 56001

## Cemeteries in the Diocese of Winona-Rochester

Sacred Heart Cemetery
Southern terminus of Lions Street
Adams, MN 55909

St Adrian Cemetery
SW corner of Dillman Ave. and 250th St.
Adrian, MN 56110

St Theodore Cemetery
Lakewood Ave
Albert Lea, MN 56007

Calvary Cemetery
4th Dr. SW, between 17th and 19th Aves.
Austin, MN 55912

St Rose of Lima Cemetery
925 SW 2nd St
Avoca, MN 56114

St Columbanus Cemetery (Main)
707 Hwy. Ave. S.
Blooming Prairie, MN 55917

DM3\7939915.1
Bodman_17918802_2

St Columbanus Cemetery (Rural)
Corner of 755th St. & 115th Ave.
Blooming Prairie, MN 55917

Calvary Cemetery
N. side of Riverside Rd.
Blue Earth, MN 56013

Sacred Heart Cemetery
On Frontier Rd., Brewster, 1/2way between 11th St. and 210th St.
Brewster, MN 56119

St Patrick Cemetery
Cork Hollow Dr., North of County Rd. 3, W. of Brownsville
Brownsville, MN 55919

Calvary Cemetery
W. end of County Rd. 249, near S. Winnebago St
Caledonia, MN 55921

Calvary Cemetery
12747 County Rd. 21
Canton, MN 55922

St Liguori Cemetery
22620 County. Rd. 14
Preston, MN 55965

Calvary Cemetery
33030 County Rd. 5
Chatfield, MN 55923

St. Mary Cemetery
32769 US-52
Chatfield, MN 55923

St Francis de Sales Cemetery
12872 610th Street
Claremont, Minnesota 55924

Ss Peter & Paul Cemetery
22032 County Rd 18
Kellogg, MN 55945

DM3\7939915.1
Bodman_17918802_2

Calvary Cemetery
510 Mill. St.
Currie, MN

Holy Cross Cemetery
SW of intersection of Center St. and W. Frontage Rd.
Dakota, MN 55925

Corpus Christi Cemetery
Corner of 755th St. & 115th Ave.
Blooming Prairie, MN 55917

Calvary Cemetery
40985 180th St.
Delavan, Minnesota 56023

St Mary Cemetery
W. side of Whigam Ave., S. of 4th St.
Dundee, MN 56131

Holy Family Cemetery
400-001 196th Street
Lake Crystal, MN 56055

Our Lady of Mount Carmel Cemetery
NE of Cty Rd 17 and 160th St.
Barber Twp., MN, 55328

St Aloysius Cemetery
Co Hwy 26 and Kieffer Dr.
Elba, MN 55910

St Aidan Cemetery
SE corner of 740th Ave. and 325th St.
Bath, MN 56042

St Mary Cemetery
Intersection of 325th St. and Ahlers Ave.
Ellsworth, MN 56129

Holy Redeemer Cemetery
2451 110th Ave SE
Eyota, MN 55934

DM3\7939915.1
Bodman_17918802_2

Calvary Cemetery
1405 Albion Ave.
Fairmont, MN 56031

Carrolton Cemetery
29057 County Rd. 8
Fountain, MN 55935

St Nicholas Cemetery
N of old church, between Pleasant Valley Rd. and Crazy Corners Rd.
N of Cty Rd. 249
Freeburg, MN 55921

St Gabriel Cemetery
191 240th Ave.
Fulda, MN 56131

St Mary Cemetery
W. end of Twp. Rd. No. T-269A
Ellendale, MN 56026

St Joseph (Calvary) Cemetery
15524 555th Ave.
Good Thunder, Minnesota 56037

St Finbarr Cemetery
NE Corner of 730th Ave. and 255th St.
Grand Meadow MN 55936

St Clement Cemetery
557 Main St E
Hammond, MN 55991

Ss Peter & Paul Cemetery
24898 Hartwood Dr.
Rushford, MN 55971

Sacred Heart Cemetery
At intersection of 375th Ave (or County Rd 9) and 920th St.
Heron Lake, MN 56137

Mount Calvary Cemetery
N. of Hwy 16, between 10th St. and 8th St.
Hokah, MN 55941

DM3\7939915.1
Bodman_17918802_2

St Joseph Convent Cemetery
NE of Hokah, N of Hwy 16 and Cty Rd 21, at N end of Pfeffer Valley Rd.
Hokah, MN 55941

St Mary Cemetery
N. of County Rd. 9, 1 mile E of Hwy 76
Houston, MN. 55943

St Columba Cemetery
1456 46th St.
Iona, MN  56141

St Jarlath Cemetery
At intersection of CR 22 and CR 35
Waterville, MN 56096

St Wenceslaus Cemetery
300 U.S. 71
Jackson, MN 56143

St Ann Cemetery
37459 35th St.
Janesville, MN 56048

St Joseph Cemetery
146th St., Hwy 269
Jasper, MN 56144

St Patrick Cemetery
Intersection of County Rd. 8, County Rd. 11, and County Rd. 13
Ridgeway, MN 55987

St John Cemetery
County road 7
Adams, MN 55909

St Agnes Cemetery
63558 170th Ave.
Kellogg, MN 55945

Crucifixion Cemetery
Intersection of Cty 6 & 25
La Crescent, Minnesota 55947

DM3\7939915.1
Bodman_17918802_2

Pine Creek Cemetery
Intersection of Beckman Rd. and County Rd. 6
La Crescent, MN 55947

Precious Blood Cemetery
23337 Lamoille Rd.
Winona, MN 55987

St Mary Cemetery
W. of Hwy 63 and Cross St.
Lake City, MN 55041

Holy Family Cemetery
400-001 196th Street, Lake Crystal
Lake Crystal, MN 56055

St Joseph Cemetery
44605 740th St.
Lakefield, MN 56150

Holt Cemetery (St Patrick Cemetery)
W. side of S. terminus of Auburn Ave
Lanesboro, MN 55949

St Patrick Cemetery
SW of intersection of Cemetery Rd. N. and 115th St.
Leroy, MN 55951

St Rose of Lima Cemetery
925 SW 2nd St
Avoca, MN 56114

St Anthony Cemetery
NE corner of Dayton Ave., and 170th St.
Lismore, MN

Holy Trinity Cemetery
9687 24th Ave. SE
Owatonna MN 55060

St Catherine Cemetery
NE portion of intersection of James St. and Hwy 75
Luverne, MN 56156

73

Calvary Cemetery
73383 345th St.
St. James, MN 56081

Calvary Cemetery
62286 State Highway 60
Madison Lake, MN 56063

Calvary Cemetery
200 Goodyear Avenue
Mankato, MN 56001

St Margaret Cemetery
598 Cemetery Rd.
Mantorville, MN 55955

Calvary Cemetery
301-020 Troendele Street
Mapleton, MN  56065

Ss Peter & Paul Cemetery
1/10th of a mile N. of Oak St. NE on County Rd. 1
Mazeppa, MN 55956

Resurrection Cemetery
2913 66th St. NW
Medford, MN 55049

St Patrick Cemetery (West Albany)
30932 Hwy. 60
Millville, MN 55957

St Mary Cemetery
56677 116th Ave.
Altura, MN 55910

St John the Baptist Cemetery
44605 740th St. Minneota Township
Minneota Township, MN

St Paul Cemetery
133 Homer Rd.
Winona, MN 55987

DM3\7939915.1
Bodman_17918802_2

St John the Baptist Cemetery
320 Cemetery Road
Minnesota Lake (Danville Township), MN 56068

Calvary Cemetery
SE corner of the intersection at 240th Ave. and 136th St.
New Richland, MN, 56072

Immaculate Conception of St Mary Cemetery
15163 County Rd 31
Altura, MN 55910

Sacred Heart Cemetery
9687 24th Ave. SE
Owatonna MN 55060

Seco Cemetery (St. Wenceslaus of Moravia)
5778 SW 32nd Ave.
Owatonna, MN 55060

St Leo Cemetery
657 115th St.
Pipestone, MN 56164

St Joachim Cemetery
10th St. NW
Plainview, MN 55964

St Mary Cemetery
18441 455the Ave.
Preble, MN 55954

Calvary Cemetery
22620 County. Rd. 14
Preston, MN 55965

St Patrick Cemetery
Intersection of County Rd. 8, County Rd. 11, and County Rd. 13
Ridgeway, MN 55987

Calvary Cemetery
500 11th Ave. NE
Rochester, MN 55906

DM3\7939915.1
Bodman_17918802_2

Holy Trinity Cemetery
83 Main St.
Rollingstone, MN 55969

St Peter Cemetery
410 Maple St. SW
Rose Creek, MN 55970

St Joseph Cemetery
44332 County Rd. 27
Rushford, MN 55971

St Luke Cemetery
803 120th St.
Sherburn, MN 56171

St Bridget Cemetery
2003 Co. Hwy 20
Rochester, MN 55904

St Ann Cemetery
1597 101St St.
Slayton, MN  56172

St Ignatius Cemetery
13665 County Rd. 12
Spring Valley, MN 55975

Calvary Cemetery
20050 25th St. SE
St. Charles, MN 55972

Immaculate Conception Cemetery
15163 County Rd 31
Altura, MN 55910

St Kilian Cemetery
313 4th Ave.
Wilmont, MN 56185

St Bernard Cemetery
460 10th St. NW
Stewartville, MN 55976

DM3\7939915.1
Bodman_17918802_2

St Joseph Cemetery
26185 627th St.
Theilman, MN

St James Cemetery
E. Corner of 125th St. & 725th Ave.
Twin Lakes, MN 56029

St Matthew Cemetery
52900 Firefly Rd.
Vernon Center, MN 56090

St Felix Cemetery
1210 Rustic Lane E.
Wabasha, MN 55981

St Joseph Cemetery
Intersection of Main St. and Hwy. 83
Waldorf, MN 56091

Calvary Cemetery
N. of intersection of 336th Ave. & 128th St.
Waseca, MN 56093

St Mary Cemetery
St Mary Cemetery Road
Waseca, MN 56093

St Casimir Cemetery
SW corner of 1st St. NW and Half Moon Rd.
Wells, MN 56097

St Vincent de Paul Cemetery
720 1st St
West Concord, MN 55985

Calvary Cemetery
22412-22000 State Hwy. 266
Wilmont, MN 56185

Immaculate Conception Cemetery
25124 MN-43
Winona, MN 55987

DM3\7939915.1
Bodman_17918802_2

St Francis Xavier Cemetery
Co. Rd. 26 at S. 1st St.
Windom, MN 56101

St Mary Cemetery
At the W. terminus of 6th Ave SW
Winnebago, MN, 56098

St Mary Cemetery
1333 Homer Road
Winona, MN 55987

St Martin Cemetery
1091 160th Ave.
Woodstock, MN 56186

St Mary Cemetery
W. Side of Read Ave, between 260th St. and E. Clary St.
Worthington, MN 56187

St Kilian Cemetery
19675 County Rd. 117
Wykoff, MN 55990

### **Miscellaneous Organizations**

Catholic Charities of the Diocese of Winona-Rochester
a/k/a Catholic Charities of Southern Minnesota f/k/a The Lamberton Home, Winona
111 Market Street, Suite 2
P.O. Box 379
Winona, MN 55987

Vision 2020 Education Foundation
1165 6th Street West
Winona, MN 55987

St. Thomas Aquinas Catholic Newman Center
Winona State University Campus Ministry
475 Huff St.
Winona, MN 55987

DM3\7939915.1
Bodman_17918802_2

## ATTACHMENT F

## <u>NOTICE NAMES AND ADDRESSES</u>

DoW:

With copies to:
Robert J. Diehl, Jr.
Bodman PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
rdiehl@bodmanlaw.com

and

Thomas R. Braun
Restovich Braun & Associates
117 East Center Street
Rochester, MN 55904
(507) 216-8652
thomas@restovichlaw.com

LONDON MARKET INSURERS

For Resolute Management Services Limited:
Martin Futter, Esq. LLB (Hons)  PGDip (LPC)

Account Manager
Resolute Management Services Ltd.
London Underwriting Centre
4th Floor, 8 Fenchurch Place
London EC3M 4AJ
England
Tel: +44 (0) 207 342 2455

For Company Leader:
Mr. Steve Dodson
Head of Claims
Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd and/or London & Edinburgh Insurance Company Ltd (as successor to London & Edinburgh General Insurance Company Ltd))
1 Alie St.
London E1 8DE
England
Tel: +44 (0) 207 265 5031

79

With copies to:                         Catalina J. Sugayan, Esq.
                                        Clyde & Co US LLP
                                        55 West Monroe Street
                                        Suite 3000
                                        Chicago, IL 60603
                                        Tel: 312.635.6917

                                        Russell W. Roten, Esq.
                                        Duane Morris LLP
                                        865 South Figueroa Street
                                        Suite 3100
                                        Los Angeles, CA 90017-5450
                                        Tel: 213.689.7439


INTERSTATE FIRE AND
CASUALTY COMPANY                        Deborah Sons
                                        Allianz Resolution Management
                                        1465 North McDowell Road, Suite 201
                                        Petaluma, CA 94954
                                        312.456.7383


With a copy to                          Charles E. Jones, Esq.
                                        Moss & Barnett
                                        1200 South Fifth Street
                                        Minneapolis, MN  55402
                                        612.877.5259

80

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    Case No. 18-33707

Diocese of Winona-Rochester,                              Chapter 11

　　　　　　　Debtor.

**MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION UNDER
SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULES 6004 AND 9019 FOR AN ORDER (I) APPROVING SETTLEMENT
AGREEMENT BETWEEN THE DEBTOR, THE OTHER DOW ENTITIES AND
THE LMI/INTERSTATE ENTITIES AND (II) AUTHORIZING THE DEBTOR TO
SELL INSURANCE POLICIES AND GRANT RELATED RELEASES**

## I.　　INTRODUCTION

The Diocese and UCC submit this memorandum, in support of their Motion[2] for orders
approving the Settlement Agreement and Release (the "Settlement Agreement") between the
Diocese, the other DoW Entities named therein (the "DoW Entities"), and the following
insurers: certain Underwriters at Lloyd's, London, and certain London Market Companies
(collectively, "London Market Insurers") and Interstate Fire & Casualty Company ("Interstate"
and collectively with the London Market Insurers, "LMI/Interstate"). The Court should approve
the Settlement Agreement, attached to the Motion as **Exhibit A**, because approval of the
agreement is in the best interests of the Diocese's estate and creditors.   The Settlement
Agreement resolves the coverage disputes regarding Tort Claims between LMI/Interstate and
the Diocese and the other DoW Entities.

## II.　　FACTS

The factual basis for this memorandum is set forth in the verified Motion.

---

[2] All terms not specifically defined in this memorandum shall have the meaning given them in the Motion.

## III.    ARGUMENT

Section 363(b)(1) of the Bankruptcy Code provides: "The Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

A sale of assets of a debtor should be authorized under Section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1993); *In re Schipper*, 933 F. 2d 513, 515 (7th Cir. 1991). The business judgment rule shields a debtor's management from judicial second-guessing. "'[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.'" *In re Farmland Indus, Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986)). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). As set forth in the Motion, the Diocese entered into the Settlement Agreement after intense negotiation with LMI/Interstate over several years. The Diocese and the UCC have determined that the Settlement Agreement is in the best interest of the debtor, its estate, and its creditors.

### a)    SALE FREE AND CLEAR OF LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES

2

Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the enumerated requirements will suffice to warrant a debtor's sale of estate assets free and clear of all liens, claims, and encumbrances. The Subject Insurance Policies here are subject to a bona fide dispute and any claims against the Subject Insurance Policies are capable of money satisfaction. It is therefore appropriate for the Diocese, under the Settlement Agreement, to sell the Subject Insurance Policies free and clear of all liens, interests, claims, and encumbrances.

**b)    GOOD FAITH PURCHASER UNDER 363(m)**

Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In the*

3

*Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d at 1125 (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))).

The negotiation of the Settlement Agreement was conducted at arm's length and in good faith, with the substantial involvement of a mediator. In this case the intense, multi-lateral negotiations among the parties ensure that the London Market Insurers and Interstate are good-faith purchasers of the Subject Insurance Policies.

    **c)**    **APPROVAL OF THE SETTLEMENT UNDER FED. R. BANKR. P. 9019**

Rule 9019 of the Federal Rules of Bankruptcy Procedure provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a). In bankruptcy proceedings, compromise is a favored and normal part of the reorganization process. *In re Trism, Inc.*, 282 B.R. 662. 666 (B.A.P. 8th Cir. 2002). "A decision to approve or disapprove a proposed settlement under Bankruptcy Rule 9019 is within the discretion of the bankruptcy judge." *Id.* at 666 (citing *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d at 1135–36 (8th Cir. 1984)). Bankruptcy Rule 9019 vests a bankruptcy court with "broad authority to approve or disapprove all compromises and settlements affecting the bankruptcy estate." *In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997). In exercising its discretion, a court should consider the following factors:

4

1.      The probability of success in the litigation;

2.      The difficulties, if any, to be encountered in the matter of collection;

3.      The complexity of the litigation involved, and the expense, inconvenience, and
delay necessarily attending to it;

4.      The paramount interests of the creditors and a proper deference to their reasonable
views in the premises; and

5.      Whether the conclusion of the litigation promotes the integrity of the judicial
system.

*See In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d at 1135–36 (citing *Drexel v. Loomis*, 35 F.2d

800, 806 (8th Cir. 1929), and *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry,*

*Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968)); *In re Bates*, 211 B.R. at 343; *see also In re*

*Farmland Indus., Inc.*, 289 B.R. 122 (B.A.P. 8th Cir. 2003).

Consideration of these factors allows a court to determine whether a settlement is "fair

and equitable," *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

390 U.S. at 424, and in the best interests of the estate, *In re Trism, Inc.*, 282 B.R. at 668. A court's

function is not to ensure that the proposed settlement is the best possible settlement obtainable.

Rather, the court must determine only whether the settlement falls below the lowest point on the

range of reasonableness. *In re Hanson Indus., Inc.*, 88 B.R. 942, 945 (Bankr. D. Minn. 1988); *see*

*also In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985). In this instance, consideration

of these factors support the conclusion that the Settlement Agreements should be approved.

**d)      ANALYSIS**

The Diocese, UCC, the other DoW Entities, and counsel representing the vast majority of

survivors who are creditors of the Diocese have spent several years mediating monetary terms

5

and several months negotiating a written Settlement Agreement with LMI/Interstate.   If the settlement is not approved by this Court, it may take years to litigate and resolve the parties' dispute over coverage for Tort Claims under the Subject Insurance Policies.

In light of: (i) the significant costs such litigation would impose on the Diocese's estate to continue the dispute over coverage against LMI/Interstate; (ii) the considerable time it would take to obtain a final determination of the Diocese's rights and claims under the Subject Insurance Policies; (iii) the risk that the Diocese may not prevail in litigation of the issues; (iv) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the disputes potentially for years; and (v) the desire to obtain promptly the maximum value from LMI/Interstate under the Subject Insurance Policies, the Diocese and UCC have agreed that it is in the best  interest of the estate and its creditors to reach a negotiated resolution of the dispute with LMI/Interstate.

### 1)  Probability of Success in Litigation

Given the inherent uncertainty with respect to the outcome of the coverage disputes, this factor weighs heavily in favor of the approval of the Settlement Agreement. The parties' dispute involves the interpretation of multiple insurance agreements and litigation of complex legal theories and defenses, including, in some instances, whether any insurance was issued at all. The London Market Insurers and Interstate are well-represented parties with the motivation, the resources, and the demonstrated willingness to litigate the multiple significant coverage issues that arise in this complicated legal setting.

Although the Diocese and UCC are confident of the merits of the debtor's positions, there can be no guarantee that they would ultimately be successful in any coverage litigation. Moreover, litigation could continue for several years, including appeals, and could produce a

6

mixed result for creditors.

### 2)  Likely Difficulties in Collection

Absent settlement, it is likely that the Tort Claimants will not receive compensation, if any, for several years and that this chapter 11 case will persist during that time. The timely, lump sum payment of the settlement amounts for the benefit of the Tort Claimants weighs this factor in favor of approval of the Settlement Agreement.

### 3)  The Complexity of the Litigation Involved, and the Expense, Inconvenience, and Delay

The mechanics of litigating this dispute would involve the interpretation of many historical insurance agreements and necessitate the adjudication of complex and disputed legal issues. The litigation would be complicated, time consuming, and expensive. In the absence of the Settlement Agreement, the Diocese anticipates that there will be a substantial delay in collecting insurance proceeds from LMI/Interstate.

### 4)  Interest of Creditors

The Diocese, the other DoW Entities and the UCC support the Settlement Agreement. The Settlement Agreement will provide survivors with a necessary mechanism for prompt recovery on their claims, without the expense or delay of proceeding within the tort system.

The Diocese has exercised its business judgment and concluded that it cannot reasonably justify the expense, delay, and uncertainty of pursuing litigation against LMI/Interstate in light of the terms proposed in the Settlement Agreement. The proposed settlement is well within the range of the likely outcomes of the insurance coverage disputes and represents an appropriate compromise and settlement. This is true especially when taking into account the costs, risks, and potential rewards of litigation. Far from falling "below the lowest point in the range of

7

reasonableness," *Pacific Gas*, 304 B.R. at 417, the proposed payment of $6.5 million falls well above the lowest reasonable return for the estate. Moreover, the Settlement Agreement results in a known outcome for the Diocese and will provide substantial compensation for survivors. For all of these reasons, the Settlement Agreement is fair and equitable and approval of the agreement is in the best interest of the estate and its creditors.

## IV.    <u>CONCLUSION</u>

The Diocese used its business judgment when it entered into the Settlement Agreement and that agreement represents years of intense negotiations among the parties. Because the sale of the Subject Insurance Policies is in the best interest of the estate and the settlement amount falls within the range of reasonableness, the Court should approve the Settlement Agreement and the sale of the Subject Insurance Policies free and clear of all liens, interests, claims, and encumbrances. Therefore, the Diocese and UCC respectfully request that the Court grant the Motion and enter an order (i) approving the Settlement Agreement, (ii) authorizing the Diocese to sell the Subject Insurance Policies free and clear of all liens, claims, interests, and encumbrances and grant related releases, (iii) waiving the stay imposed by Fed. R. Bankr. P. 6004(h), and (iv) granting such other relief as the Court may deem to be just and equitable.  The Diocese and UCC further request that the Court separately enter the Settlement Approval Findings and Conclusions in the form attached concurrently with entry of the order approving the Settlement Agreement.

In accordance with Local Rule 9011-4(f), the parties authorize the filer to submit this memorandum with the electronic signature of any non-filing party.

[The remainder of the page is left intentionally blank]

Bodman_17599390_3

Respectfully submitted,

Dated:  August 17, 2021

**RESTOVICH BRAUN & ASSOCIATES**

/e/Thomas R. Braun
Thomas R. Braun (#350631)
Christopher W. Coon (#390083)
117 East Center Street
Rochester, MN 55904
(507) 216-8652
thomas@restovichlaw.com
christopher@restovichlaw.com

and

**BODMAN PLC**

/e/Robert J. Diehl, Jr.
Robert J. Diehl, Jr. (P31264)
Brian R. Trumbauer (P57747)
Jaimee L. Witten (P70068)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
rdiehl@bodmanlaw.com
btrumbauer@bodmanlaw.com
jwitten@bodmanlaw.com

**ATTORNEYS FOR THE DIOCESE OF
WINONA-ROCHESTER**

Bodman_17599390_3

**STINSON, LLP**

/e/Robert T. Kugler
Robert T. Kugler (#194116)
Edwin H. Caldie (#388930)
Andrew J. Glasnovich (#398366)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
robert.kugler@stinson.com
ed.caldie@stinson.com
drew.glasnovich@stinson.com

Telephone: 612-335-1500
Facsimile: 612-335-1657

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
FOR THE DIOCESE OF WINONA-
ROCHESTER**

10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 18-33707 |
| Diocese of Winona-Rochester, | Chapter 11 |
| Debtor. | |

## SETTLEMENT APPROVAL FINDINGS AND CONCLUSIONS

This case is before the court on the *Joint Motion Under Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 for an Order (i) Approving Settlement Agreement Between the Debtor, the Other DoW Entities and the LMI/Interstate Entities and (ii) Authorizing the Debtor to Sell Insurance Policies and Grant Related Releases* (the "Motion") filed on August 17, 2021 under sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 7052, 9014, and 9019, and Local Rules 2002-1, 9013-1, and 9013-2 for entry of an order (1) approving the Settlement Agreement and Release attached to the Motion as Exhibit A (the "Settlement Agreement"), (2) authorizing the debtor to sell the subject insurance policies under the Settlement Agreement, and (3) granting such other relief as is just and proper.

Undefined capitalized terms in these Settlement Approval Findings and Conclusions have the meanings set forth in the Settlement Agreement.  Based upon the Motion and the Settlement Agreement, the court makes the following findings and conclusions:

IT IS FOUND AND DETERMINED:

1.      The debtor demonstrated sound business reasons for the sale of the LMI Insurance Policies to the London Market Insurers and the Interstate Insurance Policies to Interstate;

2.      The Parties mediated their disputes over the Tort Claims and the Coverage Claims pursuant to the order approving the Mediation Stipulation, beginning in May, 2019;

3.     In the Mediation, the Parties negotiated extensively, at arms-length, and in good faith.  The London Market Insurers are purchasers in good faith of the LMI Insurance Policies and Interstate is a good faith purchaser of the Interstate Insurance Policies, within the meaning of Bankruptcy Code § 363(m), and are entitled to all of the protections of that statute;

4.     LMI/Interstate are bona fide good faith purchasers of the Subject Insurance Policies, for value;

5.     The terms of the transactions contemplated by the Settlement Agreement, as well as the genesis and background of the Settlement Agreement, have been disclosed to the Court;

6.     The terms and conditions of the Settlement Agreement (including the consideration to be realized by the debtor's bankruptcy estate) are fair and reasonable;

7.     The transactions contemplated by the Settlement Agreement are in the best interests of the debtor's bankruptcy estate, its creditors, and other stakeholders;

8.     The only potential holders of Interests in or against the Subject Insurance Policies are the DoW Entities, the Other Allegedly Insured Entities and Persons who hold Claims against the DoW Entities, which are allegedly covered by the Subject Insurance Policies;

9.     The DoW Entities are Parties to the Settlement Agreement, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

10.     The Barred Claims are subject to bona fide dispute, hence the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

11.     All holders of Coverage Claims could be compelled, in a legal or equitable Action, to accept a money satisfaction of such Claims; therefore the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

12.     The compromises and settlements embodied in the Settlement Agreement have been negotiated in good faith, and are reasonable, fair, and equitable;

2

13.     In light of the: (a) probability of success in the litigation of the Insurance Coverage

Action; (b) difficulties, if any, to be encountered in the matter of collection; (c) complexity of the

litigation involved, and the expense, inconvenience, and delay necessarily attending thereto; and

(d) paramount interest of the creditors and a proper deference to their reasonable views, the

Settlement Agreement is fair and equitable and in the best interest of the debtor's bankruptcy

estate and its creditors;

14.     The Settlement Agreement is intended to be and is a compromise between the Parties

and shall not be construed as an admission of coverage under the Subject Insurance Policies, an

admission concerning the amount of a reasonable settlement of any Claim, an admission concerning

the liability of or damages caused by the DoW Entities with respect to any Tort Claim (including the

reasonableness of any such damages), nor shall the Settlement Agreement or any provision thereof

be construed as a waiver, modification, or retraction of the positions of the Parties with respect to

the interpretation and application of the Subject Insurance Policies. The Settlement Agreement does

not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons

outside the scope of the Settlement Agreement.  The Settlement Agreement is without prejudice to

positions taken by the London Market Insurers and Interstate with regard to other insureds, and

without prejudice with regard to positions taken by any DoW Entity with regard to other insurers,

and no other insurer may admit or seek to admit the Settlement Agreement or related approval papers

into evidence for any purpose whatsoever;

15.     The LMI Buy-Back Payment is fair, adequate, and reasonable consideration for (a)

the sale by the DoW Entities and the buy-back by the London Market Insurers of the LMI

Insurance Policies; and (b) the Entities' Release;

16.     The Interstate Buy-Back Payment is fair, adequate, and reasonable consideration

for (a) the sale by the DoW Entities and the buy-back by Interstate of the Interstate Insurance

Bodman_17599390_3

Policies; and (b) the Entities' Release;

17.     The debtor provided due and adequate notice of the (a) sale of the Subject Insurance Policies; (b) terms and conditions of the Settlement Agreement; and (c) hearing on the sale of the Subject Insurance Policies, in accordance with Bankruptcy Rules 2002 and 6004 to all known and unknown Claimants;

18.     It would be impractical to divide the Subject Insurance Policies amongst the DoW Entities and the holders of Tort Claims; therefore, to realize the value of the Subject Insurance Policies for the debtor's bankruptcy estate and the Tort Claimants requires the sale of the Subject Insurance Policies;

19.     The sale of the Subject Insurance Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b);

20.     The sale of the Subject Insurance Policies free and clear of the Interests of all Persons satisfies the requirements of Bankruptcy Code § 363(f);

21.     The Claims that allegedly would be covered by the Subject Insurance Policies, which policies are being acquired by LMI/Interstate pursuant to the Settlement Agreement, are deemed to be (a) "interests" as that term is used in Bankruptcy Code § 363(f); and (b) "Interests" as used in the Settlement Agreement; and

22.     The Settlement Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

Dated:                                   _____

                                         William J. Fisher
                                         United States Bankruptcy Judge

4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                                    Case No. 18-33707

Diocese of Winona-Rochester,                              Chapter 11

                    Debtor.

---

### ORDER APPROVING SETTLEMENT AGREEMENT WITH CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, CERTAIN LONDON MARKET INSURANCE COMPANIES AND INTERSTATE FIRE & CASUALTY COMPANY

This case is before the court on the *Joint Motion Under Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 for an Order (i) Approving Settlement Agreement Between the Debtor, the Other DoW Entities and the LMI/Interstate Entities and (ii) Authorizing the Debtor to Sell Insurance Policies and Grant Related Releases* (the "Motion") filed on August 17, 2021 under sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 7052, 9014, and 9019, and Local Rules 2002-1, 9013-1, and 9013-2 for entry of an order (1) approving the Settlement Agreement and Release attached to the Motion as Exhibit A (the "Settlement Agreement"), (2) authorizing the debtor to sell the subject insurance policies under the Settlement Agreement, and (3) granting such other relief as is just and proper.

Undefined capitalized terms in this order have the meanings set forth in the Settlement Agreement. Based upon the Motion and the Settlement Agreement, and the findings and conclusions set forth in the court's Settlement Approval Findings and Conclusions entered concurrently with this order:

IT IS ORDERED:

1.     The motion is granted and the Settlement Agreement is approved in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy

Rules 6004 and 9019;

2.    Effective as of the date the Trust Receives the Settlement Amount, the sale of the LMI Insurance Policies to the London Market Insurers, and the Interstate Insurance Policies to Interstate, free and clear of all Interests of all Persons, including all Interests, if any, arising under Minn. Stat. Chapter 60A, is authorized;

3.    Effective as of the date the Trust Receives the Settlement Amount, all Persons are barred, estopped, and permanently enjoined from asserting any Barred Claims against the LMI/Interstate Entities;

4.    The Parties are authorized to perform their respective obligations under the Settlement Agreement;

5.    Effective as of the date the Trust Receives the Settlement Amount, all Claims against, and Interests in and to, the Subject Insurance Policies are fully extinguished without reservation;

6.    Effective as of the date the Trust Receives the Settlement Amount, all Barred Claims and other Interests that any Person, including CMS, might have in, or against, the Subject Insurance Policies attach to the proceeds of the sale of the Subject Insurance Policies;

7.    The Trustee, upon the Trustee's appointment under the debtor's plan of reorganization, is authorized to perform the obligations, if any, imposed upon the Trustee by the Settlement Agreement;

8.    The effectiveness of this order is contingent upon it becoming a Final Order, the entry of the Confirmation Order, and the Confirmation Order becoming a Final Order.

9.    The stay imposed by Fed. R. Bankr. P. 6004(h) is waived.

10.    The court retains jurisdiction to resolve any disputes that may arise in respect of the implementation of the Settlement Agreement, which shall be construed in accordance with

2

Minnesota law, or the interpretation or enforcement of this order.


Dated:                                    _____
                                          William J. Fisher
                                          United States Bankruptcy Judge

Bodman_17599390_3